# Exhibit C

# AGREEMENT RE POST-COMPLETION COVENANTS

(the **Agreement**)

**DATED 17 MARCH 2017**

**THE UNDERSIGNED:**

(1) **De Nederlandsche Bank N.V.**, a public limited liability company, incorporated under the laws of Netherlands, having its statutory seat (*statutaire zetel*) in Amsterdam, The Netherlands (**DNB**);

(2) **Trier Holding B.V.**, a company incorporated under the laws of The Netherlands having its statutory seat (*statutaire zetel*) in Hoofddorp, The Netherlands, registered with the trade register of the Chamber of Commerce under number 68313659 (the **Transferee**);

(3) **Netherlands Insurance Holdings, Inc. (Delaware)**, a company incorporated under the laws of the State of Delaware, having its registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, and assigned Delaware Secretary of State file number 6309629 (**Shareholder 1**);

(4) **NIH Capital, LLC**, a company incorporated under the laws of North Carolina having its registered office at 327 Hillsborough Street, Raleigh, North Carolina 27603, and assigned North Carolina Secretary of State identification number 1573596 (**Shareholder 2**); and

(5) **Mr Greg Evan Lindberg**, born in California on [redacted] 1970 and residing at 3406 Stagecoach Road, Durham, North Carolina 27713 (**Lindberg**, and jointly with Shareholder 1 and Shareholder 2, the **Indirect Shareholders**).

DNB, the Transferee and the Indirect Shareholders shall hereinafter each be referred to as a **Party** and together they shall be referred to as the **Parties**.

**WHEREAS:**

(A) Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V., a company incorporated under the laws of The Netherlands having its statutory seat (*statutaire zetel*) at Baarn, The Netherlands, registered with the trade register of the Chamber of Commerce under number 31007947 (the **Company**) operates an insurance business under the name "Conservatrix Leven".

(B) DNB has prepared a transfer plan (*overdrachtsplan*) (which includes amongst others the Confirmation Letter and the Service Agreement, each as defined herein or in the Confirmation Letter) (the **Transfer Plan**) in respect of the Company to force a transfer of all issued and outstanding shares in the capital of the Company (the **Shares**) in accordance with Part 3.5.4a of the DFSA.

(C) As part of the Transfer Plan, DNB and the Transferee have conducted discussions on the transfer of the Shares to the Transferee (the **Proposed Transaction**). The terms and conditions of the Proposed Transaction have been laid down in a confirmation letter thereto from the Transferee, dated on or around the date hereof (the **Confirmation Letter**).

(D) The process towards completion of the Transfer (as defined in the Confirmation Letter) (**Completion**) has been agreed between DNB and the Transferee in a submission protocol, dated on or around the date hereof (the **Submission Protocol**).

(E) Amongst others, the Parties have agreed to certain post-Completion covenants governing the Company, the Transferee and the Indirect Shareholders. These post-Completion covenants are hereby agreed between the Parties, subject to Completion occurring.

## 1. INTERPRETATION

1.1 Unless the contrary intention appears, in addition to terms defined in this Agreement, the definitions and other provisions set forth in Schedule 1 (*Definitions and Interpretation*) apply throughout this Agreement.

1.2 In this Agreement, unless the contrary intention appears, a reference to a clause, Schedule or Annex is a reference to a clause, schedule or annex of this Agreement. The Schedules and Annexes form part of this Agreement.

1.3 The headings in this Agreement do not affect its interpretation.

## 2. DNB COVENANTS

2.1 Subject to Completion occurring, DNB hereby covenants that, unless otherwise agreed with the Transferee in writing:

(a) as of Completion, DNB will not sanction or take measures in relation to the conduct of the Company that took place prior to Completion, with the exception of such (unauthorised) conduct that continues for at least thirty (30) Business Days after Completion;

(b) at the reasonable request(s) of the Company, DNB will upon such request(s) assess whether or not the Company is stabilised, in the sense that the Company has restored a sound, controlled and ethical operating environment (*beheerste en integere bedrijfsvoering*);

