# EXHIBIT B

HERMANS & SCHUTTEVAER
NOTARISSEN ADVISEURS MEDIATORS

Ref: BZI (9 June 2023.1)
Dos: 2023.1365.01

## DEED OF DECLARATION UNDER OATH

On this day, the fifteenth day of June two thousand twenty-three,
personally appeared before me, Robertus Hendrikus Martinus van Zijl, assigned civil-law notary, hereinafter referred to as: 'civil-law notary', authorized to execute deeds in the protocol of Ingeborg Marguérithe Duyverman, civil-law notary in Utrecht, the Netherlands:
Mr **Christiaan Anton Schwarz**, born in Leiden, the Netherlands, on the twenty-sixth day of December nineteen hundred and fifty-four, residing at Johan de Wittstraat 7, 2334 AL Leiden, married.
The person appearing declared that he wishes to make a declaration under oath in accordance with the Dutch Act on formalities of the Oath ("*Wet vorm van de Eed*") for the purpose of confirming a true copy of an arbitral award.
The person appearing subsequently declared:
(a) that his date of birth is the twenty-sixth day of December nineteen hundred and fifty-four;
(b) that he is an arbitrator at the Netherlands Arbitration Institute (Stichting Nederlands Arbitrage Instituut or NAI);
(c) that attached to this deed is a true and correct copy of the arbitral award dated the thirty-first day of January two thousand and twenty, between the Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. on the one hand and mr. Greg Evan Lindberg, Trier Holding B.V., Netherlands Insurance Holdings, Inc. and NIH Capital, LLC on the other hand.
Subsequently, the person appearing, under penalty of perjury, declared under oath in accordance with the Dutch Act on formalities of the Oath ("*Wet vorm van de Eed*"), that such declaration is fully consistent with the truth, by stating: "*zoo waarlijk helpe mij God Almachtig*" (so truly help me God Almighty), before me, civil-law notary.
**CONCLUSION**
This deed, drawn up in one original copy, was executed in Houten, the Netherlands, on the date first before written.
The person appearing is known to me, civil-law notary.
I, civil-law notary, have determined the identity of the person appearing by means of a document designated for that purpose.
After the substance of this deed had been made known and explained to the person appearing, he declared that he had noted the contents of this deed timely before its execution, agreed to its contents and did not require it to be read out in full.
Subsequently, after a partial reading in accordance with the law, this deed was immediately thereupon signed by the person appearing and by me, civil-law notary.

Signatures follow.

**ISSUED FOR TRUE COPY**

mr. R.H.M. VAN ZIJL
mr. I.M. DUYVERMAN
NOTARIS TE UTRECHT
TOEGEVOEGD NOTARIS TE UTRECHT

APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1. Country: THE NETHERLANDS
   This public document
2. has been signed by **mr. R.H.M. van Zijl**
3. acting in the capacity of candidate notary at Utrecht
4. bears the seal/stamp of Mr. I.M. Duyverman

Certified

5. in Utrecht
6. on 16-06-2023
7. by the registrar of the district court of Midden-Nederland
8. no. 23/2048
9. Seal/stamp:
10. Signature:

C.A. van Baalen

NAI 4792
Arbitral Tribunal: Professor C.A. Schwarz
Residing at Leiden, The Netherlands

**ARBITRAL AWARD IN SUMMARY PROCEEDINGS**

re:

**NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ**
**VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.**
a company having its seat at Utrecht, The Netherlands,

Claimant

represented by its counsel:
D. Horeman, Esq. and Chr.F. Kroes, Esq.;

vs.

1. **MR GREG EVAN LINDBERG,**
   a private individual residing at Durham, North Carolina, United States of America,
2. **TRIER HOLDING B.V.,**
   a company having its seat at Utrecht, The Netherlands,
3. **NETHERLANDS INSURANCE HOLDINGS, INC.,**
   a company having its seat at Wilmington, Delaware, United States of America,
4. **NIH CAPITAL, LLC,**
   a company having its seat at Raleigh, North Carolina, United States of America,

Respondents

represented by their counsel:
R.J. Theissen, Esq. and D. Knottenbelt, Esq.

Nederlands Arbitrage Instituut
Administrateur
NAI
Administrator
Netherlands Arbitration Institute

## I Jurisdiction

1.1 The arbitral tribunal notes that Respondents (as defined below) in their Statement of Defence (as mentioned below in the description of the present summary proceedings) raised a plea that the arbitral tribunal does not have jurisdiction on the ground of non-existence of a valid arbitration agreement and, alternatively, invalid composition of the arbitral tribunal.

1.2 For the reasons set out below (under the caption "Discussion of claims and defences"), the arbitral tribunal holds that it has jurisdiction to rule on this matter. As the matter of jurisdiction is closely connected to the substantive issues, the arbitral tribunal discusses the matters below.

1.3 A request for main arbitral proceedings was filed at the time of the hearing (17 January 2020), yet no arbitral tribunal was appointed at that time.

## II The Summary Arbitral Proceedings

2.1 On 22 December 2019, Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V., (hereinafter also: **Conservatrix**) - through its counsel - filed a request for summary arbitral proceedings (with exhibits numbered C-1 through C-35) (hereinafter: **RfA**) with the Netherlands Arbitration Institute (hereinafter: **NAI**) against Greg Evan Lindberg, Trier Holding B.V., Netherlands Insurance Holdings, Inc., and NIH Capital, LLC, (hereinafter, respectively: **Lindberg**, **Trier**, **NIH Inc** and **NIH Capital**, and collectively: **Respondents**), with reference to article 35(2) NAI Arbitration Rules in force as of 1 January 2015 (hereinafter: **NAI Rules 2015**). The RfA was received by the administrator of the NAI by e-mail of 22 December 2019. The exhibits to the RfA were received by the NAI (by e-mail) on 23 December 2019.

2.2 On 24 December 2019, the administrator of the NAI (by e-mail) confirmed to Conservatrix and Respondents (at the addresses of Respondents supplied by Conservatrix), the appointment as arbitrator in these summary proceedings of Professor C.A. Schwarz, following receipt by the NAI of his signed statement (of 23 December 2019) pursuant to article 11(4) NAI Rules 2015, confirming independence and impartiality, availability and acceptance of the mandate.

2.3 On 7 January 2020, the administrator of the NAI, at the request of the arbitral tribunal, (by e-mail) confirmed the appointment of Ms. M.P.J. Smakman as arbitral secretary in these summary proceedings, following receipt by the NAI of her signed statement (of 2 January 2020) pursuant to article 20 in conjunction with article 11(4) NAI Rules 2015, confirming independence and impartiality, availability and

acceptance of the mandate, and carrying a disclosure. Neither of the parties raised an objection against the appointment of the arbitral secretary.

2.4 On 3 January 2020, the arbitral tribunal held a conference call with the parties to discuss and establish the order of proceedings. Counsel for Conservatrix and Trier participated in the call. Lindberg, NIH Inc and NIH Capital did not participate in the call, nor were they represented during the call.

2.5 On 3 January 2020, following the call on the matter of the order of procedure, the arbitral tribunal (by e-mail) confirmed and further established the order of proceedings, and held that:

- the place of arbitration is Rotterdam;
- the proceedings would be conducted in the English language, allowing Respondents to indicate whether they preferred to receive English translations of any exhibits submitted in the (original) Dutch language;
- a hearing would be held on 17 January 2020, starting at 10h30, and parties were invited to express their preference with respect to the language to be conducted during the hearing;
- Claimant should be ready to submit proof of notice to every Respondent under article 36(3) of the NAI Rules 2015, if so requested by the arbitral tribunal; and
- Respondents were to file a written statement in response to the RfA, no later than on 14 January 2020, at 20h00 CET; while no other written submissions were foreseen, additional exhibits were permitted to be submitted by 15 January 2020, at 20h00 CET, at the latest.

2.6 Parties were invited to comment on the content of the 3 January 2020 e-mail. The arbitral tribunal received no comments or objections.

2.7 On 3 January 2020, Professor Schwarz (by e-mail), with reference to article 11(5) NAI Rules 2015, communicated to the parties that he teaches at the same faculty as counsel for one of the Respondents, who came forward after his appointment as arbitrator on 27 December 2019. None of the parties raised an objection in relation to the arbitral tribunal's disclosure.

2.8 On 6 January 2020, Counsel for Trier informed the arbitral tribunal that no English translation was required of the exhibits submitted in the Dutch language by Claimant.

2.9 On 9 January 2020, Claimant (by e-mail) submitted a letter, with attachments numbered Annex 1 through Annex 55, with a view to evidence that Conservatrix, on initiating the present proceedings, had properly notified all Respondents,

including those that thus far had not made an appearance in the present proceedings.

2.10 On 10 January 2020, the arbitral tribunal (by e-mail) confirmed particulars of the hearing. A copy of the procedural order of 3 January 2020, together with a copy of the e-mail of 10 January 2020, were sent to the addresses as provided by Claimant of Lindberg, NIH Inc and NIH Capital by courier service.

2.11 On 13 January 2020, Mr. Knottenbelt (counsel thus far only for Trier) informed the arbitral tribunal (by e-mail) that his firm had now also been instructed by NIH Inc, NIH Capital and Lindberg. Counsel, furthermore, added that while Trier would be represented by its statutory director at the hearing, NIH Inc, NIH Capital and Lindberg would not appear in person.

2.12 On 14 January 2020, Claimant, also on behalf of counsel for Respondents (by e-mail) informed the arbitral tribunal that the parties had a joint preference for conducting the hearing in Dutch, adding that the parties would submit English versions of their pleading notes at the hearing.

2.13 On 14 January 2020, Respondents (by e-mail) submitted a (joint) Statement of Defence (with exhibits marked R-1 through R-6).

2.14 On 15 January 2020, Claimant (by e-mail) submitted additional exhibits, marked C-36 through C-39.

2.15 On 16 January 2020, Claimant (by e-mail) submitted one additional exhibit, marked C-40. Respondents raised no objection with respect to this additional exhibit.

