Greg Lindberg
Chairman
Netherlands Insurance Holdings, LLC
NIH Capital LLC
P.O. Box 159
Thonotosassa, FL 33592

Email: gel@greglindberg.com
Tel: 1-919-308-9686

July 19th 2024

Mr. Willem van Baren
Tribunal Chairman
Jan van Goyenkade 12
1075 HP Amsterdam
The Netherlands

Via email only: Willem.vanbaren@arbitration.nl

**Re: Summary Arbitral Proceedings related to Conservatrix**

Mr. Chairman,

On behalf of Netherlands Insurance Holdings, LLC and NIH Capital, LLC, I am writing to address a number of matters related to the Summary Arbitral Proceedings (hereinafter the "Summary Proceedings") of Conservatrix as outlined below.

As a first matter, nothing herein shall be considered an admission that myself, Netherlands Insurance Holdings, LLC, or NIH Capital, LLC (hereinafter the "U.S. Respondents") are bound by the Summary Proceedings that have taken place. Likewise nothing herein shall be considered an admission that the U.S. Respondents have consented to the Summary Proceedings.

As you are aware, myself, Netherlands Insurance Holdings, LLC, or NIH Capital, LLC are all U.S. residents and under the terms of the New York Convention, U.S. parties are not bound by Summary Arbitral Proceedings that have taken place in the Netherlands.

Stefan Kröll[1], a recognized expert on the subject, clearly states the same. As Kröll concludes, "The characterization of decisions rendered in such [summary] proceedings as awards under the

[1] Stefan Kröll is Professor at Bucerius Law School, Hamburg and Director of its Center for International Dispute Resolution. He is the President of the German Arbitration Institute (DIS) and member of the international advisory board of the Arbitration Institute of the Finland Chamber of Commerce. In addition, he is a visiting professor at the School of International Arbitration at the Centre for Commercial Law Studies (Queen Mary, University of London). As an independent arbitrator he has sat in more than 90 arbitrations (ICC, DIS, VIAC, SCC, Swiss Rules, UNCITRAL, KCAB; ad-hoc; emergency arbitrator) involving private parties as well as state parties. Stefan is regularly listed as one of the leading arbitration experts in Germany and Most in Demand Arbitrators in Germany (Band 1). He acts regularly as experts in arbitration proceedings.

Netherlands Arbitration Law does not, however, lead to their enforceability under the New York Convention."

As you are aware, Summary Proceedings in the Netherlands, per the plain terms of the Dutch Code of Civil Procedure, have no precedential value and are not full or final proceedings on the merits.

Specifically the NAI rules state that "The *provisional* decision shall in no way prejudice the final decision of the arbitral tribunal with regards to the merits of the case." (NAI Arbitration Rules, Art. 37(6) emphasis added. Note that the same principle is confirmed in Article 42m of the NAI Arbitration Rules with slightly different wording.

Thus any Main Proceedings that may follow Summary Proceedings require all merits of the matter to be evaluated *de novo*. This leads to Kröll's clear conclusion that the limited "finality" of Summary Proceedings "prevents…their classification as awards in the sense of the Convention."

Furthermore, none of the U.S. Respondents have consented to Summary Proceedings. Without such consent per the plain terms of the Netherlands Arbitration Act, the Summary Proceedings are not binding on the U.S. Respondents.

Article 1051 of the Netherlands Arbitration Act is clear on this matter:

*Article 1051 Summary arbitral proceedings*
*- 1. Parties may by agreement empower the arbitral tribunal or its chairman give a decision (arbitral award) in summary arbitral proceedings, within the limits imposed by Article 254(1).*

Per the plain terms of Article 1051, Summary Proceedings require an agreement by the Parties, and there is clearly no such agreement in this matter between the Claimants and the U.S. Respondents. In short, the Summary Proceedings are not binding on the U.S. Respondents and have no precedential value for any further Main Proceedings that may follow.

They were not full proceedings, not final proceedings, and significant new evidence presented here was not considered.

Meanwhile the Claimants have had ample time opportunity to pursue Main Proceedings in this matter but have steadfastly refused to do so – likely because in any Main Proceedings they would be required to provide evidence included here that is contrary to their false assertions.

In fact, the Claimants have taken no action to proceed with Main Proceedings for over four years. It's clear that time is not of the essence for the Claimants, in part because the Claimants have transferred all Conservatrix assets to Chesnara, PLC and Chesnara is now servicing the policyholders formerly supported by Conservatrix.

Nothing herein shall waive any of the defenses in the attached Statement of Defense, as submitted to this Tribunal on January 14th 2020 and nothing herein shall limit or waive any potential counterclaims that may be brought by the U.S. Respondents, including counter claims regarding:

(a) The negligence by the Claimants in failing to maintain the reinsurance agreement with Colorado Bankers Life Insurance Company (CBL) that provided over EUR 70 million in capital support to Conservatrix. The Claimants allegedly based their acceptance of the termination of this reinsurance agreement on the fact that CBL lost its rating, however nothing in the reinsurance agreement required CBL to maintain any rating. The assets backing the reserves ceded by Conservatrix to CBL were at all times held in *an entirely segregated account*. As a result of this complete segregation, the overall condition of CBL had no impact on the security of the assets backing the reinsurance with Conservatrix.

