# EXHIBIT A

Rechtbank Amsterdam (District Court of Amsterdam)

**Order of 5 February 2026**

ECLI:NL:RBAMS:2026:1107

Case No. C/13/769512 / HA RK 25-169

*Conservatrix Group S.A.R.L.*

*v.*

*De Nederlandsche Bank N.V.*

Order as published by the court on rechtspraak.nl (Dutch original),
followed by certified English translation (Sure Translation)
with Certification of Translation Accuracy at the end

# ECLI:NL:RBAMS:2026:1107

| | |
|---|---|
| Instantie | Rechtbank Amsterdam |
| Datum uitspraak | 05-02-2026 |
| Datum publicatie | 05-02-2026 |
| Zaaknummer | C/13/769512 / HA RK 25-169 |
| Rechtsgebieden | Civiel recht |
| Bijzondere kenmerken | Eerste aanleg - meervoudig |
| Inhoudsindicatie | Bij beschikking van 15 mei 2017 heeft rechtbank overdrachtsplan DNB voor verzekeraar goedgekeurd (art. 3:195c (oud) Wft en art. 3:159u (oud) Wft). Bekrachtigd door de Hoge Raad (ECLI:NL:HR:2019:746). Verzekeraar verzoekt herroeping van de beschikking van de rechtbank op de voet van art. 390 jo art 382 Rv en afgifte/inzage stukken (art. 195 Rv). Rechtbank oordeelt dat sprake is van bedrog door wederpartij in het geding gepleegd als bedoeld in artikel 382 onder a Rv. Bedrog ten aanzien van het niet inlichten over de met het overdrachtsplan verbonden herverzekering. Processueel causaal verband tussen bedrog en beslissing. Geen heropening geding omdat de aard van de beschikking zich tegen herroeping verzet. Verzoeker wordt niet-ontvankelijk verklaard. Het verzoek om inzage in stukken te verlenen wordt grotendeels toegewezen. |
| Vindplaatsen | Rechtspraak.nl |

# Uitspraak

**RECHTBANK Amsterdam**

Civiel recht

Zaaknummer / rekestnummer: C/13/769512 / HA RK 25-169

**Beschikking van 5 februari 2026**

in de zaak van

de rechtspersoon naar buitenlands recht

**CONSERVATRIX GROUP S.A.R.L.**,

gevestigd te Luxemburg (Luxemburg),

verzoekende partij,

hierna te noemen: Conservatrix Groep,

advocaat: mr. W.A. Westenbroek,

tegen

de naamloze vennootschap

**DE NEDERLANDSCHE BANK N.V.**,

gevestigd te Amsterdam,

verwerende partij,

hierna te noemen: DNB,

advocaat: mr. P.P.M. van Kippersluis.

**1 Samenvatting**

1.1. Op 15 mei 2017[1] heeft deze rechtbank op verzoek van DNB, nadat de Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. (hierna: Conservatrix) en Conservatrix Groep als belanghebbenden waren gehoord, op de voet van artikel 3:159u lid 1 (oud) Wet op het financieel toezicht (Wft), kort gezegd het door DNB opgestelde overdrachtsplan goedgekeurd hetgeen betekende dat alle aandelen van Conservatrix Groep in Conservatrix overgingen op Trier Holding B.V. (hierna: Trier) tegen betaling van 1. De Hoge Raad heeft in zijn arrest van 17 mei 2019[2] de beschikking van de rechtbank bekrachtigd. Conservatrix is op 8 december 2020 in staat van faillissement verklaard.

1.2. Bij verzoekschrift van 20 mei 2025 heeft Conservatrix Groep de rechtbank verzocht de beschikking van 15 mei 2017 op de voet van artikel 390 jo 382 Wetboek van Burgerlijke Rechtsvordering (Rv) te herroepen, althans te verklaren voor recht dat sprake is geweest van bedrog aan de zijde van DNB. Ook heeft zij de rechtbank verzocht DNB te bevelen inzage te verlenen in diverse stukken, waaronder stukken die in de procedure in 2017 niet met Conservatrix Groep en de rechtbank zijn gedeeld.

1.3. Conservatrix Groep stelt dat DNB in 2017 in de procedure bij de rechtbank bedrog heeft gepleegd. Volgens Conservatrix Groep heeft DNB enkel gesproken over een kapitaalstorting door Trier en heeft DNB haar en de rechtbank ten onrechte niet ingelicht over de met het overdrachtsplan verbonden herverzekering bij de Amerikaanse vennootschap Colorado Bankers Life Insurance Company (hierna: CBL).

1.4. Het begrip (processueel) bedrog zoals bedoeld in artikel 382 onder a Rv moet ruim worden uitgelegd. Van bedrog in deze zin is al sprake wanneer een partij in de procedure belet dat feiten aan het licht komen die voor de tegenpartij tot een gunstige afloop van die procedure zouden hebben kunnen leiden. Eerst moet de rechter uitsluitend onderzoeken of van bedrog in deze zin sprake is.

1.5. De rechtbank oordeelt dat inderdaad sprake is van "bedrog in het geding gepleegd" als bedoeld in artikel 382 onder a Rv, omdat de herverzekering door DNB buiten de procedure is gehouden. Daardoor heeft geen volwaardig debat kunnen plaatsvinden over de vraag of minder vergaande maatregelen (alternatieven) mogelijk waren geweest om Conservatrix te redden. Dit betekent echter niet dat de zaak wordt heropend. Omdat terugdraaien van de overdracht van de aandelen in Conservatrix niet meer mogelijk is, verzet de aard van de oorspronkelijke beschikking zich tegen herroeping en wordt Conservatrix Groep daarom niet-ontvankelijk verklaard in haar verzoek. De zaak zal dan ook niet opnieuw worden beoordeeld.

1.6. Het verzoek van Conservatrix Groep om inzage in stukken te verlenen, wordt (grotendeels) toegewezen.

## 2 De procedure

2.1. Het verloop van de procedure blijkt, voor zover van belang, uit:

- het verzoekschrift tot herroeping ex artikel 390 Rv jo 382 Rv, tot het bevelen tot overlegging van stukken ex artikel 21, 22 en 195/195a Rv, althans artikel 843a Rv, en tot verklaring voor recht dat sprake is geweest van bedrog aan de zijde van DNB, ingekomen ter griffie op 20 mei 2025, met producties;
- de nadere toelichting en onderbouwing bij verzoekschrift tot herroeping van 20 mei 2025 en overlegging aanvullende producties, met producties;
- het verweerschrift van DNB, met producties;
- het proces-verbaal van de mondelinge behandeling van 27 november 2025, met de daarin vermelde stukken, waaronder de spreekaantekeningen van (de advocaten van) Conservatrix Groep en DNB.

2.2. De beschikking is bepaald op vandaag.

## 3 De feiten

3.1. Conservatrix oefende met vergunning en onder prudentieel toezicht van DNB een levensverzekeringsbedrijf uit. Alle aandelen in Conservatrix werden tot 15 mei 2017 gehouden door Conservatrix Groep. Conservatrix is op 8 december 2020 in staat van faillissement verklaard.

3.2. Bij besluit van 1 april 2014 heeft DNB op de voet van artikel 1:76 lid 2 sub b en lid 3 Wft P. de Groot (hierna: de curator) benoemd als curator ten aanzien van de directie van Conservatrix, onder meer op de grond dat DNB bij Conservatrix tekenen zag van een ontwikkeling die het eigen vermogen en de solvabiliteit in gevaar konden brengen en zij direct ingrijpen noodzakelijk achtte.

3.3. Op 3 juli 2014 heeft DNB van Conservatrix een herstelplan verlangd als bedoeld in artikel 3:132 lid 1 (oud) Wft. In dat plan moest Conservatrix onder meer vermelden op welke wijze en binnen welke termijnen zij aan de vereiste solvabiliteitsnormen zou voldoen.

3.4. Op 23 september 2014 heeft DNB besloten niet in te stemmen met het door Conservatrix ingediende herstelplan omdat dit naar haar oordeel niet voorzag in een duurzame oplossing om te komen tot structureel herstel. Daarnaast heeft DNB per uiterlijk 30 september 2014 van Conservatrix een minimumbedrag aan vereiste solvabiliteit verlangd van 130%.

3.5. DNB heeft aan Conservatrix begin januari 2016 medegedeeld dat zij een overdrachtsplan als bedoeld in artikel 3:159c lid 1 (oud) Wft aan het voorbereiden was.

3.6. Op 26 oktober 2016 heeft DNB aan Conservatrix schriftelijk medegedeeld dat zij voornemens is de vergunning voor het uitoefenen van het levensverzekeringsbedrijf in te trekken op grond van artikel 1:104 lid 2 sub c Wft. DNB heeft daarvoor de volgende toelichting gegeven:

"Op basis van de jaarrekening over boekjaar 2015 stelt DNB vast dat Conservatrix ultimo 2015 niet voldeed aan de vereiste solvabiliteit volgens de destijds geldende regels (Solvency I) en dat zij daarom niet voldoet aan de overgangsregeling (). Gelet op de Day One rapportage waaruit bleek dat Conservatrix niet voldoet aan het minimumkapitaal-vereiste, was Conservatrix verplicht om een financieel kortetermijnplan bij DNB in te dienen. Nu vast is komen te staat dat Conservatrix dit niet heeft gedaan, is DNB wettelijk verplicht om de vergunning in te trekken."

*Overdrachtsprocedure*

3.7. Op 22 maart 2017 heeft DNB op de voet van artikel 3:159u (oud) Wft

een verzoekschrift tot goedkeuring van het overdrachtsplan ingediend bij deze rechtbank (deze procedure wordt hierna ook de overdrachtsprocedure genoemd). DNB heeft in haar verzoekschrift kort gezegd naar voren gebracht dat de voorwaarden van het overdrachtsplan zijn uitgewerkt in een eenzijdige verklaring van Trier aan DNB, een zogenaamde Confirmation Letter3 van 17 maart 2017. DNB en Trier zijn overeengekomen dat alle door Conservatrix uitgegeven aandelen na rechterlijke goedkeuring en door het uitspreken van de overdrachtsregeling worden overgedragen aan Trier tegen betaling door Trier aan Conservatrix Groep van 1. Daarnaast is volgens DNB van belang dat Trier zal zorgdragen voor een versterking van het kapitaal die ertoe leidt dat de solvabiliteitsratio van Conservatrix op het moment van overdracht ten minste 135% bedraagt.

3.8. In de Confirmation Letter is, voor zover van belang, opgenomen dat:

“() the transfer of the Shares to the Transferee shall be effected on the basis of approval of a transfer plan (*overdrachtsplan*) by the Court (the **Transfer Plan**) ().

() the Transferee shall capitalize the Company in line with arrangements agreed with DNB;

() the Transferee will capitalize the Company as soon as possible (), but in any event within two (2) Business Days after the Transfer Date.”

3.9. Bij beschikking van 15 mei 20174 heeft de rechtbank het overdrachtsplan goedgekeurd en de overdrachtsregeling ten aanzien van Conservatrix uitgesproken. De rechtbank heeft getoetst aan het criterium van artikel 3:159ij (oud) Wft 5 aan de hand van twee subvragen:

( a) zijn er ten aanzien van Conservatrix tekenen van een gevaarlijke ontwikkeling met betrekking tot het eigen vermogen, de solvabiliteit of de technische voorzieningen?; en

( b) is redelijkerwijs te voorzien dat die ontwikkeling niet voldoende of niet tijdig ten goede zal keren?

Daarnaast diende de rechtbank de vraag te beantwoorden of de in het overdrachtsplan genoemde prijs, gegeven de omstandigheden van het geval, een redelijke prijs is.6

3.10. Conservatrix Groep is bij verzoekschrift van 15 augustus 2017 in cassatie gekomen van deze beschikking van de rechtbank. Bij beschikking van 17 mei 20197 heeft de Hoge Raad het cassatieberoep verworpen.

*Evaluatierapport*

3.11. Op 14 december 2021 is het rapport van de door de minister van Financiën ingestelde evaluatiecommissie Conservatrix (hierna: het Evaluatierapport) openbaar gemaakt. De evaluatiecommissie heeft onderzoek gedaan naar de handelwijze van DNB en het ministerie van Financiën ten aanzien van Conservatrix bij de overdracht van de aandelen aan Trier en in de periode tot het faillissement van Conservatrix op 8 december 2020. In het Evaluatierapport staat onder meer het volgende:

“()

Op 22 oktober 2021 heeft de Evaluatiecommissie de vraag naar de kapitaalstorting aan De Nederlandsche Bank voorgelegd. De reactie luidt als volgt:

In het beoordelingskader dat op 7 maart 2017 in de stuurgroep [Conservatrix] is besproken, wordt kapitaalstorting als criterium genoemd om de SCR ratio [SCR Solvency Capital Requirement onder Solvency II, rb] op 135 procent te krijgen, waarbij is aangegeven dat de benodigde omvang op 5 maart werd geschat op 103 miljoen euro.

In de beoordeling van het criterium is "kapitaalstorting" bewust tussen aanhalingstekens geplaatst omdat bekend werd dat de daadwerkelijke kapitaalstorting af zou wijken vanwege de af te sluiten herverzekering. De exacte omvang was echter op dat moment nog onduidelijk. Deze toelichting staat vermeld in de beoordeling (...).

Op 7 maart 2017 werd het positieve effect van de voorgestelde herverzekeringsconstructie op het eigen vermogen getaxeerd op circa 67 miljoen euro, waarbij maximaal 150 miljoen euro aan verzekeringsverplichtingen werd herverzekerd. De berekende toevoeging aan het eigen vermogen bestond uit het verschil tussen de te betalen premie en de herverzekerde verplichtingen (50 miljoen euro) en een vrijval van de risicomarge (17 miljoen euro). Bij de overdracht in mei 2017 heeft de herverzekeringsovereenkomst met CBL uiteindelijk bijgedragen aan een toename van het Solvency II eigen vermogen met 61 miljoen euro, opgebouwd uit het verschil tussen de betaalde herverzekeringspremie en de herverzekerde verplichtingen en een vrijval van de risicomarge van 11 miljoen euro. Omdat op 7 maart 2017 de details van de herverzekeringsovereenkomst tussen Conservatrix en CBL, en de uitwerking daarvan op de solvabiliteit, nog niet duidelijk waren is in de informatievoorziening aan de Toezichtraad aangegeven wat de omvang van de maximale kapitaalstorting zou zijn (circa 103 miljoen euro) met de kanttekening dat het definitieve bedrag afhankelijk zou zijn van de omvang van de effecten van de herverzekeringsovereenkomst op het eigen vermogen en de aan te houden SCR. Bij de overdracht aan Trier Holding is het Solvency II eigen vermogen met in totaal ruim 79 miljoen euro versterkt, bestaande uit de kapitaalstorting van ruim 18 miljoen euro en de effecten van de gesloten herverzekeringsovereenkomst met CBL. Door de kapitaalversterking en de verlaging van de SCR herstelde de SCR ratio tot ruim boven de 135 procent.

()

5.9.2 Het submission protocol

De afspraken met Lindberg [*ultimate beneficial owner (ubo)* van Trier, rb] werden vastgelegd in een groot aantal documenten met verschillende partijen als betrokkenen en ondertekenaars. Allereerst is er een hoofddocument, de *Confirmation Letter to the Dutch Central Bank for the transfer of the shares in Nederlandsche Algemeene Maatschappij van Levensverzekering Conservatrix N.V.* In deze *Confirmation Letter* met als datum 17 maart 2017 () werd de overdracht van de aandelen en van allerlei voorzieningen, zoals websites en domeinnamen, vastgelegd.

In andere overeenkomsten is sprake van het vastleggen van verplichtingen die partijen ten opzichte van elkaar hebben.

Zo kwamen ook op 17 maart 2017 Trier Holding B.V. en De Nederlandsche Bank het *submission protocol* overeen. Dit protocol is getekend door De Nederlandsche Bank en door de bestuurders van Trier Holding B.V.

Het protocol bevat summier weergegeven de belangrijkste afspraken met Trier Holding B.V., onder andere over de vereiste solvabiliteitsratio van 135 procent en de herverzekering.

*Het Agreement re post-completion covenants* kent verschillende annexen. *Het Agreement* zelf is ondertekend door:

De Nederlandsche Bank

Trier Holding B.V.

Netherlands Insurance Holding Inc. (Delaware)

NIH Capital LLC (North Carolina)

[naam 2]

()

5.9.3 *Het recapilization commitment*

In deze Annex is opgenomen dat de zogeheten bijstortverplichting opgenomen waarop Trier Holding B.V. en de indirecte aandeelhouders zich verplichten een SCR van minimaal 135 procent te handhaven.