(c) as of Completion, DNB will discontinue the pending withdrawal procedure in relation to the Company's license and DNB hereby confirms that, to its best knowledge, the Company holds such license that is on the date of this Agreement sufficient to conduct its Business (as defined in the Confirmation Letter);

(d) as soon as reasonably practicable after Completion but ultimately thirty (30) Business Days (as defined in the Confirmation Letter) after Completion, DNB will revoke the appointment of the trustee (*curator*) of the Company;

(e) DNB will only invoke the Commitment (as defined in paragraph 3.1(l) below) after the expiry of six (6) months of the moment that the Company no longer complies with the Proposed Minimum SCR Ratio (as defined below), such compliance being monitored by the Transferee and verified by DNB in accordance with applicable law and regulation;

(f) within ninety (90) days from the date of Completion, DNB will perform an assessment on the risk management policies and procedures and the implementation thereof within the Company, whereby DNB acknowledges that it:

(i) shall discuss the assessment with the management of the Company and the Transferee as soon as practically possible after finalising the assessment; and

(ii) if and to the extent it appears during the assessment that DNB has any concerns with regard to the policies and procedures and the implementation thereof within the Company, DNB shall as soon as practically possible inform the management of the Company and the Transferee accordingly;

(g) provided that private placements meet the criteria set forth below (the **Criteria**), and provided that the risk management policy has according to DNB been satisfactorily implemented within the Company, then after ninety (90) days from the date of Completion, DNB shall not restrict the Company's investment in private placements (for the avoidance of doubt, the foregoing is without prejudice to the obligations set forth in paragraphs 3.1(r), 3.1(w) and 3.1(x) below). The Criteria are as follows:

(i) all private placements shall be rated by an ESMA-certified/registered credit rating agency;

(ii) all private placements shall be rated at least B- or equivalent or higher;

(iii) no private placement rated BBB- and above by an ESMA-certified/registered credit rating agency or equivalent to a single issuer shall be more than 3% of the assets, respectively 2% in case of a lower rating;

(iv) all private placements shall be administered by a third party agent or custodian;

(v) all private placements shall receive a third party arms' length pricing opinion;

(vi) the private placement portfolio shall have a weighted average credit score of "BB" or higher;

(vii) each private placement shall have specific performance covenants; and

(viii) the majority of the private placements shall be senior secured investments where the Company as lender has a first claim on all assets and cash flows of the borrower; and

(h) DNB will reasonably reconsider the Company's restrictions set forth in paragraph 3.1(q) within 24 months as of Completion, unless the Company would not yet be sufficiently stabilised by then (to be assessed by DNB in accordance with paragraph (b) above), and if the Company is sufficiently stable (to be assessed by DNB in accordance with paragraph (b) above), the Company will be treated by DNB as any other stable insurance company in the Netherlands; and

(i) in case the Enterprise Chamber decides not to reject one or more of the provisional measures (*onmiddelijke voorzieningen*) as currently requested by Conservatrix Groep S.a.r.l., DNB will undertake all reasonable actions within its powers to overturn such a decision and the consequences thereof, including but not limited to, in as far as within DNB's powers, an appeal to the Dutch Supreme Court and support the Company in all reasonable ways in that respect and to procure, in as far as within DNB's powers, that any management or supervisory board member appointed by the Enterprise Chamber abides by the agreements made between DNB and the Transferee in the context of the acquisition by Eli Group or an Affiliate of the Shares.

## 3. TRANSFEREE COVENANTS

3.1 Unless otherwise agreed with DNB in writing, subject to Completion occurring, the Indirect Shareholders (as applicable) and the Transferee hereby each individually and irrevocably covenant that as of Completion and, unless specifically determined otherwise, at all times thereafter:

***Corporate Structure***

(a) Shareholder 1, acting as the sole shareholder of the Transferee, and Shareholder 2, acting as the sole shareholder of Shareholder 1, have and shall have no association with the current shareholders of the Company or their relatives or Connected Persons, except in as far as reasonably required to conduct the Business of the Company in which case such association shall only occur on the basis of commercial agreements that are at arm's length terms;

(b) for as long as the Transferee is a Connected Person of the Company, Lindberg is and shall remain the ultimate beneficial owner of the Company;