2.16 On 17 January 2020, a hearing in this matter was held in Rotterdam in one of the meetings rooms of the building where the NAI holds office. The hearing was held in the Dutch language, as per parties' express preference (see above sub 2.12).

2.17 At the hearing of 17 January 2020, Conservatrix was represented by Mr. R. Collé, Mr. P. Heuperman, Mr. P. Poppe and Ms. C. de Kok de Rooij, and by its counsel Mr. D. Horeman, Mr. M. Eliens, Mr. Chr.F. Kroes and Ms. O. van Erp Taalman Kip. Respondent Trier was represented by its statutory director Mr. M. Klessens. All Respondents were represented by their counsel Mr. R.J. Thelssen, Mr. D. Knottenbelt, Ms. W. Pieters, Ms. D. Hansen and Ms. M. Timmermans. At the hearing, counsel for the parties – referring to pleading notes which were submitted – pleaded their arguments and presented additional information with respect to the issues set out in their respective submissions, also in answer to questions raised by the arbitral tribunal. Parties themselves also presented additional information at the hearing. At the end of the hearing, the arbitral tribunal set the date for making its award at 31 January 2020, and set an order of procedure for parties submissions on costs of legal assistance in these summary arbitral proceedings.

2.18 On 17 January 2020, the parties by e-mail submitted a digital copy of their pleading notes. Respondents also submitted an English translation of the Dutch version of the pleading notes submitted during the hearing.

2.19 On 21 January 2020, Claimant (by e-mail) informed the arbitral tribunal that parties had agreed to limit their submissions in respect of the costs of legal assistance to legal fees and disbursements and other costs (incl. advances to the NAI) and to not provide any further substantiation, and that neither party would require an opportunity for rebuttal. Furthermore, Claimant on behalf of the parties requested for an extension of time until 22 January 2020, which extension was subsequently granted by the arbitral tribunal.

2.20 On 22 January 2020, both Claimant and Respondents (by e-mail) sent the arbitral tribunal a submission of costs of legal assistance.

## III Facts

3.1 On the basis of the undisputed, or insufficiently disputed statements as well as the exhibits brought forward, the following facts are presumed. More detailed facts relating to specific issues are set forth in the discussion of those issues sub VI below.

3.2 Conservatrix is a Dutch life insurer. In 2017, Conservatrix was in a financially challenging situation. Conservatrix' supervisor (*toezichthouder*), De Nederlandsche Bank N.V. (hereinafter: **DNB**), intervened, by invoking its power to force a transfer of the shares in Conservatrix to Trier through a ruling of the District Court Amsterdam.

3.3 Trier is shareholder in Conservatrix, and (since acquiring the shares in 2017) holds 100% of the voting rights in Conservatrix. Lindberg indirectly, through its wholly owned subsidiary NIH Capital, which in its turn holds a 100% interest in NIH Inc, is the ultimate shareholder of Trier.

3.4 On 15 May 2017, the Amsterdam District Court in its judgment approved the transfer of shares in Conservatrix to Trier (ECLI:NL:RBAMS:2017:3309, Exhibit C-3). In its ruling, the Amsterdam District Court decided that € 1,-- was a fair price to be paid to the then shareholder (Conservatrix Group) in Conservatrix by the selected Transferee (Trier), chosen by DNB in view of the willingness of Trier and its (in)direct shareholders to invest in Conservatrix in the promised manner, creating a solvency ratio of at least 135%, and to commit to maintain a minimum solvency ratio of 135% within Conservatrix. More specifically, the Amsterdam District Court held (translated from the original Dutch text, vide para 29 RfA):

> *"4.14.3 Conservatrix Group argues against this that there are still options to avert the dangerous development.*

> *4.14.4 The court again does not agree with Conservatrix Group. In our judgment, there is a prima facie finding that the dangerous development in relation to solvency described above cannot be averted sufficiently or not timely, or that DNB has provided sufficient reasons why it came to that view. We elaborate on that below.*
>
> *[...]*
>
> *c. Any concrete expectation of strengthening Conservatrix's capital by or from the side of Conservatrix Group is absent. Already in 2014, Conservatrix Group indicated that it did not want to make a capital contribution, and it repeated that at the Enterprise Chamber hearing and during oral argument in the present proceedings.*
>
> *d. In Conservatrix Group's view, there is one alternative way to let the capital be sufficient, namely by so-called en bloc amendment of insurance policies' conditions. In DNB's view, that is not a real solution because it would erode policy holders' rights to an unacceptable level, to the benefit of a shareholder who is unwilling to make a capital contribution. The board of directors of Conservatrix also does not regard the mere application of en bloc clauses as a realistic alternative.*
>
> *[...]"*

3.5 The Amsterdam District Court in its 15 May 2017 judgment, furthermore, held (again, translated from the original Dutch text, vide para 30 RfA):

> *"4.15.5 DNB argues that Trier's offer (discussed with it), and therefore the transfer plan as submitted for approval, has been done under the following conditions:*
>
> *- in addition to payment of the purchase price of EUR 1.00, Trier will make a capital contribution that provides a solvency ratio of at least 135%;*
>
> *- Trier will ensure that Conservatrix will maintain that solvency ratio of 135%, unless agreed otherwise with DNB;*
>
> *[...]*
>
> *4.15.8 Furthermore, the court took into account that although various other external parties [...] made offers for Conservatrix, as DNB explained, those offers usually were conditional, were not pursued, are not based yet on an elaborate due diligence as Trier did perform, and/or were not accompanied by the same safeguards for inter alia policy holders. Put briefly, none of these offers is sufficiently comparable with the present offer.*
>
> *[...]"*

3.6 The Supreme Court later upheld the aforementioned decision of the Amsterdam District Court in its judgment of 17 May 2019 (ECLI:NL:HR:2019:746).

3.7 The Solvency Capital Requirement is a requirement under relevant European regulation, the Dutch Financial Supervision Act (hereinafter: **Wft**, or **DFSA**), and ancillary regulation for a specific solvency ratio of an insurer. The requirement sets the amount of funds that (re)insurance companies under relevant regulation are required to hold to ensure that the insurer can meet its obligations to policyholders and other beneficiaries over the following 12 months with a 99.5% probability. The "Solvency Capital Requirement (coverage) ratio" is the capital that insurance companies have available to support their solvency capital requirement and must be at least 100%. In the procedural documents, the abbreviation SCR is sometimes

used to refer to the Solvency Capital Requirement, and in other instances used to refer to the Solvency Capital Requirement (coverage) ratio. Hereunder the abbreviation **SCR** will be used to refer to the Solvency Capital Requirement ratio.

3.8 In a Confirmation Letter dated 17 March 2017, and addressed to DNB, Trier confirmed, subject to the approval of the Amsterdam District Court, the conditions under which it would accept the transfer of the shares in Conservatrix. The conditions included the immediate recapitalization by Trier of Conservatrix, by investment of a total amount of approximately € 88.4M. The Confirmation Letter (Exhibit C-6), to the extent relevant for purposes of these summary proceedings, provides as follows (whereby Conservatrix is referred to as "Company", and Trier as "Transferee"):

> *"RECITALS:*
>
> *[...]*
>
> *(D) Whilst the Company is not a signatory to this Letter, the obligations of, limited assurances given by, and terms and conditions affecting, the Company, as set out in this Letter are a critical part of the Transaction and will therefore be part of the Transfer Plan and, as part of the Transfer Plan, the Court will be requested to bind the Company by such terms and conditions as set out in this Letter as part of the Transfer Plan.*
>
> *[...]*
>
> *18. DISPUTE RESOLUTION*
>
> *[...]*
>
> *18.2 If the Dispute is not resolved within 30 (thirty) days of delivery of a notice (...) then, at the election of either Party to the Dispute, the Dispute shall be finally and exclusively settled by arbitration in The Netherlands in accordance with the rules of arbitration of The Netherlands Arbitration Institute (Nederlands Arbitrage Instituut). The following principles apply to both arbitral proceedings, as well as summary arbitral proceedings:*
>
> *(a) the tribunal shall be composed of three arbitrators who shall all be lawyers with a Dutch law degree or admitted to practice Dutch law, provided that the chairman shall in addition have specialised knowledge of the DFSA.*
>
> *[...]*
>
> *18.3 This clause 18 shall also apply to disputes arising in connection with other agreements which are connected with this Letter, unless the relevant agreement expressly provides otherwise.*
>
> *[...]"*

3.9 The Confirmation Letter (Exhibit C-6) is Annex 1 to the Submission Protocol, between DNB and Trier with regard to the transfer of the shares in Conservatrix. The Submission Protocol (Exhibit C-5), to the extent relevant for purposes of these summary proceedings, provides as follows (whereby Conservatrix is referred to as "Company", and Trier as "Transferee"):

> *"WHEREAS:*
>
> *[...]*

*(B) DNB has prepared a transfer plan (overdrachtsplan) (which includes the Confirmation Letter (as defined below) [...] (the* ***Transfer Plan****) in respect of the Company to force a transfer of all issued and outstanding shares in the capital of the Company (the* ***Shares****) in accordance with Part 3.5.4a of the DFSA.*

*(C) As part of the Transfer Plan, DNB and the Transferee have conducted discussions on the transfer of the Shares to the Transferee (the* ***Proposed Transaction****).*

*(D) In view of these discussions, DNB and Transferee have conducted negotiations regarding a confirmation letter in respect of the Proposed Transaction.*

*(E) As a result of the negotiations, the terms and conditions of the Proposed Transaction have been laid down in a confirmation letter and the Schedules thereto (the confirmation letter signed by the Transferee is attached hereto as Annex 1) (the* ***Confirmation Letter****).*

*[...]*

*(G) The Transaction will be effected by approval of the Court of the Transfer Plan, declaring the transfer regulation (overdrachtsregeling) applicable to the Company and the effectuation of subsequent completion requirements.*

*(H) The Parties wish to agree in this Protocol certain specific terms and conditions of effectuating the Proposed Transaction.*