(b) The negligence by the Claimants in agreeing to a sale of the Conservatrix assets for a "nominal sum" to Chesnara PLC allowing Chesnara to recognize a windfall gain at the expense of the U.S. Respondents[2]. As the attached Exhibit XX makes clear, the entire book of Conservatrix business was transferred to Chesnara which reaped immediate gains of £14 million and will continue to reap ongoing gains of £4 million a year for over a decade. In other words, the negligence of the Claimants in proceeding with a very poorly timed and negotiated sale to Chesnara lead to a loss of over £54 million of value to the U.S. Respondents and a gain of the same amount for Chesnara.

(c) The negligence of the Claimants in agreeing to a sale of the Conservatrix assets at the worst possible time for the Conservatrix assets in many decades. As the Tribunal is aware, the Conservatrix assets consisted of retirement policies and the value of these assets was very sensitive to movements in long-term interest rates. At the time of the sale to Chesnara, long-term government bond rates were at all times lows thus reducing the value of the Conservatrix assets. Long-term bond rates have more than doubled since the time of the sale. Meanwhile, all policyholder liabilities were being fully serviced at the time of the sale and all the Claimants had to do was exercise some prudence and patience and the value of the Conservatrix assets would have increased dramatically with the subsequent rise in long-term government bond rates. Currently the German 30-year bond rate is over 2.75 percent. All the Claimants had to do was exercise prudence and patience and the value of the Conservatrix book of business would have increased by well over EUR 150 million. Their failure to exercise this simple prudence and patience was highly negligent and harmed the U.S. Respondents by over EUR 150 million.

(d) The summary proceedings did not consider communications among officers of the Claimants that showed clear and convincing data attached hereto that Conservatrix was fully stabilized by December of 2017. These communications provide evidence that full

---

[2] As per the attached Exhibit, "The [Conservatrix] book is being bought for a nominal sum, with Chesnara adding £35m of capital. Of this, £14m will come from Waard's existing resources and £21m from the group. The acquisition is expected to increase group Economic Value by £18m, 3% of the 2021 year-end total." Furthermore, Chesnara reports that "The acquisition is expected to add £4m p.a. to cash generation under steady- state businesses. This is almost 10% of our group steady-state forecast for 2022, or 20% of the actual base cash generation in 2021. Although the deal is small in some ways, the cash contribution is very good. The expectation is that this level can be sustained for over a decade."

stabilization of Conservatrix was achieved by mid-2018. These communications, as attached here, make it clear that:

a. In December of 2017, Conservatrix had a very healthy SCR of 156%;
b. The DNB had discussed with a Conservatrix Supervisory Board Member Matteo Castelvitri in July of 2018 and acknowledged a "leap forward in terms of progress" sufficient for the DNB to consider the implementation of private placements, the movement of the reinsurance from CBL to Bermuda without a formal process and other changes, and;
c. Conservatrix had completed a successful "dry run" for the implementation of private placements as March of 2018.

On the last item (d) above, Matteo Castelvetri, who was approved by the DNB as a Supervisory Board member for Conservatrix in February of 2018 reported the following in July of 2018:

*As discussed, I had a call with Thjis [the DNB official in charge of the Conservatrix regulation] this morning. Michiel also joined him.*
*They acknowledged the leap forward in terms of progress at CSV*
*They were apologetic on the delay of response for the OPIT, they said we should hear before end of summer*
*They look forward to receiving ORSA, want to make sure capital is stable*
*They are ok to receive DNO to move CSV under BIH (our Lux holding), but prefer Trier to remain in between givensupreme court situation*
*They are ok to consider moving reinsurance from CBL to PBL (Bermuda), but they will need to receive details about PBL and structure of the trust. They care about economic reality as usual.*
*They say it won't be a formal process, but just something we need to agree with the two of them*
*Gave a quick run-through of the ICAV given Thjis is not in town on Wed when we meet Renate and Michiel with Johnand Corinnna*
*We discussed changing some of the agreed wording on the investments, like for example the need of third party ratings, given not economical and ICAV already provides safeguards. They are open in the context of the overall quality of the ICAV*
*They also expressed appreciation if affiliates can be done via the ICAV, but not a must*
*Finally we discussed putting PP into the trust assets. They say that from their perspective the 20% of PP applies to both on-balance sheet and trust, so we could invest 20% of the Trust in the ICAV. Or if we do less in one we can domore in the other, as long as the 20% cap is respected.*
*Overall a very good call, and openness from Thjis to look at what makes sense in the context of an evolving and improving group.*

It's clear from the above notes from Matteo's July 2018 call with Thjis at the DNB that Conservatrix had achieved a Sound and Controlled Operating Environment. The DNB was willing to allow Conservatrix to proceed with private placements which means ALL of the below factors listed in the *Agreement Re: Post-Completion Covenants* at (r)(i) through (r)(viii) were achieved.