()

5.9.4 De herverzekeringsovereenkomst

Op 15 mei 2017, de dag van de uitspraak van de rechtbank Amsterdam, over de goedkeuring van het overdrachtsplan, kwamen Conservatrix en CBL een Aggregate Excess of Loss Reinsurance Treaty overeen. De Nederlandsche Bank is geen partij in deze overeenkomst, maar heeft wel in de Process Letter waarmee de onderhandelingen met [naam 1] begonnen, en in het Agreement voorwaarden gesteld waaraan een herverzekeringsovereenkomst moet voldoen om in aanmerking te komen als risicolimitering onder Solvency II. Bij de uiteindelijke tekst van de overeenkomst was De Nederlandsche Bank betrokken: de ontwerptekst werd bezien om vast te stellen of aan alle gestelde voorwaarden was voldaan.

().”

*Schadeloosstellingsprocedure Ondernemingskamer*

3.12. Conservatrix Groep heeft in 2017 bij de Ondernemingskamer van het Gerechtshof Amsterdam een verzoekschrift ingediend op de voet van artikel 3:159ab (oud) Wft tot vaststelling van een aanvullende schadeloosstelling in verband met de gedwongen overdracht van de aandelen Conservatrix. De verwerende partij in deze procedure is de Staat der Nederlanden (hierna: de Staat).

3.13. Bij beschikking van 24 augustus 2021[8] heeft de Ondernemingskamer overwogen voornemens te zijn een deskundigenbericht te gelasten ter beantwoording van de vraag naar de waarde van de aandelen in Conservatrix. In de beschikking van 20 december 2024[9] heeft de Ondernemingskamer vervolgens een deskundigenbericht gelast en een drietal deskundigen benoemd.

3.14. Bij beschikking van 4 juni 2025[10] heeft de Ondernemingskamer de benoeming van een van de deskundigen beëindigd en een nieuwe deskundige benoemd. Ook heeft de Ondernemingskamer het voorschot van de kosten van het onderzoek vastgesteld en bepaald dat dit voorschot ieder voor de helft door Conservatrix Groep en de Staat dient te worden voldaan.

3.15. Bij verzoekschrift van 20 mei 2025 heeft Conservatrix Groep (ook) bij de Ondernemingskamer een verzoekschrift ingediend waarin zij kort gezegd verzoekt de beschikkingen van 24 augustus 2021 en 20 december 2024 op de voet van artikel 387 Rv te herroepen. Bij beschikking van 31 juli 2025[11] heeft de Ondernemingskamer dit verzoek afgewezen.

## 4 Het verzoek en het verweer

***Herroepingsverzoek***

4.1. Conservatrix Groep verzoekt op grond van artikel 382 Rv dat de rechtbank bij beschikking, uitvoerbaar bij voorraad:

1. een dag en uur bepaalt, waarop de behandeling van dit verzoekschrift aanvangt;
2. de aangevoerde gronden voor herroeping van de beschikking van 15 mei 2017 juist bevindt als bedoeld in artikel 387 Rv en het geding in zijn geheel heropent;
3. Conservatrix Groep in de gelegenheid stelt haar stellingen en verweren te wijzigen en aan te vullen;
4. de beschikking van 15 mei 2017 herroept en daarbij:

a. het overdrachtsplan niet goedkeurt, althans de goedkeuring laat vervallen en de overdrachtsregeling niet uitspreekt dan wel het uitspreken van de overdrachtsregeling intrekt;

b. voor recht verklaart, althans vaststelt, althans oordeelt, althans overweegt dat:

i. sprake is geweest van bedrog door DNB;

ii. DNB daardoor schadeplichtig is;

iii. de goedkeuring van het overdrachtsplan berust op bedrog en/of dat het overdrachtsplan niet zou zijn goedgekeurd als het bedrog niet had plaatsgevonden;

iv. het uitspreken van de overdrachtsregeling berust op bedrog en/of dat deze overdrachtsregeling niet zou zijn uitgesproken als het bedrog niet had plaatsgevonden;

v. dat de prijs van 1 zoals opgenomen in het overdrachtsplan niet redelijk is;

vi. niet redelijkerwijs was te voorzien dat de gevaarlijke ontwikkeling op het gebied van solvabiliteit niet voldoende of niet tijdig ten goede zou kunnen worden gekeerd;

5. DNB in de werkelijke proceskosten veroordeelt.

4.2. Conservatrix Groep heeft aan haar herroepingsverzoek ten grondslag gelegd dat de beschikking van de rechtbank berust op door DNB in het geding gepleegd bedrog12 en dat zij na de beschikking van de rechtbank stukken van beslissende aard in handen heeft gekregen, dan wel met het bestaan daarmee bekend is geworden, die door toedoen van DNB waren achtergehouden.13 Bij nadere toelichting en onderbouwing bij verzoekschrift tot herroeping heeft Conservatrix Groep ook aan haar herroepingsverzoek ten grondslag gelegd dat sprake is van stukken waarvan de valsheid is erkend.14

4.3. Volgens Conservatrix Groep bestaat het bedrog van DNB erin dat DNB in haar verzoekschrift en in de procedure ten onrechte:

( a) heeft gesteld dat sprake was van een gevaarlijke ontwikkeling met betrekking tot de solvabiliteit van Conservatrix die niet voldoende tijdig kon worden gekeerd;

( b) heeft gesteld dat een kapitaalstorting van minimaal 58,1 miljoen benodigd zou zijn om de geconstateerde gevaarlijke ontwikkeling weg te nemen;

( c) heeft gesteld dat zij genoodzaakt was de vergunning van Conservatrix in te trekken als het overdrachtsplan niet werd goedgekeurd;

( d) heeft gesteld dat Trier zou zorgen voor de benodigde kapitaalversterking die zou voorzien in een solvabiliteitsratio van ten minste 135%;

( e) de herverzekering heeft verzwegen en stukken heeft achtergehouden, en;

( f) heeft verzwegen dat de beoogde stijging van de solvabiliteitsratio naar ten minste 135% niets van doen had met de gestelde kapitaalversterking en kapitaalstorting door Trier, maar bewerkstelligd zou worden door een al op 17 maart 2017 door DNB en een derde partij overeengekomen herverzekeringsconstructie, die uit eigen middelen van Conservatrix zelf zou worden gefinancierd.

Omdat de herverzekering helemaal niet is genoemd in het overdrachtsplan en ook niet in de processtukken is besproken, heeft DNB de rechtbank in 2017 een niet met de werkelijkheid corresponderend overdrachtsplan voorgehouden. Op basis daarvan heeft DNB goedkeuring gevraagd en verzocht om het uitspreken van de overdrachtsregeling, terwijl DNB wist dat de rechtbank en Conservatrix Groep onvolledig werden geïnformeerd. Uit het Evaluatierapport blijkt verder dat door DNB in de overdrachtsprocedure ten onrechte stukken zijn achtergehouden, waaronder het submission protocol dat blijkens het Evaluatierapport de belangrijkste afspraken met Trier bevat over de vereiste solvabiliteit van 135% en de herverzekering. In de procedure bij de Ondernemingskamer tussen de Staat en Conservatrix Groep heeft de Staat naar voren gebracht dat de herverzekeringsovereenkomst integraal en onlosmakelijk onderdeel uitmaakte van het overdrachtsplan. Het verzoekschrift van DNB in de overdrachtsprocedure was “vals” omdat een essentieel onderdeel eruit is gelaten. De erkenning van de Staat moet ook aan DNB worden toegerekend, aldus steeds Conservatrix Groep.

4.4.

DNB verzet zich tegen toewijzing van het verzoek en voert daartoe het volgende aan. Inhoudelijk bestaat er geen grond voor herroeping van de beschikking. De herverzekering ziet op de te nemen maatregelen ter verbetering van de solvabiliteit en hoeft dan ook niet aan de rechtbank ter toetsing te worden voorgelegd. Als de herverzekering was besproken, had dat niet tot een andere uitkomst geleid.

Ook kan het verzoek op processuele gronden volgens DNB niet worden toegewezen. Allereerst is het verzoek te laat ingediend omdat Conservatrix Groep al (op zijn laatst) sinds juli 2018 bekend was met de herverzekering en het feit dat die onderdeel uitmaakte van de afspraken met Trier over de kapitaalversterking na de overdracht. Bovendien verzet de aard van de beschikking zich tegen herroeping. Tot slot heeft Conservatrix Groep geen belang bij herroeping, omdat het enige alternatief voor de overdracht het faillissement van Conservatrix was.

***Verzoek inzage stukken***

4.5. Conservatrix Groep verzoekt (bij wijze van zelfstandig verzoek) dat de rechtbank bij beschikking, uitvoerbaar bij voorraad:

1. voor zover DNB niet heeft meegewerkt aan het (buitengerechtelijke) verzoek om stukken te verstrekken, DNB beveelt (een afschrift van) de hierna genoemde stukken aan Conservatrix Groep over te leggen op straffe van een dwangsom van 1 miljoen indien DNB daaraan niet voldoet binnen een (1) week na betekening van het bevel daartoe van de rechtbank, te vermeerderen met 10.000 voor iedere dag dat DNB nadien daarmee in gebreke blijft:

a. het Submission Protocol op 17 maart 2017 getekend door Trier en DNB;

b. het Agreement re post-completion covenants op 17 maart 2017 ondertekend door DNB, Trier, Netherlands Insurance Holding Inc. (Delaware), NIH Capital LLC (North Carolina) en [naam 2] ;

c. de Recapilization Commitment op 17 maart 2017 ondertekend door DNB, Trier [naam 2] en NIG Capital LLC (North Carolina);

d. de Aggregate Excess of Loss Reinsurance Treaty op 15 mei 2017 ondertekend door de nieuwe bestuurders van Conservatrix en CBL;

e. de Process Letter van DNB;

f. alle bijlagen en annexen bij voornoemde documenten en alle andere aanverwante documenten die verband houden met de afspraken die door of met instemming of goedkeuring van DNB met derden zijn gemaakt rondom de gedwongen overname als gevolg waarvan Conservatrix Groep haar aandelen kwijt is geraakt, waaronder de op bladzijde 97 van het Evaluatierapport bedoelde documentatie en rapporten;

g. de grootboekrekening eigen vermogen 2017 en een gedetailleerd overzicht van het verloop van het eigen vermogen bij de jaarrekening 2017 van Conservatrix, als bedoeld in artikel 2:378 BW;

h. het accountantsverslag over het onderzoek van de jaarrekening 2017 als bedoeld in artikel 2:393 lid 4 BW;

i. de op pagina 7 van de jaarrekening 2017 van Conservatrix genoemde assessment van KPMG Advisory N.V ("*[t]he market value of the reinsurance agreement was assessed by KPMG Advisory N.V.*").

4.6. Conservatrix Groep verzoekt op grond van artikelen 21 en 22 Rv en artikel 843a Rv (oud) dan wel artikel 195/195a Rv (nieuw) dat DNB een afschrift aan haar verstrekt van de genoemde stukken. Conservatrix Groep stelt (a) dat zij voldoende belang heeft bij het krijgen van deze gegevens omdat deze van belang zijn voor de verdere beoordeling of (i) er überhaupt een noodzaak was tot gedwongen overdracht van de aandelen, (ii) er geen minder vergaande maatregelen mogelijk waren en (iii) de prijs gegeven de omstandigheden van het geval redelijk was,15 (b) dat de gegevens relevant zijn voor de rechtsbetrekking waarbij Conservatrix Groep partij is en (c) dat Conservatrix Groep voldoende concreet heeft omschreven om welke gegevens het gaat. Conservatrix Groep voert aan dat haar belang zowel ziet op de herroepingsprocedure en de schadeloosstellingsprocedure bij de Ondernemingskamer als op de mogelijke aansprakelijkheid van DNB en de Staat op grond van

onrechtmatige daad.

4.7. DNB verzet zich ook tegen toewijzing van dit verzoek. DNB voert daartoe het volgende aan. Omdat het herroepingsverzoek niet kan worden toegewezen, ontbreekt het belang van Conservatrix Groep bij de verzochte stukken en ontbreekt ook de vereiste rechtsbetrekking tussen DNB en Conservatrix Groep. Voor zover het verzoek ziet op een eventuele wens van deskundigen om in de schadeloosstellingsprocedure bij de Ondernemingskamer stukken bij hun onderzoek te betrekken, is er ook sprake van onvoldoende belang. Bovendien zal in de schadeloosstellingsprocedure geen deskundigenonderzoek plaatsvinden, omdat Conservatrix Groep geen (voorschot)betaling wenst te verrichten aan de deskundigen. DNB brengt ook naar voren dat de stukken toezichtvertrouwelijk zijn.16 Dit toezichtvertrouwelijke karakter van de stukken levert een gewichtige reden op die zich tegen inzage verzet.17 Tot slot voert DNB aan dat zij niet alle verzochte stukken in haar bezit heeft.

## 5 De beoordeling

### *Herroepingsverzoek*

*Juridisch kader*

5.1. Een beschikking kan op verzoek van de oorspronkelijke verzoeker of van een belanghebbende worden herroepen op de gronden genoemd in artikel 382 Rv, tenzij de aard van de beschikking zich daartegen verzet. De artikelen 382 tot en met 384 en 386 tot en met 389 Rv zijn overeenkomstig van toepassing (artikel 391 Rv).

5.2. Op basis van artikel 382 Rv kan herroeping van een uitspraak plaatsvinden (die in kracht van gewijsde moet zijn gegaan, wil herroeping openstaan) indien:
a. het berust op bedrog door de wederpartij in het geding gepleegd;
b. het berust op stukken, waarvan de valsheid na de uitspraak is erkend of bij gewijsde is vastgesteld, of;
c. de partij na de uitspraak (de beschikking) stukken van beslissende aard in handen heeft gekregen die door toedoen van de wederpartij waren achtergehouden.

5.3. Op grond van artikel 387 Rv wordt het geding geheel of gedeeltelijk heropend indien de rechter de aangevoerde grond of gronden juist bevindt. In de fase vóór die heropening, in welke fase de zaak zich nu bevindt, staat de gegrondheid van het oorspronkelijke verzoek dus niet ter discussie, maar moet de rechter uitsluitend onderzoeken of zich een herroepingsgrond voordoet.

5.4. Conservatrix Groep heeft zich onder meer beroepen op de in artikel 382 onder a Rv opgenomen grond voor herroeping. Het begrip bedrog zoals bedoeld in artikel 382 onder a Rv moet ruim worden uitgelegd. Van bedrog in deze zin is al sprake wanneer een partij door haar oneerlijke proceshouding belet dat in de procedure feiten aan het licht komen die tot een voor de tegenpartij gunstige afloop van die procedure zouden hebben kunnen leiden. Dit zal zich onder meer voordoen wanneer een partij feiten verzwijgt, terwijl zij wist of behoorde te weten dat de tegenpartij niet met die feiten bekend was of redelijkerwijs bekend behoorde te zijn.18

5.5. Omdat voor herroeping op grond van bedrog is vereist dat de rechterlijke beslissing berust op dat bedrog, moet er een (processueel) causaal verband zijn tussen de als bedrog aangedragen feiten enerzijds en de genomen beslissing anderzijds. Voldoende is dat het aannemelijk is dat de beslissing van de rechter bij een juiste voorstelling van feiten anders zou zijn uitgevallen. Voor het slagen van een beroep op een herroepingsgrond is niet vereist dat al komt vast te staan dat een eerder toegewezen verzoek toch kan worden afgewezen, of omgekeerd. Die vraag moet beantwoord worden in de fase nadat het geding is heropend en waarin opnieuw over het oorspronkelijke verzoek wordt

beslist.

5.6. Een verzoek tot herroeping moet worden ingesteld binnen drie maanden nadat de grond voor herroeping is ontstaan en de verzoeker daarmee bekend is geworden.19

5.7. In het geval van bedrog loopt de termijn vanaf de ontdekking daarvan door de benadeelde. Het bedrog is in beginsel pas ontdekt, als de partij die is bedrogen beschikt over het bewijs dat het is gepleegd en dat voordien in het algemeen slechts sprake was van een gerezen verdenking.20 Van ontdekking van het bedrog is echter niet pas sprake als de partij die zich bedrogen acht, in staat is het bedrog overtuigend aan te tonen.21 Het moment waarop het bedrog werd ontdekt is subjectief. Niet van belang is wanneer iets redelijkerwijs ontdekt had kunnen worden. Die subjectiviteit strekt zich echter niet uit tot de vraag wanneer sprake is van kennisname van zodanige feiten en omstandigheden, dat daaruit duidelijk is dat sprake is van een bedrieglijke dan wel oneerlijke proceshouding. Kort gezegd gaat het om het moment waarop de grond voor herroeping in zijn volle omvang wordt ontdekt: het moment waarop het vermoeden omslaat in zekerheid. Dit bekendheidscriterium is ook van toepassing bij de bepaling van het aanvangstijdstip van de herroepingsactie in het geval van valse stukken en in het geval van achtergehouden stukken.