(c) Shareholder 1 and Shareholder 2 are not and shall not form part of the Eli Group (whereby it is explicitly permitted that Lindberg is the ultimate beneficiary owner of both the Eli Group as well as the Company);

***Governance***

(d) it will procure that the Company will apply the mitigated large-companies regime, provided that:

(i) the Supervisory Board (as defined below) shall have a nomination right (*recht van voordracht*) with respect to the appointment of the executive board members of the Company by the general meeting of the Company (**General Meeting**);

(ii) the Supervisory Board has an advisory role (*raadgevende stem*) with respect to any proposed suspension or dismissal of an executive board member of the Company by the General Meeting; and

(iii) the mitigated large-companies regime will be slightly amended as long as no works council is in place;

(e) it will procure that the board of directors of the Company will comprise of at least 2 (two) executive board members (the **Board of Directors**). The Transferee acknowledges that DNB prefers that a chief operating officer (the **COO**) will be appointed. The COO will be sufficiently experienced and have specialised knowledge of the DFSA. The COO will not necessarily be a member of the Board of Directors.

(f) it will procure that the supervisory board of the Company will comprise of at least 3 (three) supervisory board members (the **Supervisory Board**);

(g) it will procure that the majority of the Supervisory Board, including the chairman, will not consist of Lindberg or people who work for the Eli Group and will not be a Connected Person of the Eli Group;

(h) it will procure that all members of the Board of Directors and Supervisory Board meet the suitability and integrity screening of DNB;

(i) it will procure that the Company shall not bring any action or claim against the members of the Board of Directors and Supervisory Board in office immediately prior to the Transfer Date pursuant to section 2:9 Dutch Civil Code, except in case of fraud or wilful misconduct;

***Recapitalization & SCR Ratio***

(j) on or around Completion (subject to the provisions of the Confirmation Letter), it will recapitalize the Company with such amount of Tier 1 equity that is sufficient to reach an

SCR ratio of the Company of at least 135% (the **Proposed Minimum SCR Ratio**). The Transferee currently estimates such amount to be EUR 102,863,000;

(k) it will procure that the Company shall maintain the Proposed Minimum SCR Ratio (which ratio may be changed in the future by the Company after written confirmation of DNB) and any shortfall in the Proposed Minimum SCR Ratio will be replenished with core equity contributions (however, taking into account the provisions of the Commitment);

(l) prior to Completion, the duly signed commitment as attached hereto as Annex 1 (the **Commitment**) will be provided to DNB;

(m) it will source the required funds to capitalise and maintain a sound operating and financial profile of the Company from the Eli Group, and hereby confirms that these funds are less than ca. 10 - 20% of the entire Eli Group's pre-tax net worth;

***Dividend and Divestments Policy***

(n) it will, and it will procure that the Company will, refrain from declaring or paying out any dividend within the period that is 10 (ten) years after Completion;

(o) The Transferee and the Indirect Shareholders are allowed to divest or sell the Company (or any part thereof) but they are not intending to do so, with the knowledge of today;

***Sound and Controlled Operating Environment*** *(beheerste bedrijfsvoering)*

(p) it will take all measures required to restore the Company to a sound and controlled operating environment (*beheerste bedrijfsvoering*);

(q) until the (organisation of the) Company is stabilised (to be assessed by DNB), it will procure that:

(i) no acquisitions with regard to insurance companies and/or insurance portfolios will be considered or effectuated by the Company; and

(ii) no production of new policies will be started by the Company. Once new production is allowed (to be assessed by DNB), such new production will in no event include policies in accordance with the profit-sharing arrangements as applied in the current NGP policy conditions;

(r) it will ensure proper risk management at the level of the Company before investments in private placements can be considered acceptable by DNB. This requires amongst others:

(i) full insight in the entities in which will be and is invested (e.g. decision-makers, detailed balance sheets, cash flows and look through for financial links);

(ii) it will ensure that all required ongoing customer due diligence and monitoring will take place on all its investments. This requires amongst others thoroughly documented trails of the ultimate beneficial owners of the private placements companies;