*[...]*

*5. OBLIGATIONS ON THE COMPANY*

*5.1 [...]*

*5.2 It is understood that by approving the Transfer Plan, the Court ratifies/confirms as part of the Transfer Plan that whilst in view of the specific nature of the Proposed Transaction, the Company is not a signatory to the Confirmation Letter, the obligations of, assurances given by, and terms and conditions affecting, the Company, as set out in the Confirmation Letter are a critical part of the Proposed Transaction and form an important basis for the Transferee to agree to the terms of the Proposed Transaction, and will therefore be part of the Transfer Plan and by the Court approving the Transfer Plan the Company will be bound by such terms and conditions as set out in the Confirmation Letter.*

*[...]*

*7. POST-COMPLETION COVENANTS*

*DNB and, amongst others, the Transferee have agreed to certain post-Completion covenants, as described in the agreement hereto as Annex 2.*

*[...]*

*11. LAW AND DISPUTES*

*11.1 This Protocol, the documents related thereto and all non-contractual obligations arising out of or in connection with this Protocol, including the dispute resolution provisions in this clause 11, shall be governed by, construed and take effect in accordance with the laws of The Netherlands (and excluding, for the avoidance of doubt, the laws of any non-European part of The Netherlands).*

*[...]*

*11.3 If the Dispute is not resolved within 30 days of delivery of a notice (...) then, at the election of either Party to the Dispute, the Dispute shall be finally*

*and exclusively settled by arbitration in The Netherlands in accordance with the rules of arbitration of The Netherlands Arbitration Institute (Nederlands Arbitrage Instituut). The following principles apply to both arbitral proceedings, as well as summary arbitral proceedings:*

*(a) the tribunal shall be composed of three arbitrators who shall all be lawyers with a Dutch law degree or admitted to practice Dutch law, provided that the chairman shall in addition have specialized knowledge of the DFSA.*

*[...]*

*11.4 This clause 11 shall also apply to disputes arising in connection with other agreements which are connected with this Protocol, unless the relevant agreement expressly provides otherwise.*

*[...]"*

3.10 In the Agreement Re Post-Completion Covenants dated 17 March 2017 (Annex 2 to the Submission Protocol, Exhibit C-4), between DNB, Trier, NIH Inc, NIH Capital and Lindberg (hereinafter: **Covenants**), to the extent relevant for purposes of these summary proceedings, it is stated (whereby Conservatrix is referred to as "Company", Trier as "Transferee" and NIH Inc, NIH Capital and Lindberg collectively as "Indirect Shareholders"):

*"[...]*

*(B) DNB has prepared a transfer plan (overdrachtsplan) (which includes the Confirmation Letter [...] (the **Transfer Plan**) in respect of the Company to force a transfer of all issued and outstanding shares in the capital of the Company (the **Shares**) in accordance with Part 3.5.4a of the DFSA.*

*(C) As part of the Transfer Plan, DNB and the Transferee have conducted discussions on the transfer of the Shares to the Transferee (the **Proposed Transaction**). The terms and conditions of the Proposed Transaction have been laid down in a confirmation letter thereto from the Transferee [...] (the **Confirmation Letter**).*

*(D) The process towards completion of the Transfer [...] (**Completion**) has been agreed between DNB and the Transferee in a submission protocol, dated on on or around the date hereof (the **Submission Protocol**).*

*(E) Amongst others, the Parties have agreed to certain post-Completion covenants governing the Company, the Transferee and the Indirect Shareholders. These post-Completion covenants are hereby agreed between the Parties, subject to Completion occurring.*

*[...]*

*2. DNB COVENANTS*

*2.1 Subject to Completion occurring, DNB hereby covenants that, unless otherwise agreed with the Transferee in writing:*

*[...]*

*(b) at the reasonable request(s) of the Company, DNB will upon such request(s) assess whether or not the Company is stabilized, in the sense that the Company has restored a sound, controlled and ethical operating environment (beheerste en integere bedrijfsvoering);*

*[...]*

*(e) DNB will only invoke the Commitment [...] after the expiry of six (6) months of the moment that the Company no longer complies with the*

*Proposed Minimum SCR Ratio (as defined below), such compliance being monitored by the Transferee and verified by DNB in accordance with applicable law and regulation;*

*[...]*

*3. TRANSFEREE COVENANTS*

*3.1 Unless otherwise agreed with DNB in writing, subject to Completion occurring, the Indirect Shareholders (as applicable) and the Transferee hereby individually and irrevocably covenant that as of Completion, and, unless specifically determined otherwise, at all times thereafter:*

*[...]*

*Recapitalization & SCR Ratio*

*(j) on or around Completion (subject to the provisions of the Confirmation Letter), it will recapitalize the Company with such amount of Tier 1 equity that is sufficient to reach an SCR ratio of the Company of at least 135% (the **Proposed Minimum SCR Ratio**). The Transferee currently estimates such amount to be EUR 102,863,000;*

*(k) it will procure that the Company shall maintain the Proposed Minimum SCR Ratio (which ratio may be changed in the future by the Company after written confirmation of DNB) and any shortfall in the Proposed Minimum SCR Ratio will be replenished with core equity contributions (however, taking into account the provisions of the Commitment);*

*(l) prior to Completion, the duly signed commitment as attached hereto as Annex 1 (the **Commitment**) will be provided to DNB;*

*(m) it will source the required funds to capitalize and maintain a sound operating and financial profile of the Company from the Eli Group, and hereby confirms that these funds are less than ca. 10 – 20% of the entire Eli Group's pre-tax net worth;*

*[...]*

*Policyholders*

*(aa) there will be no modification of the benefits of the policyholders of the Company and the Company shall not propose or execute any (en bloc) amendment of the policies for the purpose of preventing or curing a dangerous development of its solvability, capital or technical provisions, except with the prior approval of DNB;*

*[...]*

*6. MISCELLANEOUS*

*6.1 Clause[s] (...) 11 (Law and Disputes) (...) of the Submission Protocol shall apply mutatis mutandis to this Agreement as if incorporated herein by reference."*

3.11 Annex 1 to the Covenants is a Recapitalization Commitment dated 17 March 2019 (hereinafter: **Recapitalization Commitment,** Exhibit C-4). The Recapitalization Commitment, to the extent relevant for purposes of these summary proceedings, provides as follows (whereby Conservatrix is referred to as "Company", Trier as "Transferee" and NIH Inc, NIH Capital and Lindberg collectively as "Indirect Shareholders"):

*"[...]*

*WHEREAS:*

*[...]*

*(B) [DNB] has prepared a transfer plan (overdrachtsplan) (the* ***Transfer Plan****) in respect of the Company to force a transfer of all issued and outstanding shares in the capital of the Company (the* ***Shares****).*

*(C) As part of the Transfer Plan, DNB and the Transferee have conducted discussions on the transfer of the Shares to the Transferee (the* ***Proposed Transaction****). The terms and conditions of the Proposed Transaction have been laid down In a confirmation letter thereto from the Transferee dated 17 March 2017. The process towards completion of the transfer referred to under (B) (****Completion****) has been agreed between DNB and the Transferee in a submission protocol, dated on or around the date hereof (the* ***Submission Protocol****).*

*(D) As part of the Submission Protocol, DNB, the Transferee and the Indirect Shareholders have entered into an agreement re post-completion covenants. In light of that agreement, the Transferee and the Indirect Shareholders hereby wish to confirm certain commitments in relation to the recapitalization of the Company.*

*1. COMMITMENT*

*1.1 Unless otherwise agreed with DNB in writing, subject to Completion occurring, the Transferee and Indirect Shareholders hereby commit to maintain a minimum solvency capital ratio of 135% within the Company (as outlined in the Solvency II Directive, Directive 2009/138/EC) (the* ***Proposed Minimum SCR Ratio****) as of Completion (the* ***Commitment****);*

*1.2 The Commitment is subject to the following terms and conditions:*

*(a) Subject to the provision set out below under (b), the Transferee will, and the Indirect Shareholders will procure that the Transferee will, replenish any shortfall in the Proposed Minimum SCR Ratio with core equity contributions.*

*(b) As soon as the Company is stabilized, the Commitment shall be limited in the sense that further capitalization of the Company over and above the initial amount of capitalization by the Transferee on Completion, shall be based on a viable business case for the Company (the analysis thereof may include taking into account the interest of the shareholder).*

*(c) Notwithstanding paragraph (b) above, Lindberg will use all his reasonable (voting) powers to ensure that the Company will at all times comply with applicable law and regulations.*

*(d) DNB will reasonably consider to waive the requirement of the Commitment to the extent provided by Lindberg, provided that sufficient alternative comfort can be offered via an irrevocable Company group guarantee. For the avoidance of doubt, such guarantee shall not be automatically terminated upon the Company group no longer being affiliated to the Company.*

*(e) DNB may only invoke the Commitment after the expiry of six (6) months of the moment that the Company does no longer comply with the Proposed Minimum SCR Ratio.*

*(f) The Company shall not make any changes in the Proposed Minimum SCR Ratio without the prior written confirmation of DNB.*

*[...]*

*2. GOVERNING LAW AND JURISDICTION*

*2.1 The recapitalization commitment is governed by Dutch law. All disputes arising out of or in connection with this recapitalization commitment shall be*

*referred to arbitration in accordance with the Arbitration Rules of the Netherlands Arbitration Institute (Nederlands Arbitrage Instituut, NAI)."*

3.12 On 15 May 2017, Conservatrix (effective 31 March 2017) entered into a reinsurance agreement with another company of which Lindberg is the (indirect) controlling shareholder, Colorado Bankers Life Insurance Company (hereinafter: **CBL**). The reinsurance agreement with Lindberg's affiliate CBL (Exhibit C-7) had the effect of increasing Conservatrix' own funds and was the biggest part of the initial recapitalization committed by Lindberg/Respondents. Conservatrix on the same date entered into a Trust Agreement (Exhibit C-8) with inter alia CBL, to establish a trust account for the benefit of Conservatrix.