*Sound and Controlled Operating Environment (beheerste bedrijfsvoering)*

(p) it will take all measures required to restore the Company to a sound and controlled operating environment (*beheerste bedrijfsvoering*);

(q) until the (organisation of the) Company is stabilised (to be assessed by DNB), it will procure that:

(i) no acquisitions with regard to insurance companies and/or insurance portfolios will be considered or effectuated by the Company; and

(ii) no production of new policies will be started by the Company. Once new production is allowed (to be assessed by DNB), such new production will in no event include policies in accordance with the profit-sharing arrangements as applied in the current NGP policy conditions;

(r) it will ensure proper risk management at the level of the Company before investments in private placements can be considered acceptable by DNB. This requires amongst others:

(i) full insight in the entities in which will be and is invested (e.g. decision-makers, detailed balance sheets, cash flows and look through for financial links);

(ii) it will ensure that all required ongoing customer due diligence and monitoring will take place on all its investments. This requires amongst others thoroughly documented trails of the ultimate beneficial owners of the private placements companies;

(iii) a transparent and validated pricing process and model that leads to a correct current value of an at-arms-length transaction;

(iv) an adequate risk management system to point out and quantify the risks of the investments (e.g. credit, spread and concentration risk);

(v) governance in design, existence and operation, that is compatible with the complexity of the investments and accounts for possible conflicts of interest (e.g. competence, independent risk management function and the management board is responsible for designing and on a regular basis updating the investment policy of the company);

(vi) the Company reserves sufficient capital above the SCR-requirement to cover any risks that are not included in the Solvency II Standard Formula;

(vii) the Company is at all times able to justify that the investments satisfy the prudent person principle; and

(viii) the Company is able to justify that non-Affiliated parties are in no circumstances under material direct influence of the Eli Group or Lindberg directly. This includes that any financial relations cannot result in a material dependency of the non-Affiliated parties on the Eli Group or Lindberg directly;

In order for DNB to consider the private placements restrictions, as the DNB was clearly willing to do in July of 2018, then Conservatrix had to be stabilized within the meaning of the Post Completion Covenants as listed above.

There is zero chance that the DNB would have been willing to allow Conservatrix to proceed with private placement investments unless all of the eight factors listed above had been complied with to their satisfaction.

The attached Exhibits make it clear that Conservatrix was stabilized by mid-2018 and this stabilization limited the capitalization commitment of the U.S. Respondents.

As per the Recapitalization Commitment dated March 17th 2017:

(b) As soon as the Company is stabilized, the Commitment shall be limited in the sense that further capitalization of the Company over and above the initial amount of capitalization by the Transferee on Completion, shall be based on a viable business case for the Company (the analysis thereof may include taking into account the interest of the shareholder).

After the date of stabilization (achieved by mid-2018) any further commitment by the U.S. Respondents was limited to the existence of a viable business case for the Company, with such analysis taking into the account the interests of the shareholder (the U.S. Respondents).

By the time the Claimants made a demand for funds under the Recapitalization Commitment in August of 2019, it was plainly clear that no viable business case existed for Conservatrix that took into account the interests of the shareholder.

The U.S. Respondents' affiliated U.S. insurers had been placed in rehabilitation and the U.S. Respondents had made the decision to completely exist the insurance industry entirely as a result.

Note that at all times during this entire matter, from the closing of the Conservatrix acquisition in March of 2017 to present, the U.S. Respondents had zero role in the management of Conservatrix. None of the U.S. Respondents were board members of Conservatrix at any time and the company was controlled by an independent board.

The U.S. Respondents' sole role in this entire matter was to capitalize Conservatrix with EUR 88 million and trust the independent supervisory board to act prudently in managing this investment. As the above makes clear, the independent board of Conservatrix acted negligently and the liability for their negligence rests with the Claimants.

There is no basis in law or equity for the negligence of the Claimants resulting in liability for the U.S. Respondents.

Please advise if the Claimants wish to withdraw their claims in these proceedings in the light of the above facts and potential counterclaims.

Thank you.

/s/______________________________

Greg Lindberg
Chairman
Netherlands Insurance Holdings, LLC
NIH Capital LLC
P.O. Box 159
Thonotosassa, FL 33592

# RE: call with Thjis - DNB

Lou Hensley <lou.hensley@globalbankers.com>

Mon 7/9/2018 8:47 AM

To:Matteo Castelvetri <matteo.castelvetri@globalbankers.com>; Greg E. Lindberg <gel@eliequity.com>; Paul Brown <paul.brown@GlobalBankers.com>; Brian Stewart <Brian.Stewart@globalbankers.com>; Tamre Edwards <Tamre.Edwards@GlobalBankers.com>; Mike Farley <mike.farley@globalbankers.com>; Scott Boug <scott.boug@globalbankers.com>; Chris Herwig <cherwig@eliglobal.com>;

Cc:George Luecke <George.Luecke@globalbankers.com>;

Nice job and thanks for the update.

https://drive.google.com/uc?id=0B48RmrvXCy7DQ014Qjd3WF9jLU0

**Lou E. Hensley** Co-CEO & President
**Global Bankers Insurance Group**
a: 2327 Englert Dr. Durham, NC 27713
p: + 1.919.864.2407 m: +1.704.252.2014
www.globalbankers.com

Hire the Best | Expect the Best | Keep Climbing | Never Stop Learning | Get Our Hands Dirty | Think Globally