*Verzoek tot herroeping tijdig*

5.8. Naar het oordeel van de rechtbank is het verzoek tot herroeping tijdig ingesteld.

Conservatrix Groep stelt dat de gronden voor herroeping (bedrog en het achterhouden van stukken) aan haar voor het eerst op 25 februari 2025 duidelijk zijn geworden. Op die dag is zij door haar voormalig advocaat geïnformeerd over de onderdelen van het Evaluatierapport waaruit dit blijkt. Uit het Evaluatierapport komt naar voren dat DNB al in maart 2017 wist dat geen sprake zou zijn van een kapitaalstorting door Trier die zou voorzien in een solvabiliteitsratio van ten minste 135%, maar dat daaraan ook een herverzekering ten grondslag lag. Conservatrix Groep heeft toen pas (dus op 25 februari 2025) ontdekt dat de herverzekering al voor 15 mei 2017 was uitonderhandeld en dat deze onlosmakelijk was verbonden met het overdrachtsplan. Het verzoek tot herroeping is ingesteld op 20 mei 2025. Daarmee is het verzoek tot herroeping dus tijdig, binnen de gestelde termijn van drie maanden, ingesteld.

5.9. DNB betoogt dat Conservatrix Groep in haar verzoek niet-ontvankelijk moet worden verklaard, omdat het verzoek tot herroeping te laat is ingesteld. DNB heeft in dat kader aangevoerd dat Conservatrix Groep in ieder geval al vanaf 6 juli 2018 (toen zij haar schriftelijke toelichting indiende in de cassatieprocedure) wist van de herverzekering en ook dat de herverzekering onderdeel was van de met Trier gemaakte afspraken. Dit betoog van DNB wordt verworpen. Hiertoe wordt het volgende overwogen.

5.10. DNB heeft tijdens de procedure bij deze rechtbank die heeft geleid tot de beschikking van 15 mei 2017 met geen enkel woord gerept over de herverzekering met CBL. Ook heeft DNB geen stukken overgelegd waaruit deze herverzekering blijkt. DNB heeft erop gewezen dat zij in haar verweerschrift van 19 oktober 2017 in de cassatieprocedure heeft uiteengezet dat de herverzekering onlosmakelijk verbonden was met het overdrachtsplan. In dat verweerschrift heeft zij daarover het volgende naar voren gebracht:

"10.7 Ongedaanmaking van de overdrachtsregeling zou in het onderhavige geval onevenredig ernstige gevolgen hebben. DNB licht dit als volgt toe.

10.8 Met haar recapitalization commitment heeft Trier aan DNB bevestigd een solvabiliteitsratio van 135% voor Conservatrix te realiseren en in stand te houden. Hiervoor was direct na de overgang van de aandelen een kapitaalversterking nodig van 88.426.000. Die kapitaalversterking is gefinancierd door (i) een agiostorting door Trier op de aandelen in

Conservatrix en (ii) een herverzekeringsovereenkomst tussen Conservatrix en Colorado Bankers.

10.9 Indien aangenomen zou moeten worden dat vernietiging van de beschikking van de Rechtbank tot gevolg zou hebben dat de overgang van de aandelen op Trier niet in stand blijft betekent dit waarschijnlijk dat de met die overgang nauw samenhangende agiostorting en herverzekering evenmin

in stand kunnen blijven. Hierdoor komt de solvabiliteit van Conservatrix (opnieuw) ernstig in gevaar. ()”

5.11. Anders dan DNB betoogt, blijkt hieruit niet dat de herverzekeringsovereenkomst al was uitonderhandeld en opgesteld vóór de datum van de gedwongen overdracht of dat deze onlosmakelijk was verbonden met het overdrachtsplan. Dat Conservatrix Groep daarmee bekend zou zijn, volgt ook niet uit de schriftelijke toelichting die Conservatrix Groep op 6 juli 2018 heeft ingediend in de cassatieprocedure tegen de beschikking. Daarin brengt Conservatrix Groep juist naar voren dat Conservatrix haar resultaat binnen een half jaar tijd ten positieve heeft omgebogen en dat zij er dus vanuit ging dat de herverzekering ná 15 mei 2017 tot stand was gekomen. In deze schriftelijke toelichting heeft Conservatrix Groep onder meer het volgende geschreven:

“Met andere woorden, hoofdzakelijk door het afsluiten van een enkele nieuwe overeenkomst van herverzekering heeft Conservatrix haar resultaat **binnen een half jaar tijd** dramatisch ten positieve omgebogen, hetgeen uiteraard veelzeggend is voor de inherente gezondheid en winstpotentie van Conservatrix ten tijde van de gedwongen overdracht op 15 mei 2017. Ronduit bizar is echter dat Colorado Bankers Life Insurance Company, met wie Conservatrix de overeenkomst van herverzekering heeft afgesloten, via [naam 1] een groepsmaatschappij is van Trier Holding B.V., en uiteindelijk in eigendom toebehoort aan [naam 2] (). Een vorm van intragroeps-herverzekering die DNB bij Conservatrix eerder, in december 2015, nog als zijnde te riskant nadrukkelijk had veroordeeld!”

Conservatrix Groep heeft er tijdens de zitting in deze procedure nog (terecht) op gewezen dat zij dan niet over een nieuwe overeenkomst van herverzekering zou hebben gesproken als zij wist dat de herverzekering onderdeel uitmaakte van het overdrachtsplan.

5.12. Voorts heeft DNB een beroep gedaan op de volgende feiten en omstandigheden ter onderbouwing van haar betoog dat de vereiste bekendheid bij Conservatrix Groep al geruime tijd aanwezig was:

- de in de cassatieprocedure overgelegde jaarrekening 2017 van Conservatrix waarin staat opgenomen dat: “*As part of the agreement with DNB the new shareholder recapitalized the company above the envisaged minimum Solvency II ratio of 135% by injecting 18.4 million of capital directly and 72.1 million via a reinsurance agreement with Colorado Bankers Life, affiliate US company. The market value of the reinsurance agreement was assessed by KPMG Advisory N.V. After the recapitalization DNB revoked the appointment of the trustee but the company is still under so-called intensified supervision from DNB*.”,

- de aangehaalde Borgersbrief van 15 maart 2019 van Conservatrix Groep waarin is geschreven dat: “*Trier het overgrote deel van de door het "overdrachtsplan" verlangde kapitaalbuffer heeft "ingebracht" d.m.v. een intragroeps-herverzekering, met als laatste herverzekeraar een op Barbados gevestigde groepsmaatschappij (Bankers Reinsurance Company Ltd.) ().”* en

- [naam 3] , bestuurder van Conservatrix Groep, is gehoord door de onderzoekers van de evaluatiecommissie en was (dus) op de hoogte van de herverzekering.

Ook dit alles kan niet leiden tot de conclusie dat van de vereiste (subjectieve) bekendheid kan worden gesproken (zie hiervoor onder 5.7). Uit het enkele gegeven dat Trier uiteindelijk het kapitaal heeft versterkt door een herverzekering volgt niet dat Conservatrix Groep ermee bekend was dat de herverzekering voor 15 mei 2017 al was uitonderhandeld door DNB en onderdeel uitmaakte van de kapitaalstorting door Trier genoemd in het overdrachtsplan. De aangehaalde passages zijn daarvoor te weinig concreet over het moment en de wijze waarop de herverzekering tot stand is gekomen.

5.13. Ook het enkel noemen van het Evaluatierapport door de voormalig advocaat van Conservatrix Groep in een stuitingsbrief van 13 mei 2022 betekent niet dat Conservatrix Groep op dat moment bekend was met (de volledige inhoud van) dat rapport.

*Herroepingsgrond: bedrog in het geding gepleegd*

5.14. De rechtbank brengt in herinnering dat Conservatrix Groep heeft gesteld dat DNB onder meer bedrog heeft gepleegd door in de overdrachtsprocedure in 2017 (i) te stellen dat een kapitaalstorting van minimaal 58,1 miljoen vereist was, (ii) te stellen dat Trier zou zorgen voor de benodigde kapitaalversterking die zou voorzien in een solvabiliteitsratio van ten minste 135%, (iii) de herverzekering te verzwijgen, (iv) het Submission Protocol achter te houden en (v) te verzwijgen dat de beoogde stijging van de solvabiliteitsratio naar ten minste 135% niets van doen had met de gestelde kapitaalversterking en kapitaalstorting door Trier, maar bewerkstelligd zou worden door een al op 17 maart 2017 door DNB en een derde partij overeengekomen herverzekeringsconstructie die uit eigen middelen van Conservatrix werd gefinancierd. Omdat de herverzekering helemaal niet is genoemd in het overdrachtsplan en ook niet is besproken, heeft DNB de rechtbank in 2017 een niet met de werkelijkheid corresponderend overdrachtsplan voorgehouden, aldus Conservatrix Groep.

5.15. Vaststaat dat in het overdrachtsplan (en de processtukken zijdens DNB in de overdrachtsprocedure) het begrip herverzekering niet voorkomt. Tijdens de zitting bij de rechtbank in 2017 is door DNB, zoals hiervoor al overwogen, ook met geen woord gerept over de herverzekering. Met het Evaluatierapport is echter duidelijk geworden dat de kapitaalversterking van Conservatrix, in ieder geval in overwegende mate, heeft plaatsgevonden middels een herverzekering, dat de (beoogde) stijging van de solvabiliteitsratio naar 135% (voornamelijk) door die herverzekering is bereikt en niet of slechts ten dele door een kapitaalstorting door Trier. Van een kaptaalstorting van (minimaal) 58,1 miljoen is geen sprake geweest. Ook is met het Evaluatierapport duidelijk geworden dat het reeds op het moment dat het overdrachtsplan aan de rechtbank ter goedkeuring werd voorgelegd de bedoeling was dat de kapitaalversterking van Conservatrix (in belangrijke mate) zou plaatsvinden door middel van deze herverzekering.

5.16. De stelling van DNB dat geen melding is gemaakt van de herverzekering omdat nog niet duidelijk was hoe de kapitaalversterking zou plaatsvinden en dat dit pas zou spelen na de goedkeuring, vindt geen steun in de feiten. Uit het Evaluatierapport blijkt dat op 17 maart 2017 tussen Trier en DNB een Submission Protocol is overeengekomen, waarin de belangrijkste afspraken met Trier staan, onder meer over de vereiste solvabiliteitsratio van 135% én de herverzekering. Al met al volgt uit het Evaluatierapport dat voorafgaand aan het indienen van het verzoekschrift op 22 maart 2017 voor DNB duidelijk was dat er een herverzekering zou worden gesloten. Uit de stukken blijkt dat op 7 maart 2017 het positieve effect van de voorgestelde herverzekeringsconstructie op het eigen vermogen werd getaxeerd op circa 67 miljoen, waarbij maximaal 150 miljoen aan verzekeringsverplichtingen werd herverzekerd. In het Evaluatierapport staat dat alleen de exacte uitwerking van de herverzekering op de solvabiliteit op dat moment nog niet duidelijk was (zie 3.11).

5.17. Voorts betoogt DNB dat zij in de overdrachtsprocedure in 2017 niet uitsluitend over een kapitaal*storting* heeft gesproken, maar over kapitaal*versterking*, waarmee ook andere maatregelen ter verbetering van de solvabiliteit zijn bedoeld, waaronder de herverzekering. Ook dit betoog kan DNB niet baten. DNB heeft in de procedure in 2017, naar thans is gebleken ten onrechte, de indruk gewekt dat een kapitaal*storting* van (minimaal) 58,1 miljoen noodzakelijk was en dat het overdrachtsplan inhield dat dit bedrag door Trier zou worden betaald. Het is juist dat DNB in 2017 in haar verzoekschrift en pleitnotities zowel gebruik heeft gemaakt van het woord “kapitaalversterking” als “kapitaalstorting”, maar heeft daarbij niet duidelijk gemaakt dat met kapitaal*versterking* niet alleen een kapitaal*storting* werd bedoeld. Dit blijkt uit de processtukken.

5.17.1. DNB heeft in haar verzoekschrift ter goedkeuring van het overdrachtsplan over de kapitaalversterking destijds het volgende naar voren gebracht (onderstrepingen rechtbank):

“ 4.17 De geconstateerde gevaarlijke ontwikkeling met betrekking tot de aanwezige solvabiliteit kan worden weggenomen door een kapitaalstorting van een zodanige omvang dat weer wordt voldaan aan het solvabiliteitsvereiste (SCR en MCR). Daartoe is per ultimo 2016 een kapitaalstorting benodigd van minimaal EUR 58,1 miljoen.

()

5.6 Ten aanzien van de solvabiliteitspositie is overeengekomen dat Trier het kapitaal van Conservatrix op het moment van de overdracht van de aandelen zodanig zal versterken dat de solvabiliteitsratio van Conservatrix ten minste 135% bedraagt. ()

6.38 De nieuwe aandeelhouder van Conservatrix zal echter zorgdragen voor een kapitaalversterking die ertoe leidt dat Conservatrix weer voldoet aan het minimumkapitaalvereiste en de solvabiliteitsratio op ten minste 135% komt te liggen, waardoor de continuïteit van Conservatrix is geborgd. Dit betekent dat de verhaalspositie van de schuldeisers van Conservatrix verbetert ten opzichte van een alternatief scenario.

6.39 De overdracht is bovendien in het belang van polishouders, wier positie door de overdracht zal verbeteren. Hun belangen zijn beter beschermd, doordat Conservatrix als gevolg van de kapitaalstorting weer solvabel is en de continuïteit van Conservatrix is geborgd. Er is dan ook geen noodzaak meer voor DNB om, zoals eerder voorgenomen, de vergunning van Conservatrix in te trekken en als gevolg daarvan de beschikkingsbevoegdheid te beperken.

()

6.41 () Als gevolg van de toegezegde kapitaalstorting is bij een overdracht aan Trier in tegenstelling tot de eerder overwogen overdracht aan LVM geen sprake van aantasting van rechten van polishouders en/of (andere) schuldeisers. ()"

5.17.2. In de pleitnotities van DNB van destijds staat (onderstreping rechtbank):

"4.8 Kort gezegd: waar Trier nu bereid is om het negatief eigen vermogen aan te zuiveren en het solvabiliteitstekort op te heffen ()

5.3 () De Confirmation Letter vormt inderdaad het overdrachtsplan waarvan goedkeuring wordt gevraagd, en bevat de voorwaarden waaronder de overdracht van de aandelen plaatsvindt. ()

5.9 () In het bijzonder kan DNB in deze periode bewerkstelligen dat de door Trier toegezegde kapitaalstorting uiterlijk op of direct na de datum van de overdracht wordt voldaan. ()"

5.18. De rechtbank heeft het in 2017 ook niet zo begrepen, zoals blijkt uit de beschikking. In de beschikking in r.o. 4.15.5 is overwogen dat het overdrachtsplan de voorwaarde inhoudt dat Trier naast de betaling van de koopsom van 1 een kapitaal*storting* doet die voorziet in een solvabiliteitsratio van ten minste 135%. In de beschikking is dat als volgt verwoord (onderstreping rechtbank):

"DNB stelt dat het (met haar afgestemde) bod van Trier, en daarmee het overdrachtsplan zoals dit ter goedkeuring voorligt, onder de volgende voorwaarden is gedaan:

- naast de betaling van de koopsom van EUR 1,00, doet Trier een kapitaalstorting die voorziet in een solvabiliteitsratio van ten minste 135%

()."

Verder heeft de rechtbank in haar beschikking overwogen (onderstrepingen rechtbank):

"4.14.2. DNB stelt dat de mogelijkheden om de gevaarlijke ontwikkeling ten goede te keren uit en te na zijn verkend. Tot aanvaardbare resultaten heeft dat volgens haar niet geleid. DNB stelt dat Conservatrix haar eigen vermogen (naar de stand ultimo 2016 en zonder rekening te houden met extra tegenvallers) met ten minste EUR 28,9 miljoen moet versterken om te voldoen aan het onder Solvabiliteit II geldende minimumkapitaalvereiste (MCR) (neergelegd in artikel 3:53 lid 4 Wft) en met ten minste EUR 58,1 miljoen om te voldoen aan het daaronder geldende solvabiliteitkapitaalvereiste (SCR). Conservatrix zal haar eigen vermogen vervolgens nog verder moeten versterken om een buffer te hebben voor het opvangen van tegenvallers, aldus DNB. ()"

5.19. DNB heeft zich er nog op beroepen dat het toezichtvertrouwelijke informatie betrof. De rechtbank verwerpt ook dit betoog. DNB heeft toen en ook nu niet duidelijk gemaakt waarom het Submission Protocol en de andere documenten waarin de afspraken met Trier zijn vastgelegd niet bekend konden worden gemaakt in een procedure en tijdens een zitting die achter gesloten deuren plaatsvond en waarvoor de wet (Rv) ook nog allerlei waarborgen biedt om te voorkomen dat informatie die vertrouwelijk moet blijven, niet in de openbaarheid komt.