(iii) a transparent and validated pricing process and model that leads to a correct current value of an at-arms-length transaction;

(iv) an adequate risk management system to point out and quantify the risks of the investments (e.g. credit, spread and concentration risk);

(v) governance in design, existence and operation, that is compatible with the complexity of the investments and accounts for possible conflicts of interest (e.g. competence, independent risk management function and the management board is responsible for designing and on a regular basis updating the investment policy of the company);

(vi) the Company reserves sufficient capital above the SCR-requirement to cover any risks that are not included in the Solvency II Standard Formula;

(vii) the Company is at all times able to justify that the investments satisfy the prudent person principle; and

(viii) the Company is able to justify that non-Affiliated parties are in no circumstances under material direct influence of the Eli Group or Lindberg directly. This includes that any financial relations cannot result in a material dependency of the non-Affiliated parties on the Eli Group or Lindberg directly;

(s) usual reinsurance terms will apply including a voluntary exit clause for the Company and future (major) changes in the reinsurance arrangements of the Company are subject to DNB approval;

(t) reinsurance of the portfolio of the Company on a funds paid basis will be limited to a maximum amount of EUR 150 million with at least half with Colorado Bankers Life Insurance Company (CBL) as counterparty;

(u) if the US regulatory approval required for the reinsurance has not been obtained prior to Completion, the Company can effectuate the reinsurance arrangement post-Completion whilst ensuring that the Company meets the SCR requirements under (j) above;

(v) collateral will be provided of at least 105% of SII-BEL at all times, subject to quarterly review and rebalancing whereby the provided collateral will be (i) of sufficient credit quality, (ii) of sufficient liquidity, and (iii) sufficiently stable in quality, all in accordance with the Solvency II requirements (amongst others prescribing that the collateral will not contain private placements);

(w) without prejudice to paragraph (x) below, private placements will be limited to 20% of the total investment portfolio of the Company, whereby investments to Affiliates of the Eli Group will be limited to 10% of the total investment portfolio of the Company;

(x) a total maximum for private placements in Affiliates of EUR 75m is applicable during a period of 36 months after Completion, provided that this maximum may increase if and only to the extent the excess capital will be further in excess of the 100% SCR ratio (still taking into account the maximum of 10% of the total investment portfolio of the Company);

(y) in respect of the present pension arrangement for own personnel (**PEP**), including the Quota Share Reinsurance Treaty between the Company and Heco Reassurantie S.A. (**Heco Re**) and the 2016 Deposit Agreement between the Company and Heco Re, it acknowledges that:

(i) in order to optimise the Company's recovery options on Heco Re under the 2016 Deposit Agreement, the Quota Share Reinsurance Treaty and the 2016 Deposit Agreement will remain in place with regard to the benefits acquired up to 1 April

2017 (*premievrij maken*) of Heco Re, provided that the Company and the Transferee will use their best efforts to procure that the Quota Share Reinsurance Treaty and 2016 Deposit Agreement will be terminated as soon as possible after the Company's recovery options are secured;

(ii) the PEP can only be continued by the Company for a period of 3 months from Completion as long as the accrual of new pension benefits takes place on the balance sheet of the Company and is not reinsured at Heco Re. After 3 months of Completion, the PEP can only be continued once DNB has confirmed to the Company that it is satisfied with the management of PEP and upon confirmation by the Company that a new reinsurance treaty is in place with a reinsurer that is deemed acceptable by DNB and is not a Connected Person of the current direct and indirect shareholders of the Company. This new reinsurance treaty and related reinsurance construction shall be subject to prior DNB approval and also has to be applicable on the pension benefits that have been vested in the period of 3 months from Completion;

(z) The MKB pension portfolio of the Company (currently estimated at a value of EUR 30m) will remain in place as from Completion, subject to compliance to the rules of controlled and sound business operations and that the implementation and financing of the portfolio are in line with the Dutch Pension Act;

***Policyholders***

(aa) there will be no modification of the benefits of the policyholders of the Company and the Company shall not propose or execute any (en bloc) amendment of the policies for the purpose of preventing or curing a dangerous development of its solvability, capital or technical provisions, except with the prior approval of DNB;

(bb) it will operate the Company to the benefit of all stakeholders, including the policyholders of the Company over the long term;

***Other***

(cc) Lindberg will use all his reasonable (voting) powers to ensure that the Company shall at all times comply with applicable law and regulations; and

(dd) it understands and accepts that DNB imposes the restrictions set forth in paragraph (q) on the Transferee, Indirect Shareholders and the Company in light of the distressed situation of the Company.