3.13 On 18 March 2019, Lindberg was indicted in the United Stated for allegedly bribing the insurance commissioner of North Carolina. AM Best, a rating agency, downgraded its credit rating for CBL. In June 2019, CBL was put under rehabilitation after a petition of the Commissioner of Insurance of North Carolina by order of the General Court of Justice (Superior Court Division) and a Rehabilitator (hereinafter: **the Rehabilitator**) was appointed (Exhibits C-12 and C-13).

3.14 By letter of 12 June 2019 (Exhibit C-22), DNB - referring to a financial report received from Conservatrix - notified (the board of directors of) Trier (with copy to Lindberg, NIH Inc, NIH Capital and counsel of the law firm Houthoff):

> *"DNB has received information from [Conservatrix] (the **Company**) in relation to the Company's solvency capital requirement ratio (the **SCR Ratio**) as referred to in the Solvency II Directive. In the periodic financial report provided by the Company to DNB on 6 May 2019, the SCR Ratio of the Company was calculated by the Company to be 132.51% at 31 March 2019. DNB considers the date of 6 May 2019 as the moment that the Company does no longer comply with the Minimum SCR Ratio of 135%.*
>
> *The Direct Shareholder and the Indirect Shareholders have committed themselves to maintain the Company's SCR Ratio at a minimum of 135% (the **Minimum SCR Ratio**). As part of this commitment, the Direct Shareholder has agreed to replenish any shortfall in the Minimum SCR Ratio with core equity contributions. The Indirect Shareholders have agreed to procure that the Direct Shareholder will fulfill this commitment.*
>
> *DNB hereby notifies you that the period of six (6) months after which DNB will have the right to invoke the aforementioned commitment has started 6 May 2019.*

3.15 By letter of 8 August 2019 (Exhibit C-30), DNB informed Conservatrix, referring to a financial report received from Conservatrix on 6 August 2019 that reported a solvency capital requirement ratio of 75% per 30 June 2019, that the minimum SCR had not been met. In the same letter, DNB requested Conservatrix to submit a recovery plan, per the terms of the DFSA.

3.16 By letter of 22 August 2019 (Exhibit C-23), Conservatrix informed Mr. Castelvetri and Mr. Klessens (Trier):

> *"Recent events at CBL have exclusively triggered a critical solvency event at Conservatrix. Our Solvency II SCR ratio has reduced form 129% to 75% at 30*

*June 2019 as a direct consequence of CBL's de-rating following the Rehabilitation Order. Having exhausted all other immediately available capital-enhancing options, Conservatrix requires additional SII-compliant capital of at least EUR 8.2m to restore solvency above 100% based on 30 June figures, to avoid regulatory action under the Dutch Recovery and Resolution Act."*

3.17 On 5 September 2019, Mr. Castelvetri, who was at that time both supervisory board member of Conservatrix (Exhibit C-17) and CEO of its shareholder Trier (Exhibit C-18) by e-mail to Conservatrix (Exhibit C-24) responded as follows:

> *"Thank you for your letter.*
>
> *The matters you refer to are being discussed at both Trier and UBO level, but I am afraid we are not yet in a position to give you a formal response.*
>
> *However, we and the UBO recognize the importance of the issues you have raised and hope to be in a position to answer in the following weeks."*

3.18 By letter of 6 September 2019 (Exhibit C-25) from DNB to Trier (with copy to NIH Inc, NIH Capital, Lindberg and a Dutch law firm), DNB requested that Trier and/or NIH Inc, NIH Capital and Lindberg *"confirm that no later than 6 November 2019 the SCR Ratio of Conservatrix will have been restored to a minimum of 135%"*.

3.19 By letter of 2 October 2019 from DNB to Trier (Exhibit C-32), DNB informed Trier, referring to a meeting on 17 September 2019 attended by representatives of Trier, Eli Global LLC (in which Lindberg is the indirect controlling sole shareholder) and DNB:

> *"Our main concern is the breach of the Solvency Capital Requirement (SCR) by Conservatrix. As you know Conservatrix shall present a recovery plan for approval to DNB before 6 October 2019, which shall be carried out ultimately on 6 February 2020. If DNB will not approve the recovery plan or Conservatrix is not capable to carry out the approved recovery plan in time, DNB can withdraw the license of Conservatrix.*
>
> *[...]*
>
> *Eventually, if it turns out that Conservatrix will not be capable to comply with the solvency requirements within the applicable legal time limits, DNB may request a bankruptcy pursuant to special legal supervisory grounds. This means a judge may grant DNB's request regardless of the possibility to meet regular creditors' claims."*

3.20 On 4 October 2019, Conservatrix submitted an initial recovery plan to DNB (Exhibit C-40).

3.21 By letter of 22 October 2019 (Exhibit C-26), Trier responded to DNB and denied, among other things, the existence of a (prolonged) shortfall of the SCR, and suggested that a possible solution to any shortfall might lie in cutting the rights of policyholders.

3.22 By e-mail of 5 November 2019 (Exhibit C-33), the Rehabilitator in CBL informed Conservatrix:

> *"As discussed in our conference call last week, the Receiver for Colorado Bankers Life has determined that assuming and performing under the*

*reinsurance agreement with Conservatrix would be materially detrimental to the estate and prejudicial to the interests of Colorado Bankers Life's policyholders and other creditors. Therefore, in lieu of exercising his statutory right to immediately disavow the reinsurance agreement with Conservatrix, he is proposing to commute the agreement back to inception and equitably distribute the assets currently held in trust at Fifth Third Bank. (...)"*

3.23 By letter of 20 November 2019 (Exhibit C-28), Conservatrix reported to Trier its urgent financial needs and asked for a quick response.

3.24 By letter of 29 November 2019 (Exhibit C-29), Trier responded to Conservatrix denying the shortfall in the SCR.

3.25 By letter of 20 December 2019 (Exhibit C-32), DNB informed Trier in response to the aforementioned letter of 22 October 2019 from Trier to DNB:

> *"In your letter dated 22 October 2019 you take the position that the Commitment cannot be invoked yet. According to you, the Company's SCR ratio has not fallen below 135%, because a wrong underlying premise of the recognition of the reinsurance contract between the Company and Colorado Bankers Life Insurance Company (CBL) was used. Furthermore, you take the position that the Commitment can only be invoked if it is based on a viable business case.*
>
> *We do not agree with your point of view for the following reasons.*
>
> *(...)*
>
> *Secondly, we do not agree that the Commitment would by definition not apply when an assessment would not result in a viable and sustainable business case. Such position is based on an incorrect interpretation of the Commitment, since it ignores the fact that the Company is not stabilized in the sense that the Company has restored a sound, controlled and ethical operating environment (beheerste en integere bedrijfsvoering). It is only after the Company is stabilized (to be assessed by DNB), that the Commitment shall be limited in the sense that further capitalization of the Company over and above the initial amount of capitalization by Trier shall be based on a viable business case for the Company. DNB never declared the Company stabilized.*
>
> *In summary, your arguments for not complying with the Commitment fail. We urge Trier (as direct shareholder of the Company), and Netherlands Insurance Holdings, Inc., NIH Capital, LLC and Mr Greg Evan Lindberg (as indirect shareholders of the Company) to comply with the Commitment and replenish the shortfall in the SCR of the Company with core equity contributions to a minimum SCR ratio of 135% without any further delay. (...)"*

3.26 DNB on the same date (20 December 2019) sent Conservatrix a letter (Exhibit C-32), stating:

> *"[DNB] has been informed that [Conservatrix] intend to initiate arbitration proceedings against [Respondents] (the "Shareholders") in order to enforce the Recapitalization Commitment ("Commitment") that DNB and the Shareholders have agreed on for the benefit of Conservatrix on 17 March 2017."*

3.27 By e-mail of 22 December 2019 (Exhibit C-31), Conservatrix (through its counsel) sent a final request to Lindberg et al. to replenish the shortfall.

3.28 On 22 December 2019 (part of Exhibit C-36), the Rehabilitator of CBL notified Conservatrix that he had disavowed the reinsurance agreement. The Rehabilitator added:

> *"[a]s a result of this disavowal, the Treaty is deemed to be void ab initio, and we will be seeking a judicial determination as to the proper distribution of assets in the Trust Account."*

## IV Claim and defences raised in relation to the claim

4.1 In these summary arbitral proceedings Conservatrix requests the arbitral tribunal:

> *"by means of interim relief and in the form of an arbitral award, to:*
>
> *(a) ORDER Lindberg et al., jointly and severally,*
>
> *(i) primarily to replenish the shortfall in the SCR of Conservatrix to a SCR of 135%, with core equity contributions, within seven (7) calendar days after the award, or such time as the Tribunal may deem appropriate, and thereafter maintain a minimum SCR of 135% in accordance with the Commitment;*
>
> *(ii) in the alternative to replenish the shortfall in the SCR of Conservatrix to the statutory minimum SCR of 100%, with core equity contributions, within seven (7) calendar days after the award or such time as the Tribunal may deem appropriate, and thereafter maintain a minimum SCR of 100%;*
>
> *(iii) in the second alternative to take such measures to restore Conservatrix's SCR as the Tribunal deems fit; and*
>
> *(iv) in the final alternative to transfer assets to Conservatrix in an amount and a form deemed appropriate by the Tribunal.*
>
> *(b) ORDER Lindberg et al.*
>
> *(i) primarily to pay Conservatrix an immediately payable penalty ("dwangsom") of EUR 150 million if the award is not timely complied with in whole or in part, or such penalty as the Tribunal considers appropriate under the circumstances; or*
>
> *(ii) in the alternative to add to the amounts in part (a) the statutory interest under Article 6:119a DCC until the date of actual payment in full; and*
>
> *(c) ORDER Lindberg et al. jointly and severally to pay all the costs and expenses of these arbitration proceedings, including the administrative expenses, the fees and expenses of the arbitral tribunal, the fees and expenses of Conservatrix's legal representation in this arbitration and any other costs of this arbitration."*

4.2 Underlying Conservatrix' aforesaid request to the arbitral tribunal is Conservatrix' contention that Conservatrix has become party to the Recapitalization Commitment, and to the arbitration agreement contained therein, by accepting of certain stipulations as third-party beneficiary (*derdenbeding*) contained therein.