**From:** Matteo Castelvetri
**Sent:** Monday, July 9, 2018 8:01 AM
**To:** Greg Lindberg <gel@eliequity.com>; Lou Hensley <lou.hensley@globalbankers.com>; Paul Brown <paul.brown@GlobalBankers.com>; Brian Stewart <Brian.Stewart@globalbankers.com>; Tamre Edwards <Tamre.Edwards@GlobalBankers.com>; Mike Farley <mike.farley@globalbankers.com>; Scott Boug <scott.boug@globalbankers.com>; Chris Herwig <cherwig@eliglobal.com>
**Cc:** George Luecke <George.Luecke@globalbankers.com>
**Subject:** Fwd: call with Thjis - DNB

fyi, good call with Thjis at the DNB re Conservatrix

Matteo Castelvetri - Managing Director, Europe
Global Bankers Insurance Group
+44-7881-931-797

---

**From:** Matteo Castelvetri <matteo.castelvetri@globalbankers.com>
**Sent:** Monday, July 9, 2018 11:26 am
**To:** Erwin van der Wal; Peter de Bruijne; Menno Harkema; corrado.pistarino@conservtrix.nl
**Cc:** reinier hinse; Joost Melis; George Luecke; Alistair Bell; Erik Vynckier
**Subject:** call with Thjis - DNB

As discussed, I had a call with Thjis this morning. Michiel also joined him.

- They acknowledged the leap forward in terms of progress at CSV

- They were apologetic on the delay of response for the OPIT, they said we should hear before end of summer
- They look forward to receiving ORSA, want to make sure capital is stable
- They are ok to receive DNO to move CSV under BIH (our Lux holding), but prefer Trier to remain in between given supreme court situation
- They are ok to consider moving reinsurance from CBL to PBL (Bermuda), but they will need to receive details about PBL and structure of the trust. They care about economic reality as usual. They say it won't be a formal process, but just something we need to agree with the two of them
- Gave a quick run-through of the ICAV given Thjis is not in town on Wed when we meet Renate and Michiel with John and Corinnna
- We discussed changing some of the agreed wording on the investments, like for example the need of third party ratings, given not economical and ICAV already provides safeguards. They are open in the context of the overall quality of the ICAV
- They also expressed appreciation if affiliates can be done via the ICAV, but not a must
- Finally we discussed putting PP into the trust assets. They say that from their perspective the 20% of PP applies to both on-balance sheet and trust, so we could invest 20% of the Trust in the ICAV. Or if we do less in one we can do more in the other, as long as the 20% cap is respected.

Overall a very good call, and openness from Thjis to look at what makes sense in the context of an evolving and improving group.

Let's see, but I have reason to be optimistic overall.

**Matteo Castelvetri** Managing Director, Europe
**Global Bankers Insurance Group**
US:2327 Englert Dr.Durham, NC 27713
UK:1 King William St., London EC4N 7AR
m:+44 7881 931797
matteo.castelvetri@globalbankers.com
www.globalbankers.com

Hire the Best | Expect the Best | Keep Climbing | Never Stop Learning | Get Our Hands Dirty | Think Globally

Conservatrix
levensverzekeringen

**MEMO**

To : EB

CC : MT

From : F&C

Date : Jan 17th 2018

**Re : Main indicators December 2017**

- **Solvency**
  The (proxy) SCR ratio (=as of Jan 5th) decreased from 172% (Sept, 30th) to 156% due to a decline of the eligible own funds. This is because of lower interest rates (11 bp) and higher allocated costs, required capital remains unchanged.

- **Assetmix**
  Bank has decreased with over € 20 mln and mortgages with approx. € 3,5 mln, where bonds has increased with approx. € 25 mln. Total value of investments has remained unchanged (€ 552 mln).

- **Cost**
  Operating cost of 2017 amounts over € 11 mln, higher than expected but within budget (€ 11,5 mln).
  Last month the costs were much higher than previous months which is explained by post calculation of pension costs of staff, costs for the development of the new brand and redemption money.

- **Premium-income**
  Premium-income is showing a predictable, decreasing, line. One-time premiums are volatile and low amounts.

- **Surrenders**
  The number of requests for, and paid out, surrenders is showing an average comparable with former years until this month, after a peak in May (mainly because of information to policyholders about the take over). Last month, requests for surrender where much lower than the same month in previous years. The number and amount of paid out surrenders also shows a large decline.

- **Staff**
  Total number of staff (incl external) increased with 2 FTE compared to last month (3 new employees of which 2 external). Illness frequency was high, 5,4%. There have been nine sickness notices in December (frequency 2,3), which is relatively high.