5.20. Uit dit alles volgt dat DNB de rechtbank en Conservatrix Groep in de procedure in 2017 niet (actief) over de herverzekering heeft geïnformeerd, althans niet kenbaar heeft gemaakt dat de kapitaalversterking grotendeels uit de herverzekering met CBL bestond en niet enkel uit een kapitaalstorting, terwijl zij wist of behoorde te weten dat Conservatrix Groep niet met die feiten bekend was of redelijkerwijs bekend behoorde te zijn. Het enkele feit dat DNB dit niet heeft gedaan, betekent op zichzelf nog niet dat sprake is van bedrog in de zin van artikel 382 onder a Rv. Daarvoor is ook vereist dat het, kort gezegd, een voor de beslissing van de rechtbank destijds het goedkeuren van het overdrachtsplan *relevant* feit was. Bovendien moet een (processueel) causaal verband bestaan tussen de als grond voor herroeping aangedragen feiten enerzijds en de door de rechtbank genomen beslissing in de beschikking van 15 mei 2017 anderzijds (zie 5.5). Voldoende is dat het aannemelijk is dat de beslissing van de rechter bij een juiste voorstelling van de feiten anders zou zijn uitgevallen.

5.21. DNB stelt zich op het standpunt dat de herverzekering niet relevant was voor de beoordeling door de rechtbank in 2017 en dat DNB deze (dus) niet naar voren hoefde te brengen. DNB heeft dit als volgt toegelicht. Vanwege het toetsingskader in de Wft bestond geen aanleiding om de herverzekering dan wel de wijze van kapitaalversterking te noemen. De rechtbank hoefde zich niet uit te laten over specifieke maatregelen ter verbetering van de solvabiliteit van Conservatrix. Het lag niet op de weg van de rechtbank om te toetsen op welke wijze de overnemende partij (Trier) de solvabiliteit van Conservatrix weer op het gewenste niveau zou krijgen. Dergelijke afspraken vielen binnen het mandaat van DNB als toezichthouder. Bij het vaststellen of de prijs redelijk is, gaat het bovendien om het te verwachten toekomstperspectief zonder uitvoering van het overdrachtsplan. De rechtbank hoefde zich volgens DNB dan ook niet te buigen over het toekomstscenario waarin het overdrachtsplan werd uitgevoerd.

5.22. Ook dit verweer van DNB gaat niet op. De rechtbank moest bij de beoordeling van het verzoek van DNB in 2017 niet alleen beoordelen (i) of de in het overdrachtsplan genoemde prijs voor overname van de aandelen, in dit geval 1, onder de gegeven omstandigheden een redelijke prijs was, maar ook (eerst) (ii) of summierlijk was gebleken dat bij Conservatrix tekenen waren van een gevaarlijke ontwikkeling met betrekking tot het eigen vermogen, de solvabiliteit of de technische voorzieningen en of redelijkerwijs te voorzien was dat die ontwikkeling niet voldoende of niet tijdig ten goede zou keren (zie hiervoor onder 3.9). Vooral voor deze laatste (volgorderlijk eigenlijk de eerste) toets is het feit dat de herkapitalisatie kennelijk kon plaatsvinden middels een herverzekering van belang. Immers, in het geval dat de situatie met minder vergaande maatregelen dan een overdrachtsregeling had kunnen worden hersteld, zou de rechtbank tot het oordeel hebben kunnen komen dat er nog geen sprake was van een gevaarlijke ontwikkeling (die niet voldoende of niet tijdig ten goede zou keren), en dus niet was voldaan aan de grond om de overdrachtsregeling uit te spreken.22

5.23. Met het sluiten van de herverzekering is, zo is gebleken, een bedrag van 100 miljoen uit de eigen middelen van Conservatrix als premie aan CBL betaald waarmee voor een bedrag van 150 miljoen aan verzekeringsverplichtingen van Conservatrix door CBL zijn herverzekerd. Door deze herverzekering is het eigen vermogen van Conservatrix toegenomen (met 61 miljoen). De premie is dus volledig voldaan uit de eigen middelen met als gevolg een forse toename van het eigen vermogen. Dit blijkt ook uit de jaarrekening 2017 van Conservatrix waarin is opgenomen dat: *"The full-year 2017 result before tax increased significantly to 84.9 million compared with -18.3 million in the previous year. This improvement was mainly caused by a new reinsurance agreement with Colorado Bankers Life Insurance Company. A single reinsurance premium of 100 million was paid while the reinsurers' share of the changes in technical provisions rose to 152 million. Due to the reinsurance agreement 10.7*

*million of risk margin was released. () In combination with a significantly decreased solvency capital requirement (SCR) to 25.4 million, this resulted in a Solvency II ratio of 188% (2016: -16%) () Result on reinsurance agreement EUR 48.861.000.*"

5.24. Conservatrix Groep heeft naar voren gebracht dat zij een vergelijkbare herverzekering had kunnen sluiten met Heco Reassurantie N.V. S.A. (hierna: Heco Re), maar dat deze mogelijkheid mede door het niet benoemen van de herverzekering met CBL ten onrechte niet aan bod is gekomen tijdens de procedure in 2017. Conservatrix Groep heeft dit als volgt nader toegelicht.

5.24.1. Conservatrix had op 15 mei 2017 haar onderneming kunnen voortzetten door een vergelijkbare herverzekering te sluiten met Heco Re. Heco Re (waarvan [naam 3] aandeelhouder is) is, anders dan waar DNB vanuit gaat (en ging), geen aan Conservatrix verbonden partij. Het is een Europese herverzekeraar, waarvan de directie destijds werd gevoerd door de gerenommeerde verzekeringsmakelaar AON Global Risk Consulting. De twijfels van DNB over de solvabiliteit van Heco Re waren niet terecht.

5.24.2. Daar staat volgens Conservatrix Groep tegenover dat CBL een kleine verzekeringsmaatschappij was met één aandeelhouder, Lindberg, die bovendien niet onder Europees toezicht stond en waarmee een herverzekeringsovereenkomst werd gesloten die niet at arms length was. Uit het Evaluatierapport blijkt bovendien dat de herverzekeringsovereenkomst met CBL niet met voldoende waarborgen was omgeven:

"() Met de kennis van nu bevatte de vormgeving van de afspraken met de nieuwe eigenaar gevoelige onvolkomenheden. Zo ontbrak een vorm van zekerheidstelling voor de bijstortingsverplichting ter borging van de solvabiliteit. De herverzekeringsovereenkomst (die werd ondergebracht bij een dochteronderneming van Lindberg) roept bij de Evaluatiecommissie vragen op. Ook bood de herverzekeringsovereenkomst de nieuwe eigenaar mogelijkheden om het herverzekeringsrisico onder te brengen bij weer een andere dochteronderneming van de nieuwe eigenaar op Barbados. Aan het onderpand, het zogenaamde collateral, waren voorwaarden gesteld die niet werden nagekomen. ()"

5.24.3. In 2014 heeft Conservatrix Groep onderzocht of de solvabiliteit van Conservatrix versterkt zou kunnen worden door een herverzekeringsovereenkomst te sluiten tussen Heco Re en Conservatrix, maar daar is verder geen opvolging aan gegeven, omdat dit bij DNB (en de curator) op bezwaren stuitte. Conservatrix Groep had andere herverzekeraars kunnen benaderen, zoals door haar ook in 2014 was voorgesteld, maar dit heeft zij niet gedaan omdat zijdens DNB alleen de optie verkoop als realistisch scenario werd voorgehouden. Daardoor heeft Conservatrix Groep de mogelijkheid van een herverzekering niet verder onderzocht. In het licht van de houding van DNB en de curator leek het zinloos daar verder nog energie in te steken.

5.24.4. Dit bracht met zich, aldus nog steeds Conservatrix Groep, dat DNB, door haar opstelling in de eerdere fase en door de herverzekeringsovereenkomst met CBL die tot de vereiste kapitaalversterking heeft geleid en de modaliteiten daarvan niet te melden in de procedure in 2017, Conservatrix Groep de mogelijkheid heeft onthouden om aan te tonen dat de herverzekeringen met elkaar te vergelijken zijn.

5.25. DNB zet daar tegenover dat zij niet zou hebben ingestemd met een herverzekeringsovereenkomst tussen Conservatrix en Heco Re om de solvabiliteit van Conservatrix te verbeteren en heeft dat als volgt toegelicht. Heco Re was een groepsvennootschap van Conservatrix Groep die geen klanten buiten de eigen groep had, zodat sprake was van een te grote verwevenheid tussen Conservatrix en Heco Re. DNB vroeg zich af of de herverzekeringspremie at arms length was. Ook had DNB twijfels over de solvabiliteit van Heco Re. Dit alles betekende, aldus DNB, dat de rechtbank een herverzekering bij Heco Re niet zou hebben kunnen meenemen in haar beoordeling.

5.26.

De rechtbank overweegt als volgt. Tegen de achtergrond dat de herverzekering door CBL heeft plaatsgevonden uit de eigen middelen van Conservatrix, en op grond van wat partijen over en weer hebben aangevoerd, kan niet zonder meer de conclusie worden getrokken dat, zoals DNB betoogt, een herverzekering bij Heco Re geen reële mogelijkheid was. Daarbij wordt ook in aanmerking genomen dat, gelet op wat bekend is over de voorwaarden die DNB had bedongen met Trier en de herverzekeringsconstructie, op die herverzekering (ook) het nodige aan te merken was. In ieder geval blijkt daaruit dat DNB bereid was om Conservatrix na het sluiten van een herverzekeringsovereenkomst met een verbonden partij weer onder vergunning te laten opereren in de markt. Hieruit blijkt dat aannemelijk is dat minder ingrijpende maatregelen mogelijk waren, namelijk een herverzekering bij Heco Re of bij een andere herverzekeraar.

5.27. Het argument van DNB dat Conservatrix Groep niet bereid was om zelf kapitaal te storten en dat alleen daardoor al een totaalpakket zoals zij met Trier had afgesproken niet mogelijk was, wordt verworpen. De rechtbank heeft in de beschikking van 15 mei 2017 weliswaar het volgende overwogen: "*Elk concreet uitzicht op versterking van het kapitaal van Conservatrix door of van de zijde van Conservatrix Groep ontbreekt. Al in 2014 heeft Conservatrix Groep te kennen gegeven niet te willen bijstorten, en ter zitting bij de Ondernemingskamer en tijdens de mondelinge behandeling van het onderhavige verzoek heeft zij dit herhaald.*", maar Conservatrix Groep heeft erop gewezen dat die verklaring is gedaan in de context van de informatie die op dat moment door DNB aan haar en de rechtbank was voorgelegd. Conservatrix Groep stelt thans dat zij, als zij had geweten van de herverzekeringsmogelijkheid, in staat en bereid was geweest om 18,4 miljoen te storten zoals Trier volgens DNB heeft gedaan. De rechtbank acht dit niet onaannemelijk. Zoals hiervoor overwogen heeft DNB de indruk gewekt dat een kapitaalstorting van 58,1 miljoen noodzakelijk was. Dit bleek niet juist te zijn. Conservatrix Groep dacht dat herverzekeren niet mogelijk was. Conservatrix Groep betwist overigens dat Trier daadwerkelijk een kapitaalstorting van ruim 18 miljoen heeft gedaan. Tijdens de mondelinge behandeling is dit besproken en het is de rechtbank ook niet duidelijk geworden of die kapitaalstorting heeft plaatsgevonden

5.28. Omdat de herverzekering door DNB in 2017 buiten de procedure is gehouden, heeft dus geen volwaardig debat kunnen plaatsvinden over de vraag of minder vergaande maatregelen (alternatieven) mogelijk waren geweest. Dit betekent dat voldoende is aangetoond dat sprake is van een oneerlijke proceshouding van DNB in de voorgaande procedure op een punt dat mede bepalend was voor de beoordeling van het verzoek ten gunste van DNB. Het is aannemelijk dat het oordeel van de rechtbank in de overdrachtsprocedure anders zou zijn geweest als was meegewogen dat de door Trier op grond van het overdrachtsplan te verschaffen kapitaalversterking van Conservatrix om tot een solvabiliteitsratio van 135% te komen (grotendeels) bestond uit de met CBL gesloten herverzekering, waarvan de premie is voldaan uit de eigen middelen van Conservatrix. De beslissing van de rechtbank op het oorspronkelijke verzoek in 2017 berust daarmee op bedrog door DNB in het geding gepleegd als bedoeld in artikel 382 onder a Rv. Deze door Conservatrix Groep aangevoerde herroepingsgrond wordt door de rechtbank dan ook juist bevonden. De andere door Conservatrix Groep aangevoerde herroepingsgronden (op grond van artikel 382 sub b en c Rv) behoeven om die reden verder geen bespreking.

*De aard van de beschikking verzet zich tegen herroeping*

5.29. Zoals hiervoor overwogen bepaalt artikel 390 Rv dat een beschikking kan worden herroepen tenzij de aard van de beschikking zich daartegen verzet. Een beschikking waarin de feitelijke gevolgen van de beschikking onomkeerbaar zijn, verzet zich naar haar aard tegen herroeping. Dat doet zich ook hier voor: de aandelen in Conservatrix zijn overgedragen en Conservatrix verkeert inmiddels bovendien in staat van faillissement.

Dit betekent dat het rechtsmiddel van herroeping hier niet openstaat. De rechtbank neemt daarbij in aanmerking dat de strekking en de regeling in de Wft (oud) over de behandeling van een verzoek tot het uitspreken van de overdrachtsregeling en de rechtsmiddelen die krachtens die wet tegen een beslissing daarop kunnen worden aangewend, zich verzetten tegen herroeping. In de Wft (oud) is

bepaald dat als een verzet van een aandeelhouder tegen een overdrachtsregeling slaagt, dat slechts tot vernietiging leidt indien de ongedaanmaking van de overdrachtsregeling geen onevenredig ernstige gevolgen zou hebben.23 Verder staat tegen een beschikking waarbij een overdrachtsregeling wordt uitgesproken geen hoger beroep open omdat de mate van urgentie groot is.24 Gelet op de bij de overdracht gemoeide belangen van derden, waaronder de polishouders, mag over het in stand blijven van die beslissing geen onzekerheid bestaan.

5.30. Conservatrix Groep zal daarom in haar verzoek tot herroeping niet-ontvankelijk worden verklaard. Aan een verdere beoordeling komt de rechtbank in deze procedure dan ook niet toe, en dus ook niet aan de door Conservatrix Groep verzochte verklaringen voor recht genoemd in haar verzoek tot herroeping onder 4b (zie 4.1). Een eventuele oplossing kan in een dergelijk geval gevonden worden in een vordering tot schadevergoeding op de partij die het (processuele) bedrog heeft gepleegd.

**Verzoek inzage stukken**

5.31. Het verzoek tot inzage is gedaan na 1 januari 2025. Dit heeft tot gevolg dat het bewijsrecht zoals dit geldt vanaf 1 januari 2025 van toepassing is.25

5.32. De rechtbank stelt voorop dat DNB niet heeft meegewerkt aan een buitengerechtelijk inzageverzoek, zodat het verzoek tot inzage in de stukken ter beoordeling voorligt.

5.33. Voor toewijzing van een vordering tot recht op inzage in de zin van artikel 195 Rv moet aan de vereisten uit artikel 194 Rv zijn voldaan.26 Degene die informatie van een ander verlangt (i) moet partij zijn bij een rechtsbetrekking en (ii) de verlangde informatie moet voldoende bepaald zijn. Verder moet (iii) een partij een voldoende belang hebben bij haar informatieverzoek en moet (iv) degene van wie inzage wordt verlangd over de gevraagde informatie beschikken of deze makkelijk van een derde kunnen verkrijgen.27 Wanneer sprake is van een uitzonderingsgrond zoals een gewichtige reden verzet dat zich tegen het verstrekken van de gevraagde informatie.28

5.34. DNB betwist dat Conservatrix Groep enig belang heeft bij afschrift van de gevraagde stukken omdat het herroepingsverzoek moet worden afgewezen. De rechtbank is het met DNB eens dat Conservatrix Groep geen belang heeft bij de verzochte stukken voor zover inzage ziet op de herroepingsprocedure omdat Conservatrix Groep in het herroepingsverzoek niet-ontvankelijk zal worden verklaard. Conservatrix Groep heeft echter niet alleen gewezen op de herroepingsprocedure, maar ook op de schadeloosstellingsprocedure bij de Ondernemingskamer en mogelijke aansprakelijkheid van DNB en de Staat op grond van onrechtmatige daad. Met het oog op (het inschatten van haar kansen in) die procedures heeft Conservatrix Groep voldoende belang bij het verkrijgen van inzage in de verzochte stukken.