## 4. RISK MANAGEMENT POLICY

Prior to Completion, DNB and the Transferee will agree on a general framework of the risk management policy for private placements. To this end, the Transferee shall promptly after the date of this Agreement provide DNB with full insight into its present policies and procedures.

## 5. TERMINATION

5.1 Prior to Completion occurring, this Agreement automatically terminates upon the termination of the Submission Protocol in accordance with the terms thereof.

5.2 As of Completion, this Agreement cannot be terminated by any Party, other than with the prior written approval of all other Parties.

5.3 Each Party waives its right to rescind (*ontbinden*) this Agreement on the basis of Section 6:265 of the DCC. Furthermore, a mistaken Party shall bear the risk of any mistake (*dwaling*) in making this Agreement.

## 6. MISCELLANEOUS

6.1 Clauses 8 (*Confidentiality*), 9 (*Notices*), 11 (*Law and Disputes*) and 12 (*Language*) of the Submission Protocol shall apply *mutatis mutandis* to this Agreement as if incorporated herein by reference.

## 7. COUNTERPARTS

This Agreement may be executed in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

*[signature page to follow]*

This Agreement has been signed by the Parties (or their duly authorised representatives) on 17 March 2017.

**For and on behalf of DNB:**

De Nederlandsche Bank N.V.
By: M.W. van Woerden
Title: Director Insurance Supervision Division

By:
Title:

**For and on behalf of the Transferee:**

Trier Holding B.V.
By:
Title:

**For and on behalf of Shareholder 1:**

Netherlands Insurance Holdings, Inc. (Delaware)
By:
Title:

**For and on behalf of the Shareholder 2:**

NIH Capital, LLC
By:
Title:

**For and on behalf of Lindberg:**

By: Greg Lindberg

This Agreement has been signed by the Parties (or their duly authorised representatives) on 17 March 2017.

**For and on behalf of DNB:**

______________________

**De Nederlandsche Bank N.V.**
By:
Title:

______________________

By:
Title:

**For and on behalf of the Transferee:**

______________________

**Trier Holding B.V.**
By: George Luecke
Title: Managing director

**For and on behalf of Shareholder 1:**

______________________

**Netherlands Insurance Holdings, Inc. (Delaware)**
By: Title:
Title:

**For and on behalf of the Shareholder 2:**

______________________

**NIH Capital, LLC**
By:
Title:

**For and on behalf of Lindberg:**

______________________

By: Greg Lindberg

This Agreement has been signed by the Parties (or their duly authorised representatives) on 17 March 2017.

**For and on behalf of DNB:**

**De Nederlandsche Bank N.V.**
By:
Title:

By:
Title:

**For and on behalf of the Transferee:**

**Trier Holding B.V.**
By: Paul Brown
Title: Managing Director

**For and on behalf of Shareholder 1:**

**Netherlands Insurance Holdings, Inc. (Delaware)**
By:
Title:

**For and on behalf of the Shareholder 2:**

**NIH Capital, LLC**
By:
Title:

**For and on behalf of Lindberg:**

By: Greg Lindberg

This Agreement has been signed by the Parties (or their duly authorised representatives) on 17 March 2017.