4.3 Conservatrix submits that, inter alia, the downgrade of CBL made that the reinsurance arrangement between Conservatrix and CBL no longer meets the eligibility criteria under the Solvency II Directive, leading to decrease of the SCR from above 136% to (at most) 75%. Also apart from this, the SCR has fallen below

the 135% threshold and, accordingly, Respondents must restore it to and maintain it at that level.

4.4 Respondents, on the other hand, deny the existence of an arbitration agreement as is required pursuant to article 1021 of the Dutch Code of Civil Procedure. Respondents argue that Conservatrix is not a party to the Covenants and Recapitalization Commitment and, thus, cannot rely on article 2 of the Recapitalization Commitment, containing the applicable arbitration clause. Further, the Recapitalization Commitment does not qualify as a third-party stipulation, and Conservatrix cannot rely on the provisions of the Recapitalization Commitment. Alternatively, Respondents argue that the arbitral tribunal has no jurisdiction because of an invalid composition of the arbitral tribunal.

4.5 Respondents further submit that the matter is not sufficiently urgent, and is, otherwise, not suitable to be considered and decided in arbitral summary proceedings for being too complex. Respondents also submit that the Recapitalization Commitment cannot be invoked at this point in time, due to (a) its terms and conditions not being fulfilled, and (b) the calculations of the SCR being inaccurate. Further, in the absence of a viable business and investment plan, one of the requisite conditions to trigger the Commitments under the Recapitalization Commitment, has not been met.

4.6 Respondents, more specifically, request that the arbitral tribunal:

> "*a. denies to have jurisdiction;*
>
> *b. dismisses all of Conservatrix's claims;*
>
> *c. orders that Conservatrix reimburses Respondents for all costs, expenses and attorneys' fees and disbursements incurred in this arbitration plus the applicable legal interest from the date of the award to the date of full payment.*"

4.7 Further assertions and defences raised will be discussed below.

## V Applicable law, place and language and measure for decision-making

5.1 The arbitral tribunal finds that Dutch law shall govern both the procedural and the substantive matters in this dispute, including the issue of jurisdiction, given that the Recapitalization Commitment provides in article 2(1) that "*[t]he recapitalization commitment is governed by Dutch law*", and, furthermore, provides that "*[a]ll disputes arising out of or in connection with this recapitalization commitment shall be referred to arbitration in accordance with the Arbitration Rules of the Netherlands Arbitration Institute (Nederlands Arbitrage Instituut, NAI)*", and that the place of arbitration is determined to be Rotterdam (see para 2.5 *supra*) (to which determination no objections were raised), thereby having particular regard to the provisions of article 42(2) in conjunction with article 36(1) NAI Rules 2015 and

article 1073 Dutch Code of Civil Procedure (hereinafter: **DCCP**). Moreover, there is common ground between the parties that Dutch law governs the issues brought before the arbitral tribunal, and parties have based their claims and defences on the assumption that Dutch law applies to the procedural and substantive issues.

5.2 The NAI Rules 2015 (i.e. the NAI arbitration rules in force as of 1 January 2015) apply in the present proceedings, pursuant to article 62(2) NAI Rules 2015 in conjunction with article 36(1) NAI Rules 2015, being the (version of the) rules in the form they have at the time the proceedings were commenced.

5.3 As parties have not authorized the arbitral tribunal to act as amiable compositeur as per articles 36(1) NAI Rules 2015 in conjunction with article 42(3) NAI Rules 2015, the arbitral tribunal will, on the basis of article 36(1) in conjunction with article 42(1) NAI Rules 2015, make its award in accordance with the rules of law.

5.4 The place of arbitration is Rotterdam, as determined by the arbitral tribunal in its order of 3 January 2020 (to which no objections were raised), in view of the fact that the arbitration clause in the Recapitalization Commitment is silent on the topic of the place of arbitration and no place of arbitration has been determined in the pending main proceedings (ref. article 35(2) of the NAI Rules 2015).

5.5 The language of the arbitration is English, as the Recapitalization Commitment is silent on the topic of language of the arbitration, and parties' preference expressed to conduct the proceedings in English (ref. article 5(1) NAI Rules 2015 in conjunction with article 36(1) NAI Rules 2015).

## VI Discussion of claims and defences

6.1 The arbitral tribunal first turns to the preliminary issues raised by Respondents, i.e. challenging jurisdiction of the arbitral tribunal (for alleged lack of an arbitration agreement and, alternatively, invalid composition of the arbitral tribunal), and whether the standards for awarding provisional relief have been met. The arbitral tribunal addresses both issues below under (A.) and (B.).

### *(A.) Jurisdiction*

#### *(A.1) Alleged absence of arbitration agreement*

6.2 The first preliminary issue to be addressed concerns the matter of the arbitral tribunal's jurisdiction to decide this matter.

6.3 The arbitral tribunal establishes that Respondents have timely raised their plea that the arbitral tribunal lacks jurisdiction, as required by article 36(6) of the NAI Rules 2015 and article 1052(2) DCCP. Pursuant to article 1052(1) DCCP, the arbitral tribunal is competent to decide on its own jurisdiction.

6.4 The arbitral tribunal is competent to deal with a dispute in the event parties have concluded a valid arbitration agreement (articles 1020 and 1021 DCCP). In this particular case, the existence of a separate arbitration agreement concluded between Conservatrix and Respondents has not been asserted. Conservatrix bases its opinion that it can validly invoke the arbitration agreement contained in the Recapitalization Commitment (the existence and validity of which have not been disputed by any of the parties), against Respondents, on the theory of acceptance of rights that confer a benefit on Conservatrix as a third-party beneficiary (in Dutch: *derdenbeding*), under article 6:253(1) Dutch Civil Code (hereinafter: **DCC**), which provides (translated):

> *"An agreement creates a right for a third party to demand performance from one of the parties or otherwise invoke the agreement against one of them, if the agreement contains a clause to that effect and the third party accepts this clause."*

6.5 As Respondents have explicitly denied the existence of intention to be bound by an arbitration agreement, Conservatrix bears the burden to prove the existence of a valid arbitration agreement between the parties. The arbitral tribunal, for the following reasons, holds that Conservatrix has met that burden of proof.

6.6 The arbitral tribunal, on the basis of interpretation of the Recapitalization Commitment between and among Respondents, must determine whether the terms offer Conservatrix the right to demand specific performance of the obligations ensuing from the Recapitalization Commitment. In the process of interpretation, it is a basic principle under Dutch law that all circumstances in the case at hand need to be considered, thereby giving due regard to principles of reasonableness and fairness (see Dutch Supreme Court 1 October 2004, NJ 2005, 499).

6.7 The arbitral tribunal holds that both the literal text of the Recapitalization Commitment itself, also seen within the context of the set of interrelated agreements that form the transaction documentation pertaining to transfer of shares in Conservatrix in 2017, provide ample indications to conclude that the commitments contained in the Recapitalization Commitment (also, and on acceptance) confer rights on Conservatrix as a third-party beneficiary. The Recapitalization Commitment is an undertaking of Respondents vis-à-vis DNB, as the (prudential) supervisor of Conservatrix. The arbitral tribunal is satisfied, on the basis of wording and also in the context of the transactional documents as a whole, that the undertaking not only serves the interest of Conservatrix, but is a statement directed at Conservatrix. Reference is made to recital sub (D) of the Recapitalization Commitment quoted sub para 3.11 above, that reads: *"As part of the Submission Protocol, DNB and the Transferee and the Indirect Shareholders entered into an agreement re post-completion covenants. In light of that*

*agreement, the Transferee and the Indirect Shareholders hereby wish to confirm certain commitments in relation of the recapitalization of the Company."*

6.8 The arbitral tribunal is also satisfied that it was the intention of the parties to create a direct course of action for Conservatrix, secured by the (prudential) supervisor DNB that was in charge of the process of transferring the shares to Trier and its indirect shareholders. The intention to create this position for Conservatrix is evident from the letter of DNB to Conservatrix, dated 20 December 2019 (see para 3.26 above, Exhibit C-32) where DNB observes that the Recapitalization Commitment that DNB and the Shareholders have agreed, contains a commitment "*that DNB and the Shareholders have agreed on for the benefit of Conservatrix on 17 March 2017*".

6.9 Respondents submit that the Recapitalization Commitment is part of a complex set of agreements, and the relationship between the agreements would be lost if Conservatrix would be allowed to invoke a single agreement from the whole. The arbitral tribunal is of the view that this line of defence does not hold up. Respondents overlook that the obligation to maintain a minimum SCR was and continues to be a critical part of the overall transaction, and DNB's decision to accept Trier's take-over bid over competing bids at the time.

6.10 The arbitral tribunal has no doubt that the arbitration clause in article 2(1) of the Recapitalization Commitment was intended to allow Conservatrix, on acceptance, the possibility to initiate arbitral proceedings. The arbitral tribunal rejects Respondents' contention that qualifying the Recapitalization Commitment as a third-party clause would be undesirable and illogical, as it is unlikely that the scope of the arbitration clause was limited to disputes among Trier and its indirect shareholders.

6.11 The fact that Conservatrix has accepted the third-party stipulation, as required under Article 6:253 DCC, has not been called into question in the present proceedings, and has been confirmed in the RfA to the extent required.

6.12 For the above reasons, the arbitral tribunal arrives at the conclusion, and so holds, that the Recapitalization Commitment was formulated and intended to confer rights on Conservatrix to claim specific performance of the obligations ensuing from the Recapitalization Commitment.