Sinds 1872

# Conservatrix

levensverzekeringen

17-01-2018 11:22

| Main indicators 2017 (figures per ending period) | Cum april | May | June | July | Aug | Sept | Oct | Nov | Dec | Cumulative | Forecast | Budget / norm |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Solvency (* € 1 mio)** | | | | | | | | | | | | |
| Available Own Funds | | | 71,2 | | 67,1 | 71,7 | 69,7 | 66,1 | 68,5 | | | |
| Eligible Own Funds | | | 47,0 | | 41,4 | 47,1 | 44,5 | 39,7 | 42,9 | | | |
| Required capital (SCR) | | | | | | 27,5 | 27,5 | 27,6 | 27,4 | | | |
| SCR-ratio (proxy) | | | 156% | | 144% | 172% | 162% | 144% | 156% | | | > = 135% |
| MCR-ratio | | | 313% | | | 348% | NA | NA | NA | | | |
| **Assetmix (* € 1 mio)** | | | | | | | | | | | | |
| Real Estate | | 7,4 1% | 7,4 1% | 7,4 1% | 7,4 1% | 7,4 1% | 7,4 1% | 7,4 1% | 7,4 1% | | | 1% |
| Bonds (& funds) | | 66,0 6% | 65,3 6% | 65,9 6% | 108,7 10% | 162,1 29% | 170,6 31% | 191,3 35% | 215,9 39% | | | 25% |
| ABS | | - 0% | - 0% | - 0% | - 0% | - 0% | 0% | 0% | 0% | | | 0% |
| Mortgages Residential | | 330,2 29% | 309,6 28% | 304,9 28% | 304,9 27% | 302,3 55% | 301,9 55% | 297,4 54% | 293,9 53% | | | 59% |
| Loans / mortgages | | 15,0 1% | 20,5 2% | 20,5 2% | 11,0 1% | 10,8 2% | 11,1 2% | 11,1 2% | 11,2 2% | | | 0% |
| Private placements | | - 0% | - 0% | - 0% | - 0% | 0% | 0% | 0% | 0% | | | 0% |
| Bank | | 150,4 13% | 152,5 14% | 155,6 14% | 123,0 11% | 69,7 13% | 62,8 11% | 45,2 8% | 23,6 4% | | | 15% |
| **Total investments** | | **569,0** 50% | **555,3** 50% | **554,3** 50% | **555,0** 50% | **552,3** 100% | **553,7** 100% | **552,4** 100% | **552,0** 100% | | | 100% |
| Investments at the risk of policyholder | | 14,3 | 13,9 | 13,7 | 13,4 | 14,2 | 14,5 | 14,4 | 14,5 | | | 0% |
| **Costs (x € 1.000)** | | | cum June | * | * | | | | | | | |
| Internal | | | 1.284 | 252 | 303 | 302 | 348 | 344 | 1.077 | 3.910 | | |
| External | | | 867 | 247 | 206 | 177 | 245 | 204 | 297 | 2.243 | | |
| Personnel | | | 2.151 | 499 | 509 | 479 | 593 | 548 | 1.374 | 6.153 | | |
| Commissions | | | 252 | 43 | 41 | 34 | 41 | 39 | 60 | 510 | | |
| Office | | | 460 | 25 | 33 | 314 | 106 | 117 | 173 | 1.228 | | |
| Accomodation | | | 77 | 1 | 16 | 53 | 23 | 56 | -18 | 208 | | |
| Marketing | | | 51 | 31 | 11 | 14 | 70 | 86 | 432 | 695 | | |
| General | | | 1.202 | 133 | 246 | -13 | 93 | 142 | 249 | 2.053 | | |
| Depreciation | | | 215 | - | - | 45 | 14 | 13 | 13 | 300 | | |
| **Total** | | | **4.408** | **732** | **856** | **926** | **941** | **1.001** | **2.283** | **11.146** | | **11.500** |
| **Production (monthly) (€ 1.000)** | | | | | | | | | | | | |
| **Premium-income (x € 1.000)** | | | | | | | | | | | | |
| - monthly | 9.980 | 2.195 | 2.873 | 2.327 | 2.199 | 2.041 | 2.377 | 2.303 | 2.770 | 29.064 | | |
| - one offs | 125 | 12 | 55 | 44 | 69 | 136 | 13 | 50 | 80 | 584 | | |
| **Surrenders** | | | | | | | | | | | | |
| € paid out surrenders | 4.728 | 3.165 | 1.185 | 1.144 | 974 | 1.142 | 865 | 915 | 405 | 14.522 | | |
| # requests for surrenders | 768 | 277 | 193 | 165 | 154 | 180 | 177 | 176 | 136 | 2.226 | | |
| # paid out surrenders | 381 | 110 | 134 | 88 | 103 | 79 | 75 | 98 | 73 | 1.141 | | |
| **Workforce** | | | | | | | | | | | | |
| # FTE begin of period | 27,0 | 27,0 | 36,3 | 36,3 | 36,3 | 37,3 | 39,2 | 39,6 | 42,0 | 27,0 | | |
| # FTE in | | 13,9 | | | 1,0 | 4,0 | 1,0 | 2,6 | 3,0 | 25,5 | | |
| # FTE out | | 4,7 | | | | 2,1 | 0,6 | 0,2 | 1,0 | 8,6 | | |
| **# FTE period end** | **27,0** | **36,3** | **36,3** | **36,3** | **37,3** | **39,2** | **39,6** | **42,0** | **44,0** | **44,0** | | |
| of which # FTE external | 3,0 | | 10,3 | 10,3 | 10,3 | 9,8 | 9,8 | 11,2 | 12,2 | | | |
| # headcount period end | | | 39 | 39 | 40 | 43 | 43 | 46 | 48 | | | |
| Illness frequency | | | | | | 0,36 | 1,06 | 1,95 | 2,33 | | | |
| % illness | | | | | | 1,7% | 4,5% | 4,6% | 5,4% | | | |