5.35. De rechtbank stelt verder vast dat is voldaan aan het vereiste van het "zijn van een partij bij een rechtsbetrekking". Het begrip partij bij een rechtsbetrekking moet ruim worden opgevat. Met rechtsbetrekking wordt elke rechtsbetrekking bedoeld, niet alleen een overeenkomst, maar ook een verbintenis uit de wet zoals een onrechtmatige daad. Het bestaan van een rechtsbetrekking hoeft nog niet in rechte vast te staan. Vaak zijn bepaalde feiten die van belang zijn voor het bestaan, de inhoud of de omvang van een rechtsbetrekking nog niet helder. Precies om die reden kan een partij aanspraak maken op bepaalde gegevens waarover zij niet zelf beschikt, maar een ander wel.29

5.36. Verder moeten de verlangde stukken voldoende bepaald zijn. Ook aan dit vereiste is voldaan, met uitzondering van enkele stukken genoemd in 4.5 onder 1 f . Voldoende bepaald zijn "alle bijlagen en annexen bij voornoemde documenten", maar dat geldt niet voor "alle andere aanverwante documenten die verband houden met de afspraken die door of met instemming of goedkeuring van DNB met derden zijn gemaakt rondom de gedwongen overname als gevolg waarvan Conservatrix Groep haar aandelen kwijt is geraakt" en ook niet voor "alle op bladzijde 97 van het Evaluatierapport bedoelde documentatie en rapporten". Op bladzijde 97 van het Evaluatierapport is slechts het volgende

opgenomen (onderstreping rechtbank):

"Op 17 maart 2017 kwamen Trier Holding B.V. en De Nederlandsche Bank een submission protocol en een Agreement re post-completion covenants overeen met daarbij horende annexen. De indiening van het verzoekschrift door De Nederlandsche Bank moest in overeenstemming met de minister gebeuren. De tijd die de directeur Financiële Markten en haar medewerkers nog hadden bedroeg twee weken om aan de hand van het verzoekschrift en alle onderliggende documentatie en rapporten tot een gefundeerd oordeel te komen."

Uit de tekst blijkt niet welke "documenten en rapporten" hier zijn bedoeld. De omschrijving van deze "documenten en rapporten" is zeer ruim en daarmee te weinig specifiek om als "voldoende bepaald" te kunnen worden aangemerkt.

5.37. Ook kan DNB worden aangemerkt als "degene die over de gegevens beschikt". Van het beschikken over gegevens is in elk geval sprake als een partij de gegevens waarvan inzage wordt verlangd, fysiek onder zich heeft. Het kan ook zijn dat de aangesproken partij, DNB, de gegevens gemakkelijk via een derde kan verkrijgen. DNB heeft onvoldoende geconcretiseerd over welke stukken zij niet beschikt en/of dat en waarom zij die niet gemakkelijk zou kunnen verkrijgen.

5.38. Volgens DNB heeft zij zwaarwegende belangen die zich tegen de verzochte inzage verzetten. Het gaat volgens haar om inzage in toezichtvertrouwelijk gegevens. Op zich is juist dat de wetgever een wettelijke geheimhoudingsplicht bij uitstek heeft bedoeld als een gewichtige reden.30 DNB heeft echter niet toegelicht welke stukken op grond van de wet31 als toezichtvertrouwelijk moeten worden aangemerkt en waarom, zodat de rechtbank aan dit verweer als onvoldoende geconcretiseerd voorbij gaat.

5.39. Gelet op het voorgaande zal het verzoek van Conservatrix Groep, voor zover dit verzoek betrekking heeft op verstrekking van afschrift van de stukken opgenomen onder 4.5 onder 1 a tot en met e, g tot en met i, en deels f, worden toegewezen.

*Termijn en dwangsom*

5.40. Naar het oordeel van de rechtbank is het geven van een termijn een week na betekening van de beschikking te kort voor verstrekking van de stukken, mede omdat eventuele stukken nog moeten worden opgevraagd bij derden. Daarom wordt een termijn bepaald van dertig dagen na betekening van de beschikking voor het verstrekken van de stukken.

5.41. De rechtbank ziet geen aanleiding om aan DNB een dwangsom op te leggen. De stelling dat DNB eerder essentiële stukken heeft achtergehouden in de procedures, zoals Conservatrix Groep heeft aangevoerd, is daarvoor onvoldoende. De rechtbank gaat ervan uit dat DNB gevolg zal geven aan een uitspraak van de rechter.

5.42. Zoals verzocht zal de beschikking uitvoerbaar bij voorraad worden verklaard.

*Proceskosten*

5.43. De rechtbank ziet aanleiding om DNB de proceskosten van Conservatrix Groep te laten betalen. De proceskosten aan de zijde van Conservatrix Groep worden vastgesteld op:

| | | |
|---|---|---|
| - griffierecht | 714,00 | |
| - salaris advocaat | 1.385,00 | (2,5 punten × 554,00) |
| - nakosten | 198,00 | (plus de verhoging zoals vermeld in de beslissing) |
| Totaal | 2.297,00 | |

5.44.

Voor zover Conservatrix Groep in dit stadium van de procedure verzoekt DNB te veroordelen in de werkelijke proceskosten, geldt het volgende. Voor toekenning van de daadwerkelijk gemaakte advocaatkosten in afwijking van het gewoonlijk gehanteerde liquidatietarief is geen grond. Voor een veroordeling in de werkelijk gemaakte proceskosten kan alleen plaats zijn in buitengewone omstandigheden, waarbij dient te worden gedacht aan misbruik van procesrecht of onrechtmatig handelen. Daarvan is pas sprake in geval van een evident ongegronde vordering of verweer, zoals wanneer de vordering of het verweer wordt gebaseerd op feiten en omstandigheden waarvan een procespartij de onjuistheid kende of had behoren te kennen of op stellingen waarvan zij op voorhand moest begrijpen dat deze geen kans van slagen hadden.32 Bij het aannemen van misbruik van procesrecht of onrechtmatig handelen als grond voor een veroordeling in de werkelijk gemaakte proceskosten past terughoudendheid, gelet op het recht op toegang tot de rechter, dat mede gewaarborgd wordt door artikel 6 EVRM.33 Verweer voeren in deze procedure op de wijze waarop zij dat heeft gedaan levert geen misbruik van procesrecht op aan de zijde van DNB.

## 6 De beslissing

De rechtbank

6.1. verklaart Conservatrix Groep niet-ontvankelijk in haar verzoek tot herroeping,

6.2. beveelt DNB om binnen dertig (30) dagen na betekening van deze beschikking aan Conservatrix Groep te verstrekken een afschrift van:

a. het Submission Protocol op 17 maart 2017 getekend door Trier en DNB;

b. het Agreement re post-completion covenants op 17 maart 2017 ondertekend door DNB, Trier, Netherlands Insurance Holding Inc. (Delaware), NIH Capital LLC (North Carolina) en [naam 2] ;

c. de Recapilization Commitment op 17 maart 2017 ondertekend door DNB, Trier [naam 2] en NIG Capital LLC (North Carolina);

d. de Aggregate Excess of Loss Reinsurance Treaty op 15 mei 2017 ondertekend door de nieuwe bestuurders van Conservatrix en CBL;

e. de Process Letter van DNB;

f. alle bijlagen en annexen bij voornoemde documenten;

g. de grootboekrekening eigen vermogen 2017 en een gedetailleerd overzicht van het verloop van het eigen vermogen bij de jaarrekening 2017 van Conservatrix;

h. het accountantsverslag over het onderzoek van de jaarrekening 2017;

i. de op pagina 7 van de jaarrekening 2017 van Conservatrix genoemde assessment van KPMG Advisory N.V ("[t]he market value of the reinsurance agreement was assessed by KPMG Advisory N.V."),

6.3. veroordeelt DNB in de proceskosten aan de zijde van Conservatrix Groep van 2.297,00, te betalen binnen veertien dagen na aanschrijving daartoe, te vermeerderen met 98,00 plus de kosten van betekening als DNB niet vrijwillig aan de veroordelingen voldoet en de beschikking wordt betekend,

6.4. verklaart deze beschikking tot zover uitvoerbaar bij voorraad,

6.5. wijst het meer of anders verzochte af.

Deze beschikking is gegeven door mr. R.A. Dudok van Heel, mr. M. Wouters en mr. G.C. de Heer, rechters, bijgestaan door mr. E.C. Kleverlaan, griffier, en in het openbaar uitgesproken op 5 februari 2026.

---

1 ECLI:NL:RBAMS:2017:3309

2 ECLI:NL:HR:2019:746

3 Confirmation Letter to the Dutch Central Bank for the transfer of the shares in Nederlandsche Algemeene Maatschappij van Levensverzekering Conservatrix N.V.

4 Zie voetnoot 1

5 In samenhang met 3:159c (oud) Wft

6 Artikel 3:159ij lid 2 (oud) Wft

7 Zie voetnoot 2

8 ECLI:NL:GHAMS:2021:2592, bekrachtigd bij het arrest van de Hoge Raad van 2 juni 2023, ECLI:NL:HR:2023:839

9 ECLI:NL:GHAMS:2024:3571

10 ECLI:NL:GHAMS:2025:1459

11 ECLI:NL:GHAMS:2025:2200

12 Artikel 382 sub a Rv

13 Artikel 382 sub c Rv

14 Artikel 382 sub b Rv

15 Artikel 3:159r (oud) Wft en 3:159ij (oud) Wft

16 Artikel 1:89 Wft

17 Artikel 194 lid 2 Rv

18 HR 4 oktober 1996, ECLI:NL:HR:1996:ZC2162

19 Artikel 383 Rv

20 Kamerstukken II 1999-2000, 26 855, nr. 3, p. 173

21 HR 2 november 2012, ECLI:NL:HR:2012:BW9877

22 Memorie van Toelichting bij de Interventiewet (Tweede Kamer, vergaderjaar 2011-2012, 33 059, nr. 3, p. 55

23 Artikel 3:159aa Wft (oud)

24 Artikel 3:159aa lid 2 Wft (oud) en Kamerstukken II 2011/12, 33059, nr. 7, p.17

25 Artikel XIIA van de Wet vereenvoudiging en modernisering bewijsrecht

26 Voor zover nodig kan het verzoek tot inzage ook op grond van artikel 196 Rv worden gedaan (een verzoek om een voorlopige bewijsverrichting)

27 Artikel 194 lid 1 Rv

28 Artikel 194 lid 2 Rv

29 Kamerstukken II 2019/20, 35 498, nr. 3, p. 47 (MvT)

30 Artikel 194 lid 2 Rv

31 Artikel 1:89 Wft

32 HR 29 juni 2007, ECLI:NL:HR:2007:BA3516

33 HR 23 december 2022, ECLI:NL:HR:2022:1934

ECLI:NL:RBAMS:2026:1107

Court Amsterdam District Court
Date of judgment 05-02-2026
Date of publication 05-02-2026
Case number C/13/769512 / HA RK 25-169
Areas of law Civil law
Special characteristics Court of first instance - panel of judges
Case summary By order dated 15 May 2017 the court approved the transfer plan of DNB for the insurer (Art. 3:195c (former) Wft and Art. 3:159u (former) Wft). Upheld by the Supreme Court (ECLI:NL:Supreme Court:2019:746). Insurer seeks revocation of the District Court's order pursuant to Article. 390 in conjunction with Article 382 DCCP and production/inspection of documents (Art. 195 DCCP). Court rules that the opposing party committed fraud in the proceedings within the meaning of Article 382 under a Rv. Fraud concerning the failure to disclose the reinsurance associated with the transfer plan. Procedural causal link between fraud and the decision. No reopening of the proceedings because the nature of the order precludes reopening. The applicant is declared -inadmissible. The request for access to the documents is largely granted.
Sources Rechtspraak.nl

Decision

DISTRICT COURT Amsterdam

Civil law

Case number / petition number: C/13/769512 / HA RK 25-169

Order of 5 February 2026

in the matter of

the legal entity incorporated under foreign law
CONSERVATRIX GROUP S.A.R.L.,
having its registered office in Luxembourg (Luxembourg),
applicant,
hereinafter referred to as: Conservatrix Groep,
attorney: mr. W.A. Westenbroek,

against

the public limited company
DE NEDERLANDSCHE BANK N.V.
, having its registered office in Amsterdam,
defendant,
hereinafter referred to as: DNB,
attorney: Mr. P.P.M. van Kippersluis.

1 Summary.

1.1. On 15 May 20171 this court, at DNB's request,, after the Nederlandsche Algemeene Maatschappij van Levensverzekering “Conservatrix” N.V. (hereinafter: Conservatrix) and Conservatrix Groep had been heard as interested parties, pursuant to Article 3:159u, paragraph 1 (former) Financial Supervision Act (Wft), in short, approved the transfer plan drawn up by DNB, which meant that all shares in Conservatrix held by Conservatrix Groep were transferred to Trier Holding B.V. (hereinafter: Trier) in exchange for payment of 1. In its judgment of, the Supreme Court 17 May 20192 upheld the District Court's decision. Conservatrix was on 8 December 2020 declared bankrupt.

1.2. By petition dated 20 May 2025 Conservatrix Groep applied to the court to have the decision of 15 May 2017 pursuant to Article 390 in conjunction with 382 Code of Civil Procedure (Rv) revoked, or, in the alternative, to declare that there was fraud on the part of DNB. It also requested the court to order DNB to provide access to various documents, including documents that in the proceedings in 2017 were not shared with Conservatrix Groep and the court.

1.3. Conservatrix Groep contends that DNB in 2017 committed fraud in the proceedings before the court. According to Conservatrix Group, DNB referred only to a capital contribution by Trier and wrongly failed to inform Conservatrix Group and the court about the matters associated with the transfer plan reinsurance with the American company Colorado Bankers Life Insurance Company (hereinafter: CBL).

1.4. The concept of (procedural) fraud as referred to in Article 382 under a of the Code of Civil Procedure must be interpreted broadly. There is already fraud in this sense when a party to the proceedings prevents facts from coming to light that could have led to a favorable outcome of those proceedings for the opposing party. First, the court must examine only whether there has been fraud in this sense.

1.5. The District Court finds that there has indeed been “fraud committed in the proceedings” as referred to in Article 382 under a of Rv, because the reinsurance was excluded from the proceedings by DNB. As a result, no full debate could take place on whether less drastic measures (alternatives) might have been possible to save Conservatrix. However, this does not mean that the case will be reopened. Because it is no longer possible to reverse the transfer of the shares in Conservatrix, the nature of the original order precludes revocation and Conservatrix Groep is therefore-declared inadmissible in its application. The case will therefore not be reconsidered.

1.6. The request by Conservatrix Groep to provide access to documents, is (largely) granted.

## 2 The proceedings

2.1. The course of the proceedings is evidenced, insofar as relevant, by:.
- the petition for revocation pursuant to Article 390 Rv in conjunction with 382 Rv, seeking an order for the production of documents pursuant to Article 21, 22 and 195/195a Rv, or alternatively Article 843a Rv, and for a declaration that there has been fraud on the part of DNB, received at the court registry on 20 May 2025, with exhibits;
- the further explanation and substantiation accompanying the application for reopening dated 20 May 2025 and submission of additional exhibits, with exhibits;
- DNB's statement of defence, with exhibits;
- the official-record of the oral hearing held on 27 November 2025, together with the documents listed therein, including the speaking notes of (counsel for) Conservatrix Groep and DNB.

2.2. The decision was scheduled for today.

## 3 The facts

3.1. Conservatrix carried on a life insurance business under licence and under the prudential supervision of DNB. All shares in Conservatrix were, until 15 May 2017 , held by Conservatrix Groep. Conservatrix was on 8 December 2020 declared bankrupt.

3.2. By decision of 1 April 2014 DNB, pursuant to Article 1:76 paragraph 2 point b and paragraph 3 of the Wft, P. de Groot (hereinafter: the special administrator) appointed as a trustee with respect to the management board of Conservatrix, among other things, on the ground that DNB saw signs at Conservatrix of a development that could endanger its equity and solvency, and considered immediate intervention necessary.

3.3. On 3 July 2014 DNB required Conservatrix to submit a recovery plan as referred to in Article 3:132 paragraph 1 (former) Wft. In that plan, Conservatrix was required, among other things, to state how and within what time limits it would meet the required solvency standards.