**For and on behalf of DNB:**

______________________ ______________________

**De Nederlandsche Bank N.V.**
By:
Title:

By:
Title:

**For and on behalf of the Transferee:**

**Trier Holding B.V.**
By: Greg E Lindberg
Title: Chairman

**For and on behalf of Shareholder 1:**

**Netherlands Insurance Holdings, Inc. (Delaware)**
By: Greg E Lindberg
Title: Chairman

**For and on behalf of the Shareholder 2:**

**NIH Capital, LLC**
By: Greg E. Lindberg
Title: Chairman

**For and on behalf of Lindberg:**

By: Greg Lindberg

## SCHEDULE 1

## DEFINITIONS AND INTERPRETATION

In addition to the terms defined elsewhere in this Agreement, the following words and expressions shall have the following meanings:

**Affiliate** means in relation to any company, any person or entity that is, solely or jointly, under a material direct influence from the Eli Group or Lindberg, which material direct influence includes any financial relations resulting in a material dependency of the non-affiliated parties on the Eli Group or Lindberg directly, and **Affiliated** shall be construed accordingly;

**Connected Persons** means in relation to any company, any person or entity, directly or indirectly, solely or jointly, controlling or controlled by that company; and

**Eli Group** means Eli Global LLC and Eli Global US insurance group and their Connected Persons, or any of them whereby it is acknowledged that Lindberg shall for the purposes of this Agreement not be considered a member of the Eli Group.

1. In this Agreement, unless the context otherwise requires:

   (a) references to a **person** include any individual, firm, body corporate (wherever incorporated), government, state or agency of a state or any joint venture, association, partnership, works council or employee representative body (whether or not having separate legal personality);

   (b) references to a company shall be construed so as to include any company, corporation or other body corporate or other legal entity, wherever and however incorporated or established;

   (c) references to a paragraph, clause, or Schedule shall refer to those in this Agreement unless stated otherwise;

   (d) the singular shall include the plural and vice versa and references to words importing one gender include all genders;

   (e) notwithstanding clause 12 (*Language*) of the Submission Protocol, if in this Agreement a Dutch term is given in italics or in italics and in brackets after an English term and there is any inconsistency between the Dutch and the English, the meaning of the Dutch term shall prevail;

   (f) references to any Dutch legal term or concept shall, in respect of any jurisdiction other than Dutch law, be construed as references to the term or concept which most nearly corresponds to it in that jurisdiction;

   (g) references to Euro, EUR or € are references to the lawful currency from time to time of The Netherlands;

   (h) any phrase introduced by the terms including, include, in particular or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms; and

   (i) unless otherwise provided herein, all references to a fixed time of a day will mean Amsterdam time.

2. All periods of time set out in this Agreement or any other Transaction Document will be calculated from midnight to midnight. They will start on the day following the day on which the event triggering the

relevant period of time has occurred. The expiration date will be included in the period of time. If the expiration date is a Saturday, a Sunday or a (bank) holiday in The Netherlands, the expiration date will be postponed until the next Business Day. Unless otherwise provided herein, all periods of time will be calculated in calendar days. All periods of time consisting of a number of months (or years) will be calculated from the day in the month (or year) when the triggering event has occurred until the eve of the same day in the following month(s) (or year(s)).

3. Except as otherwise expressly provided in this Agreement, any express references to an enactment (which includes any legislation in any jurisdiction) includes references to:

(j) that enactment as amended, consolidated or re-enacted by or under any other enactment before or after the date of this Agreement;

(k) any enactment which that enactment re-enacts (with or without modification); and

(l) any subordinate legislation (including regulations) made (before or after the date of this Agreement) under that enactment, amended, consolidated or re-enacted as described under (j) or (k) above, except to the extent that any of the matters referred to in (j) to (l) occurs after the date of this Agreement and increases or alters the liability of the Transferee or the Company under this Agreement.

4. Where there is any inconsistency between the definitions set out in this Schedule 1 (*Definitions and Interpretation*) and the definitions set out in any clause or any other Schedule, then, for the purpose of construing such clause or Schedule, the definitions set out in such clause or Schedule shall prevail.