6.13 It follows from Dutch law that Conservatrix, on acceptance of this third-party stipulation, has acceded to the entire Recapitalization Commitment (article 6:254 Dutch Civil Code, see also ECLI:NL:GHARL:2014:5856). Consequently, Conservatrix is entitled to invoke and rely on the arbitration agreement contained in the Recapitalization Commitment.

*(A.2) Alleged invalid composition arbitral tribunal*

6.14 On the matter of jurisdiction, Respondents, alternatively, argue that the arbitral tribunal lacks jurisdiction on the ground that it is invalidly composed (article 1052(3) DCCP).

6.15 Respondents submit that if at all Conservatrix accepted any third-party beneficiary stipulation, then it must necessarily follow that Conservatrix became party to the Confirmation Letter, which forms part of the (main) Submission Protocol. Consequently, the arbitration agreement contained in the Submission Protocol (article 11, see para 3.9 above) and in the Confirmation Letter (article 18, see para 3.8 above), according to Respondents must be followed, which express specific rules around the composition of an arbitral tribunal in summary proceedings (i.e. three arbitrators who shall be lawyers with a Dutch law degree whilst the chairman shall in addition have specialised knowledge of the DFSA).

6.16 The arbitral tribunal holds that, besides the fact that the Confirmation Letter of Trier as well as the Submission Protocol refer to the transfer of shares in Conservatrix and have as such no relation with the recapitalization of Conservatrix, the provisions on the resolution of disputes in the Confirmation Letter and in the Submission Protocol are not applicable, as article 2(1) of the Recapitalization Commitment forms an independent and self-contained provision for the settlement of disputes arising out of or in connection with this agreement.

6.17 The fact that the Recapitalization Commitment is annexed to the Confirmation Letter and the Submission Protocol, which both contain an (almost identical) arbitration agreement covering disputes over "agreements which are connected" to these agreements, does not change this conclusion. Articles 11(4) of the Submission Protocol and article 18(3) of the Confirmation Letter contain a specific carve-out for agreements that expressly provide otherwise. The arbitral tribunal is satisfied that the Recapitalization Commitment, by containing a specific clause on dispute resolution, whereas an agreement like the Agreement Re Post-Completion Covenants in article 6(1) incorporates the dispute mechanism of article 11 of the Submission Protocol by reference only, provides sufficient ground to arrive at the conclusion that parties to the Recapitalization Commitment opted for a different set of rules around composition of the arbitral tribunal for disputes arising out of that agreement.

6.18 Given that the composition of the arbitral tribunal in the present proceedings has taken place in accordance with article 35 of the NAI Rules 2015 as per the arbitration clause of the Recapitalization Commitment, the arbitral tribunal is satisfied that Respondents' alternative ground to challenge the jurisdiction of the arbitral tribunal, falls.

6.19 For the reasons stated above, the arbitral tribunal holds that it has jurisdiction to consider the claims raised by Conservatrix against Respondents in the present proceedings.

***(B.) Standard for granting provisional relief***

6.20 The second (preliminary) issue to be addressed concerns whether the standards have been met for granting provisional measures under article 36 NAI Rules 2015 and as a matter of Dutch law.

6.21 Respondents in this respect submit:

- Conservatrix has no "urgent interest that requires immediately enforceable provisional relief", as required by article 35(2) NAI Rules 2015. This is even more pressing, given that main proceedings are pending, wherefore the tribunal must apply a stricter test of urgency (vide NAI notes to article 35(2) NAI Rules 2015, para 9.2).
- Conservatrix has not substantiated its urgent interest. Article 3:135 Wft only requires the preparation of a recovery plan in case of a deficiency (which Respondents deny exists in the present circumstances). Furthermore, Respondents argue that the Wft provides for various extensions of deadlines.
- DNB's absence of action following earlier correspondence shows that it apparently does not consider the matter to be urgent either. Respondents point out that the statutory time limits for DNB deviate from the agreed timelines, and that it may well be that DNB tolerates the present situation.
- Conservatrix could only have a claim against Trier, who has no means to satisfy the claim. There is no likelihood that any title against the other Respondents could be executed.
- There is a real risk that Conservatrix is unable to repay the amounts granted if the substantive claim is ultimately rejected on the merits (*restitutierisico*), which requires that on balancing the interests of the parties, it is warranted that Conservatrix' claims should be denied, or referred to main proceedings per article 36(9) NAI Rules 2015.

6.22 The arbitral tribunal observes that article 35(2) in conjunction with article 36(2) of the NAI Rules 2015 provides that, where the seat of arbitration is within The Netherlands, as it is the case in the present proceedings, arbitral tribunals are authorized to make an award on provisional measures in all "urgent cases that require immediately enforceable provisional relief".

6.23 In addition, article 36(9) of the NAI Rules 2015 provides that the arbitral tribunal may reject a claim if it is "too complicated". Accordingly, a provisional decision may

not be granted if it supposes a complex inquiry into the evidence. In other words, a provisional measure needs to be grounded on a *prima facie* basis.

6.24 Conservatrix' claims (essentially) relate to the payment of an amount of money. To award a monetary claim in summary arbitral proceedings, the same criteria can be applied as are developed in summary proceedings before the civil courts. This entails that claims in emergency proceedings can only be awarded if the existence and the amount of the claims are to a great extent plausible, while, in addition, an immediate decision is required for reasons of acute emergency and the risk that a party cannot repay, assessed while weighing the parties' interests, does not preclude an order to pay.

6.25 In the opinion of the arbitral tribunal, Conservatrix has demonstrated its urgent interest in the claim. Conservatrix has demonstrated that for the continuity of its business activities, an immediate decision is needed. DNB as Conservatrix' supervisor has in no uncertain terms notified Conservatrix and its shareholders of the shortfall in the SCR. Irrespective of whether DNB validly called in the Recapitalization Commitment on 6 November 2019 (six months after the moment on which the solvency capital ratio remained below the committed 135% as was confirmed to Trier (with copies to other Respondents) by DNB in its letter of 12 June 2019), more important is the moment on which the ratio fell below 100%. This moment was formally determined by DNB on 6 August 2019. As of this moment a period of 6 months, in discretion of DNB potentially prolonged with 3 months, commenced in which the effective recovery of Conservatrix must be realized. Given the fact that the Recovery Plan 2019, drafted by Conservatrix and presented to DNB on 4 October 2019, has not (yet) been agreed by DNB, there is a real threat for Conservatrix that DNB will intervene and will revoke Conservatrix' license and request its bankruptcy on 6 February 2020 or, if DNB would decide to prolong the period of 6 months, on 6 May 2020.

6.26 Respondents, furthermore, argue that the case is too complex, both with respect to procedure and on substance, to make it suitable to be decided in summary proceedings. Respondents argue that this holds true in particular with respect to the matter of the calculation of the SCR and the question as to whether the conditions of the Recapitalization Commitment have been met. Moreover, it is unclear to Respondents what is expected, for lack of clarity around what amount will have to be supplemented and how that amount will be calculated. For the reasons below, the arbitral tribunal, on careful consideration of the case file and the exchange of information during the hearing, is satisfied that Conservatrix has made a *prima facie* case that warrants a provisional measure. Respondents' concerns around the perceived vagueness of the claim and the potential inability to arrive at a conclusive calculation of the required capital contribution will also be addressed below.

6.27 The arbitral tribunal is satisfied that a potential restitution risk does not preclude the award of a provisional measure requested. It is a well-established principle in summary proceedings before the civil courts that the more certainty exists that a claim on the merits would prevail, on weighing the interests of the parties, less interest is placed on the risk that a party cannot repay. Moreover, in the light of weighing the position of the parties involved, the arbitral tribunal takes into account that Conservatrix is seeking a payment order from its group company Trier, whilst the (indirect) shareholders of Trier agreed to procure that Trier will be able to come up to its obligation to maintain a SCR of 135% in Conservatrix. This situation of a group transaction, in the opinion of the arbitral tribunal, colours the argument of the risk of the inability of repayment, as the claim eventually would be of a parent-company against a 100% subsidiary.

***(C) Substantive Issues***

6.28 The arbitral tribunal now turns to the substantive defences raised by Respondents, against Conservatrix' claim.

***(C.1) SCR calculation, (in)sufficient evidence of shortfall***

6.29 Respondents have argued that Conservatrix cannot assert any rights under the Recapitalization Commitment, due to the unclarity around the term solvency capital ratio. There is no agreement on what data should be used nor are there clear criteria available to make these considerations, according to Respondents. Input from actuaries and accountants is required, as well as input from US legal counsel to interpret the repercussions of the actions of Conservatrix towards CBL and the Respondents with respect to the (impact of the issues around the) reinsurance arrangements. Respondents argue there is no, or insufficient evidence of a shortfall of the SCR at this moment in time.

6.30 On the issue of the calculation of the SCR, Respondents argue that although the "Solvency Capital Requirement" is a well-defined concept in the context of the Dutch Financial Supervision Act (Wft) and in Solvency II, the concept of the solvency capital *ratio* (SCR) is not a clearly defined term. Consequently, as Respondents submit, the interpretation of this concept is vague and debatable, which, in their opinion, should lead to the conclusion that the method of calculating this ratio is debatable.

6.31 In this respect, the arbitral tribunal is satisfied that it is clear from parties' submissions and the information exchanged during the hearing, that the Conservatrix' board maintained a consistent method of calculating the solvency capital requirements and the ratio since Respondents acquired the shares in Conservatrix in March 2017. In other words, the way in which the solvency capital requirements and the ratio was calculated at the 2017 take-over and during the

subsequent time period has not changed, while essentially, over time, the same data on which the calculation was based, were used. On this basis, the arbitral tribunal is satisfied that Respondents agreed with the method of calculation, which was the basis of Conservatrix' reporting to DNB. By questioning the basis on which the SCR is calculated at the moment Conservatrix reports a (significant) shortfall of the SCR relative to the agreed level under the Recapitalization Commitment, Respondents overlook the structure and commitments accepted between the parties involved. The arbitral tribunal is of the opinion that this method of calculating the solvency capital requirement and the ratio should be the basis for the calculation of the shortfall in the SCR to be replenished within the period as established in the rulings.