* Booked costs, allocation to months has not been fully taken into account in this report (yet)

P:\POSTBUS.FA_Conservatrix\Rapportages\2017\12-dec Q4\main indicators\[Main Indicators dec 17.xlsx]Engelstalig

## Life assurance




*Source: Refinitiv*

## Market data

| | |
|---|---|
| EPIC/TKR | **CSN** |
| Price (p) | **289.0** |
| 12m high (p) | 320.0 |
| 12m low (p) | 253.6 |
| Shares (m) | 150.1 |
| Mkt cap (£m) | 433.9 |
| Economic value (£m) | 624.2 |
| Country/CCY of listing | UK/GBP |
| Market | London |

## Description

Chesnara primarily manages and acquires closed life assurance books in the UK, Sweden and the Netherlands.

## Company information

| | |
|---|---|
| CEO | Steve Murray |
| CFO | David Rimmington |
| Chairman | Luke Savage |

+44 (0)1772 972 050
www.chesnara.co.uk

## Key shareholders

| | |
|---|---|
| Aberdeen Standard | 13.0% |
| Columbia Threadneedle | 12.1% |
| M&G | 6.4% |
| Interactive Investor | 6.2% |
| Hargreaves Lansdown | 6.1% |
| Canaccord Genuity | 5.7% |
| Janus Henderson | 3.5% |
| Royal London | 3.0% |

## Diary

| | |
|---|---|
| 31 Aug | Interim results |

## Analyst

Brian Moretta +44 (0)203 693 7075
bm@hardmanandco.com

# CHESNARA PLC

## Another fine acquisition

**Chesnara has announced its seventh acquisition in the Netherlands, buying the closed life insurance books of "Conservatrix". The latter is a life insurance and mortgage provider that filed for bankruptcy at the end of 2020 as a consequence of strategic errors by its US owner. The new policies will be bought by Chesnara's Waard subsidiary, increasing its policy count by ca.70% and assets under administration by ca.90%. While less significant on these measures for the group as a whole, the acquisition does add meaningfully to its expected cashflow; it is expected to add £4m p.a. to the group.**

- **Capital:** The book is being bought for a nominal sum, with Chesnara adding £35m of capital. Of this, £14m will come from Waard's existing resources and £21m from the group. The acquisition is expected to increase group Economic Value by £18m, 3% of the 2021 year-end total.

- **Estimates:** The transaction has increased our normalised 2022E EPS by 35%, to 41.9p, while our 2023E EPS rises by 4%, to 27.3p. The first half saw weak equity markets and rising bond yields. While we have not adjusted our estimates, the interim results are likely to bring a fall in Economic Value.

- **Valuation:** With a price at approximately two thirds of its Economic Value, Chesnara seems undervalued. A prospective dividend yield of 8.1%, with good prospects of continued growth, also suggests an undervalued stock.

- **Risks:** Ultimately, the company remains tied to movements in financial markets and adverse developments in operational areas. Having just come through a testing period for the latter, in particular, we can see how well Chesnara can manage these challenges.

- **Investment summary:** Chesnara has three pillars for delivering value, under a responsible risk-based management. A close analysis reveals that there is substance underlying these aims. In our opinion, the discount to Economic Value looks wider than it should, and the yield appears high for a dividend that is both secure and growing.

## Financial summary and valuation

| Year-end Dec (£m) | 2018 | 2019 | 2020 | 2021 | 2022E | 2023E |
|---|---|---|---|---|---|---|
| Operating earnings | -22.8 | 5.6 | -66.1 | -58.8 | 5.0 | 5.3 |
| Economic earnings | -49.7 | 121.1 | 22.9 | 109.6 | 36.5 | 38.8 |
| Economic Value earnings | -60.9 | 104.0 | -37.6 | 57.8 | 62.8 | 41.0 |
| Economic Value/share (p) | 418 | 446 | 424 | 416 | 435 | 439 |
| Base cash generation | 48 | 37 | 28 | 20 | 41 | 48 |
| EPS (p) | -40.6 | 69.3 | -25.1 | 38.5 | 41.9 | 27.3 |
| DPS (p) | 20.67 | 21.30 | 21.94 | 22.60 | 23.28 | 23.98 |
| Price/Economic Value (x) | 0.69 | 0.65 | 0.68 | 0.70 | 0.66 | 0.66 |
| Dividend yield | 7.2% | 7.4% | 7.6% | 7.8% | 8.1% | 8.3% |

*Source: Hardman & Co Research*

**Disclaimer:** This research has been paid for by the company. Please read the important disclaimers at the end of this document.