3.4. On 23 September 2014 DNB decided not to approve the recovery plan submitted by Conservatrix because, in its opinion, it did not provide a sustainable solution for achieving structural recovery. In addition, DNB set a deadline of no later than 30 September 2014 , requiring Conservatrix to maintain a minimum required solvency level of 130%.

3.5.;DNB informed Conservatrix in early January 2016 that it was preparing a transfer plan as referred to in article 3:159c, paragraph 1 (former) Wft.

3.6. On 26 October 2016 DNB informed Conservatrix in writing that it intends to withdraw the licence to conduct the life insurance business pursuant to Article 1:104 paragraph 2 subparagraph c of the Wft. DNB provided the following explanation for this:

“Based on the financial statements for the financial year 2015 DNB finds that Conservatrix as at the end of 2015 did not meet the required solvency under the rules applicable at the time (Solvency I) and that it therefore does not meet the requirements of the transitional arrangement (). In view of the Day One report, which showed that Conservatrix did not meet the minimum capital-requirement, Conservatrix was required to submit a financial plan for the short term to DNB. Now that it has been established that Conservatrix has not done so, DNB is legally required to withdraw the licence.”

Transfer procedure

3.7. On 22 March 2017 DNB was, pursuant to Article 3:159u (former) Wft. application for approval of the transfer plan filed with this court (this proceeding is also referred to below as the transfer proceeding). DNB has, in short, submitted in its application that the conditions of the transfer plan were set out in a unilateral declaration by Trier to DNB, a letter referred to as a Confirmation Letter3 from 17 March 2017. DNB and Trier agreed that all shares issued by Conservatrix would, following court approval and by virtue of the transfer scheme being ordered, be transferred to Trier for payment by Trier to Conservatrix Groep of 1. In addition, according to DNB, it is important that Trier will ensure a capital increase that results in Conservatrix's solvency ratio being at least 135%.

3.8. The Confirmation Letter, insofar as relevant, states that:

"() the transfer of the Shares to the Transferee shall be effected on the basis of approval of a transfer plan (transfer plan) by the Court (the Transfer Plan) ().

() the Transferee shall capitalize the Company in line with arrangements agreed with DNB;

() the Transferee will capitalize the Company as soon as possible (), but in any event within two (2) Business Days after the Transfer Date."

3.9. By order of 15 May 20174 the court approved the transfer plan and ordered the transfer arrangement with respect to Conservatrix. The court applied the criterion set out in Article 3:159ij (former) Wft 5 on the basis of two subquestions:
( a) are there signs, with respect to Conservatrix, of a dangerous development relating to its equity, its solvency or technical provisions?;and.
(b) is it reasonably foreseeable that this development will not be reversed sufficiently or in a timely manner? In addition, the court had to determine whether the price stated in the transfer plan, given the circumstances of the case, is a reasonable price.6

3.10. Conservatrix Groep filed an appeal in cassation by petition dated 15 August 2017 against this decision of the District Court. By decision of 17 May 20197 the Supreme Court dismissed the appeal in cassation.

Evaluation Report.

3.11. On 14 December 2021 the report of the Conservatrix evaluation committee established by the Minister of Finance was (hereinafter: the Evaluation Report) made public. The evaluation committee investigated the conduct of DNB and the Ministry of Finance with regard to Conservatrix during the transfer of the shares to Trier and in the period up to the bankruptcy of Conservatrix on 8 December 2020. The Evaluation Report states, among other things, the following:
"()

On 22 October 2021 the Evaluation Committee submitted the question concerning the capital contribution to De Nederlandsche Bank. The response is as follows:
In the assessment framework that on 7 March 2017 in the steering committee [Conservatrix] was discussed, a capital contribution is mentioned as a criterion for bringing the SCR ratio [SCR Solvency Capital Requirement under Solvency II, rb] to 135 percent, where it was stated that the amount required on 5 March was estimated at 103 million euros.

In the assessment of the criterion, “capital contribution” deliberately placed in quotation marks because it became known that the actual capital contribution would differ due to the reinsurance to be taken out. However, the exact extent was still unclear at that time. This explanation is included in the assessment (...).

On 7 March 2017 the positive effect of the proposed reinsurance arrangement on equity was estimated at approximately 67 million euros, with a maximum of 150 million euros in insurance liabilities was reinsured. The calculated increase in equity consisted of the difference between the premium payable and the reinsured liabilities (50 million euros) and a release of the risk margin (17 million euros). Upon the transfer in May 2017 the reinsurance agreement with CBL ultimately contributed to an increase in Solvency II own funds of 61 million euros, consisting of the difference between the reinsurance premium paid and the reinsured obligations, and a release of the risk margin of 11 million euros. Because on 7 March 2017 the details of the reinsurance agreement between Conservatrix and CBL, and its impact on solvency, were not yet clear, the information provided to the Supervisory Council indicated what the amount of the maximum capital contribution would be (approximately 103 million euros) with the caveat that the final amount would depend on the extent of the effects of the reinsurance agreement on equity and the SCR to be maintained. Upon the transfer to Trier Holding, the Solvency II own funds were strengthened by a total of more than 79 million euros, consisting of the capital contribution of more than 18 million euros and the effects of the reinsurance agreement concluded with CBL. As a result of the capital strengthening and the reduction in the SCR, the SCR ratio recovered to well above 135 percent.

()

5.9.2 The submission protocol

The agreements with Lindberg [ultimate beneficial owner (UBO) of Trier, District Court] were recorded in a large number of documents involving and signed by various parties. First of all, there is a main document, the Confirmation Letter to the Dutch Central Bank for the transfer of the shares in Nederlandsche Algemeene Maatschappij van Levensverzekering Conservatrix N.V. In this Confirmation Letter dated 17 March 2017 () the transfer of the shares and various resources, such as websites and domain names, was documented.

Other agreements set out the obligations that the parties have toward each other.
Similarly, on 17 March 2017 Trier Holding B.V. and De Nederlandsche Bank agreed on the submission protocol. This protocol was signed by De Nederlandsche Bank and by the directors of Trier Holding B.V.

The protocol briefly sets out the key agreements with Trier Holding B.V., including the required solvency ratio of 135 percent and the reinsurance.
The Agreement re post-completion covenants has several annexes. The Agree- ment itself was signed by:
De Nederlandsche Bank

Trier Holding B.V.
Netherlands Insurance Holding Inc. (Delaware)
NIH Capital LLC (North Carolina)
[name 2]
()

5.9.3 The recapitalization commitment

This Annex sets out the so-called recapitalization commitment under which Trier Holding B.V. and the indirect shareholders undertake to maintain an SCR of at least 135 percent to be maintained.
()

5.9.4 The reinsurance agreement
On 15 May 2017, the date of the judgment of the Amsterdam District Court, concerning the approval of the transfer plan, Conservatrix and CBL entered into an Aggregate Excess of Loss Reinsurance Treaty. De Nederlandsche Bank is not a party to this agreement, but did, in the Process Letter with which negotiations with [name 1] began, and the Agreement set out conditions that a reinsurance agreement must meet in order to qualify as risk mitigation under Solvency II. De Nederlandsche Bank was involved in the final text of the agreement: the draft text was reviewed to determine whether all stipulated conditions had been met
()."
Enterprise Chamber Compensation Proceedings

3.12. Conservatrix Group filed in 2017 an application with the Enterprise Chamber of the Amsterdam Court of Appeal pursuant to section 3:159ab (former) Wft for the determination of additional compensation in connection with the compulsory transfer of the shares in Conservatrix. The respondent in these proceedings is the State of the Netherlands (hereinafter: the State).

3.13. By order dated 24 August 20218 held that it intended to order an expert report to answer the question as to the value of the shares in Conservatrix. In the decision of 20 December 20249 the Enterprise Chamber subsequently ordered an expert report and appointed three experts.

3.14. By order of 4 June 202510 the Enterprise Chamber terminated the appointment of one of the experts and appointed a new expert. The Enterprise Chamber also determined the advance payment for the costs of the investigation and ordered that Conservatrix Groep and the State each pay half of this advance..

3.15. By application dated 20 May 2025 Conservatrix Groep has (also) filed an application with the Enterprise Chamber in which, in brief, it requests that the orders of 24 August 2021 and 20 December 2024 pursuant to Article 387 Rv to revoke. By decision of 31 July 202511 the Enterprise Chamber denied this request.

4 The request and the defense
Application for revocation
4.1. Pursuant to Article 382 DCCP, Conservatrix Group requests that the Court issue an order, provisionally enforceable:

1. setting a date and time for the hearing of this application to commence;
2. finding the grounds advanced for revocation of the order of 15 May 2017 to be valid within the meaning of Article 387 DCCP and reopening the proceedings in their entirety;

3. allowing Conservatrix Group to amend and supplement its assertions and defenses;
4. revoking the order of 15 May 2017 and, in doing so:

a. refusing to approve the transfer plan, or at least withdrawing the approval, and not issuing the transfer order or withdrawing the issuance of the transfer order;
b. declaring as a matter of law, or at least determining, or at least ruling, or at least finding that:
i. DNB committed fraud;
ii. DNB is consequently liable for damages;
iii. the approval of the transfer plan was based on fraud and/or that the transfer plan would not have been approved if the fraud had not occurred;
iv. the issuance of the transfer order was based on fraud and/or that this transfer order would not have been issued if the fraud had not occurred;
v. that the price of 1 as stated in the transfer plan is not reasonable;.
vi. it could not reasonably have been foreseen that the dangerous development regarding solvency could not be sufficiently or promptly reversed;
5. ordering DNB to pay the actual costs of the proceedings.

4.2. Conservatrix Group based its application for revocation on the assertion that the Court's order was based on fraud committed by DNB in the proceedings12 and that, after the Court's order, it obtained documents of a decisive nature, or became aware of their existence, which had been withheld through the actions of DNB.13 In its further explanation and substantiation of the application for revocation, Conservatrix Group also based its
application for revocation on the assertion that there are documents whose falsity has been acknowledged.14.

4.3. According to Conservatrix Group, DNB's fraud consists of DNB having improperly done the following in its application and during the proceedings:
( a) asserted that there was a dangerous development concerning Conservatrix's solvency that could not be reversed sufficiently promptly;
( b) asserted that a capital contribution of at least 58,1 million would be required to eliminate the identified dangerous development;
( c) asserted that it would be compelled to revoke Conservatrix's license if the transfer plan was not approved;
( d) asserted that Trier would provide the required capital reinforcement that would ensure a solvency ratio of at least 135%;
( e) concealed the reinsurance and withheld documents, and;
( f) concealed that the intended increase in the solvency ratio to at least 135% had nothing to do with the alleged capital reinforcement and capital contribution by Trier, but would be achieved through a reinsurance arrangement already agreed upon by DNB and a third party on 17 March 2017 that would be financed from Conservatrix's own resources.
Because the reinsurance was not mentioned at all in the transfer plan and was also not discussed in the pleadings, DNB presented the Court in 2017 with a transfer plan that did not correspond to reality. On that basis, DNB requested approval and requested the issuance of the transfer order, while DNB knew that the Court and Conservatrix Group were being incompletely informed.;The Evaluation Report further shows that DNB improperly withheld documents in the transfer proceedings, including the submission protocol, which, according to the Evaluation Report, contains the principal agreements with Trier concerning the required solvency of 135%

and the reinsurance. In the proceedings before the Enterprise Chamber between the State and Conservatrix Group, the State argued that the reinsurance agreement formed an integral and inseparable part of the transfer plan. DNB's application in the transfer proceedings was “false” because an essential component had been omitted from it. The State's acknowledgment must also be attributed to DNB, according to Conservatrix Group throughout.

4.4.

DNB opposes the granting of the application and argues as follows. On the merits, there is no ground for revocation of the order. The reinsurance concerns the measures to be taken to improve solvency and therefore does not need to be submitted to the Court for review. If the reinsurance had been discussed, this would not have led to a different outcome.
According to DNB, the application also cannot be granted on procedural grounds. First, the application was filed too late because Conservatrix Group had already been aware, at the latest since July 2018, of the reinsurance and the fact that it formed part of the agreements with Trier concerning the capital reinforcement following the transfer. Furthermore, the nature of the order precludes revocation. Finally, Conservatrix Group has no interest in revocation because the only alternative to the transfer was Conservatrix's bankruptcy.

Application for inspection of documents

4.5. Conservatrix Group requests, by way of an independent application, that the Court issue an order, provisionally enforceable:
1. insofar as DNB has not cooperated with the extrajudicial request to provide documents, ordering DNB to submit a copy of the documents listed below to Conservatrix Group, subject to a penalty payment of 1 million if DNB fails to comply within one (1) week after service of the Court's order to that effect, to be increased by 10.000 for each day that DNB subsequently remains in default:
a. the Submission Protocol signed by Trier and DNB on 17 March 2017;
b. the Agreement re post-completion covenants signed on 17 March 2017 by DNB, Trier, Netherlands Insurance Holding Inc. (Delaware), NIH Capital LLC (North Carolina) and [name 2] ;
c. the Recapitalization Commitment signed on 17 March 2017 by DNB, Trier, [name 2] and NIG Capital LLC (North Carolina);
d. the Aggregate Excess of Loss Reinsurance Treaty signed on 15 May 2017 by the new directors of Conservatrix and CBL;
e. DNB's Process Letter;
f. all appendices and annexes to the aforementioned documents and all other related documents concerning the agreements made by or with the consent or approval of DNB with third parties in connection with the compulsory acquisition as a result of which Conservatrix Group lost its shares, including the documentation and reports referred to on page 97 of the Evaluation Report;
g. the general ledger account for equity 2017 and a detailed statement of changes in equity accompanying Conservatrix's 2017 financial statements, as referred to in Article 2:378 DCC;
h. the auditor's report on the audit of the 2017 financial statements as referred to in Article 2:393 paragraph 4 DCC;
i. the assessment by KPMG Advisory N.V. mentioned on page 7 of Conservatrix's 2017 financial statements ("[t]he market value of the reinsurance agreement was assessed by KPMG Advisory N.V.").

4.6. Pursuant to Articles 21 and 22 DCCP and Article 843a DCCP (old) or Article 195/195a DCCP (new), Conservatrix Group requests that DNB provide it with a copy of the specified

documents. Conservatrix Group asserts (a) that it has a sufficient interest in obtaining this information because it is relevant to the further assessment of whether (i) there was any need at all for a compulsory transfer of the shares, (ii) less far reaching measures were possible and (iii) the price was reasonable given the circumstances of the case,15 (b) that the information is relevant to the legal relationship to which Conservatrix Group is a party and (c) that Conservatrix Group has described the information concerned with sufficient specificity. Conservatrix Group argues that its interest relates both to the revocation proceedings and the compensation proceedings before the Enterprise Chamber, as well as to the possible liability of DNB and the State on the ground of tort.

4.7. DNB also opposes the granting of this application. DNB argues as follows. Because the application for revocation cannot be granted, Conservatrix Group has no interest in the requested documents, and the required legal relationship between DNB and Conservatrix Group is also lacking. Insofar as the application concerns any desire by experts to include documents in their investigation in the compensation proceedings before the Enterprise Chamber, there is likewise insufficient interest. Furthermore, no expert investigation will take place in the compensation proceedings because Conservatrix Group does not wish to make an advance payment to the experts. DNB also argues that the documents are confidential for supervisory purposes.16 This confidential supervisory nature of the documents constitutes a compelling reason that precludes inspection.17 Finally, DNB argues that it does not have all the requested documents in its possession.

5 The assessment

Application for revocation

Legal framework.

5.1. An order may, at the request of the original applicant or an interested party, be revoked on the grounds specified in Article 382 DCCP, unless the nature of the order precludes this. Articles 382 through 384 and 386 through 389 DCCP apply mutatis mutandis (Article 391 DCCP).
5.2. Pursuant to Article 382 DCCP, a judgment may be revoked, provided it has become final and binding, if:
a. it is based on fraud committed by the opposing party in the proceedings;
b. it is based on documents whose falsity was acknowledged after the judgment or established by a final and binding judgment, or;
c. after the judgment (the order), the party obtained documents of a decisive nature that had been withheld through the actions of the opposing party.
5.3. Pursuant to Article 387 DCCP, the proceedings are reopened in whole or in part if the court finds the ground or grounds advanced to be valid.;In the phase before such reopening, which is the phase in which the case is currently situated, the merits of the original application are therefore not at issue, and the court must examine exclusively whether a ground for revocation exists.
5.4. Conservatrix Group has relied, among other things, on the ground for revocation set out in Article 382 under a DCCP. The concept of fraud as referred to in Article 382 under a DCCP must be interpreted broadly. Fraud in this sense already exists when a party, through its dishonest conduct in the proceedings, prevents facts from coming to light that could have led to an outcome of those proceedings favorable to the opposing party. This will occur, among other circumstances, when a party conceals facts while it knew or should have known that the opposing party was not aware of those facts or could not reasonably be expected to be aware of them.18.
5.5. Because revocation on the ground of fraud requires that the judicial decision be based on that fraud, there must be a procedural causal connection between the facts presented as fraud, on the one hand, and the decision rendered, on the other. It is sufficient that it is plausible that

the court's decision would have been different if the facts had been correctly presented. For reliance on a ground for revocation to succeed, it is not necessary to establish at that stage that an application previously granted can nevertheless be denied, or vice versa. That question must be answered in the phase after the proceedings have been reopened, in which a new decision is rendered on the original application.