## ANNEX 1

## COMMITMENT

[*To be attached separately*]

**RECAPILIZATION COMMITMENT**

**DATED 17 MARCH 2017**

**THE UNDERSIGNED:**

(1) **Trier Holding B.V.**, a company incorporated under the laws of The Netherlands having its statutory seat (*statutaire zetel*) in Hoofddorp, The Netherlands, registered with the trade register of the Chamber of Commerce under number 68313659 (the **Transferee**);

(2) **Netherlands Insurance Holdings, Inc. (Delaware)**, a company incorporated under the laws of the State of Delaware, having its registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, and assigned Delaware Secretary of State file number 6309629 (**Shareholder 1**);

(3) **NIH Capital, LLC**, a company organized under the laws of the State of North Carolina, having its registered office at 327 Hillsborough Street, Raleigh, North Carolina 27603, and assigned North Carolina Secretary of State identification number 1573596 (**Shareholder 2**); and

(4) **Mr Greg Evan Lindberg**, born in California on [redacted] 1970 and residing at 3406 Stagecoach Road, Durham, North Carolina 27713 (**Lindberg**, and jointly with Shareholder 1 and Shareholder 2, the **Indirect Shareholders**).

**WHEREAS:**

(A) Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V., a company incorporated under the laws of The Netherlands having its statutory seat (statutaire zetel) at Baarn, The Netherlands, registered with the trade register of the Chamber of Commerce under number 31007947 (the **Company**) operates an insurance business under the name "Conservatrix Leven".

(B) De Nederlandsche Bank N.V., a public limited liability company, incorporated under the laws of Netherlands, having its statutory seat (*statutaire zetel*) in Amsterdam, The Netherlands (**DNB**), has prepared a transfer plan (*overdrachtsplan*) (the **Transfer Plan**) in respect of the Company to force a transfer of all issued and outstanding shares in the capital of the Company (the **Shares**).

(C) As part of the Transfer Plan, DNB and the Transferee have conducted discussions on the transfer of the Shares to the Transferee (the **Proposed Transaction**). The terms and conditions of the Proposed Transaction have been laid down in a confirmation letter thereto from the Transferee dated 17 March 2017. The process towards completion of the transfer referred to under (B) (**Completion**) has been agreed between DNB and the Transferee in a submission protocol, dated on or around the date hereof (the **Submission Protocol**).

(D) As part of the Submission Protocol, DNB, the Transferee and the Indirect Shareholders have entered into an agreement re post-completion covenants. In light of that agreement, the Transferee and the Indirect Shareholders hereby wish to confirm certain commitments in relation to the recapitalization of the Company.

## 1. COMMITMENT

1.1 Unless otherwise agreed with DNB in writing, subject to Completion occurring, the Transferee and Indirect Shareholders hereby commit to maintain a minimum solvency capital ratio of 135% within the Company (as outlined in the Solvency II Directive, Directive 2009/138/EC) (the **Proposed Minimum SCR Ratio**) as of Completion (the **Commitment**);

1.2 The Commitment is subject to the following terms and conditions:

(a) Subject to the provision set out below under (b), the Transferee will, and the Indirect Shareholders will procure that the Transferee will, replenish any shortfall in the Proposed Minimum SCR Ratio with core equity contributions.

(b) As soon as the Company is stabilized, the Commitment shall be limited in the sense that further capitalization of the Company over and above the initial amount of capitalization by the Transferee on Completion, shall be based on a viable business case for the Company (the analysis thereof may include taking into account the interest of the shareholder).

(c) Notwithstanding paragraph (b) above, Lindberg will use all his reasonable (voting) powers to ensure that the Company will at all times comply with applicable law and regulations.

(d) DNB will reasonably consider to waive the requirement of the Commitment to the extent provided by Lindberg, provided that sufficient alternative comfort can be offered via an irrevocable Company group guarantee. For the avoidance of doubt, such guarantee shall not be automatically terminated upon the Company group no longer being affiliated to the Company.

(e) DNB may only invoke the Commitment after the expiry of six (6) months of the moment that the Company does no longer comply with the Proposed Minimum SCR Ratio.

(f) The Company shall not make any changes in the Proposed Minimum SCR Ratio without the prior written confirmation of DNB.

1.3 The validity and enforceability of the Commitment and the terms and conditions thereto as set out under clause 1.1 and 1.2 is confirmed by the legal opinion given by Houthoff Buruma New York B.V. dated 17 March 2017, as attached hereto as Schedule 1. The due authorization of Shareholder 1 and Shareholder 2 is confirmed by the legal opinion given by McGuireWoods LLP dated 17 March 2017, as attached hereto as Schedule 2.