6.32 European regulations, the Wft and other regulation provide rules about what is required from life insurers active in the Dutch market, such as Conservatrix. Prudential Supervisor of this industry is DNB. A key aspect of the prudential supervision by DNB is making sure that, in view of their role in society, these insurers are financially solid, in which perspective the SCR plays an important role. In this case the discussion is highly influenced by the question whether the downgrade of Conservatrix' reinsurer CBL has or should have an effect on the calculation of the SCR.

6.33 In this respect, the arbitral tribunal has considered that on 15 May 2017, Conservatrix entered into a reinsurance agreement with CBL, a life insurer in which Lindberg indirectly is the sole shareholder. The reinsurance was installed to bridge the gap in the SCR of Conservatrix, at the moment of acquiring all the shares in Conservatrix by Trier, amounting to € 102.9M. Trier made a capital injection of € 18.4M, and the reinsurance agreement with CBL increased the own funds of Conservatrix to the required level at the time of take-over as set out in the Recapitalization Agreement (Exhibit R-1).

6.34 As noted sub 3.13 above, Lindberg was indicted and on 27 June 2019 the Wake County Superior Court issued an Order of Rehabilitation, Order Appointing Receiver and Order Granting Injunctive Relief in respect of a number of companies of Lindberg, among which CBL (Exhibit C-12). The consequent downrating of CBL had, at least in the opinion of Conservatrix, considerable impact on the calculation of its SCR, that was, on basis of the calculations of Conservatrix, already under the level of 135% stipulated in the Recapitalization Commitment as the minimum SCR to be maintained.

6.35 Respondents are of the opinion that this downgrading has no influence on the calculation of the SCR, whilst (the board of) Conservatrix holds that this situation has a significant negative effect on the SCR, especially since the Rehabilitator has the possibility of a "disavowal" of the contract between Conservatrix and CBL. The possibility of such a disavowal, as indisputably was brought forward during the oral

hearing of parties, would lead to a situation wherein the financial position of the parties will be assumed to be as it was before entering into the reinsurance contract, which would foreseeable lead to a loss, as calculated by the board of Conservatrix and was not (sufficiently) disputed by Respondents, of more than € 110M. On 22 December 2019, the Rehabilitator disavowed the contract and seeks to unwind the reinsurance agreement before courts in North Carolina.

6.36 In the light of these events, the arbitral tribunal holds that, apart from specific regulations in this respect, principles of responsible business and good governance form the basis for a necessary write-down of the value of the reinsurance contract, which depreciation leads to the increase of the solvency capital requirement, leading to a decrease of the SCR. The arbitral tribunal rejects the submission of Respondents that the write-down of the value of the reinsurance contract has no influence on the Solvency Capital Requirement and thus also not on the SCR.

6.37 The arbitral tribunal holds that parties may and should be able to rely on the calculation of the solvency capital requirement and the SCR by the board of Conservatrix over time, which calculation formed the trigger for DNB to interfere on basis of article 3:135 Wft as of 6 August 2019. At the same time the arbitral tribunal is not able to correctly calculate the amount of the shortfall in the SCR and the amount of this shortfall has not been indicated in the procedural documents nor during the oral hearing. The arbitral tribunal accepts the fact that there is a shortfall in the SCR and assumes that the downgrading of CBL, also in view of the recent disavowal of the reinsurance agreement by the Rehabilitator in CBL as mentioned under 3.28 above, must in all likelihood have its effect on the outcome of the actual calculation of the SCR, using the calculation method as used by the board of Conservatrix since March 2017. These viewpoints will be reflected in the rulings.

***(C.2) Other terms and conditions to which Recapitalization Commitment is subject***

6.38 Respondents have argued that, even if any shortfall of the ratio were to be established, Conservatrix cannot assert any rights under the Recapitalization Commitment, for reason that other conditions of the Recapitalization Commitment have not been met. Respondents in this respect argue that the Covenants, the agreed commitments and the Wft provide for several terms and conditions to be fulfilled before the Recapitalization Commitment can be invoked validly. According to Respondents, such terms and conditions have not been met because:

a. NIH Inc, NIH Capital and Lindberg have not enabled Trier to replenish any supposed shortfall, relying on article 1.2(a) Recapitalization Commitment;

b. Conservatrix has been stabilized in the sense that the initial recapitalization has taken place, and any further investment is only due if there is a viable

business case for Conservatrix, relying on article 1.2(b) Recapitalization Commitment;

c. The funding by Eli Group has not been arranged due to the lacking substantiation and the current disagreement between Conservatrix and CBL, relying on article 3.1(m) Covenants;

d. The existence of a viable business plan has neither been argued nor proven, nor have concrete proposals been made on the basis of which Eli Global LLC would be able and willing to finance this;

e. The six months waiting periods has not expired (article 1.2(e) Recapitalization Commitment);

f. Conservatrix has the obligation to keep itself well first and has not fulfilled this role as envisaged in the Recapitalization Commitment, relying on article 2:129 DCC, articles 3:57 and 3:135 Wft, and article 1.2(c) Recapitalization Commitment; and

g. The SCR calculation triggering the terms of the Recapitalization Commitment has not been performed in the manner prescribed by the approved transfer plan with the associated documents as approved by DNB and by the Amsterdam District Court.

6.39 Respondents' submission para 6.38, sub (a.) above, ties in with the defence raised in the relation to the issue raised in connection with the urgent interest, namely that Conservatrix supposedly only has a direct claim against Trier, not the other Respondents. The first argument is that only Trier can be held liable to replenish the shortfall, and not the (in)direct shareholders, referring to the text of Art.1.2(a) of the Recapitalization Commitment that reads (quoted again here, for ease of reference):

> *"Subject to the provisions set out below under (b), the Transferee will, and the Indirect Shareholders will procure that the Transferee will, replenish any shortfall in the Proposed Minimum SCR ratio with core equity contributions."*

6.40 The rationale behind this reasoning by Respondents is that Conservatrix can only demand that NIH Inc, NIH Capital and Lindberg enable Trier to supplement the SCR of Conservatrix up to 135%. In light of the fact that Trier has no means to satisfy the claim of Conservatrix, this claim, in the opinion of Respondents, should be denied.

6.41 The arbitral tribunal observes that there is a difference in the wording of article 1.1 and article 1.2(a) of the Recapitalization Commitment. In article 1.1 of the Recapitalization Commitment, Trier and its (in)direct shareholders commit to maintain a minimum solvency capital ratio of 135% within Conservatrix as outlined in the Solvency II Directive (defined as the Proposed Minimum SCR ratio). In article

1.2(a) of the Recapitalization Commitment, it is stated that Trier will replenish any shortfall in the Proposed minimum SCR with core equity contributions. The obligation of the (in)direct shareholders is to *procure* that Trier will replenish. Respondents correctly point out that the obligation to replenish the shortfall does not rest on them directly. At the same time it should be noted that NIH Inc, NIH Capital and Lindberg, the last as ultimate beneficiary owner, are closely related in a group structure with Trier.

6.42 This fact colours, in the findings of the arbitral tribunal, the situation and strengthens the extent to which Conservatrix may rely on compliance with the obligation of the (in)direct shareholders of Trier. The Recapitalization Commitment contains no provisions relating to the source of financing, stipulating the strict obligation of Trier to replenish, and the obligation to procure that possibility, on the basis of the text of that commitment, in fact containing the direct obligation for the (in)direct shareholders to finance Trier. Moreover, the arbitral tribunal gives weight to the fact that the Covenants in article 3.1(m) (see para 3.10 above) provide an obligation on Respondents to "source the required funds to capitalise and maintain a sound operating and financial profile of [Conservatrix] from the Eli Group", in which Lindberg has a controlling interest.

6.43 As decided hereunder, the (in)direct shareholders of Trier will not be obliged to replenish the shortfall, but will be held to procure that Trier performs under its obligations under the Recapitalization Commitment. In this respect the arbitral tribunal holds that there is a special duty of care towards Conservatrix for Lindberg as indirect shareholder of Trier to guarantee the required level of financing of that company in view of the obligation to replenish the shortfall in the SCR of Conservatrix. Respondents have neither in the procedural documents, nor at the oral hearing argued that there are reasons to presume that Lindberg is not in the position to instruct (the management of) the Eli Group to finance Trier to be able to come up to the obligations under the Recapitalization Commitment (in conjunction with the Covenants). In other words, reasons why Lindberg (and NIH Inc and NIH Capital) is not able to carry out his obligation under the Recapitalization Commitment to procure that Trier will replenish the shortfall in the SCR ratio (article 1.2(b) of the Recapitalization Commitment) are not presented. In article 1.2(c) of the Recapitalization Commitment, it is explicitly stipulated that Lindberg will (even if there would be no obligation to further capitalization of Conservatrix in absence of a viable business case for the company after the company would be stabilized, see hereunder) use all his reasonable (voting) powers to ensure that Conservatrix will at all times comply with applicable law and regulations.

6.44 Respondents' submission para 6.38, sub (b.), (c.) and (d.) above, are predicated on the assumption that replenishment of the SCR at this moment in time is conditional on the financial good standing of Conservatrix. The arbitral tribunal

reminds the parties that article 1.2(b) of the Recapitalization Commitment, which reads as follows:

> *"As soon as the Company is stabilized, the Commitment shall be limited in the sense that further capitalization of the company over and above the initial amount of capitalization by the Transferee on Completion, shall be based on a viable business case for the Company (the analysis thereof may include taking into account the interest of the shareholder)."*

6.45 The conditionality of the obligation under the Recapitalization Commitment depends on the question whether or not Conservatrix was, at any moment after Completion, stabilized. The arbitral tribunal finds that a situation of a sound and controlled operating environment (*een situatie van beheerste bedrijfsvoering)* has not occurred since Completion up until now. That is also the opinion of DNB, as is evident from the 20 December 2019 letter, quoted in para 3.25 above. A situation of stability can only occur after an assessment by DNB (Agreement Re Post-Completion Covenants, heading *Sound and Controlled Operating Environment (beheerste bedrijfsvoering (q).)* The arbitral tribunal concludes that art.1.2(b) of the Recapitalization Commitment does not preclude Conservatrix to invoke the commitment because Conservatrix never achieved a stabilized position.