## Economic Value earnings




- Volatility for investment assets in recent years
- Also affected by operational challenges
- Forecasts are based on normalised assumptions
- Expected gains from Sanlam, Robein Leven and Conservatrix, totalling £31m in 2022

## Base cash generation (bar) and dividends paid (line)




- 2018 cash generation boosted by one-off releases from UK with-profits funds
- 2020 affected by Scildon, 2021 by a challenging Swedish market
- Symmetric adjustment smooths effect of markets on cash
- Expected removal of headwinds should restore cash generation to comfortable levels

## Economic Value




- Volatility for investment assets in recent years – this will have an impact on the interim results
- Also affected by operational challenges
- Forecasts are based on normalised assumptions
- Expected gains from Sanlam, Robein Leven and Conservatrix, totalling £31m in 2022

## Dividend per share




- Chesnara has been a consistent dividend payer for more than a decade and a half
- We forecast continued steady growth

*Source: Company data, Hardman & Co Research*

# New acquisition

Chesnara has announced its latest acquisition, which is the closed insurance portfolio of Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. ("Conservatrix"). The company was in liquidation, and has been purchased for a nominal sum, together with a £35m injection of capital.

## Conservatrix background

Established in 1872, Conservatrix was a provider of life insurance and mortgage products based in Utrecht. In life assurance, it was a writer of funeral plans, annuities, term assurance and some savings business.

In 2017, it was purchased by a US investment group, Global Growth, which reinsured much of the life insurance business. Unfortunately, the reinsurer failed, and Conservatrix was left with large losses.

This is reflected in the historical profits. In the year to 31 December 2019, Conservatrix had a loss of €161.8m, as the value of the reinsurance contracts was written down. It was declared bankrupt in December 2020 – the first life insurance failure in the Netherlands for over 25 years. In the year to 31 December 2021, as it was run by court-appointed trustees for the liquidation of the estate, it made a profit of €75.6m. This mostly reflected policyholder benefits being written down after events.

From a Chesnara perspective, the good news about this is that the bankruptcy was due to a strategic error, not issues with the book of business. Although it is unlikely that policyholders who experienced benefit writedowns will retain much goodwill, careful management, and being part of a stronger group, should mitigate any risk.

Chesnara also supplied some alternative metrics for Conservatrix (compared with Waard and the Chesnara group at 2021 year-end, plus announced acquisitions):

- number of policies: 70,000 (Ward: 95,000, group: 967,000); and
- assets under administration: £0.5bn (Waard: £0.5bn, group: £12.3bn).

## What Chesnara is doing

As Chesnara notes, this is its seventh acquisition within the Netherlands. As with most of the other acquisitions, the purchasing entity will be Waard, Chesnara's closed business there. Although Waard had surplus capital, the £35m capital injection required is greater than it had comfortably available. Waard will provide £14m from existing resources, with £21m coming from the parent company.

As well as the financial assets and liabilities, the expectation is that Waard will take on the existing employees. The assets backing the policies are largely fixed-income, with little unit-linked business or equity exposure.

The deal is expected to complete in autumn 2022.



Case 1:23-cv-00879-CCE-JEP Document 49-1 Filed 07/19/24 Page 14 of 17

## Benefits

We have noted in previous reports that Waard is comfortably the smallest operation within Chesnara. Even though it will remain the smallest operation, this deal significantly adds to its scale (policy count up 70%). We do not expect additional operational efficiencies as a consequence of the acquisition, but it should underpin the existing operations.

The deal will be directly accretive to Chesnara in two ways:

- It is expected to add £18m to Economic Value, or about 3% of the total at the 2021 year-end.
- The acquisition is expected to add £4m p.a. to cash generation under steady-state businesses. This is almost 10% of our group steady-state forecast for 2022, or 20% of the actual base cash generation in 2021. Although the deal is small in some ways, the cash contribution is very good. The expectation is that this level can be sustained for over a decade.

We note that the deal is being funded from existing resources, which were boosted by the bond issue earlier this year. At the 2021 results announcement, Chesnara noted that it could finance deals of over £100m. This deal should leave over £65m of capacity, before allowing for any subsequent cash generation.

Given that, it is no surprise that solvency remains strong. The pro-forma solvency ratio (2021 year-end plus acquisitions) would be 171%, comfortably above the top-end of the targeted 140%-160% range.



Case 1:23-cv-00879-CCE-JEP Document 49-1 Filed 07/19/24 Page 15 of 17

# Forecasts

In our previous report, we noted that we had assumed, somewhat arbitrarily, that there would be sufficient acquisitions in 2022 to offset the additional cost of the bond in 2023. We now note that, while the deal should complete this year, it will only contribute to earnings and cash for one or two months.

For Economic Value earnings, we already had £13m of gains for the Sanlam and Robein Leven acquisitions. To this, we now add the £18m for Conservatrix. For earnings, we have not varied the operational figures, but have added to our economic variances. With relatively low risk assets, we have added £0.2m for 2022 and £1.5m for 2023.

We note that, after some initial surprising robustness around the Ukraine war, equity markets fell in 2Q. The FTSE All-Share fell 8% in the first half, although other markets were weaker. In particular, the Swedish OMX30 fell 25%, which will adversely affect the insurance company Movestic. Although there will be some benefit to solvency from increasing bond yields, we are likely to see a fall in Economic Value at the interim results in August. As yet, we have not adjusted our forecasts for this.

Recall that our forecasts are effectively on a normalised basis, and so there are not huge ongoing adjustments from our previous estimates The net effect of the changes is to increase our 2022E EPS by 35%, to 41.9p, while we raise our 2023E EPS by 4%, to 27.3p.