5.6. An application for revocation must be filed within three months after the ground for revocation arose and the applicant became aware of it.19

5.7. In the event of fraud, the period runs from its discovery by the injured party. In principle, the fraud is not discovered until the party that was deceived has evidence that it was committed, as before that time there was generally only a suspicion that had arisen.20 However, the fraud is not discovered only when the party that considers itself deceived is able to prove the fraud convincingly.21 The time at which the fraud was discovered is subjective. It is irrelevant when something could reasonably have been discovered. However, that subjectivity does not extend to the question of when a party has become aware of facts and circumstances showing clearly that there was fraudulent or dishonest conduct in the proceedings. In short, the relevant point is when the ground for revocation is discovered in its full extent, namely, the moment when suspicion turns into certainty. This criterion of awareness also applies when determining the commencement date of the revocation action in the case of false documents and in the case of withheld documents.

Application for revocation filed in time

5.8. In the Court's opinion, the application for revocation was filed in time.

Conservatrix Group asserts that the grounds for revocation, namely fraud and the withholding of documents, first became clear to it on 25 February 2025. On that day, its former attorney informed it of the sections of the Evaluation Report demonstrating this. The Evaluation Report shows that DNB already knew in March 2017 that there would be no capital contribution by Trier that would ensure a solvency ratio of at least 135%, but that this was also based on reinsurance. Only then, namely on 25 February 2025, did Conservatrix Group discover that the reinsurance had already been fully negotiated before 15 May 2017 and that it was inseparably connected with the transfer plan. The application for revocation was filed on 20 May 2025. The application for revocation was therefore filed in time, within the specified period of three months.

5.9. DNB argues that Conservatrix Group's application must be declared inadmissible because the application for revocation was filed too late. In that context, DNB argued that Conservatrix Group had in any event known of the reinsurance since 6 July 2018, when it submitted its written submissions in the classification proceedings, and also knew that the reinsurance formed part of the agreements made with Trier. This argument by DNB is rejected. The following considerations apply.

5.10. During the proceedings before this Court that resulted in the order of 15 May 2017, DNB did not mention the reinsurance with CBL at all. Nor did DNB submit any documents showing this reinsurance. DNB pointed out that, in its statement of defense of 19 October 2017 in the cassation proceedings, it explained that the reinsurance was inseparably connected with the transfer plan. In that statement of defense, it argued the following in this regard:

“10.7 Reversal of the transfer order would have disproportionately serious consequences in the present case. DNB explains this as follows.

10.8 Through its recapitalization commitment, Trier confirmed to DNB that it would achieve and maintain a solvency ratio of 135% for Conservatrix. This required capital reinforcement of 88.426.000 immediately after the transfer of the shares. That capital reinforcement was financed through (i) a share premium contribution by Trier on the shares in.
Conservatrix and (ii) a reinsurance agreement between Conservatrix and Colorado Bankers.

10.9 If it were to be assumed that annulment of the District Court's order would have the effect that the transfer of the shares to Trier would not remain in force, this would probably mean that the share premium contribution and reinsurance closely associated with that transfer likewise. could not remain in force. As a result, Conservatrix's solvency would again be seriously jeopardized. ()”

5.11. Contrary to DNB's argument, this does not show that the reinsurance agreement had already been fully negotiated and drawn up before the date of the forced transfer or that it was inextricably linked to the transfer plan. Nor does it follow from the written submissions filed by Conservatrix Groep on 6 July 2018 in the classification proceedings against the decision that Conservatrix Groep was aware of this. In those written submissions, Conservatrix Groep specifically argued that Conservatrix had dramatically turned its result around within six months and that it therefore assumed that the reinsurance had been concluded after 15 May 2017. In these written submissions, Conservatrix Groep wrote, among other things, the following:

"In other words, principally by concluding a single new reinsurance agreement, Conservatrix dramatically turned its result around within six months, which is, of course, highly significant as regards the inherent health and profit potential of Conservatrix at the time of the forced transfer on 15 May 2017.;What is downright bizarre, however, is that Colorado Bankers Life Insurance Company, with which Conservatrix concluded the reinsurance agreement, is, through [name 1], a group company of Trier Holding B.V., and is ultimately owned by [name 2] (). A form of intragroup reinsurance that DNB had previously, as recently as December 2015, expressly condemned at Conservatrix as being too risky!"

At the hearing in these proceedings, Conservatrix Groep also pointed out, correctly, that it would not have referred to a new reinsurance agreement if it had known that the reinsurance formed part of the transfer plan.

5.12. Furthermore, in support of its argument that Conservatrix Groep had already had the requisite knowledge for a considerable period, DNB relied on the following facts and circumstances:
- the 2017 financial statements of Conservatrix submitted in the cassation proceedings, which state: "As part of the agreement with DNB the new shareholder recapitalized the company above the envisaged minimum Solvency II ratio of 135% by injecting 18.4 million of capital directly and 72.1 million via a reinsurance agreement with Colorado Bankers Life, affiliate US company. The market value of the reinsurance agreement was assessed by KPMG Advisory N.V. After the recapitalization DNB revoked the appointment of the trustee but the company is still under so-called intensified supervision from DNB.",

- the cited Borgers letter of 15 March 2019 from Conservatrix Groep, which states: "Trier "contributed" the vast majority of the capital buffer required by the "transfer plan" by means of intragroup reinsurance, with the ultimate reinsurer being a group company established in Barbados (Bankers Reinsurance Company Ltd.) ()." and
- [name 3], a director of Conservatrix Groep, was interviewed by the investigators of the evaluation committee and was therefore aware of the reinsurance.
None of this can lead to the conclusion that the requisite subjective knowledge existed either (see 5.7 above). The mere fact that Trier ultimately strengthened the capital through reinsurance does not mean that Conservatrix Groep was aware that the reinsurance had already been fully negotiated by DNB before 15 May 2017 and formed part of the capital injection by Trier referred

to in the transfer plan. The cited passages are insufficiently specific regarding when and how the reinsurance came about.

5.13. Nor does the mere mention of the Evaluation Report by Conservatrix Groep's former lawyer in an interruption letter dated 13 May 2022 mean that Conservatrix Groep was aware of the full contents of that report at that time.

Ground for revocation: fraud committed in the proceedings

5.14. The court recalls that Conservatrix Groep asserted that DNB committed fraud by, among other things, (i) stating in the transfer proceedings in 2017 that a capital injection of at least 58,1 million was required, (ii) stating that Trier would provide the necessary capital strengthening that would ensure a solvency ratio of at least 135%, (iii) concealing the reinsurance, (iv) withholding the Submission Protocol and (v) concealing that the intended increase in the solvency ratio to at least 135% had nothing to do with the stated capital strengthening and capital injection by Trier, but would be achieved by means of a reinsurance arrangement that DNB and a third party had already agreed on 17 March 2017 and that was financed from Conservatrix's own funds. According to Conservatrix Groep, because the reinsurance was not mentioned at all in the transfer plan and was not discussed either, DNB presented the court in 2017 with a transfer plan that did not correspond to reality.

5.15. It is established that the concept of reinsurance does not appear in the transfer plan or in DNB's pleadings in the transfer proceedings. As already considered above, DNB also did not say a word about the reinsurance during the hearing before the court in 2017. However, the Evaluation Report has made clear that the capital strengthening of Conservatrix took place, at least predominantly, by means of reinsurance, that the intended increase in the solvency ratio to 135% was achieved mainly through that reinsurance and not, or only in part, through a capital injection by Trier. There was no capital injection of at least 58,1 million. The Evaluation Report has also made clear that, at the time the transfer plan was submitted to the court for approval, it was already intended that the capital strengthening of Conservatrix would take place to a significant extent by means of this reinsurance.

5.16. DNB's assertion that the reinsurance was not mentioned because it was not yet clear how the capital strengthening would take place and that this would only become relevant after approval is not supported by the facts. The Evaluation Report shows that Trier and DNB agreed on a Submission Protocol on 17 March 2017, which set out the principal agreements with Trier, including those concerning the required solvency ratio of 135% and the reinsurance. Overall, it follows from the Evaluation Report that, before the petition was filed on 22 March 2017, it was clear to DNB that a reinsurance agreement would be concluded. The documents show that, on 7 March 2017, the positive effect of the proposed reinsurance arrangement on equity was estimated at approximately 67 million, with insurance liabilities of up to 150 million being reinsured. The Evaluation Report states that only the exact effect of the reinsurance on solvency was not yet clear at that time (see 3.11).

5.17. DNB further argues that, in the transfer proceedings in 2017, it did not refer exclusively to a capital injection, but to capital strengthening, which was also intended to include other measures to improve solvency, including the reinsurance. This argument cannot assist DNB either. In the proceedings in 2017, DNB created the impression, incorrectly as has now become apparent, that a capital injection of at least 58,1 million was necessary and that the transfer plan provided that this amount would be paid by Trier. It is true that DNB used both the term “capital strengthening” and the term “capital injection” in its petition and written pleadings in 2017, but it did not make clear that capital strengthening did not mean only a capital injection. This is apparent from the pleadings.

5.17.1. In its petition for approval of the transfer plan, DNB stated the following at the time concerning the capital strengthening (underlining by the court):
“4.17 The identified dangerous development regarding the available solvency can be remedied by a capital injection of such a size that the solvency requirement (SCR and MCR) is once again met. To that end, as at year end 2016, a capital injection of at least EUR 58,1 million is required.
()

5.6 With regard to the solvency position, it was agreed that Trier would strengthen Conservatrix's capital at the time of the transfer of the shares to such an extent that Conservatrix's solvency ratio would be at least 135%. ()

6.38 However, the new shareholder of Conservatrix will provide capital strengthening that will result in Conservatrix once again meeting the minimum capital requirement and achieving a solvency ratio of at least 135%, thereby safeguarding the continuity of Conservatrix. This means that the creditors of Conservatrix will have better prospects of recovery than under an alternative scenario.

6.39 Moreover, the transfer is in the interests of policyholders, whose position will improve as a result of the transfer. Their interests are better protected because, as a result of the capital injection, Conservatrix is solvent again and the continuity of Conservatrix is safeguarded. There is therefore no longer any need for DNB, as previously intended, to revoke Conservatrix's licence and, as a consequence, restrict its power of disposition. ()

6.41 () As a result of the promised capital injection, a transfer to Trier, unlike the previously contemplated transfer to LVM, does not impair the rights of policyholders and/or other creditors. ()"

5.17.2. DNB's written pleadings at the time state (underlining by the court):
"4.8 In short: whereas Trier is now willing to eliminate the negative equity and remedy the solvency shortfall ()

5.3 () The Confirmation Letter does indeed constitute the transfer plan for which approval is sought and contains the conditions under which the transfer of the shares takes place. ().

5.9 () In particular, during this period DNB can ensure that the capital injection promised by Trier is paid no later than on or immediately after the date of the transfer. ()".

5.18. Nor did the court understand it that way in 2017, as is apparent from the decision. In paragraph 4.15.5 of the decision, it was considered that the transfer plan included the condition that, in addition to paying the purchase price of 1, Trier would make a capital injection resulting in a solvency ratio of at least 135%. This was worded as follows in the decision (underlining by the court):
"DNB states that Trier's bid, which was coordinated with DNB, and therefore the transfer plan as submitted for approval, was made subject to the following conditions:
- in addition to paying the purchase price of EUR 1,00, Trier will make a capital injection resulting in a solvency ratio of at least 135%
()."
The court further considered in its decision (underlining by the court):

"4.14.2. DNB states that the possibilities of reversing the dangerous development have been explored exhaustively. According to DNB, this did not produce acceptable results. DNB states that Conservatrix must strengthen its equity, based on the position at year end 2016 and without

taking additional setbacks into account, by at least EUR 28,9 million in order to meet the minimum capital requirement (MCR) applicable under Solvency II, as laid down in article 3:53 paragraph 4 Wft, and by at least EUR 58,1 million in order to meet the solvency capital requirement (SCR) applicable under it. According to DNB, Conservatrix will then have to strengthen its equity even further in order to have a buffer to absorb setbacks. ()”

5.19. DNB further relied on the argument that the information was confidential for supervisory purposes. The court rejects this argument as well. Neither then nor now has DNB made clear why the Submission Protocol and the other documents recording the agreements with Trier could not be disclosed in proceedings and during a hearing held behind closed doors, for which the law (Rv) also provides various safeguards to prevent information that must remain confidential from becoming public.

5.20. It follows from all of this that, in the proceedings in 2017, DNB did not actively inform the court and Conservatrix Groep about the reinsurance, or at least did not disclose that the capital strengthening consisted largely of the reinsurance with CBL and not solely of a capital injection, even though it knew or should have known that Conservatrix Groep was not aware of those facts and could not reasonably be expected to have been aware of them. The mere fact that DNB failed to do so does not in itself mean that there was fraud within the meaning of article 382 under a Rv. This also requires, in short, that the fact was relevant to the court's decision at the time to approve the transfer plan. In addition, there must be a procedural causal link between the facts relied on as grounds for revocation, on the one hand, and the decision made by the court in the decision of 15 May 2017, on the other hand (see 5.5). It is sufficient that it is plausible that the court's decision would have been different if the facts had been presented correctly.

5.21. DNB takes the position that the reinsurance was not relevant to the court's assessment in 2017 and that DNB therefore did not need to raise it. DNB explained this as follows. In view of the assessment framework under the Wft, there was no reason to mention the reinsurance or the method of capital strengthening. The court did not have to rule on specific measures to improve Conservatrix's solvency. It was not for the court to assess how the acquiring party, Trier, would restore Conservatrix's solvency to the desired level. Such arrangements fell within DNB's mandate as supervisory authority. Moreover, when determining whether the price was reasonable, what mattered was the expected future outlook without implementation of the transfer plan. According to DNB, the court therefore did not need to consider the future scenario in which the transfer plan was implemented.

5.22. This defence by DNB also fails. When assessing DNB's application in 2017, the court had to assess not only (i) whether the price specified in the transfer plan for the acquisition of the shares, in this case 1, was a reasonable price under the given circumstances, but also, first, (ii) whether it had been demonstrated on a summary basis that Conservatrix showed signs of a dangerous development regarding its equity, solvency or technical provisions and whether it was reasonably foreseeable that this development would not be reversed sufficiently or in time (see 3.9 above). The fact that the recapitalisation could apparently take place by means of reinsurance is particularly relevant to this latter assessment, which in sequence was actually the first. After all, if the situation could have been remedied by measures less far reaching than a transfer scheme, the court could have concluded that there was not yet a dangerous development that would not be reversed sufficiently or in time, and therefore that the ground for ordering the transfer scheme had not been met.22.

5.23. As has become apparent, upon conclusion of the reinsurance, an amount of 100 million was paid to CBL as a premium from Conservatrix's own funds, in return for which CBL reinsured Conservatrix's insurance liabilities in an amount of 150 million. As a result of this reinsurance, Conservatrix's equity increased by 61 million. The premium was therefore paid in full from its own funds, resulting in a substantial increase in equity. This is also apparent from Conservatrix's 2017 financial statements, which state: “The full-year 2017 result before tax increased significantly to 84.9 million compared with -18.3 million in the previous year. This improvement was mainly caused by a new reinsurance agreement with Colorado Bankers Life Insurance Company. A single reinsurance premium of 100 million was paid while the reinsurers' share of the changes in technical provisions rose to 152 million. Due to the reinsurance agreement 10.7. million of risk margin was released. () In combination with a significantly decreased solvency capital requirement (SCR) to 25.4 million, this resulted in a Solvency II ratio of 188% (2016: -16%) () Result on reinsurance agreement EUR 48.861.000.”

5.24. Conservatrix Group has argued that it could have entered into comparable reinsurance with Heco Reassurantie N.V. S.A. (hereinafter: Heco Re), but that this possibility, partly because the reinsurance with CBL was not mentioned, was wrongly not addressed during the proceedings in 2017. Conservatrix Group explained this further as follows.

5.24.1. On 15 May 2017, Conservatrix could have continued its business by entering into comparable reinsurance with Heco Re. Contrary to what DNB assumes (and assumed), Heco Re (of which [name 3] is a shareholder) is not a party affiliated with Conservatrix. It is a European reinsurer whose management at the time was conducted by the renowned insurance broker AON Global Risk Consulting. DNB's doubts about Heco Re's solvency were unfounded.