## 2. GOVERNING LAW AND JURISDICTION

2.1 The recapitalization commitment is governed by Dutch law. All disputes arising out of or in connection with this recapitalization commitment shall be referred to arbitration in accordance with the Arbitration Rules of the Netherlands Arbitration Institute (*Nederlands Arbitrage Instituut, NAI*).

This recapitalization commitment has been signed by the Transferee, Shareholder 1, Shareholder 2 and Lindberg (or their duly authorised representatives) on 17 MARCH 2017.

**For and on behalf of the Transferee:**

______________________________

**Trier Holding B.V.**

______________________________

By: George Luecke
Title: Managing director

**For and on behalf of the Shareholder 1:**

______________________________

**Netherlands Insurance Holdings, Inc.**

By:______________________________
Title:

**For and on behalf of the Shareholder 2:**

______________________________

**NIH Capital, LLC**

By:______________________________
Title:______________________________

______________________________

**Mr Greg Evan Lindberg**

STATE OF NORTH CAROLINA

COUNTY OF ______________

I, __________________________, a Notary Public for ______________ County, North Carolina, do hereby certify that Greg Evan Lindberg personally appeared before me this date and is personally known to me through satisfactory evidence and has acknowledged the voluntary and due execution of the foregoing recapitalization commitment.

WITNESS my hand and official seal, this the _______ day of March, 2017.

Notary Public: ___________________________

My commission expires: ____________, 20__

This recapitalization commitment has been signed by the Transferee, Shareholder 1, Shareholder 2 and Lindberg (or their duly authorised representatives) on 17 MARCH 2017.

**For and on behalf of the Transferee:**

______________________________

**Trier Holding B.V.**

By: Paul Brown
Title: Managing Director

**For and on behalf of the Shareholder 1:**

______________________________

**Netherlands Insurance Holdings, Inc.**

By:______________________________
Title:______________________________

**For and on behalf of the Shareholder 2:**

______________________________

**NIH Capital, LLC**

By:______________________________
Title:______________________________

______________________________

**Mr Greg Evan Lindberg**

STATE OF NORTH CAROLINA

COUNTY OF ______________

I, ________________________, a Notary Public for ______________ County, North Carolina, do hereby certify that Greg Evan Lindberg personally appeared before me this date and is personally known to me through satisfactory evidence and has acknowledged the voluntary and due execution of the foregoing recapitalization commitment.

WITNESS my hand and official seal, this the ______ day of March, 2017.

Notary Public: ________________________

My commission expires: ___________, 20__

This recapitalization commitment has been signed by the Transferee, Shareholder 1, Shareholder 2 and Lindberg (or their duly authorised representatives) on 17 MARCH 2017.

For and on behalf of the Transferee:

Trier Holding B.V.

By:
Title: Greg E Lindberg Chairman

For and on behalf of the Shareholder 1:

Netherlands Insurance Holdings, Inc.

By:
Title: Greg E Lindberg Chairman

For and on behalf of the Shareholder 2:

NIH Capital, LLC

By: Greg Evan Lindberg
Title: Chairman

Mr Greg Evan Lindberg

STATE OF NORTH CAROLINA

COUNTY OF Durham

I, René S. Wicker, a Notary Public for Durham County, North Carolina, do hereby certify that Greg Evan Lindberg personally appeared before me this date and is personally known to me through satisfactory evidence and has acknowledged the voluntary and due execution of the foregoing recapitalization commitment.

WITNESS my hand and official seal, this the 15th day of March, 2017.

RENE' S WICKER
NOTARY PUBLIC
Durham County
North Carolina
Commission expires May 11, 2019

Notary Public:

My commission expires: 5/11, 2019

This recapitalization commitment has been signed for acknowledgement and receipt by DNB (or their duly authorized representatives) on March/7, 2017:

**For and on behalf of DNB:**

______________________________ ______________________________

**De Nederlandsche Bank N.V.**

| | |
|---|---|
| By: M.W. VAN WOERDEN | By: |
| Title: DIRECTOR INSURANCE SUPERVISION DIVISION | Title: |