6.46 The allegation that Trier is dependent of NIH Capital, NIH Inc and Lindberg, and external financiers (Eli Group) is not a valid defence vis-à-vis Conservatrix. As determined above (para sub 6.42), the Recapitalization Commitment stipulates a strict obligation to replenish.

6.47 Respondents' submission para 6.38, sub (e.) above, necessarily fails. In the light of this discussion Respondents submit that, even if it were that the SCR did fall below 100% in June 2019, the 6-month period after which DNB has to take action vis-à-vis Conservatrix did not end in November 2019, because of the fact that the Solvency II proxy of October showed, in the calculation of Conservatrix (*without taking into account the position of CBL, the tribunal adjusts)* that the SCR was above 135%. Respondents submit that would mean that the period ended in October 2019. Regardless of the question whether or not such a situation would stop the 6-month period, this viewpoint is also based on the theoretical approach that the position of CBL has no influence on the calculation of the SCR, which opinion is rejected by the arbitral tribunal as held sub 6.36 above.

6.48 Respondents' submission para 6.38, sub (f.) above, fails for the reason that Respondents have failed to sufficiently substantiate where Conservatrix caused the situation on itself. Moreover, Respondents overlook that Conservatrix, not having been qualified to have been stabilized, is still in a situation that DNB has imposed certain limitations in respect of its business operations.

6.49 Respondents' submission para 6.38, sub (g.) above, fails for the reasons, already discussed above, that the arbitral tribunal is satisfied that the calculations by the

board of Conservatrix are consistent with past practice, and correct for present purposes.

6.50 In short, the arbitral tribunal concludes that Respondents' defences as mentioned in para 6.38, above, are rejected.

***(C.3) Alleged Absence of Concrete Claim***

6.51 Finally, Respondents have argued (Oral Arguments, para 9) that it is unclear what Respondents must do if the claim is allowed. Without a clear and reasoned calculation, it is unclear what amount is requested.

6.52 The arbitral tribunal holds, and shall so rule, that Conservatrix is entitled to provisional relief in the form of an order to replenish the shortfall, by a reasonable time period from the date of this award. The arbitral tribunal thereby gives allowance to Respondents' concerns around the efforts to arrive at a calculation of the specific amount of capital contribution to meet agreed levels, while being mindful of the fact that Conservatrix has an urgent interest to meet statutory requirements in view of the measures announced by DNB. The arbitral tribunal sets such time limit at 60 days after issuing the award.

6.53 Further, as the arbitral tribunal holds that given the apparent reluctance on the part of Respondents under the present circumstances to meet their obligations, there is sufficient reason to impose a penalty if the shortfall is not replenished after the 60 days period, as claimed by Conservatrix.

6.54 Conservatrix asks the arbitral tribunal to impose a penalty (*dwangsom)* on the order to maintain the solvency capital ratio of 135%, arguing that there is no violation of the statutory provision in Dutch law (article 611a jo. 1056 Dutch Code of Civil Procedure) that precludes a penalty for monetary claims. Maintaining the SCR can, according to Solvency II, be done in different ways. Respondents have not challenged this position of Conservatrix, not in the procedural documents nor at the oral hearing. The arbitral tribunal however holds that Dutch law precludes that penalties are imposed on obligations for which there is an effective means to execute the title. The arbitral tribunal in this respect finds that the obligation to replenish a shortfall in the SCR by Trier de facto equals a monetary claim in the sense of the Dutch Civil Code and cannot be awarded on the basis of the legal provision mentioned.

6.55 The same cannot be said for the obligations of the other Respondents, who are held to have a duty to procure that Trier replenishes the SCR shortfall. Not imposing a penalty would leave Conservatrix without an effective possibility to execute the title. The arbitral tribunal holds that these obligations can be strengthened with a penalty.

6.56 For the reasons above, the arbitral tribunal in the determination of the penalties to be imposed in this respect considers it paramount to strike a balance between the efforts by Respondents to take the appropriate measures to meet the required level of capital contribution, and Conservatrix' justified interests that the penalties imposed on Respondents provides ample incentive for Respondents to implement the appropriate measures. In this respect, the arbitral tribunal imposes penalties in the manner as set forth in the below rulings.

6.57 In view of what has been stated above, parties' other statements can remain undiscussed.

## VII Deposit of the Award

7.1 This award will not be deposited with the registry of the district court of the place of arbitration, giving due regard to the fact that parties at the hearing unanimously expressed their desire to refrain from depositing the award.

## VIII Costs

8.1 Considering that Conservatrix' claims for the majority have shall be awarded, Respondents must bear the cost of these proceedings.

8.2 Conservatrix has paid € 54,450.00 (incl. VAT) for the administration costs and has made a deposit for the fees and disbursements of the arbitral tribunal of € 85,000.00. The administrator of the NAI has, in accordance with the provisions of article 54(1) of the NAI Rules 2015, after consulting with the arbitrator, determined that the fees and disbursements of the arbitral tribunal amount to € 85,000.00 (incl. VAT, as applicable) and that the administration costs of the NAI amount to € 49,725.00 (incl. VAT, as applicable).

8.3 Consequently, the costs of these summary arbitral proceedings amount to € 134,725.00 (incl. VAT, as applicable and as specified below), and comprise the following:

- Administration costs € 49,725.00 (€ 4,725.00 VAT included);
- Fees of the arbitral tribunal € 66,907.75 (€ 6,357.75 VAT included);
- Disbursements of the arbitral tribunal (excl. fees and disbursements of the arbitral secretary) € 1,014.33 (€ 96.38 VAT included)
- Fees of the arbitral secretary € 16,790.49 (€ 1,595.48 VAT included), and
- Disbursements of the arbitral secretary € 287.43 (€ 27.31 VAT included)

and will be paid out of the payment and deposit made by Conservatrix. Consequently, Respondents will be ordered to pay Conservatrix an amount of € 134,725.00 (incl. VAT).

8.4 Furthermore, Conservatrix' costs of legal representation, forming also part of the arbitration costs, are determined as follows. Conservatrix has submitted a specification of the legal costs amounting to approximately € 250,000.00 (exclusive of VAT), not taking into account the administration costs and deposit, already dealt with above. The arbitral tribunal is of the opinion that awarding the claimed costs in full is not warranted. There is a significant imbalance between the costs claimed by Respondents (approximately € 150,000.00), while the claimed costs are significantly higher than the NAI guidelines for arbitrators provides.

8.5 On balance, the arbitral tribunal finds that it is warranted to determine the legal costs at € 200,000 (excl. VAT), having also considered the NAI guidelines for arbitrators (www.nai-nl.org), which shall have to be borne by Respondents. Consequently, Respondents shall jointly and severally be ordered to pay Conservatrix the costs of legal representation of € 200,000 (excl. VAT).

## IX Rulings

9.1 Therefore, the arbitral tribunal, with reference to article 36(1) of the NAI Rules 2015, in accordance with the rules of law, decides as follows:

a) Orders Trier Holding B.V. to replenish the shortfall in the solvency capital ratio of Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. to 135% with core equity contributions, within 60 days after the award, and thereafter to maintain a minimum solvency capital ratio of 135% in accordance with the Recapitalization Commitment;

b) Orders Mr. Greg Evan Lindberg, Netherlands Insurance Holdings, Inc. and NIH Capital, LLC, jointly and severally, to procure that Trier Holding B.V. will replenish the shortfall in the solvency capital ratio of Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. to a solvency capital ratio of 135% with core equity contributions, within 60 days after the award and thereafter to procure that Trier Holding B.V. maintains a minimum solvency capital ratio of Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. of 135% in accordance with the Recapitalization Commitment;

c) Orders Mr. Greg Evan Lindberg, Netherlands Insurance Holdings, Inc. and NIH Capital, LLC, to pay Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. an immediately payable penalty (in Dutch: *dwangsom*) of one hundred fifty million euros (€ 150M) (in total) if

the obligations under sub b) of these rulings are not timely complied with in whole or in part;

d) Orders Mr. Greg Evan Lindberg, Trier Holding B.V., Netherlands Insurance Holdings, Inc. and NIH Capital, LLC, to jointly and severally pay the costs of these summary proceedings, fixed until the issuance of this award at € 67,922.08 (incl. VAT) for fees and disbursements of the arbitral tribunal, at € 17,077.92 (incl. VAT) for fees and disbursements of the arbitral secretary, and at € 49,725.00 (incl. VAT) for the administration costs of the Netherlands Arbitration Institute, therefore in total € 134,725.00 (incl. VAT). The arbitral tribunal rules that these costs shall be paid out of the deposit of € 85,000.00 made by Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. and the administration costs of € 54,450.00 (incl. VAT) paid by Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. Consequently, the arbitral tribunal orders Mr. Greg Evan Lindberg, Trier Holding B.V., Netherlands Insurance Holdings, Inc. and NIH Capital, LLC, to jointly and severally pay to Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V., such that payment by either party discharges the obligations of the other party, and vice versa, an amount of € 134,725.00 (incl. VAT) for such costs;

e) orders Mr. Greg Evan Lindberg, Trier Holding B.V., Netherlands Insurance Holdings, Inc. and NIH Capital, LLC, to jointly and severally pay to Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V., such that payment by either party discharges the obligations of the other party, and vice versa, an amount of € 200,000 (excl. VAT) for costs of legal representation; and

f) dismisses all other claims filed by Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. in the present summary arbitral proceedings.

Place of arbitration, Rotterdam

Signed on the 31st day of January 2020, in four (4) original copies.

Professor C.A. Schwarz
Arbitral Tribunal

Nederlands Arbitrage Instituut
Administrateur
NAI
Administrator
Netherlands Arbitration Institute