Case 1:23-cv-00879-CCE-JEP Document 49-1 Filed 07/19/24 Page 16 of 17

| Economic Value earnings | | | | | | |
|---|---|---|---|---|---|---|
| **Year-end Dec (£m)** | **2018** | **2019** | **2020** | **2021** | **2022E** | **2023E** |
| Expected movement | -0.8 | -0.4 | 0.3 | -1.7 | 0.0 | 0.0 |
| New business | 10.6 | 7.8 | 3.7 | 2.4 | 8.3 | 8.7 |
| Operating experience variances | -9.0 | -6.8 | -22.0 | -19.2 | -2.8 | -2.9 |
| Operating assumption changes | 0.0 | 3.8 | -35.8 | -13.9 | 0.3 | 0.3 |
| Other operating variances | -0.8 | -0.3 | 3.9 | -0.2 | -0.8 | -0.8 |
| Total u/l operating earnings | 0.0 | 4.1 | -49.9 | -32.6 | 5.0 | 5.3 |
| Material other operating items | -22.8 | 1.5 | -16.2 | -26.2 | 0.0 | 0.0 |
| Total operating earnings | -22.8 | 5.6 | -66.1 | -58.8 | 5.0 | 5.3 |
| Economic experience variances | -50.3 | 143.1 | 45.7 | 79.5 | 34.2 | 36.5 |
| Economic assumption changes | 0.6 | -22.0 | -22.8 | 30.1 | 2.3 | 2.3 |
| Total economic earnings | -49.7 | 121.1 | 22.9 | 109.6 | 36.5 | 38.8 |
| Other non-operating variances | 1.5 | -5.2 | -2.8 | 4.5 | -5.0 | -1.1 |
| Risk margin movement | -1.9 | -7.0 | 4.7 | 10.8 | 2.4 | 2.4 |
| Gain on acquisition | 0.0 | 0.0 | 0.0 | 0.0 | 31.0 | |
| Tax | 12.0 | -10.5 | 3.7 | -8.2 | -7.0 | -4.6 |
| **Economic Value earnings** | **-60.9** | **104.0** | **-37.6** | **57.8** | **62.8** | **41.0** |
| EPS (p) | -40.6 | 69.3 | -25.1 | 38.5 | 41.9 | 27.3 |
| DPS (p) | 20.67 | 21.30 | 21.94 | 22.60 | 23.28 | 23.98 |

*Source: Hardman & Co Research*

While the normalised basis is our core expectation, in practice, results will rarely match the average. To give some idea of sensitivity, the following table gives estimates with two adjustments:

- annual equity returns of 3.5%, instead of 7%; and
- no returns from credit spreads, i.e. credit losses match the gain from the spread.

Investors can easily imply the effect of different assumptions from these.

| Sensitivity to economic assumptions | | | | |
|---|---|---|---|---|
| **£m** | **2020** | **2021** | **2022E** | **2023E** |
| Normalised Economic Value earnings | -37.6 | 57.8 | 62.8 | 41.0 |
| Half equity returns | | | 51.1 | 27.7 |
| Reduction | | | -19% | -32% |
| No credit spreads | | | 55.2 | 32.0 |
| Reduction | | | -12% | -22% |

*Source: Hardman & Co Research*

The effect of the changes on the balance sheet is less dramatic, with our Economic Value estimates increased by ca.3% for 2022 and 2023.

For cashflow, we have added £4m to our forecast for 2023, but only £0.5m for 2022, reflecting the short period after completion.

| Key balance sheet and cash generation | | | | | | |
|---|---|---|---|---|---|---|
| **Year-end Dec (£m)** | **2018** | **2019** | **2020** | **2021** | **2022E** | **2023E** |
| Borrowings | 109.2 | 88.2 | 67.0 | 47.2 | 200.0 | 200.0 |
| Economic Value | 626.3 | 670.0 | 636.8 | 624.2 | 652.8 | 658.4 |
| Economic Value/share (p) | 418 | 446 | 424 | 416 | 435 | 439 |
| | | | | | | |
| Base cash generation | | | | | | |
| UK | 55.8 | 33.6 | 29.5 | 27.4 | 28.4 | 26.8 |
| Movestic | 18.1 | -6.2 | 12.4 | -14.4 | 13.0 | 13.7 |
| Waard | 7.8 | 0.8 | 4.1 | 2.9 | 4.1 | 7.8 |
| Scildon | -17.7 | 22.6 | -22.3 | 15.2 | 5.3 | 5.4 |
| Group | -16.2 | -14.0 | 4.1 | -10.8 | -10.1 | -5.3 |
| Total | 47.8 | 36.8 | 27.7 | 20.3 | 40.7 | 48.4 |
| Dividends paid | 30.4 | 31.3 | 32.3 | 33.3 | 34.3 | 35.3 |
| Dividend cash cover | 1.6x | 1.2x | 0.9x | 0.6x | 1.2x | 1.4x |

*Source: Hardman & Co Research*



Case 1:23-cv-00879-CCE-JEP Document 49-1 Filed 07/19/24 Page 17 of 17