5.24.2. According to Conservatrix Group, by contrast, CBL was a small insurance company with one shareholder, Lindberg, which was moreover not subject to European supervision and with which a reinsurance agreement was concluded that was not at arm's length. The Evaluation Report also shows that the reinsurance agreement with CBL was not surrounded by sufficient safeguards:

"() With the benefit of hindsight, the structure of the arrangements with the new owner contained significant deficiencies. For example, there was no form of security for the additional funding obligation intended to safeguard solvency. The reinsurance agreement (which was placed with a subsidiary of Lindberg) raises questions for the Evaluation Committee. The reinsurance agreement also offered the new owner opportunities to place the reinsurance risk with yet another subsidiary of the new owner in Barbados. Conditions had been imposed on the security, the so-called collateral, that were not met. ()"

5.24.3. In 2014, Conservatrix Group investigated whether Conservatrix's solvency could be strengthened by concluding a reinsurance agreement between Heco Re and Conservatrix, but this was not pursued because DNB (and the trustee) objected to it. Conservatrix Group could have approached other reinsurers, as it had also proposed in 2014, but it did not do so because DNB presented only the sale option as a realistic scenario. As a result, Conservatrix Group did not investigate the possibility of reinsurance further. In light of the position taken by DNB and the trustee, it seemed pointless to devote any further effort to it.

5.24.4. According to Conservatrix Group, this meant that, through its position in the earlier phase and by failing to disclose in the proceedings in 2017 the reinsurance agreement with CBL that had resulted in the required capital strengthening, as well as its terms, DNB deprived Conservatrix Group of the opportunity to demonstrate that the reinsurance arrangements were comparable.

5.25. DNB counters that it would not have consented to a reinsurance agreement between Conservatrix and Heco Re to improve Conservatrix's solvency, and explained this as follows. Heco Re was a group company of Conservatrix Group that had no customers outside its own group, meaning that Conservatrix and Heco Re were too closely intertwined. DNB questioned whether the reinsurance premium was at arm's length. DNB also had doubts about Heco Re's solvency. According to DNB, all this meant that the Court could not have taken reinsurance with Heco Re into account in its assessment.

5.26. The Court considers as follows. Against the background that the reinsurance by CBL was funded from Conservatrix's own resources, and on the basis of what the parties have argued, it cannot simply be concluded, as DNB contends, that reinsurance with Heco Re was not a realistic possibility. Account is also taken of the fact that, in view of what is known about the conditions DNB had agreed with Trier and the reinsurance structure, there were also substantial grounds for criticism of that reinsurance. In any event, this shows that DNB was willing to allow Conservatrix to resume operating in the market under its licence after concluding a reinsurance agreement with an affiliated party. This makes it plausible that less intrusive measures were possible, namely reinsurance with Heco Re or another reinsurer.

5.27. DNB's argument that Conservatrix Group was unwilling to contribute capital itself and that this alone made a complete package such as the one agreed with Trier impossible is rejected. Although the Court considered the following in the order of 15 May 2017: “There is no concrete prospect whatsoever of Conservatrix's capital being strengthened by or on behalf of Conservatrix Group. As early as 2014, Conservatrix Group indicated that it was unwilling to make an additional contribution, and it repeated this at the hearing before the Enterprise Chamber and during the oral hearing of the present application.”, Conservatrix Group has pointed out that this statement was made in the context of the information submitted at that time by DNB to it and to the Court. Conservatrix Group now contends that, had it known of the possibility of reinsurance, it would have been able and willing to contribute 18,4 million, as Trier did according to DNB. The Court does not consider this implausible. As considered above, DNB created the impression that a capital contribution of 58,1 million was necessary. This proved to be incorrect. Conservatrix Group believed that reinsurance was not possible. Conservatrix Group also disputes that Trier actually made a capital contribution of more than 18 million. This was discussed during the oral hearing, and it has also not become clear to the Court whether that capital contribution was made.

5.28. Because DNB kept the reinsurance outside the proceedings in 2017, there could therefore be no full debate on whether less far reaching measures (alternatives) would have been possible. This means that it has been sufficiently demonstrated that DNB adopted an unfair procedural position in the previous proceedings on a point that was partly decisive for the assessment of the application in DNB's favour. It is plausible that the Court's decision in the transfer proceedings would have been different if account had been taken of the fact that the strengthening of Conservatrix's capital to be provided by Trier under the transfer plan in order to achieve a solvency ratio of 135% consisted (largely) of the reinsurance concluded with CBL, the premium for which was paid from Conservatrix's own resources. The Court's decision on the original application in 2017 was therefore based on fraud committed by DNB in the proceedings, as referred to in Article 382(a) of the Code of Civil Procedure. The Court therefore finds this ground for revocation put forward by Conservatrix Group to be valid. For that reason, the other grounds for revocation put forward by Conservatrix Group (pursuant to Article 382(b) and (c) of the Code of Civil Procedure) need not be discussed further.

The nature of the order precludes revocation

5.29. As considered above, Article 390 of the Code of Civil Procedure provides that an order may be revoked unless the nature of the order precludes this. An order whose factual consequences are irreversible, by its nature, precludes revocation. That is also the case here: the shares in Conservatrix have been transferred and Conservatrix has moreover since been declared bankrupt.

This means that the legal remedy of revocation is not available here. In this regard, the Court takes into account that the purpose and provisions of the Financial Supervision Act (former) concerning the handling of an application for an order imposing a transfer scheme and the legal remedies that may be pursued under that Act against a decision on such an application preclude revocation. The Financial Supervision Act (former)

provides that if a shareholder's objection to a transfer scheme succeeds, this results in annulment only if reversing the transfer scheme would not have disproportionately serious consequences.23 Furthermore, no appeal lies against an order imposing a transfer scheme because of the high degree of urgency.24 In view of the interests of third parties involved in the transfer, including policyholders, there must be no uncertainty as to whether that decision remains in force.

5.30. Conservatrix Group will therefore be declared inadmissible in its application for revocation. Accordingly, the Court does not proceed to any further assessment in these proceedings, including the declaratory judgments requested by Conservatrix Group and listed under 4b in its application for revocation (see 4.1). In such a case, a possible remedy may be found in a claim for damages against the party that committed the (procedural) fraud.

Application for inspection of documents

5.31. The application for inspection was made after 1 January 2025. Consequently, the law of evidence as applicable from 1 January 2025 applies.25.

5.32. The Court notes at the outset that DNB did not cooperate with an extrajudicial request for inspection, and the application for inspection of the documents is therefore before the Court for determination.

5.33. For a claim to a right of inspection within the meaning of Article 195 of the Code of Civil Procedure to be granted, the requirements of Article 194 of the Code of Civil Procedure must be met.26 The person seeking information from another (i) must be a party to a legal relationship and (ii) the information sought must be sufficiently specific. Furthermore, (iii) a party must have a sufficient interest in its request for information and (iv) the person from whom inspection is sought must possess the requested information or be able to obtain it easily from a third party.27 Where a ground for exception applies, such as a compelling reason, this precludes the provision of the requested information.28

5.34. DNB disputes that Conservatrix Group has any interest in copies of the requested documents because the application for revocation must be rejected. The Court agrees with DNB that Conservatrix Group has no interest in the requested documents insofar as the inspection concerns the revocation proceedings, because Conservatrix Group will be declared inadmissible in its application for revocation. However, Conservatrix Group has referred not only to the revocation proceedings, but also to the compensation proceedings before the Enterprise Chamber and the possible liability of DNB and the State in tort. With a view to those proceedings (and assessing its prospects in them), Conservatrix Group has a sufficient interest in obtaining inspection of the requested documents.

5.35. The Court further finds that the requirement of "being a party to a legal relationship" has been met. The concept of a party to a legal relationship must be interpreted broadly. Legal relationship means any legal relationship, not only an agreement, but also an obligation arising by operation of law, such as a tort. The existence of a legal relationship need not yet have been established in court. Facts relevant to the existence, content or scope of a legal relationship are often not yet clear. It is precisely for that reason that a party may claim certain information that it does not possess itself but another person does.29

5.36. Furthermore, the documents sought must be sufficiently specific. This requirement has also been met, with the exception of several documents referred to in 4.5 under 1 f. "All appendices and annexes to the aforementioned documents" are sufficiently specific, but this

does not apply to “all other related documents connected with the arrangements made by DNB, or with DNB's consent or approval, with third parties in connection with the compulsory takeover as a result of which Conservatrix Group lost its shares”, nor does it apply to “all documentation and reports referred to on page 97 of the Evaluation Report”. Page 97 of the Evaluation Report contains only the following (underlining by the Court):

"On 17 March 2017, Trier Holding B.V. and De Nederlandsche Bank agreed on a submission protocol and an Agreement re post-completion covenants, together with the accompanying annexes. De Nederlandsche Bank had to submit the application in consultation with the minister. The Director of Financial Markets and her staff had two weeks remaining to reach a well founded opinion on the basis of the application and all underlying documentation and reports."

The text does not indicate which "documents and reports" are meant here. The description of these "documents and reports" is very broad and therefore insufficiently specific to be regarded as "sufficiently specific".

5.37. DNB can also be regarded as "the person who possesses the information". A party possesses information in any event if it physically holds the information for which inspection is sought. It may also be the case that the respondent party, DNB, can easily obtain the information through a third party. DNB has not specified sufficiently which documents it does not possess and/or whether and why it could not easily obtain them.

5.38. According to DNB, it has compelling interests that preclude the requested inspection. It contends that the request concerns inspection of confidential supervisory information. It is correct in itself that the legislature intended a statutory duty of confidentiality in particular to constitute a compelling reason.30 However, DNB has not explained which documents must be regarded as confidential supervisory information under the law31 and why, so the Court disregards this defence because it has not been specified sufficiently.

5.39. In view of the foregoing, Conservatrix Group's application will be granted insofar as it concerns the provision of copies of the documents listed in 4.5 under 1 a through e, g through i, and part of f.

Time limit and penalty payment

5.40. In the Court's opinion, a time limit of one week after service of the order is too short for the provision of the documents, partly because certain documents may still have to be requested from third parties. A time limit of thirty days after service of the order is therefore set for providing the documents.

5.41. The Court sees no reason to impose a penalty payment on DNB. The assertion that DNB previously withheld essential documents in the proceedings, as argued by Conservatrix Group, is insufficient for that purpose. The Court assumes that DNB will comply with a judicial decision.

5.42. As requested, the order will be declared provisionally enforceable.

Costs of the proceedings

5.43. The Court sees reason to order DNB to pay Conservatrix Group's costs of the proceedings. The costs of the proceedings incurred by Conservatrix Group are assessed as follows:.

- court fee. 714,00.
- lawyer's fee 1.385,00. (2,5 points × 554,00).
- subsequent costs. 198,00. (plus the increase as stated in the decision).

Total 2.297,00.

5.44. Insofar as Conservatrix Group requests at this stage of the proceedings that DNB be ordered to pay the actual costs of the proceedings, the following applies. There are no grounds for awarding the lawyer's fees actually incurred in deviation from the fee schedule ordinarily applied. An order to pay the actual costs of the proceedings is possible only in exceptional circumstances, such as abuse of procedural law or unlawful conduct. This applies only in the event of a manifestly unfounded claim or defence, such as where the claim or defence is based on facts and circumstances whose inaccuracy a litigant knew or ought to have known, or on assertions that it should have understood in advance had no prospect of success.32 Restraint is appropriate when finding abuse of procedural law or unlawful conduct as a basis for an order to pay the actual costs of the proceedings, in view of the right of access to a court, which is also guaranteed by Article 6 ECHR.33 Conducting its defence in these proceedings in the manner in which it did does not constitute abuse of procedural law on DNB's part.

6 The decision

The Court

6.1. declares Conservatrix Group inadmissible in its application for revocation,

6.2. orders DNB to provide Conservatrix Group, within thirty (30) days after service of this decision, with a copy of:
a. the Submission Protocol signed by Trier and DNB on March 17, 2017;
b. the Agreement re post-completion covenants signed on March 17, 2017 by DNB, Trier, Netherlands Insurance Holding Inc. (Delaware), NIH Capital LLC (North Carolina) and [name 2];
c. the Recapitalization Commitment signed on March 17, 2017 by DNB, Trier [name 2] and NIG Capital LLC (North Carolina);
d. the Aggregate Excess of Loss Reinsurance Treaty signed on May 15, 2017 by the new directors of Conservatrix and CBL;
e. DNB's Process Letter;
f. all appendices and annexes to the aforementioned documents;
g. the shareholders' equity general ledger account for 2017 and a detailed statement of changes in shareholders' equity in Conservatrix's 2017 financial statements;
h. the auditor's report on the audit of the 2017 financial statements;
i. the assessment by KPMG Advisory N.V referred to on page 7 of Conservatrix's 2017 financial statements ("[t]he market value of the reinsurance agreement was assessed by KPMG Advisory N.V."),

6.3. orders DNB to pay Conservatrix Group's legal costs of 2.297,00, payable within fourteen days after being requested to do so, to be increased by 98,00 plus the costs of service if DNB does not voluntarily comply with the orders and the decision is served,

6.4. declares this decision provisionally enforceable to this extent,

6.5. dismisses the remainder of the relief sought.

This decision was rendered by mr. R.A. Dudok van Heel, mr. M. Wouters and mr. G.C. de Heer, judges, assisted by mr. E.C. Kleverlaan, court clerk, and pronounced in open court on February 5, 2026.

[1] ECLI:NL:RBAMS:2017:3309
[2] ECLI:NL:HR:2019:746
[3] Confirmation Letter to the Dutch Central Bank for the transfer of the shares in Nederlandsche Algemeene Maatschappij van Levensverzekering Conservatrix N.V.

[4] See footnote 1
[5] In conjunction with 3:159c (former) Wft
[6] Article 3:159ij paragraph 2 (former) Wft
[7] See footnote 2
[8] ECLI:NL:GHAMS:2021:2592, affirmed by the judgment of the Supreme Court of June 2, 2023, ECLI:NL:HR:2023:839
[9] ECLI:NL:GHAMS:2024:3571
[10] ECLI:NL:GHAMS:2025:1459
[11] ECLI:NL:GHAMS:2025:2200
[12] Article 382 under a Rv
[13] Article 382 under c Rv
[14] Article 382 under b Rv
[15] Article 3:159r (former) Wft and 3:159ij (former) Wft
[16] Article 1:89 Wft
[17] Article 194 paragraph 2 Rv
[18] Supreme Court October 4, 1996, ECLI:NL:HR:1996:ZC2162
[19] Article 383 Rv
[20] Parliamentary Papers II 1999-2000, 26 855, no. 3, p. 173
[21] Supreme Court November 2, 2012, ECLI:NL:HR:2012:BW9877
[22] Explanatory Memorandum to the Intervention Act (House of Representatives, parliamentary year 2011-2012, 33 059, no. 3, p.55
[23] Article 3:159aa Wft (former)
[24] Article 3:159aa paragraph 2 Wft (former) and Parliamentary Papers II 2011/12, 33059, no. 7, p.17
[25] Article XIIA of the Simplification and Modernization of Evidence Law Act
[26] If necessary, the application for inspection may also be made pursuant to Article 196 Rv (an application
for a preliminary evidentiary measure)
[27] Article 194 paragraph 1 Rv
[28] Article 194 paragraph 2 Rv
[29] Parliamentary Papers II 2019/20, 35 498, no. 3, p. 47 (Explanatory Memorandum)
[30] Article 194 paragraph 2 Rv
[31] Article 1:89 Wft
[32] Supreme Court June 29, 2007, ECLI:NL:HR:2007:BA3516
[33] Supreme Court December 23, 2022, ECLI:NL:HR:2022:1934

SURE TRANSLATION

Sure Translation
https://www.suretranslation.com
Order ID: 6a9711cd95be64579d0956d4

# Certification of Translation Accuracy

From Dutch to English

As an authorized representative of Sure Translation, I hereby confirm, to the best of my knowledge and understanding, that the translated text was prepared by a competent translator and that it is a complete and accurate translation of the original document. I further certify that this translation was not completed by a family member, friend, or business associate.

This certification does not provide any representation concerning the authenticity or content of the original document. Moreover, Sure Translation assumes no liability for the manner in which the translation is employed by the customer or any third party. Any acceptance or use of the translation is determined by the requesting party and the recipient institution.

A copy of the translation is appended to this certification.

Joyce Wood
Authorized Representative
Order Date: 09/01/2026

**SureTranslation**

Sure Translation Agency | United States of America
CERTIFIED TRANSLATION
ATA Corporate Membership ID: M-103084