# EXHIBIT H

Colorado Bankers Life Insurance Company, in Rehabilitation v. Nederlandsche Algemeene Maatschappij van Levensverzekering “Conservatrix” N.V., Standard Financial, Ltd., and Fifth Third Bank

Wake County Superior Court, No. 19 CV 017191 — filed December 23, 2019; served on Conservatrix January 14, 2020

(public records; reproduced as served)

ab A — Verified Complaint for Declaratory Judgment and Injunctive Relief, filed December 23, 2019 (No. 19 CV 017191) — pp. 3–

Tab B — Exhibit B to the Complaint — Aggregate Excess of Loss Reinsurance Treaty (May 15, 2017) — pp. 15–46

Tab C — Exhibit C to the Complaint — Trust Agreement (May 15, 2017) — pp. 48–77

Tab D — Exhibit D to the Complaint — Rehabilitator’s notice of December 22, 2019 — pp. 79–80

Tab E — Exhibit E to the Complaint — Dentons e-mail of December 22, 2019 — pp. 82–83

Tab F — Exhibit F to the Complaint — Conservatrix’s Request for Arbitration dated December 22, 2019 — pp. 85–103

# TAB A

Verified Complaint for Declaratory Judgment and Injunctive Relief, filed December 23, 2019 (No. 19 CV 017191)

(pages 3–13)

19CV017191

STATE OF NORTH CAROLINA

WAKE COUNTY

FILED
2019 DEC 23 AM 8:50
WAKE COUNTY, C.S.C.
BY:

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. ____________

| | | |
|---|---|---|
| **COLORADO BANKERS LIFE INSURANCE COMPANY, in Rehabilitation,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING 'CONSERVATRIX' N.V., STANDARD FINANCIAL, LTD., and FIFTH THIRD BANK,** | ) | **VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| **Defendants.** | ) | |

**NOW COMES** Plaintiff Colorado Bankers Life Insurance Company ("CBL"), in Rehabilitation pursuant to the order of this Court, through its Special Deputy Rehabilitators, pursuant to N.C. Gen. Stat. §§ 1-253 *et seq.*, 58-30-85(a)(12), 58-30-20, and Rules 3, 7, 8, 57, and 65 of the North Carolina Rules of Civil Procedure, and through counsel, and hereby files this Verified Complaint for Declaratory Judgment and Injunctive Relief.

CBL seeks a judicial determination as to the proper distribution of certain funds held in trust by Fifth Third Bank (the "Trust Account") under the Trust Agreement entered into by and among CBL and Defendants Standard Financial, Ltd. ("SFL"), Nederlandsche Algemeene Maatschappij van Levensverzekering 'Conservatrix' N.V. ("Conservatrix"), and Fifth Third Bank, which was entered into pursuant to the Aggregate Excess of Loss Reinsurance Treaty (the

"Reinsurance Agreement") between Conservatrix and CBL; and moves for an order temporarily restraining and preliminarily enjoining Fifth Third Bank, Conservatrix, SFL, and any other person from removing, disturbing, or otherwise interfering with any of the assets in the Trust Account pending further order of this Court.

In support of its Complaint, CBL states as follows:

JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court. *See* N.C. Gen. Stat. § 58-30-15; N.C. Gen. Stat. § 1-253 *et seq.* ("Declaratory Judgment Act"); N.C. Gen. Stat. § 7A-245(a)(3); N.C. Gen. Stat. § 1-485.

2. This Court has the power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed, and such declaration shall have the force and effect of a final judgment or decree. N.C. Gen. Stat. § 1-253.

3. The purpose of the Declaratory Judgment Act is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.

4. An action under the Declaratory Judgment Act may be used to determine the construction of a statute and the legal rights of persons under that statute.

5. The Declaratory Judgment Act is to be liberally construed and administered.

6. Venue is proper in this Court pursuant to N.C. Gen. Stat. § 58-30-15(d) because this action is authorized by Article 30 of Chapter 58 of the North Carolina General Statutes.

7. This Court has jurisdiction over the Trust Account and the Defendants pursuant to N.C. Gen. Stat. §§ 58-30-15(c), 1-75.3, 1-75.4, 1-75.8 because this action involves property of the CBL receivership estate, Defendants Conservatrix, Fifth Third Bank, and SFL have each entered into contracts in this State with regard to the Reinsurance Agreement and Trust Account, each has or claimed an interest in the Trust Account, holds assets in which the Rehabilitator

claims an interest on behalf of CBL, and is otherwise obligated to CBL with respect to the Trust Account.

8. An actual, justiciable controversy exists between CBL and Defendants at present.

## PARTIES

9. Plaintiff CBL is a licensed North Carolina domestic life and accident and health insurer, in Rehabilitation pursuant to the order of this Court. As set forth below, CBL is a party to the Reinsurance Agreement that its Rehabilitator disavowed, and a Grantor of the Trust Agreement.

10. Defendant Conservatrix is a life insurer licensed by the Dutch Central Bank, based in Baarn, the Netherlands, which offers life insurance, pension, and mortgage insurance products. As set forth below, Conservatrix is a party to the Reinsurance Agreement that the Rehabilitator disavowed, and is the Beneficiary of the Trust Agreement.

11. Defendant SFL is a company incorporated under the laws of Malta, and a Grantor of the Trust Agreement.

12. Defendant Fifth Third Bank, an Ohio state-chartered bank that is a member of the Federal Reserve System, is the Trustee named in the Trust Agreement.

## FACTS

13. On June 27, 2019, this Court entered its Order of Rehabilitation, Order Appointing Receiver, and Order Granting Injunctive Relief ("Order of Rehabilitation"), placing Southland National Insurance Corporation, Southland National Reinsurance Corporation, Bankers Life Insurance Company, and CBL (the "Companies") into Rehabilitation pursuant to N.C. Gen. Stat. §§ 58-30-1 *et seq.*, appointing Mike Causey, Commissioner of Insurance of the State of North Carolina, as the Rehabilitator, and granting injunctive relief pursuant to N.C. Gen. Stat. § 58-30-20 that, *inter alia*, prohibits any person from interfering in any manner with the

property or assets of the Companies or with the Rehabilitator in the performance of his duties. A true and correct copy of the Order of Rehabilitation is attached hereto as Exhibit A.

14. Mike Causey, Commissioner of Insurance of the State of North Carolina and Rehabilitator of CBL, appointed Special Deputy Rehabilitators Mike Dinius and John Murphy to act for the Rehabilitator under Article 30, Chapter 58 of the North Carolina General Statutes. The Special Deputy Rehabilitators have all of the powers of the Rehabilitator granted by N.C. Gen. Stat. § 58-30-85.

15. The Rehabilitator is authorized to bring this action in the name of CBL pursuant to N.C. Gen. Stat. § 58-30-85(a)(12). Therefore, the Special Deputy Rehabilitators are authorized to bring this action in the name of CBL.

16. CBL was part of a large group of companies owned and/or controlled by Greg Lindberg ("Lindberg"), but is now under the control of the Rehabilitator.

17. In May 2017, Lindberg caused CBL to enter into the Reinsurance Agreement with Conservatrix, which was, at the time, under administration by the Dutch insurance regulator, De Nederlandsche Bank ("DNB"), in which CBL assumed a block of insurance contracts from Conservatrix consisting of annuities and pension insurance. At the time the Reinsurance Agreement was being negotiated, Lindberg was in the process of acquiring ownership or control over Conservatrix. A true and correct copy of the Reinsurance Agreement is attached hereto as Exhibit B.

18. On or about May 15, 2017, the DNB approved the acquisition of Conservatrix by Trier Holding B.V., a European affiliate of Lindberg's Global Bankers Insurance Group.

19. The Reinsurance Agreement provided for CBL to reinsure Conservatrix on an aggregate excess of loss basis 100% of all Covered Losses in excess of a Floating Retention Amount, as those terms are defined in the Reinsurance Agreement.

20. The Reinsurance Agreement further provided that CBL must establish and deposit assets into the Trust Account to serve as the collateral reserve for the business reinsured. The Trust Account was initially funded by CBL with a deposit of €100 million in cash and securities (an amount equal to the reinsurance premium paid by Conservatrix to CBL), plus additional amounts of €50 million and €7.5 million from CBL and SFL (another affiliate of CBL and a company owned and controlled by Lindberg), respectively. Thereafter, CBL was required under the Trust Agreement to maintain no less than 105% of the Net Reserves (defined in the Reinsurance Agreement as CBL's share of the gross best estimate liability calculated under European Solvency II financial regulation principles, excluding any risk margin) in the Trust Account. Currently, the amount of the assets in the Trust Account is approximately €157.5 million. A true and correct copy of the Trust Agreement is attached hereto as Exhibit C.

21. Conservatrix continues to administer the business ceded under the Reinsurance Agreement.

22. Conservatrix advised the Rehabilitator that the amount in the Trust Account was deficient—in other words, the Trust Account had fallen below the contractually required 105% of Net Reserves by a material amount—and demanded that the Rehabilitator deposit an additional €70 million of CBL assets into the Trust Account.

23. The Reinsurance Agreement provides no benefit to CBL and its policyholders and creditors. In light of the demand by Conservatrix to increase the amount of Trust Account assets, performance under the Reinsurance Agreement threatens to further diminish the value of CBL's

estate and materially prejudice the rights of CBL policyholders and creditors. Accordingly, on December 22, 2019, the Rehabilitator disavowed the Reinsurance Agreement pursuant to N.C. Gen. Stat. § 58-30-85(a)(11). A true and correct copy of the Disavowal Notice is attached hereto as Exhibit D.

24. In the cover email notifying Conservatrix of the disavowal, the Rehabilitator also put Conservatrix on notice that the Order of Rehabilitation prohibits "any person from interfering in any manner with the property of [CBL] or with said Rehabilitator in the performance of his duties, and further enjoining and restraining any person from instituting or prosecuting any suit or other action against the Rehabilitator or [CBL's] property except by prior permission of this Court first had and obtained." The Order also prohibits all persons "from obtaining preferences, judgments, attachments, garnishments, or liens against [CBL] or [its] assets, or the levying of execution or foreclosure against [CBL] or [its] assets, until further order of the Court." A true and correct copy of this email is attached hereto as Exhibit E.

25. Upon disavowal of the Reinsurance Agreement, the Reinsurance Agreement is deemed void *ab initio*, and the parties should be placed back into the position they would have been had they never entered into the Reinsurance Agreement.

26. Almost immediately after the Rehabilitator advised Conservatrix that he had disavowed the Reinsurance Agreement, Conservatrix purported to serve an arbitration demand ("Arbitration Demand") on CBL based on the disavowed and rejected Reinsurance Agreement, in direct violation of the Court's Order of Rehabilitation. A true and correct copy of the Arbitration Demand is attached hereto as Exhibit F.

27. CBL brings this action seeking (a) an order temporarily restraining and preliminarily enjoining Fifth Third Bank, Conservatrix, SFL, and any other person from

removing, disturbing, or otherwise interfering with any of the assets in the Trust Account pending further order of this Court, (b) an order temporarily restraining and preliminarily enjoining Conservatrix from proceeding with its unlawful Arbitration Demand, (c) a declaratory judgment regarding the rights of the parties, and (d) an accounting of the assets in the Trust Account.

## COUNT I - DECLARATORY JUDGMENT

28. Because of the Rehabilitator's disavowal of the Reinsurance Agreement, Conservatrix, CBL, and SFL are entitled to the return of certain assets maintained in the Trust Account.

29. In light of the Rehabilitator's disavowal of the Reinsurance Agreement, there is currently an actual controversy regarding the proper distribution of the Trust Assets to CBL, SFL and Conservatrix.

30. CBL therefore requests that the Court order a full accounting of the Trust Assets to determine the proper amounts due and owing to Conservatrix, CBL, and SFL following disavowal of the Reinsurance Agreement.

31. After completion of the accounting, CBL requests the Court enter an order distributing the Trust Assets to each party according to its contribution to the Trust Account and its share of actual interest earned in the Trust Account, and declaring that CBL is entitled to the amount established through the accounting.

## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

32. CBL requests entry of a temporary restraining order and preliminary injunction, which order would prohibit the Trustee, Conservatrix, SFL, and any other person from removing, disturbing, or otherwise interfering with any of the assets in the Trust Account until a full accounting is made of the proper amounts due and owing to Conservatrix, CBL, and SFL

following disavowal of the Reinsurance Agreement to determine the proper distribution of those Trust Account assets, and declaratory judgment is entered regarding the rights of the parties to the assets in the Trust Account.

33. CBL also requests entry of a temporary restraining order and preliminary injunction, which order would prohibit Conservatrix from proceeding on or otherwise acting on its Arbitration Demand. That demand, based on a contract that no longer exists or has any force or effect, is unlawful and is in clear and willful violation of this Court's Order of Rehabilitation.

34. The Rehabilitator of CBL is authorized to apply for injunctive relief under N.C. Gen. Stat. § 58-30-20(a), which provides:

> Any receiver appointed in a proceeding under this Article may at any time apply for, and any court of general jurisdiction may grant, such restraining orders, preliminary and permanent injunctions, and other orders as may be deemed necessary and proper to prevent: . . .
>
> (2) The transfer of property; . . .
>
> (4) Waste of the insurer's assets; . . .
>
> (6) The institution or further prosecution of any actions or proceedings;
>
> (7) The obtaining of preferences, judgments, attachments, garnishments, or liens against the insurer, its assets or its policyholders; . . . [or]
>
> (11) Any other threatened or contemplated action that might lessen the value of the insurer's assets or prejudice the rights of policyholders, creditors or shareholders, or the administration of any proceeding under this Article. . . .

35. Any transfer of property—or withdrawal of Trust Account assets—out of the Trust Account prior to completion of the unwinding and accounting of the Reinsurance Agreement, and the entry of declaratory judgment, would result in the improper transfer of CBL's property, constitute a further wasting of CBL's assets, lessen the value of CBL's assets and prejudice the rights of CBL's policyholders and creditors, and violate the provisions of the Order of Rehabilitation.

36. The parties need time for the completion of an accounting of the assets deposited in the Trust Account and the amounts paid under the Reinsurance Agreement to allow the Court to impose an equitable remedy that restores the parties to the relative positions they were in prior to the incept date of the Reinsurance Agreement.

37. Temporary and preliminary injunctive relief is necessary to prevent Conservatrix, the Trustee Fifth Third Bank, SFL, and/or any other person from transferring property out of the Trust Account pending that accounting and orderly distribution and the entry of declaratory judgment, and to prevent Conservatrix from proceeding with its unlawful Arbitration Demand.

PRAYER FOR RELIEF

WHEREFORE, plaintiff CBL respectfully requests the following relief:

1. An order temporarily restraining and preliminarily enjoining Fifth Third Bank, Conservatrix, SFL, and any other person from removing, disturbing, or otherwise interfering with any of the assets in the Trust Account pending further order of this Court;

2. An order temporarily restraining and preliminarily enjoining Conservatrix from proceeding or acting upon its Arbitration Demand;

3. An order directing a full accounting of the assets deposited in the Trust Account and the amounts paid under the Reinsurance Agreement to determine an equitable distribution of the Trust Account assets to place the parties to the Reinsurance Agreement in the position they were in prior to the incept date of the Reinsurance Agreement;

4. A judgment declaring the legal and equitable rights of CBL, Conservatrix, and SFL to the assets in the Trust Account and the proper distribution thereof, including a declaration that CBL is entitled to the amount established through the accounting ordered by this Court; and

5. Such other and further relief as the Court may deem just and proper.

This tbe 23rd day of December, 2019.

ELLIS & WINTERS LLP

Kelly Margolis Dagger
N.C. State Bar No. 44329
kelly.dagger@elliswinters.com
Paul K. Sun, Jr.
N.C. State Bar No. 16847
paul.sun@elliswinters.com
Post Office Box 33550
Raleigh, North Carolina 27636
Telephone: (919) 865-7000
Facsimile: (919) 865-7010

*Counsel for Plaintiff Colorado Bankers Life Insurance Company, in Rehabilitation*

STATE OF NORTH CAROLINA
DURHAM COUNTY

**VERIFICATION**

Mike Dinius, first being duly sworn, deposes and says, I am the Special Deputy Rehabilitator for Colorado Bankers Life Insurance Company ("CBL"), and I am authorized to make this verification on behalf of CBL. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief, and believe the allegations therein to be true and correct to the best of my knowledge and information.

This the 23rd day of December, 2019.

[signature]
Mike Dinius
Special Deputy Rehabilitator

Sworn and subscribed before me this the 23rd day of December, 2019.

Notary Public: [signature]

Printed Name: Ryan Grady Kurtz

Notary No.: 201719200094

My Commission Expires: 7-10-22

Ryan Grady Kurtz
NOTARY
My Comm. Exp.
07-10-2022
PUBLIC
Wake County, N.C.

# TAB B

Exhibit B to the Complaint — Aggregate Excess of Loss Reinsurance Treaty (May 15, 2017)

(pages 15–46)

# EXHIBIT B

EXECUTION COPY

# AGGREGATE EXCESS OF LOSS REINSURANCE TREATY

**Parties:**

**NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.**
as the Cedant

**And**

**COLORADO BANKERS LIFE INSURANCE COMPANY**
as the Reinsurer

**15 May 2017**

**DRAFT FOR DISCUSSION PURPOSES ONLY**

SCHEDULES

- Schedule A: Covered Business
- Schedule B: Floating Retention Amount Calculation
- Schedule C: Trust Agreement
- Schedule D: Eligibility Criteria
- Schedule E: Actuarial Assumptions and Guidelines

EXECUTION COPY

**THIS TREATY ("TREATY"), DATED AS OF 16 MAY 2017,[1] IS MADE BETWEEN:**

I. **NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.**, a public limited liability company (*naamloze vennootschap*), incorporated under the laws of the Netherlands with its registered seat in Baarn, the Netherlands (the "**Cedant**"); and

II. **COLORADO BANKERS LIFE INSURANCE COMPANY**, an insurance company domiciled in the State of North Carolina, United States of America (the "**Reinsurer**").

**RECITALS:**

A. The Cedant is a life insurer with its seat in the Netherlands and duly licensed by the Dutch Central Bank to act as life insurer.

B. The Reinsurer is an insurer domiciled in the State of North Carolina, United States of America.

C. The Reinsurer is authorized in the Netherlands in regards to the transaction covered by the Treaty and is subject to certain provisions of National Insurance Laws including that assets transferred to the Trust Account meet substantially similar standards as those set forth in the National Insurance Laws.

D. The parties intend to transfer from the Cedant to the Reinsurer 100% of all Covered Losses in excess of the applicable Floating Retention Amount and in accordance with the terms of this Treaty.

**IT IS HEREBY AGREED AS FOLLOWS:**

**1. DEFINITIONS AND INTERPRETATION**

**1.1. Definitions**

For the purpose of this Treaty, the following capitalised terms shall have the following meanings:

**"Cedant"** means Nederlandsche Algemeene

[1] This Agreement will be signed upon the transfer of the shares of the Cedant, following receipt of court approval with respect to such transfer of shares.

| | |
|---|---|
| | Maatschappij van Levensverzekering "Conservatrix" N.V.; |
| **"Collateral"** | means the financial instruments and cash standing to the credit of the Trust Account from time to time; |
| **"Contract Date"** | means the later of (i) the Effective Date and (ii) the date of this Agreement; |
| **"Covered Losses"** | means all claims and benefits paid to policyholders under the terms of the Covered Policies, plus all commissions and administrative and policy expenses paid by the Cedant in connection with the Covered Policies, less any new premiums collected by the Cedant in respect of the Covered Policies or accrued on the Covered Policies that were not otherwise added to the Floating Retention Amount in accordance with the provisions of Schedule B; |
| **"Covered Policies"** | means the NGP and DIL insurance policies written by the Cedant and in force as of the Effective Date, as specified in Schedule A; |
| **"Effective Date"** | means 31 March 2017; |
| **"Event of Default"** | means any event or circumstance specified as such in section 9 (*Events of Default*); |
| **"Floating Retention Amount"** | means, with respect to the period commencing on the Effective Date and ending on (and including) 31 December 2017, an amount that will result in capital relief for the Cedant of €150,000,000 of best estimate liabilities (as referred to in Solvency II) |

| | |
|---|---|
| | as of the Contract Date, and with respect to each calendar year period thereafter, the Floating Retention Amount determined in accordance with section 2.3 with respect to such calendar year period; |
| **"Interest Rate"** | means a per annum rate equal to u-yield for the year + 0.5%. U-yield for the year is u-yield (*u-rendement*) as per January 1 of the applicable year, as published by Dutch Insurers Association (*Verbond van Verzekeraars*); |
| **"LDI Securities"** | means shares of BNP P. LDI SOLUTION – Duration Matching 20-25 (security code: LU0223259903; security short name: 0223259903LU) held by the Cedant; |
| **"National Insurance Laws"** | means the laws and regulations applicable from time to time to life insurance business and life insurance in the Netherlands; |
| **"Net Reserves"** | means the share assumed by the Reinsurer of the gross best estimate liability calculated by the Cedant using procedures, assumptions and methods consistent with Solvency II on the Covered Policies, excluding any risk margin; |
| **"Reinsurer"** | means Colorado Bankers Life Insurance Company; |
| **"Settlement Period"** | means a calendar quarter; |
| **"Solvency II"** | means Directive 2009/138/EC of the European Parliament and of the Council of 25 November 2009 on the |

| | |
|---|---|
| | taking-up and pursuit of the business of Insurance and Reinsurance (Solvency II), as implemented and amended as of the Effective Date, and the corresponding delegated acts, technical standards and guidelines as adopted as of the Effective Date; |
| **"Reinsurance Documents"** | means this Treaty and the Trust Agreement; |
| **"Treaty"** | means this treaty including the Schedules hereto; |
| **"Trust Account"** | means the trust account established by the Reinsurer and Standard Financial Ltd. with the Trustee for the benefit of the Cedant; |
| **"Trust Agreement"** | means the trust agreement relating to the Trust Account among the Reinsurer, Standard Financial Ltd., the Cedant and the Trustee in the format attached as <u>Schedule C</u>; |
| **"Trustee"** | means Regions Bank NA; |
| **"Valuation Agent"** | means the agent so jointly selected by the parties for a specific type of valuation task as referred to in this Treaty, being a skilled and knowledgeable expert in the relevant field, within 30 days following the date on which it becomes apparent that a Valuation Agent is required under this Treaty, absent which the auditor shall be appointed by the Presiding Judge of the Court of Amsterdam at the request of the Reinsurer or the Cedant. |

1.2. **Interpretation**

1.2.1. Reference to any person is, where relevant, deemed to be a reference to or to include, as appropriate, that person's successors.

1.2.2. References to the singular include the plural and vice versa and references to "sections" and "Schedules" are to sections of and schedules to this Treaty.

1.2.3. The headings of sections are for convenience only and shall not affect the interpretation of this Treaty.

1.2.4. Where Dutch legal concepts are referred to by inclusion of the Dutch translation thereof, the Dutch wording shall, in case of inconsistency, prevail over the English wording of the Treaty.

1.2.5. The Schedules form part of this Treaty. In the event of any inconsistency between the provisions in the Schedules and the provisions in the main body of this Treaty, the provisions in the main body of this Treaty shall prevail.

2. **REINSURANCE AND FLOATING RETENTION AMOUNT**

2.1. The Cedant binds itself to cede to the Reinsurer and the Reinsurer binds itself to assume and reinsure, on an aggregate excess of loss basis, 100% of all Covered Losses in excess of the Floating Retention Amount upon the terms set out in this Treaty.

2.2. This Treaty shall cover the Covered Policies.

2.3. The Floating Retention Amount shall be calculated annually as of December 31 of each calendar year, beginning on 31 December 2017, for so long as this Treaty remains in effect in accordance with the formula set forth on Schedule B. The Cedant shall calculate the Floating Retention Amount and provide written notice thereof to the Reinsurer no later than February 15 of each calendar year, beginning on 15 February 2018. The updated Floating Retention Amount calculated as of any December 31 shall apply during the calendar year immediately following such December 31. Notwithstanding section 16.8, if the Reinsurer disagrees with the Cedant's calculation of the Floating Retention Amount and the parties are unable to resolve such disagreement within 30 days following the Reinsurer notifying the Cedant of such disagreement, then the parties will jointly retain the Valuation Agent to determine the Floating Retention Amount. The Valuation Agent will determine in writing the Floating Retention Amount within 30 days from appointment. Each of the parties shall reasonably assist the Valuation Agent in making its determination and shall reasonably

provide any information so requested by the Valuation Agent. The determination by the Valuation Agent shall be binding upon the parties. All costs of the Valuation Agent shall be equally shared between the parties.

2.4. Reinsurance cover shall apply only to risks accepted by the Cedant under insurance plans in accordance with the respective National Insurance Laws.

2.5. All amounts payable under this Treaty shall be in Euro (€).

**3. LIABILITY OF THE REINSURER**

**3.1. Liability**

3.1.1. Unless provided for otherwise in this Treaty, the liability of the Reinsurer shall commence and cease simultaneously with that of the Cedant.

3.1.2. The Reinsurer's liability is limited to the amount of Covered Losses occurring during the validity of this Treaty that exceed the Floating Retention Amount, as set forth in section 3.1.3. The dates of occurrence of claims under the Covered Policies are as per the policy conditions of the Covered Policies.

3.1.3. If, as of the end of any calendar quarter, the aggregate amount of all Covered Losses under this Treaty exceeds the Floating Retention Amount as of such date, then the Reinsurer shall pay to the Cedant an amount equal to (i) the aggregate amount of all Covered Losses under this Treaty as of such date, less (ii) the Floating Retention Amount as of such date, less (iii) any Covered Losses previously paid by the Reinsurer to the Cedant under this Treaty as of such date. Such payment shall be made in accordance with section 6.3 following confirmation by the Reinsurer of the settlement statement delivered by the Cedant pursuant to section 6.1.2 for the applicable calendar quarter.

**3.2. Reinstatements**

3.2.1. If a Covered Policy is reinstated without evidence of health in accordance with the policy conditions of such Covered Policy, the reinsurance hereunder shall also be automatically reinstated.

**3.3. Conversions and replacements**

3.3.1. In the event of conversion of a Covered Policy pursuant to a contractual right to convert, the policy arising from the conversion shall be reinsured on the terms of this Treaty. In the event of the conversion of a policy not reinsured under this Treaty, the policy arising from the conversion shall not be reinsured under this Treaty.

3.3.2. In the event of the replacement of a Covered Policy by a new policy at the instigation of the Cedant, the new policy shall not be reinsured under this Treaty but shall be considered surrendered under its terms for purposes of calculating Covered Losses.

**3.4. Other policy alterations**

3.4.1. Cessions on Covered Policies subject to an alteration not mentioned in this article shall continue in force on a basis consistent with the provisions of this article.

**4. REINSURANCE PREMIUM**

**4.1. Payment**

4.1.1. On the Contract Date, the Cedant shall pay to the Reinsurer reinsurance premium in the amount of €100,000,000, by transferring cash and/or financial instruments meeting the Eligibility Criteria set forth on Schedule D to the Trust Account subject to adjustement as provided in section 4.1.2.

4.1.2. If the LDI Securities are not sold by the Cedant within two business days following the Contract Date, then a premium adjustment amount equal to (i) the net proceeds received from the sale of the LDI Securities, minus (ii) the most recently published fair market value of the LDI Securities as of the close of business on the Contract Date (the "**Premium Adjustment Amount**"), shall be calculated by the Cedant following the sale of the LDI Securities by the Cedant. If the Premium Adjustment Amount is positive, then the Premium Adjustment Amount shall be payable by the Cedant to the Reinsurer. If the Premium Adjustment Amount is negative, then the Premium Adjustment Amount shall be payable by the Reinsurer to the Cedant. The Premium Adjustment Amount shall be reflected in the first settlement statement delivered by the Cedant pursuant to section 6.1.2 following the date on which the LDI Securities are sold by the Cedant, and payment of the Premium Adjustment Amount shall be made in accordance with section 6.3.

5. CLAIMS

5.1. **Settlement and liability**

5.1.1. The Cedant shall settle claims reinsured under this Treaty in a prudent and professional manner in accordance with the policy conditions of the Covered Policies and the Cedant's claims practices.

5.1.2. The Cedant may bind the Reinsurer to the extent of its liability under this Treaty, provided that it complies with all the relevant provisions of this Treaty.

5.2. **Claim reporting**

5.2.1. All claims in respect of Covered Losses shall be reported to the Reinsurer together with a copy of the required documents, as specified in section 6.1.

5.2.2. Claims in excess of the claim authority limit shall be reported within five working days of the Cedant receiving notification of such claims, indicating the name of the insured, cession number, date of birth, policy issue date, date and cause of the claim, together with the policy conditions, the underwriting file and all relevant documents already available.

5.2.3. Such documents shall be submitted in English.

5.3. **Claim payments**

5.3.1. Claim amounts shall be reflected in the report delivered by the Cedant pursuant to section 6.1 for the first Settlement Period in which the claims are reported as paid by the Cedant and are valid under section 5.1.

5.4. **Extra-contractual damages**

5.4.1. The Reinsurer is not liable for extra-contractual damages, such as punitive, bad faith or compensatory damages, which are levied against the Cedant. However, the Reinsurer recognises that circumstances may arise under which it should contribute to the Cedant's liability for extra-contractual damages. Such circumstances are those situations in which the Reinsurer was an active party and directed, consented to or ratified the act, omission or course of conduct which ultimately resulted in the assessment of damages. In such situations, the Reinsurer shall contribute equitably to such damages.

5.5. **Ex gratia payments**

5.5.1. Any payments made by the Cedant which the Cedant is not required to make according to the policy conditions of the Covered Policies (ex-gratia payments) shall not be binding on the Reinsurer without its prior written consent.



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 25 of 103

**5.6. Contested claims**

5.6.1. The Cedant shall notify the Reinsurer in advance of its intention to contest or litigate a claim involving a Covered Policy. The Cedant shall also provide the Reinsurer with prompt notice of any legal proceedings initiated against the Cedant in response to any denial of a claim on a Covered Policy. The Cedant shall keep the Reinsurer involved in developments in both such instances, including furnishing all relevant documents.

5.6.2. If the Cedant proposes to contest or litigate a claim, the Reinsurer, at its discretion, may treat such claim as if such claim were not being contested for purposes of calculating aggregate Covered Losses and determining the Reinsurer's liability hereunder.

**5.7. Interest on late payment of claims**

5.7.1. The Reinsurer shall follow the practices of the Cedant in the payment of interest on the late payment of claims for purposes of calculating Covered Losses.

**5.8. Relief and recoveries**

5.8.1. Relief and recoveries, whether recovered or received prior or subsequent to claim settlement under this Treaty, shall be deducted from the aggregate amount of Covered Losses hereunder.

**6. REINSURANCE ACCOUNTING AND ADMINISTRATION**

**6.1. Administration**

6.1.1. The Cedant is responsible for reinsurance administration, and it shall provide for each Settlement Period during the term of this Treaty, in an orderly fashion, a bordereaux showing the individual Covered Policy and claim details, in each case, as of the end of the applicable Settlement Period.

6.1.2. Together with the bordereaux, the Cedant shall provide a settlement statement, in the format mutually agreed upon by the parties, setting forth the aggregate amount of Covered Losses, the aggregate amount of Covered Losses previously paid by the Reinsurer and the applicable Floating Retention Amount then in effect, in each case, as of the end of the applicable Settlement Period, and, if applicable, the Premium Adjustment Amount. In addition, the settlement statement shall show the net amount due to the Reinsurer or the Cedant with respect to the applicable Settlement Period.

6.1.3. The Cedant shall provide as soon as possible, yet no later than 10 business days following the Settlement Period to which the reinsurance relates, the information referred to in sections 6.1.1 and 6.1.2 to the Reinsurer (signed by the Cedant as well as a digital version). In addition, the Cedant shall provide to the Reinsurer such claim details and claim documents as may be reasonably requested by the Reinsurer from time to time. The Reinsurer shall, as soon as possible after receiving the bordereaux and settlement statement, notify the Cedant whether the Reinsurer can agree with the information set forth therein.

6.1.4. It is noted that strict adherence to the provisions of this section is required in order for the parties to perform their risk management duties adequately and to publish accurate financial results. Therefore, in the event of a material failure by one party to fulfil its obligations as per this section, the other party shall have the right to levy a fee, without prejudice to such other rights and remedies as may be available to it under the terms of this Treaty. The fee shall be equal to €30,000 per month that the obligations remain unfulfilled. It is applicable as from three months after the date on which the party is notified in writing of said failure.

6.2. **Discrepancies**

6.2.1. Should there be any items incorrect in or missing from a settlement statement, such errors or omissions shall be corrected in the next quarterly settlement statement, with the current balance (if any) being paid in full, unless the discrepancy is material. In such an event, settlement shall be made in respect of those items that are agreed to be correct pending resolution of the discrepancy or finalisation of the relevant process or documentation for a particular claim.

6.2.2. This section does not prejudice any rights or remedies which may be available to either party under the terms of the Treaty.

6.3. **Payment of balances**

6.3.1. Balances in favour of one of the parties shall be paid by the other party within thirty days after receipt of confirmation by the Reinsurer of the settlement statement delivered by the Cedant pursuant to section 6.1.2.

6.3.2. Any late payments of balances shall be subject to interest, using the Interest Rate, without prejudice to any rights or remedies which may be available to either party under the terms of the Treaty.

**6.4. Balance offsetting**

6.4.1. Any balance due under this Treaty may be offset against other balances outstanding between the Cedant and the Reinsurer under this Treaty, unless such offset is illegal in the country where the Cedant is domiciled. Such right of offset shall survive the insolvency of either or both parties to the extent permitted by the applicable law.

**7. TRUST ACCOUNT**

**7.1. Trust Account**

The Trust Account shall be established by the Reinsurer subject to the terms and conditions of the Trust Agreement as attached in Schedule C.

**7.2. Exclusive use of Trust Account**

All amounts received and paid in furtherance to this Treaty, whether it be the reinsurance premium, payments received by way of reinsurance recoveries, payments of Covered Losses or otherwise, shall be received by the Reinsurer directly into the Trust Account and/or shall be by paid by the Reinsurer from the Trust Account.

**7.3. Remaining value**

Subject to section 8 and the terms of the Trust Agreement, any amount, asset, investment, security or value remaining in the Trust Account after all Covered Losses have been settled or have been elapsed, shall be for the benefit of the Reinsurer and shall be deemed to constitute a part of the consideration for its performance of this Treaty.

**8. COLLATERAL**

**8.1. Obligation to provide security**

8.1.1. The Reinsurer shall be required to provide security to the Cedant in the form of the Colleteral.

**8.2. Amount**

8.2.1. The Reinsurer shall ensure that the market value of the Collateral shall be maintained at 105% of the Net Reserves. The parties shall not have an obligation to adjust the value of the Collateral unless required pursuant to section 8.5. For the avoidance of doubt, for purposes of determining the amount of Collateral required to be maintained, the Net Reserves shall be determined in accordance with Solvency II.



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 28 of 103

8.2.2. The market value of the Collateral shall be calculated in accordance with the valuation practices and procedures as explicitly incorporated in Solvency II.

**8.3. Cedant Withdrawal Rights**

8.3.1. The cash and financial instruments held in the Trust Account shall be available to satisfy the obligations of the Reinsurer to the Cedant under this Treaty. The Cedant shall have the right to withdraw assets from the Trust Account at any time and from time to time, subject only to prior written notice by the Cedant to the Trustee; provided, that the Cedant hereby acknowledges and agrees that it shall use and apply any assets withdrawn by the Cedant from the Trust Account only for the purpose of satisfying any payment obligations of the Reinsurer to the Cedant hereunder. In the event the Cedant withdraws assets from the Trust Account in excess of the amount payable by the Reinsurer to the Cedant hereunder, the Cedant shall promptly return such excess amount to the Trust Account.

**8.4. Eligibility criteria**

The financial instruments standing to the credit of the Trust Account will have to meet the eligibility criteria as set out in Schedule D and will be denominated in Euro (€).

**8.5. Adjustment**

8.5.1. The Collateral shall be monitored by the Reinsurer on a quarterly basis to verify whether it is being maintained at the level referred to in section 8.2.1, as follows: the Cedant shall perform a detailed actuarial reserve review based on the position as at the last day of each Settlement Period in accordance with the actuarial assumptions and guidelines as set out in Schedule E in order to determine the Net Reserves and provide the result to the Reinsurer, who shall provide (i) an overview of the value of the Collateral and (ii) a statement on adjustment of the Collateral, to the Cedant within 30 days after the end of the Settlement Period.

8.5.2. The Collateral shall be adjusted upwards or downwards if a review referred to in section 8.5.1 shows that there is a deficit or a surplus when comparing the Collateral with the level referred to in section 8.2.1. In case of a deficit, the Reinsurer will make up for the deficit by paying an amount equal to the deficit to the Trust Account within 15 days following submission of the review referred to in section 8.5.1 to the Cedant. In case of a surplus, the Reinsurer will be entitled to undo the surplus by withdrawing an amount equal to the surplus from the Trust

Account within 20 days following submission of the statement of adjustment of Collateral provided under section 8.5.1 to the Cedant.

8.5.3. The actuarial assumptions and guidelines as set out in Schedule E may be changed by the Cedant, so long as such actuarial assumptions and guidelines remain within the Solvency II guidelines and consistent with the actuarial assumptions and guidelines used to prepare the Cedant's financial statements. The Cedant shall inform the Reinsurer of any changes at least one month prior to the date such changes shall take effect, which date shall be the first day of a Settlement Period. If tha Reinsurer is of the opinion that it cannot reasonably be expected to agree with a proposed change to the actuarial assumptions and guidelines, such dispute shall be solved in accordance with section 8.6.

**8.6. Dispute settlement**

8.6.1. Notwithstanding section 16.8, if the parties disagree on the calculation of the value of the Collateral, the Net Reserves and/or the amount of the adjustment required pursuant to section 8.5, the parties will jointly retain the Valuation Agent to determine the value of the Collateral, the Net Reserves and/or the amount of such adjustment, as applicable. The Valuation Agent will determine in writing (i) the value of the Collateral, (ii) the Net Reserves and/or (iii) the deficit or surplus referred to in section 8.5.2, as applicable, within 30 days from appointment. Each of the parties shall reasonably assist the Valuation Agent in making its determination and shall reasonably provide any information so requested by the Valuation Agent. The determination by the Valuation Agent shall be binding upon the parties. All costs of the Valuation Agent shall be equally shared between the parties.

## 9. EVENTS OF DEFAULT

Each of the following events or circumstances is an Event of Default:

**9.1. Material breach**

A party materially breaches any of its obligations under the Reinsurance Documents and fails to remedy the same within a notice period of 30 days.

**9.2. Misrepresentation**

a. Any representation or statement made or deemed to be made by a party in the Reinsurance Documents, or in any other document delivered by or on behalf of that party under or in connection with the Reinsurance Documents,

is or proves to have been Incorrect or misleading in any material respect when made or deemed to be made.

b. No Event of Default under paragraph (a) above will occur if the circumstances giving rise to that misrepresentation or misstatement are capable of being remedied and are remedied within 12 days of the earlier of (i) the non-defaulting party giving notice to the defaulting party and (ii) the defaulting party becoming aware of the misrepresentation or misstatement.

**9.3. Insolvency**

a. A party is unable or admits inability to pay its debts as they fall due, or is deemed to be unable to pay its debts under applicable law, suspends or threatens to suspend making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its Indebtedness.

b. A moratorium is declared in respect of any Indebtedness of a party. If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

**9.4. Insolvency proceedings**

9.4.1. Any corporate action, legal proceedings or other procedure or step is taken, or notice given, following the date hereof in relation to:

a. the suspension of payments, moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of a party; or

b. actual or anticipated financial difficulties, a composition, compromise, assignment or arrangement with any creditors of a party; or

c. the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of a party or any of its assets; or

d. enforcement of any security over any asset of a party,

or any analogous procedure or step is taken in any jurisdiction.

9.4.2. This section 9.4 shall not apply to any winding-up petition or application which is frivolous or vexatious and is discharged, stayed or dismissed within 12 days of commencement.

**10. DIRECT CLAIM**

10.1. In case of an Event of Default, the non-defaulting party shall have a direct claim on the defaulting party in accordance with the applicable provisions of Dutch law.

**11. GENERAL REPRESENTATIONS**

On the Contract Date, the Reinsurer makes the following representations to the Cedant whereas the Cedant makes the following representations to the Reinsurer:

**11.1. Status**

a. it is an insurance company, duly incorporated and validly existing under the law of its jurisdiction of incorporation, to the extent the representation is made by the Reinsurer;

b. it is a public limited liability company, duly incorporated and validly existing under the law of its jurisdiction of incorporation, to the extent the representation is made by the Cedant;

c. it has the power and is authorized under applicable laws to own its assets and to carry on its insurance business as it is being conducted.

**11.2. Binding obligations**

The obligations expressed to be assumed by it by means of the Reinsurance Documents are legal, valid, effective, binding and enforceable obligations in the country of its domicile, subject to general legal principles such as for example limitation of enforcement by insolvency laws and time barring of claims.

**11.3. Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, the Reinsurance Documents do not and will not conflict with:

a. any law or regulation applicable to it;

b. its constitutional documents; or

c. any agreement or instrument binding upon it or any of its assets or constitute a default or termination event (however described) under any such agreement or instrument.

**11.4. Power and authority**

It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Reinsurance

Documents to which it is or will be a party and the transactions contemplated by the Reinsurance Documents.

**11.5. Governing law and enforcement**

a. Subject to general legal principles, the choice of governing law of the Reinsurance Documents will be recognised and enforceable in its jurisdiction of incorporation.

b. Subject to general legal principles, any judgment obtained in relation to the Reinsurance Documents will be recognised and enforceable in its jurisdiction of incorporation.

**11.6. No default**

No Event of Default has occurred, exists or might reasonably be expected to result from the entry into, or the performance of, or any transaction contemplated by, the Reinsurance Documents.

**11.7. Information**

a. All information supplied by it or on its behalf to the other party or its representatives in connection with the Reinsurance Documents was true and accurate in all material respects as at the date it was provided or as at any date at which it was stated to be given.

b. It has not omitted to supply any information which, if disclosed, would make the information referred to in paragraph (a) above untrue or misleading in any material respect.

**11.8. No proceedings pending or threatened**

No litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency which, if adversely determined, might reasonably be expected to have a material adverse effect have (to the best of its knowledge and belief (having made due and careful enquiry)) been started or threatened against it.

**11.9. Centre of main interests and establishments**

For the purposes of The Council of the European Union Regulation No. 1346/2000 on Insolvency Proceedings (the "**Regulation**"), its centre of main interest (as that term is used in Article 3(1) of the Regulation) is situated in its jurisdiction of incorporation and it has no "establishment" (as that term is used in Article 2(h) of the Regulations) in any other jurisdiction.

12. UNDERTAKINGS BY THE CEDANT

12.1. Right of inspection by the Reinsurer

12.1.1. The Reinsurer may at all reasonable times, yet in any event within twenty days of giving notice, audit the records and procedures of the Cedant concerning the business falling within the scope of this Treaty, wherever such records or procedures are available. In addition, the Reinsurer may request to be sent or given copies by the Cedant of all relevant documentation in respect of any Covered Policies or Covered Losses ceded under this Treaty.

12.1.2. The Reinsurer shall have such a right of inspection so long as cessions under this Treaty are in force or if one of the parties hereto has a claim against the other party arising from this Treaty, even after its termination.

13. UNDERTAKINGS BY THE REINSURER

13.1. Negative pledge

The Reinsurer shall not create or permit to subsist any security over the Collateral except for any security arising by operation of law and in the ordinary course of management of the Trust Account.

14. TRANSFER OF BUSINESS

14.1. If the Cedant transfers any Covered Policies to another company or if the ownership of such Covered Policies is substantially altered through a takeover by or merger with another company, the Cedant shall obtain the prior written consent of the Reinsurer, which consent shall not be unreasonably withheld.

14.2. Consistent with the preceding paragraph, the Reinsurer agrees that none of its rights and obligations under this Treaty shall be transferred to another reinsurer without prior consent of the Cedant, which consent shall not be unreasonably withheld.

15. TERM AND TERMINATION

15.1. Term

15.1.1. This Treaty commences on the Effective Date.

15.1.2. This Treety shall remain effective until the Cedant's liability with respect to all Covered Policies has been terminated or discharged, unless terminated earlier pursuant to section 15.2.

**15.2. Early Termination**

15.2.1. So long as the Cedant is not in material breach of its obligations under this Treaty, the Cedant may terminate this Treaty as of December 31 of any calendar year by providing written notice in the form of a registered letter received by the Reinsurer at least ninety (90) days prior to the applicable termination date. Should termination be effected as per this section 15.2.1, the Reinsurer shall pay to the Cedant an amount equal to (i) 100% of the reinsurance premium paid by the Cedant under section 4.1.1, plus (ii) interest on such amount at a rate of 3.25% per annum, compounded annually, minus (iii) any Covered Losses paid by the Reinsurer to the Cedant hereunder on or prior to the termination date.

15.2.2. This Treaty may be terminated by the Reinsurer in the event the Cedant materially breaches any of its obligations under the Reinsurance Documents and fails to remedy the same within a notice period of 30 days. Should termination be effected as per this section 15.2.2, the Reinsurer shall pay to the Cedant an amount equal to (i) 95% of the reinsurance premium paid by the Cedant under section 4.1.1, minus (ii) any Covered Losses paid by the Reinsurer to the Cedant hereunder on or prior to the termination date.

15.2.3. Following any termination of this Treaty in accordance with this section 15.2 and payment of any amount required pursuant to section 15.2.1 or 15.2.2, as applicable, neither party shall have any further rights or obligations hereunder.

**15.3. Indemnification**

15.3.1. Notwithstanding any action that may be taken in accordance with the terms of section 15.2, if one party materially fails to fulfil a main obligation under this Treaty, the other party shall have a direct claim on the non-performing party to be indemnified and held harmless by that party in respect of all cessions under the affected Covered Policies. This right shall apply with full retrospective effect for any claim, cost or deterioration in expected or reported profitability which it may have incurred or experienced as a result of said failure.

15.3.2. When an Indemnity is appropriate for a particular failure, the Indemnity shall be such as to put the other party in the same financial position as it would have been if such failure had not occurred. As an example, the level of the indemnity may be determined by taking into consideration the reinsurance terms which would reasonably and properly have applied with full retrospective effect if the failure had not occurred.

15.3.3. This section 15.3 does not prejudice any other rights or remedies which may be available to either party under the terms of this Treaty. Furthermore, if the Cedant has intentionally withheld or misrepresented relevant information or data and it can be demonstrated that a prudent and professional reinsurer, in possession of the true facts, would have declined to provide reinsurance for the affected cessions, then the Reinsurer shall have the right to cancel this Treaty from commencement. In this case, all payments between the Cedant and the Reinsurer shall be refunded at the Interest Rate and no liability shall remain with the Reinsurer in respect of this Treaty.

## 16. MISCELLANEOUS

### 16.1. Confidentiality

All terms and conditions of this Treaty and any material or information provided by the Cedant or the Reinsurer shall be kept confidential as against any person who is not a party to this Treaty. This provision applies unless the disclosure is required pursuant to process of law or unless the disclosure is to advisers, consultants, third-party administrators, financial auditors, governing regulatory bodies or the Reinsurer's retrocessionaires. If a party is obliged to disclose such information to the persons or institutions mentioned above (except for governing regulatory bodies), it shall request them to abide by the same confidentiality rules. For the purpose of this section alone, a party shall be deemed to include sister, subsidiary and parent companies.

### 16.2. Compliance with data protection, money laundering and international trade controls and sanctions resolutions

16.2.1. Personal data as referred to in the Dutch Personal Data Protection Act (*Wet bescherming persoonsgegevens*) ("Wbp"), provided by the Cedant preceding, during or after the contract period of this Treaty, shall be held and processed by the Reinsurer for the management of the resulting reinsurance relationship, including the prevention and the fight against fraud during the conclusion or execution of this Treaty. The Reinsurer may also hold personal data anonymously for statistical purposes. The Cedant shall ensure that the exchange of personal data will not be in conflict with the provisions of the Wbp, for instance by the implementation of special clauses in application forms, policy conditions, insurance agreements or other relevant documents. In particular the Cedant shall ensure that it complies with the information supply to all persons involved as per article 33 of the Wbp. The Reinsurer cannot be held liable if the Cedant fails to do so. All data received by the Reinsurer preceding, during or after the contract



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 36 of 103

period of this Treaty may be stored at a filing department, which could be located abroad. The Reinsurer shall ensure that the storage is compliant with the Wbp and any other applicable regulations on personal data. Access to this storage is restricted to the Reinsurer and supervisory authorities. This filing method is part of the information supplied by the Cedant as mentioned in the preceding paragraph. The Cedant indemnifies the Reinsurer against all claims of third parties based on the argument that the Cedant is or remains in default with said obligations.

16.2.2. For the purpose of compliance with money laundering regulations in force at any point in time each party undertakes to ensure that, for the purposes of this Treaty, it has in place and will ensure that it maintains in place, on a continuing basis, all appropriate money laundering policies and procedures.

16.2.3. The Reinsurer will neither provide cover nor pay any claim or pay any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the Reinsurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of any jurisdiction applicable to the Reinsurer.

**16.3. No third-party rights**

This Treaty exists solely between the Cedant and the Reinsurer. The acceptance of reinsurance under this Treaty shall not create any right or legal relation (*derdenbedingen*) between the Reinsurer and the insured, beneficiary, or any other party to any policy of the Cedant which may be reinsured under this Treaty.

**16.4. Alterations to the Treaty**

Alterations to this Treaty can be made at any time in writing. To be valid these alterations must be signed by both parties, unless specifically provided for otherwise in this Treaty.

**16.5. Waiver**

No failure or delay by either party in exercising any right under this Treaty shall be deemed to be a waiver thereof.

**16.6. Severability**

If any provision of the Treaty shall be found to be invalid or unenforceable according to applicable law, the validity or enforceability of such provisions shall not be affected by such invalidity or unenforceability shall remain in full force and effect. The parties hereby agree to attempt to substitute for any invalid or unenforceable provision a valid or enforceable provision which achieves to the

greatest extent possible the economic, legal and commercial objectives of the invalid or unenforceable provision.

**16.7. Applicable law**

This Treaty and any non-contractual obligations arising in relation thereto shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without regard to such State's principles of conflict of law that could compel the application of the laws of another jurisdiction.

**16.8. Arbitration**

16.8.1. Any dispute arising out of or in connection with this Treaty or any agreement arising out of this Treaty shall, if no amicable settlement can be reached through negotiations, be referred to arbitration in accordance with the Arbitration Rules of the Netherlands Arbitration Institute (*Nederlands Arbitrage Instituut*). The party requesting the arbitration shall promptly give reasoned notice of its request by registered post to the other party.

16.8.2. Unless parties agree otherwise, the arbitral tribunal shall be composed of three arbitrators and shall consist of disinterested persons retired from or engaged in life insurance or life reinsurance business or advising such business in a professional capacity, with no less than ten years international experience.

16.8.3. Unless the parties agree upon a single arbitrator within thirty days after receiving a written request from the other party for arbitration, the party requesting arbitration (the claimant) shall appoint one arbitrator (the first arbitrator) and shall give written notice thereof to the other party (the respondent). Within thirty days of receiving such notice, the respondent shall appoint another arbitrator (the second arbitrator) and give written notice to the claimant, failing which the claimant may apply to the Presiding Judge of the Court of Amsterdam (the appointer) to appoint the second arbitrator.

16.8.4. Once appointed, the first and second arbitrators shall, within thirty days of the appointment of the second arbitrator, appoint a third arbitrator. Should they fail to do so, either of them, or either of the parties, may apply to the appointer for the appointment of the third arbitrator. In any event, the third arbitrator shall be the chairman of the tribunal.

16.8.5. Upon acceptance of the appointment by the chairman, the tribunal shall be constituted. The three arbitrators shall decide by majority. If a majority cannot be achieved, the decision of the chairman shall prevail.

16.8.6. If an arbitrator, subsequent to his appointment, is unwilling or unable to act, a new arbitrator shall be appointed to replace him by the procedure set out above.

16.8.7. Unless otherwise extended or ordered by the tribunal within fifteen days of the appointment of the chairman, each party shall submit its case to the tribunal within forty five days of the appointment of the chairman.

16.8.8. The tribunal shall reach its decision by reference to the customs and practices of international life insurance and life reinsurance business and shall apply or follow the law stated in section 16.7. In the event of conflict between the customs and practices and the proper law, the customs and practices shall prevail in so far as permitted by the applicable law. The tribunal shall not be bound by the formal rules of evidence. The tribunal shall have power to fix all procedural rules relating to the conduct of the arbitration.

16.8.9. The tribunal shall, within sixty days of reaching its decision in the arbitration, issue to the parties its written and reasoned award. The award shall be final and binding on the parties which covenant to carry out the same. If either of the parties should fail to carry out the award, the other may apply for its enforcement to a court of competent jurisdiction in any country in which the party in default is domiciled, or has assets, or carries on business.

16.8.10. All costs of the arbitration shall be at the discretion of the tribunal which may decide to and by whom and in what manner they shall be paid.

16.8.11. The place of arbitration shall be Amsterdam, The Netherlands. The arbitral proceeding shall be conducted in the English language.

**16.9. Submission to Jurisdiction**

16.9.1. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of any federal court located in New York County in the State of New York, United States of America, in connection with any court proceedings related to any arbitration contemplated by section 16.8, including proceedings to compel, stay or enjoin arbitration or to confirm, vacate, modify or correct an arbitration award, and agrees not to bring any such court proceeding in any court other than a federal court located in New York County in the State of New York; provided, however, that, if said court determines that it does not have subject matter jurisdiction, then said proceeding may be brought in the Supreme Court of the State of New York for New York County. Each party agrees that service of any process, summons, notice or document by registered mail addressed to such party shall be effective service of process for any court proceeding brought

against such party in any such court. Each party irrevocably and unconditionally waives any objection to the laying of venue of any such court proceeding brought in any such court and any claim that any court proceeding brought in any such court has been brought in an inconvenient forum. Each party agrees that any final, nonappealable judgment in any such court proceeding brought in any such court shall be conclusive and binding upon such party and may be enforced in any other courts to whose jurisdiction such party may be subject, by suit upon such judgment.

16.9.2. This section 16.9 shall not be read to conflict with or override the obligation of the parties to arbitrate any disputes arising out of or in connection with this Treaty.

16.10. **Waiver of Jury Trial**

16.10.1. Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any action arising out of or relating to this Treaty or the Trust Agreement, and whether made by claim, counterclaim, third-person claim or otherwise. Each party acknowledges that it and the other party have been induced to enter into this Treaty by, among other things, the mutual waivers in this section 16.10.1.

*- signature page to follow -*

*Signature page – AGGREGATE EXCESS OF LOSS REINSURANCE TREATY*

In witness whereof, agreed upon and signed in counterparts by:

| | |
|---|---|
| **NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.** | **COLORADO BANKERS LIFE INSURANCE COMPANY** |
| By: Erwin van der Wel<br>Position: CEO<br>Date: 15 May 2017 | By:<br>Position:<br>Date: |
| By: TPM Elvon<br>Position: CFO<br>Date: 15 May 2017 | By:<br>Position:<br>Date: |

*Signature page – AGGREGATE EXCESS OF LOSS REINSURANCE TREATY*

In witness whereof, agreed upon and signed in counterparts by:

| | |
|---|---|
| **NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.** | **COLORADO BANKERS LIFE INSURANCE COMPANY** |
| By:<br>Position:<br>Date: | By: Lou Hensley<br>Position: CEO<br>Date: 15 May 2017 |
| By:<br>Position:<br>Date: | By: Brian Stewart<br>Position: Senior Vice President<br>Date: 15 May 2017 |

## Schedule A

## Covered Business

***Schedule A Part I: Overview of the Direct Ingaande Lijfrente (DIL) portfolio reinsured under this Treaty***

| Tariff code | Tariff description | Commercial product name |
|---|---|---|
| 281 | DIL (281): DIL | De Direct Ingaande Lijfrenteverzekering |
| 282 | DIL (282): DIP | De Direct Ingaande Pensioenverzekering |
| 285 | DIL (285): | De Lijfrente Op Maat Verzekering |
| 286 | DIL (286): pensioen op maat | De Pensioen Op Maat Verzekering |
| 291 | DIL (291): DIL | De Direct Ingaande Lijfrenteverzekering |
| 292 | DIL (292): DIP | De Direct Ingaande Pensioenverzekering |
| 295 | DIL (295): | De Lijfrente Op Maat Verzekering |
| 296 | DIL (296): | De Pensioen Op Maat Verzekering |
| 334 | DIL (334): Tijd. rente 4% | De Direct Ingaande Lijfrenteverzekering |
| 626 | DIL (626): Ingegane lijfrente | De Direct Ingaande Lijfrenteverzekering |
| 825 | DIL (825): Uitgestelde lijfrente | De Direct Ingaande Lijfrenteverzekering |
| 826 | DIL (826): Ingegane lijfrente | De Direct Ingaande Lijfrenteverzekering |
| 981 | DIL (981): Ingegane lijfrente | De Direct Ingaande Lijfrenteverzekering |
| 985 | DIL (985): Lijfrente op maat | De Lijfrente Op Maat Verzekering |



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 43 of 103

***Schedule A Part II: Overview of the Natuurlijk Garantieplan portfolio reinsured under this Treaty***

| **Tariff code** | **Tariff description** | **Commercial product name** |
|---|---|---|
| 102 | MKB Garantiepensioen | Het MKB Garantiepensioen |
| 110 | NGP (110): DGA garantieplan | Het DGA Garantiepensioen |
| 111 | NGP (111): DGA garantieplan | Het DGA Garantiepensioen |
| 314 | NGP (314): Het Natuurlijk Garantieplan | Het 'Natuurlijk' Garantieplan |
| 315 | NGP (315): Het Top Select Garantieplan | Het Top Select Garantieplan |
| 316 | NGP (316): gouden handdrukplan kapitaal | Het Gouden Handdrukplan |
| 317 | NGP (317): NGP | Het 'Natuurlijk' Garantieplan |
| 350 | NGP (350): NGP | Het 'Natuurlijk' Garantieplan |
| 351 | NGP (351): GHP | Het Lijfrente Spaarplan |
| 355 | NGP (355): Natuurlijk Garantieplan | Het 'Natuurlijk' Garantieplan |

## Schedule B

### Floating Retention Amount Calculation

The Floating Retention Amount to be calculated as of December 31 of each calendar year shall be an amount equal to:

i. the Floating Retention Amount calculated as of December 31 of the immediately preceding calendar year (or, for purposes of determining the Floating Retention Amount as of 31 December 2017, an amount that will result in capital relief for the Cedant of €150,000,000 of best estimate liabilities (as referred to in Solvency II)) as of the Contract Date, plus

ii. the amount of any new premiums collected by the Cedant in respect of the Covered Policies or accrued on the Covered Policies since December 31 of the immediately preceding calendar year (or, for purposes of determining the Floating Retention Amount as of 31 December 2017, since the Effective Date) (to the extent such premiums were not previously taken into account in calculating the Cedant's best estimate liability under Solvency II of its retained Covered Losses using the preceding calendar year's Floating Retention Amount), plus

iii. the Annual Valuation Rate Change Adjustment as of December 31 of such calendar year.

The "Annual Valuation Rate Change Adjustment" as of December 31 of each calendar year shall equal an amount, as calculated by the Cedant, such that the Net Reserve retained by the Cedant after taking into account Covered Losses would not change due to any change in valuation interest rates.

For the avoidance of doubt, the Annual Valuation Rate Change Adjustment as of December 31 of any calendar year may be positive or negative.



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 45 of 103

EXECUTION COPY

## Schedule C

## Trust Agreement

[To be attached.]

# TAB C

Exhibit C to the Complaint — Trust Agreement (May 15, 2017)

(pages 48–77)

# EXHIBIT C

## TRUST AGREEMENT

This Trust Agreement, dated as of 15 May 2017 (this "**Trust Agreement**"), is entered into by and among Colorado Bankers Life Insurance Company, a North Carolina domiciled insurance company ("**Colorado Bankers**"), and Standard Financial Ltd. (Malta), a company incorporated under the laws of Malta ("**Standard Financial**") (each of Colorado Bankers and Standard Financial, a "**Grantor**" and, together, the "**Grantors**"), Nederlandsche Algemeene Maatschappij van Levensverzekeringen "Conservatrix" N.V., a Dutch life insurance company (the "**Beneficiary**"), and Fifth Third Bank, an Ohio state-chartered bank that is a member of the Federal Reserve System, as trustee hereunder (the "**Trustee**") (the Grantors, the Beneficiary and the Trustee are hereinafter each sometimes referred to individually as a "**Party**" and collectively as the "**Parties**").

### RECITALS:

**WHEREAS**, Colorado Bankers and the Beneficiary have entered into that certain Aggregate Excess of Loss Reinsurance Agreement, dated as of __ May 2017 (the "**Reinsurance Agreement**"), pursuant to which Colorado Bankers has agreed to provide security to the Beneficiary for the payment of amounts due under the Reinsurance Agreement by Colorado Bankers to the Beneficiary;

**WHEREAS**, Standard Financial is an affiliate of Colorado Bankers and will be providing funding to allow Colorado Bankers to satisfy its obligation to provide security to the Beneficiary for the payment of amounts due under the Reinsurance Agreement by Colorado Bankers to the Beneficiary;

**WHEREAS**, the Grantors and the Beneficiary desire to enter into this Trust Agreement and create a trust account (the "**Trust Account**") with the Trustee for the benefit of the Beneficiary to hold cash and assets as security for the payment of amounts due under the Reinsurance Agreement by Colorado Bankers to the Beneficiary; and

**WHEREAS**, the Trustee has agreed to act as Trustee hereunder, and to hold cash and assets in the Trust Account for the sole use and benefit of the Beneficiary in accordance with the terms and conditions of this Trust Agreement;

**NOW, THEREFORE**, for and in consideration of the premises and the promises and the mutual agreements hereinafter set forth, the Parties, intending to be legally bound, covenant and agree as follows:

**SECTION 1.** <u>Deposit of Assets into the Trust Account.</u>

(a) The Grantors hereby agree to establish the Trust Account with the Trustee for the sole use and benefit of the Beneficiary on the later of (i) 31 March 2017 and (ii) the date on which the approval of the District Court of Amsterdam is received with respect to the Reinsurance Agreement (the later of (i) and (ii), the "<u>Contract Date</u>"), under the terms set forth herein, in order to secure payment of amounts owed by Colorado Bankers to the Beneficiary under the Reinsurance Agreement. On the Contract Date, Colorado Bankers shall transfer to the Trustee for deposit to the Trust Account Eligible Assets in the amount of €150,000,000, and

Standard Financial shall transfer to the Trustee for deposit to the Trust Account Eligible Assets in the amount of €7,500,000. The Trustee shall administer the Trust Account, consisting of Eligible Assets, in its name as Trustee for the sole use and benefit of the Beneficiary. The Trust Account shall be subject to withdrawal by the Beneficiary and by each Grantor, in each case, solely as provided herein. The Trustee hereby accepts the Trust Account upon the terms set forth in this Trust Agreement.

(b) The Trustee will accept and credit to the Trust Account all cash and assets which from time to time are delivered to it for deposit in the Trust Account (all such assets actually received in the Trust Account are herein referred to individually as an "Asset" and collectively as the "Assets"). The Trustee is authorized and shall have the power to receive such Assets and to hold and dispose of the same for the uses and purposes of and according to the provisions herein set forth (including, but not limited to, Section 4 below), in accordance with proper written or electronic instructions. All Assets shall be maintained by the Trustee in the Trust Account separate and distinct from all other assets under the control of or on the books of the Trustee and shall be received and continuously kept within the United States of America. The Assets shall consist only of Eligible Assets.

(c) If the aggregate market value of the Assets as of the end of any calendar quarter following the Contract Date, as set forth in the report delivered by Colorado Bankers to the Beneficiary pursuant to Section 8.5.1 of the Reinsurance Agreement, is less than the Required Balance as of such calendar quarter end, as set forth in the report delivered by Colorado Bankers to the Beneficiary pursuant to Section 8.5.1 of the Reinsurance Agreement, then within five (5) Business Days of Colorado Bankers' delivery to the Beneficiary of such report, the Grantors shall cause to be deposited into the Trust Account such additional Eligible Assets as are necessary to ensure that the aggregate market value of the Assets is no less than the Required Balance. Each Grantor's respective obligation to deposit additional Eligible Assets into the Trust Account shall be in proportion to the amount of Eligible Assets initially deposited into the Trust Account by such Grantor pursuant to Section 1(a). The market value of the Assets shall be calculated in accordance with the valuation practices and procedures as explicitly incorporated in Solvency II.

(d) The Grantors represent and warrant that (i) any Assets transferred to the Trustee by them for deposit in the Trust Account will be in such form that the Beneficiary, or the Trustee upon direction by the Beneficiary, may, whenever necessary pursuant to the terms of this Trust Agreement, negotiate any such Assets without consent or signature from any Grantor or any other Person, (ii) all Assets transferred to the Trustee by them for deposit in the Trust Account will consist only of Eligible Assets and (iii) the applicable Grantor will have good and marketable title to the Assets to be so transferred and each such Asset will be at the time of such transfer free and clear of all claims, liens, interests and encumbrances whatsoever (other than those arising under this Trust Agreement).

(e) Prior to depositing any Assets in the Trust Account, and from time to time thereafter as required, the Grantor depositing Assets shall execute or cause the execution of assignments or endorsement in blank, or transfer legal title of all shares, obligations and other assets requiring assignments to the Trustee, so that the Beneficiary, or the Trustee upon direction by the Beneficiary, may, whenever necessary pursuant to the terms of this Trust Agreement,



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 50 of 103

negotiate any such Assets without the consent or signature from such Grantor or any other Person. Any Assets received by the Trustee that are not in such proper negotiable form shall not be accepted by the Trustee and shall be returned to the transferor as unacceptable. The Trustee may hold Assets in bearer form or in its own name or that of a nominee. Each Grantor shall give all notices and take all actions necessary in order to cause payments due or that become due on any Asset to be paid to the Trustee. Neither Grantor shall make or consent to any waiver, amendment or restriction on transfer with respect to any Asset, in each case, without the prior written consent of the Beneficiary.

(f) The Trustee shall have no responsibility to value the Assets or to determine whether the Assets are sufficient to secure Colorado Bankers' obligations to the Beneficiary under the Reinsurance Agreement. Furthermore, the Trustee shall have no responsibility whatsoever to determine whether Assets constitute Eligible Assets.

**SECTION 2. Statement of Assets.**

(a) The Trustee shall furnish to the Grantors and the Beneficiary a statement of all Assets (the "**Statement of Assets**") upon the inception of the Trust Account on the Contract Date and at regular intervals no less frequently than at the end of each calendar month thereafter. The Statement of Assets shall be delivered as soon as reasonably practicable following the end of each month following the Contract Date and in no event later than ten (10) days following the end of such month and shall include (i) all deposits, withdrawals, substitutions and exchanges affecting the Trust Account during such calendar month, (ii) a listing of Assets held and cash and cash equivalent balances in the Trust Account as of the end of such calendar month and (iii) such other reports as the Beneficiary may reasonably request. The Trustee shall provide the Grantors and the Beneficiary with electronic access to all available information with respect to the Trust Account.

**SECTION 3. Withdrawal of Assets from the Trust Account.**

(a) The Beneficiary shall have the right, upon five (5) Business Days' prior written notice to the Trustee substantially in the form as attached hereto as Exhibit A (a "**Beneficiary Withdrawal Notice**"), to withdraw from the Trust Account such Assets as are specified in the Beneficiary Withdrawal Notice. The Beneficiary Withdrawal Notice shall instruct the Trustee as to how such specified Assets shall be delivered. The Beneficiary may from time to time designate a third party (the "**Beneficiary Designee**") in a Beneficiary Withdrawal Notice to whom all or part of the Assets specified therein shall be delivered. The Beneficiary shall not be required to present any other statement or document in addition to a Beneficiary Withdrawal Notice in order to withdraw any Assets, except that the Beneficiary shall acknowledge receipt of any such Assets withdrawn upon request by the Trustee. The Trustee shall have no liability or responsibility to verify or determine the occurrence of any event or condition giving rise to the Beneficiary's right to withdraw Assets from the Trust Account, and the Trustee shall be protected in relying on the Beneficiary Withdrawal Notice. The Trustee shall take any and all steps necessary to transfer absolutely and unequivocally all right, title and interest in the Assets specified in such Beneficiary Withdrawal Notice and shall deliver such Assets to or for the account of the Person specified in such Beneficiary Withdrawal Notice on the date specified in

the Beneficiary Withdrawal Notice. For the avoidance of doubt, the Beneficiary shall have the right, by delivering to the Trustee a Beneficiary Withdrawal Notice five (5) Business Days prior to the date of withdrawal, to withdraw all Assets from the Trust Account in the event of a Default, insolvency or bankruptcy or other similar credit event of Colorado Bankers. Any Assets withdrawn by the Beneficiary in the event of a Default, insolvency or bankruptcy or other similar credit event of Colorado Bankers shall be held by the Beneficiary in a segregated account and used solely for the purpose of satisfying Colorado Bankers' obligations to the Beneficiary under the Reinsurance Agreement. For purposes of this Section 3(a), "**Default**" shall mean any material default by Colorado Bankers that is not cured within sixty (60) days following Colorado Bankers' receipt of notice of such default.

(b) Each Grantor shall have the right, upon written notice to the Trustee, countersigned by the Beneficiary (such countersignature shall not be unreasonably withheld, conditioned or delayed), substantially in the form as attached hereto as Exhibit B (a "**Grantor Withdrawal Notice**" and, along with any Beneficiary Withdrawal Notice, a "**Withdrawal Notice**"), to withdraw from the Trust Account such Assets as are specified in the Grantor Withdrawal Notice, only if the aggregate market value of the Assets in the Trust Account as of the end of any calendar quarter exceeds the Required Balance as of the end of such calendar quarter (as set forth in the applicable report delivered by Colorado Bankers to the Beneficiary pursuant to Section 8.5.1 of the Reinsurance Agreement). In such event, the Grantors shall have the right to withdraw Assets with a market value equal to such excess in accordance with this Section 3(b), with each Grantor having the right to withdraw its proportionate share of such excess Assets (determined based on each Grantor's proportionate share of the initial deposit made pursuant to Section 1(a)). The Grantor Withdrawal Notice shall instruct the Trustee as to how such specified Assets shall be delivered. Each Grantor may from time to time designate a third party (the "**Grantor Designee**") in a Grantor Withdrawal Notice to whom all or part of the Assets specified therein shall be delivered. The Grantors shall not be required to present any other statement or document in addition to a Grantor Withdrawal Notice in order to withdraw any Assets, except that each Grantor Withdrawal Notice must be countersigned by the Beneficiary, and the applicable Grantor shall acknowledge receipt of any such Assets withdrawn upon request by the Trustee. The Trustee shall have no liability or responsibility to verify or determine the occurrence of any event or condition giving rise to any Grantor's right to withdraw Assets from the Trust Account, and the Trustee shall be protected in relying on the Grantor Withdrawal Notice, if countersigned by the Beneficiary. Upon receipt of a Grantor Withdrawal Notice, the Trustee shall immediately take any and all steps necessary to transfer absolutely and unequivocally all right, title and interest in the Assets specified in such Grantor Withdrawal Notice and shall deliver physical custody (or such other form as is necessary to complete the transfer) of such Assets to or for the account of the Person(s) specified in such Grantor Withdrawal Notice.

(c) Subject to Section 4 of this Trust Agreement, the Trustee shall not substitute or withdraw any Asset from the Trust Account in the absence of a Withdrawal Notice or a Grantor Substitution Notice.

SECTION 4. <u>Redemption, Investment and Substitution of Assets.</u>

(a) The Trustee shall surrender for payment all maturing Assets and all Assets called for redemption, deposit the principal amount of the proceeds of any such payment to the Trust Account and give written notice of such action to the Grantors and the Beneficiary.

(b) The Grantors may retain (and pay the service fees of) one or more professional asset managers (each, an "**Asset Manager**") to make investment decisions with regard to the Assets in the Trust Account. In such event, the Grantors shall notify the Trustee and the Beneficiary in writing of the appointment of such Asset Manager. From time to time, at the written or electronic order and direction of either Grantor or the Asset Manager, the Trustee shall settle trades of Assets. The Grantors and/or the Asset Manager shall have complete discretion to direct the Trustee to invest and reinvest the Assets in the Trust Account in Eligible Assets in accordance with the Eligibility Criteria and the terms and conditions of this Trust Agreement, and the Trustee shall be fully protected in following any order, direction or instruction of either Grantor or the Asset Manager. The Grantors shall promptly notify the Beneficiary and the Trustee in writing of the termination of the appointment of an Asset Manager.

(c) From time to time, upon written notice from either Grantor to the Trustee, countersigned by the Beneficiary (such countersignature shall not be unreasonably withheld, conditioned or delayed), substantially in the form as attached hereto as <u>Exhibit C</u> (a "**Grantor Substitution Notice**"), a Grantor (or the Asset Manager) may direct the Trustee to substitute Assets held in the Trust Account with other Eligible Assets having an aggregate market value at least equal to the aggregate market value of the Assets so substituted. The delivery of the Grantor Substitution Notice shall constitute a representation and warranty by the applicable Grantor to the Trustee and the Beneficiary that, as of the date of such substitution, (i) any Assets deposited into the Trust Account in connection with such substitution are Eligible Assets, (ii) the market value of the Assets so deposited is at least equal to the market value of the Assets withdrawn from the Trust Account in connection with such substitution, (iii) the replacement Assets shall be deposited in the Trust Account prior to or simultaneously with the removal of Assets from the Trust Account in connection with any such substitution or exchange, (iv) the substitution of Assets is in compliance with the Eligibility Criteria and (v) neither Grantor shall make any substitutions under this <u>Section 4(c)</u> if either Grantor is in default under any other provision of this Trust Agreement. Each Grantor's substitution rights under this <u>Section 4(c)</u> shall solely apply with respect to such Grantor's proportionate share of the Assets held in the Trust Account (determined based on each Grantor's proportionate share of the initial deposit made pursuant to <u>Section 1(a)</u>). The Trustee shall be fully protected in following any such Grantor Substitution Notice, if countersigned by the Beneficiary, and shall have no responsibility whatsoever to determine the market value of such substituted Assets or that such substituted Assets constitute Eligible Assets.

(d) Any loss incurred from any investment made pursuant to the terms of this <u>Section 4</u> shall be borne exclusively by the Trust Account.

SECTION 5. <u>Income Account.</u>

All payments of interest, dividends and other income or distributions with respect to Assets in the Trust Account (collectively referred to as "**Income**") shall be posted and provisionally credited by the Trustee in the separate income ledger (the "**Income Account**") of the Trust Account established and maintained by the Grantors at an office of the Trustee. Any Income automatically posted and provisionally credited to the Income Account which is not subsequently received by the Trustee shall be reversed, and the Grantors shall reimburse the Trustee therefor, and the Trustee may debit the Income Account for this purpose. The Income shall be paid to the Grantors or credited to an account of the Grantors in accordance with written instructions provided from time to time by the Grantors to the Trustee. Each Grantor shall be entitled to its proportionate share of the Income in the Income Account (determined based on each Grantor's proportionate share of the initial deposit made pursuant to Section 1(a)).

**SECTION 6. Federal Income Tax Treatment.**

The Trust Account shall be treated as a grantor trust (pursuant to Sections 671 through 677 of the U.S. Internal Revenue Code of 1986) for U.S. federal income tax purposes. The Grantors shall constitute the grantor and, thus, any and all income or gain derived from the Assets shall constitute income or gain of the applicable Grantor receiving such income or gain. The Grantors shall not authorize, request or direct the Trustee, and the Trustee shall not otherwise be authorized or empowered, to do anything that would cause the Trust Account to fail to qualify as a grantor trust for such tax purposes.

**SECTION 7. Right to Vote Assets.**

The Trustee shall forward all annual and interim stockholder and other financial reports and all proxies and proxy materials relating to the Assets to the Grantors or their designee within a reasonable period of time following the Trustee's receipt thereof. The Grantors or their designee shall have the full and unqualified right to vote any shares of stock or other securities in the Trust Account and to exercise any and all rights not inconsistent with this Trust Agreement with respect to any securities or other property forming a part of the Trust Account.

**SECTION 8. Additional Rights and Duties of the Trustee.**

(a) The Trustee shall be a bank or trust company having its principal place of business in the United States.

(b) The Trustee shall not be liable for a loss incurred by any Grantor or the Beneficiary except as caused by the Trustee's own negligence, willful misconduct, or lack of good faith arising out of or in connection with the performance of its obligations in accordance with this Trust Agreement.

(c) If the Trustee receives notice of a default or refusal to pay from an issuer or transfer agent in respect of any Asset, the Trustee shall so advise the Grantors.

(d) The Trustee shall notify the Grantors and the Beneficiary in writing within ten (10) days following each deposit into, or withdrawal from, the Trust Account. Such notice shall be deemed effective if Trustee has provided online account access to the Grantors and the Beneficiary.

(e) Before accepting any Asset for deposit to the Trust Account, the Trustee shall determine that such Asset is in such form that the Beneficiary or the Trustee, upon direction by the Beneficiary may, whenever necessary pursuant to the terms of this Trust Agreement, negotiate any such Assets without the consent or signature from any Grantor or any other Person.

(f) The Trustee shall be under no obligation to determine whether or not any instructions given by the Grantors or the Beneficiary are contrary to any provision of law. It is understood and agreed that the duties and obligations of the Trustee shall only be such as are specifically set forth in this Trust Agreement, as it may from time to time be amended. Without limiting the generality of the foregoing, the Trustee shall not have any duty to advise, manage, supervise or make recommendations with respect to the purchase, retention or sale of any Assets as to which a default in the payment of principal or interest has occurred.

(g) The Trustee shall accept and open all mail directed to any Grantor or the Beneficiary in care of the Trustee and deliver a copy of such mail to the Grantors or the Beneficiary, as applicable, promptly after the Trustee's receipt thereof.

(h) The Trustee shall keep full and complete records of the administration of the Trust Account in accordance with Applicable Law. Upon the request of either Grantor or the Beneficiary, and at the Grantors' expense, the Trustee shall promptly permit the Grantors or the Beneficiary, their respective agents, employees, independent auditors and regulatory authorities to examine, audit, excerpt, transcribe and copy, during the Trustee's normal business hours, any books, documents, papers and records relating to the Trust Account or the Assets.

(i) The Trustee is authorized to follow and rely upon all instructions given by officers of either Grantor or the Beneficiary, by the Asset Manager and attorneys-in-fact acting under written authority furnished to the Trustee by the Grantors or the Beneficiary, including, without limitation, instructions given by letter or facsimile transmission, if the Trustee believes such instructions to be genuine and to have been signed, sent or presented by the proper party or parties. In the absence of negligence, willful misconduct or lack of good faith, the Trustee shall not incur any liability to anyone resulting from actions taken by the Trustee in reliance in good faith on such instructions. In the absence of its own negligence, willful misconduct or lack of good faith, the Trustee shall not incur any liability in executing instructions (i) from any attorney-in-fact prior to receipt by it of notice of the revocation of the written authority of the attorney-in-fact or (ii) from any officer of either Grantor or the Beneficiary.

(j) No provision of this Trust Agreement or any request, direction or instruction given to the Trustee hereunder shall require the Trustee to take any action which would result in any violation of this Trust Agreement or any provision of Applicable Law.

(k) The Trustee may confer with counsel of its own choice in relation to matters arising under this Trust Agreement. To the extent Trustee desires to retain counsel that is also counsel for the Grantors or the Beneficiary, the Trustee shall notify the Grantors or the Beneficiary, as appropriate, and obtain the consent of the Grantors or the Beneficiary, as appropriate, such consent not to be unreasonably withheld.

(l) The Trustee may maintain the Assets in book-entry form with, and utilize the services of, any Federal Reserve Bank, The Depository Trust Company or similar such depositories ("**Central Depositories**") as appropriate. Assets may be held in the name of a nominee maintained by the Trustee or any Central Depository.

(m) The Trustee shall be liable for (i) the safekeeping of the Assets and administering the Trust Account in accordance with the provisions of this Trust Agreement and (ii) its own negligence, willful misconduct or lack of good faith in performing its duties under this Trust Agreement. The Trustee shall exercise the standard of care with respect to the Assets that a professional trustee, engaged in the banking or trust company industry, having professional expertise in financial and securities processing transactions and custody would observe in such affairs.

(n) Whenever in the administration of the Trust Account created by this Trust Agreement the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking, suffering or omitting any action thereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement or certificate signed by or on behalf of the Grantors and/or the Beneficiary, as appropriate, and delivered to the Trustee and said statement or certificate shall be full warrant to the Trustee for any action taken, suffered or omitted by it on the faith thereof.

(o) The Trustee is not required to make advances of cash, securities or any other property on behalf of the Trust Account, or permit overdrafts in the Trust Account in connection with the acquisition or disposition of Assets; provided, however, that if the Trustee does make such advance or permit such an overdraft, such advance or overdraft shall be deemed a loan by the Trustee to the Grantors, which loan shall be payable on demand and shall bear interest at the Trustee's customary rate for similar loans. The Grantors shall be solely responsible for repayment of such loan and any interest thereon.

(p) Except as may be caused by the Trustee's own negligence, willful misconduct or lack of good faith, the Trustee shall be without liability for any loss, liability, claim or expense resulting from or caused by events or circumstances beyond the reasonable control of the Trustee, including, without limitation, the interruption, suspension or restriction of trading on or the closure of any securities markets, power or other mechanical or technological failures or interruptions, or computer viruses, attacks or intrusions, or communications disruptions, work stoppages, natural disasters or other similar events or acts, delays or inability to perform its duties due to any disorder in market infrastructure with respect to any particular security or changes to any provision of any present or future law or regulation or order of the United States of America, or any state thereof, or any other country, or political subdivision thereof or any court of competent jurisdiction.

(q) The Trustee, in incurring any debt, liability or obligation, or in taking or omitting to take any action for or in connection with the Trust, is and shall be deemed to be acting solely as a trustee, and not in an individual capacity.

(r) Nothing herein shall preclude the Trustee from acting for any other Party hereto, in a capacity unrelated to the transactions contemplated by this Trust Agreement.

(s) The Trustee shall have no responsibility or liability for:

(i) the adequacy of the Trust, or the Assets from time to time transferred into, withdrawn from, or comprising the Trust;

(ii) collecting any contributions from the Grantors or enforcing the provisions of this Trust Agreement regarding the contribution or withdrawal of Assets;

(iii) the validity, accuracy, or sufficiency of any documents, papers, securities, or payments held in the Trust; or

(iv) monitoring whether amounts withdrawn from the Trust are utilized as agreed between Colorado Bankers and the Beneficiary.

**SECTION 9. <u>The Trustee's Compensation; Expenses.</u>**

(a) The Grantors shall pay the Trustee, as compensation for its services under this Trust Agreement, an annual fee at such rate as may be agreed from time to time in writing between the Grantors and the Trustee. The Grantors shall pay or reimburse the Trustee for all of the Trustee's reasonable expenses and disbursements in connection with its duties under this Trust Agreement (including reasonable attorneys' fees and expenses), except, for the avoidance of doubt, any such expense or disbursement that was found by a court of competent jurisdiction to be caused by the Trustee's negligence, willful misconduct, lack of good faith or failure to administer the Trust Account in accordance with the terms of this Trust Agreement. The Grantors also hereby agree to indemnify the Trustee and its directors, officers, agents and employees (collectively, the "**Indemnitees**") against any and all claims (whether asserted by the Grantors, the Beneficiary or any other person or entity whether or not valid), investigations, liabilities, losses, damages, fines, penalties and expenses, including out out-of-pocket and incidental expenses and legal fees ("Losses") incurred or paid except, for the avoidance of doubt, any such expense or disbursement that was caused by the Trustee's negligence, willful misconduct or lack of good faith arising out of or in connection with the performance of its obligations in accordance with the provisions of this Trust Agreement, including any Losses arising out of or in connection with the status of the Trustee and its nominee as the holder of record of the Assets. The Grantors also agree to indemnify the Indemnitees against any and all Losses that may be imposed on, incurred by or asserted against the Indemnitees for following any instructions or other directions upon which the Trustee is authorized to rely pursuant to the terms of this Trust Agreement and all expenses incurred by the Indemnitees in the enforcement of the terms of this Trust Agreement. The Grantors hereby acknowledge that the foregoing indemnities shall survive the resignation or removal of the Trustee or the termination of this Trust Agreement. Each Grantor's respective obligations pursuant to this <u>Section 9(a)</u> shall be in proportion to the amount of Eligible Assets initially deposited into the Trust Account by such Grantor pursuant to <u>Section 1(a)</u>.

(b) No Assets shall be withdrawn from the Trust Account or used in any manner for paying compensation to, or reimbursement of expenses or indemnification of, the Trustee. The

Trustee shall have no security interest in, lien on or right of setoff against the Trust Account or any Assets therein.

**SECTION 10. Resignation or Removal of the Trustee.**

(a) The Trustee may resign at any time upon delivery of a written notice thereof to the Beneficiary and to the Grantors effective not less than ninety (90) days after receipt by the Beneficiary and the Grantors of such notice. The Trustee may be removed by the Grantors by (i) delivery to the Trustee and the Beneficiary of a written notice of removal, effective not less than ninety (90) days after receipt by the Trustee and the Beneficiary of the notice and (ii) receipt of the Beneficiary's consent to such action, which consent shall not be unreasonably withheld, conditioned or delayed. No such resignation or removal shall become effective until a successor Trustee has been appointed by the Grantors and all Assets have been duly transferred to the successor Trustee in accordance with paragraph (b) of this Section 10. In the event that the Grantors fail to appoint a successor trustee at least thirty (30) days prior to the effective date of Trustee's resignation or removal, the Trustee may file an action requesting a court of competent jurisdiction immediately appoint a successor trustee. Any successor Trustee shall be a Qualified U.S. Financial Institution authorized to act as a fiduciary. The Grantors and the Beneficiary shall be jointly and severally liable for the payment of all expenses in connection with such action.

(b) Upon the acceptance of the appointment as Trustee hereunder by a successor Trustee and the transfer to such successor Trustee of all Assets, the resignation or removal of the Trustee shall become effective. Thereupon, such successor Trustee shall succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Trustee, and the resigning or removed Trustee shall be discharged from any future duties and obligations under this Trust Agreement, but the resigning or removed Trustee shall continue after such resignation or removal to be entitled to the benefits of the indemnities provided herein for the Trustee.

**SECTION 11. Termination of the Trust Account.**

The Trust Account and this Trust Agreement shall be effective until terminated by the provision of at least thirty (30) days' advance written notice sent to the Trustee by the Grantors and the Beneficiary. Upon the termination of the Trust Account and upon joint instructions from the Grantors and the Beneficiary, the Trustee shall transfer to the Grantors or the Grantors' designee, all of the Assets not previously withdrawn by the Grantors or the Beneficiary. Each Grantor's respective right to receive any such Assets not previously withdrawn by the Grantors or the Beneficiary shall be in proportion to the amount of Eligible Assets initially deposited into the Trust Account by such Grantor pursuant to Section 1(a).

**SECTION 12. Specific Performance.**

The Grantors and the Beneficiary recognize and agree that, as between themselves, if for any reason any of the provisions of this Trust Agreement required to be performed by the Grantors or the Beneficiary for the benefit of the other are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, the

Grantors and the Beneficiary agree that, in addition to any other available remedies, the Grantors and the Beneficiary shall be entitled to an injunction restraining any violation or threatened violation of any of the provisions of this Trust Agreement by the other without the necessity of posting a bond or other form of security. In the event that any action should be brought in equity to enforce any of the provisions of this Trust Agreement by either the Grantors or the Beneficiary, neither the Grantors nor the Beneficiary will allege, and the Grantors and the Beneficiary each hereby waives the defense, that there is an adequate remedy at law.

**SECTION 13. Definitions.**

Except as the context shall otherwise require, the following terms shall have the following meanings for purposes of this Trust Agreement (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Trust Agreement):

The term "**Applicable Law**" shall mean, with respect to any Person, any domestic or foreign federal, state or local statute, law, ordinance, code or common law or any written rules, regulations, publicly available administrative interpretations, or orders issued by any Governmental Authority pursuant to any of the foregoing, and any order, writ, injunction, directive, administrative interpretation, judgment or decree of a court of competent jurisdiction applicable to such Person or its business, subsidiaries, properties, assets, officers, directors, employees or agents.

The term "**Beneficiary**" shall include any successor of the Beneficiary by contract or by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator.

The term "**Business Day**" shall mean any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, Alabama or the Netherlands are required or authorized by Applicable Law to be closed.

The term "**Covered Policies**" shall have the meaning ascribed to such term in the Reinsurance Agreement.

The term "**Eligible Assets**" shall mean cash (denominated in Euro (€)) and/or investments of the type consistent with the Eligibility Criteria.

The term "**Eligibility Criteria**" shall mean the investment guidelines attached hereto as Exhibit D.

The term "**Governmental Authority**" shall mean any United States federal or foreign, state, county, local, or other governmental or public agency, instrumentality, commission, authority, court, tribunal, arbitrator, or self-regulatory organization, board or body.

The term "**Net Reserves**" shall have the meaning ascribed to such term in the Reinsurance Agreement.

The term "**Person**" shall mean an individual, a corporation, a partnership, an association, a limited liability company, a trust or other entity or organization.

The term "**Qualified U.S. Financial Institution**" shall mean an institution that: (a) is organized or, in the case of a United States office of a foreign banking organization, licensed under the laws of the United States or any of its states; (b) is regulated, supervised, and examined by United States federal or state authorities having regulatory authority over banks and trust companies; and (c) has been determined by either the Commissioner of the North Carolina Department of Insurance or the Securities Valuation Office of the National Association of Insurance Commissioners to meet the standards of financial condition and standing considered necessary and appropriate to regulate the quality of financial institutions who serve as trustees.

The term "**Required Balance**" shall mean an amount equal to 105% of the Net Reserves of the Covered Policies.

The term "**Solvency II**" shall mean Directive 2009/138/EC of the European Parliament and of the Council of 25 November 2009 on the taking-up and pursuit of the business of Insurance and Reinsurance (Solvency II), as implemented and amended as of March 31, 2017, and the corresponding delegated acts, technical standards and guidelines as adopted as of March 31, 2017.

**SECTION 14.** **Governing Law.**

This Trust Agreement shall be subject to and governed by the laws of the State of New York, without regard to such State's principles of conflict of law that could compel the application of the laws of another jurisdiction, and the Trust Account created hereunder shall be administered in accordance with the laws of the State of New York.

**SECTION 15.** **Successors and Assigns.**

This Trust Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, permitted assigns and legal representatives; provided, however, that, in the case of the Trustee, the successor is eligible to be a trustee under the terms hereof. Neither this Trust Agreement, nor any right or obligation hereunder, may be assigned by any Party without the prior written consent of the other Parties hereto. Any assignment in violation of this Section 15 shall be void and shall have no force and effect.

**SECTION 16.** **Severability.**

If any provision of this Trust Agreement is held to be void or unenforceable, in whole or in part, (a) such holding shall not affect the validity and enforceability of the remainder of this Trust Agreement, including any other provision, paragraph or subparagraph, and (b) the Parties agree to attempt in good faith to reform such void or unenforceable provision to the extent necessary to render such provision enforceable and to carry out its original intent.

**SECTION 17.** **Entire Agreement.**

This Trust Agreement (including all Exhibits hereto) constitutes the entire agreement

among the Parties with respect to the subject matter hereof, and there are no understandings or agreements, conditions or qualifications relative to this Trust Agreement which are not fully expressed herein or therein.

**SECTION 18. Amendments.**

This Trust Agreement may be modified or otherwise amended, and the observance of any term of this Trust Agreement may be waived, only if such modification, amendment or waiver is in writing and signed by the Parties.

**SECTION 19. Notices.**

Unless otherwise specifically provided for in this Trust Agreement, all notices, requests, demands and other communications under this Trust Agreement must be in writing and will be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent by reputable overnight air courier, two (2) Business Days after mailing; (c) if sent by facsimile transmission, with a copy mailed on the same day in the manner provided in (a) or (b) above, when transmitted and receipt is confirmed by telephone; (d) if sent by e-mail; or (e) if otherwise actually personally delivered, when delivered, and shall be delivered as follows:

If to the Grantors:

Colorado Bankers Life Insurance Company
2222 Sedwick Rd.
Durham, NC 27713
Attention: CFO
E-mail: Brian.Stewart@globalbankers.com

With a copy to:

Colorado Bankers Life Insurance Company
2222 Sedwick Rd.
Durham, NC 27713
Attention: Chief Legal Officer
E-mail: Tamre.edwards@globalbankers.com

and

Standard Financial Ltd. (Malta)
[•]
Telephone: [•]
Facsimile: [•]
E-mail: [•]
Attn: [•]



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 61 of 103

If to the Beneficiary:

Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V.
[•]
Telephone: [•]
Facsimile: [•]
E-mail: [•]
Attn: [•]

If to the Trustee:

Fifth Third Bank
38 Fountain Square Plaza, 12th Floor
MD – 1090CC
Cincinnati, OH 45263
Attention: Brian Knutson, Vice President
Facsimile: 513-534-4735
Email: brian.knutson@53.com

With a copy to:

Fifth Third Bank
Global Custody Administration
5001 Kingsley Drive
MD – 1MOB2D
Cincinnati, OH 45227
Attention: Mark McCauley, Vice President
Facsimile: 513-358-6622
Email: mark.mccauley@53.com

or to such other address or to such other Person as a Party may have last designated by notice to the other Parties.

**SECTION 20. Headings.**

The headings of the Sections have been inserted for convenience of reference only and shall not be deemed to constitute a part of this Trust Agreement.

**SECTION 21. Requests for Information.**

The Trustee shall promptly respond to any and all reasonable requests for information concerning the Trust Account or the Assets by either of the other Parties to this Trust Agreement. Furthermore, the Trustee shall fully and completely respond to any direct inquiries of the insurance regulatory authority in the jurisdiction of domicile of either Grantor or the Beneficiary, or any of their respective representatives, concerning the Trust Account or the Assets, including

detailed inventories of securities or funds, and the Trustee shall permit the insurance regulatory authority in the jurisdiction of domicile of either Grantor or the Beneficiary, or their respective representatives, to examine and audit all securities or funds held hereunder. To the extent not prohibited by Applicable Law, the Trustee shall promptly provide notice to the Beneficiary and the Grantors concerning all such inquiries, and shall to the extent reasonably practicable provide seven (7) days' prior notice to the Beneficiary and the Grantors of all such examinations and audits, but shall have no liability to any other Party for its failure to do so.

**SECTION 22.** **Counterparts.**

This Trust Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute but one and the same Trust Agreement.

**SECTION 23.** **Identifying Information.**

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust, or other legal entity, the Trustee requires documentation to verify such person's formation and existence as a legal entity and may ask to see financial statements, licenses, or identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation. The Parties agree to provide all information reasonably requested by the Trustee in connection with any legislation or regulation to which the Trustee is subject, in a timely manner.

**SECTION 24.** **Waiver of Jury Trial.**

Each of the Parties hereby irrevocably waive all right to a trial by jury in any action, proceeding, claim, or counterclaim (whether based on contract, tort or otherwise) directly or indirectly arising out of or relating to this Trust Agreement.

[*Remainder of page left intentionally blank*]

**IN WITNESS WHEREOF,** the Parties hereto have caused this Trust Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**COLORADO BANKERS LIFE INSURANCE COMPANY,** as Grantor

By: [signature]
Name: Lou Hensley

Title: CEO

By: [signature]
Name: Brian Stewart

Title: Senior Vice President

**STANDARD FINANCIAL LTD. (MALTA),** as Grantor

By:________________________
Name:________________________

Title:________________________

By:________________________
Name:________________________

Title:________________________

**NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.,** as Beneficiary

By:________________________
Name:________________________

Title:________________________

By:________________________
Name:________________________

Title:________________________

Signature page Trust Agreement

**IN WITNESS WHEREOF,** the Parties hereto have caused this Trust Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**COLORADO BANKERS LIFE INSURANCE COMPANY,** as Grantor

By:________________________
Name:________________________
Title:________________________

By:________________________
Name:________________________
Title:________________________

**STANDARD FINANCIAL LTD. (MALTA),** as Grantor

By:________________________
Name: GREG LINDBERG
Title: Chairman

By:________________________
Name:________________________
Title:________________________

**NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.,** as Beneficiary

By:________________________
Name:________________________
Title:________________________

By:________________________
Name:________________________
Title:________________________

**IN WITNESS WHEREOF,** the Parties hereto have caused this Trust Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**COLORADO BANKERS LIFE INSURANCE COMPANY,** as Grantor

By:____________________
Name:____________________
Title:____________________

By:____________________
Name:____________________
Title:____________________

**STANDARD FINANCIAL LTD. (MALTA),** as Grantor

By:____________________
Name:____________________
Title:____________________

By: [signature]
Name: JOSEPH GRIOLI
Title: DIRECTOR

**NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.,** as Beneficiary

By:____________________
Name:____________________
Title:____________________

By:____________________
Name:____________________
Title:____________________

**IN WITNESS WHEREOF**, the Parties hereto have caused this Trust Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**COLORADO BANKERS LIFE INSURANCE COMPANY**, as Grantor

By:______________________________
Name:______________________________
Title:______________________________

By:______________________________
Name:______________________________
Title:______________________________

**STANDARD FINANCIAL LTD. (MALTA)**, as Grantor

By:______________________________
Name:______________________________
Title:______________________________

By:______________________________
Name:______________________________
Title:______________________________

**NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.**, as Beneficiary

By: Erwin v.d. Wal
Name:______________________________
Title: CEO

By: TPM Sloop
Name:______________________________
Title: CFO

Signature page Trust Agreement

**FIFTH THIRD BANK,** as Trustee

By: *[signature]*
Name: DAVID W. HART
Title: VICE PRESIDENT

By:____________________
Name:____________________
Title:____________________

**Exhibit A**

**BENEFICIARY WITHDRAWAL NOTICE**

Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V., a Dutch life insurance company (the "**Beneficiary**"), as beneficiary under the Trust Agreement (the "**Trust Agreement**"), dated as of __ May 2017, by and among the Beneficiary, Colorado Bankers Life Insurance Company, a North Carolina domiciled insurance company, and Standard Financial Ltd. (Malta), a company incorporated under the laws of Malta (together with Colorado Bankers Life Insurance Company, the "**Grantors**"), and Fifth Third Bank, an Ohio state-chartered bank that is a member of the Federal Reserve System, as trustee thereunder (the "**Trustee**"), requests and authorizes the Trustee to withdraw the Assets described below from the Trust Account, and to transfer such Assets in accordance with the directions set forth below:

1. Assets to be Withdrawn and Transferred:

   Amount: $____________________

   Assets: ____________________________________

2. Transfer Directions:

   Transferee: ____________________________________

   Location of Account: ___________________________

   Account No.: __________________

3. Said transfer should be made on [date].

This Certificate is a "**Beneficiary Withdrawal Notice**" within the meaning of Section 3(a) of the Trust Agreement. Capitalized terms used herein but not otherwise defined shall have the respective meanings ascribed to them in the Trust Agreement. The Beneficiary hereby certifies that the withdrawal of Assets provided for herein meets the requirements set forth in Section 8.3 of the Reinsurance Agreement.

Date: _____________________

**NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.,**

By: ____________________________
Name:
Title:

By:______________________________
Name:
Title:

**Exhibit B**

**GRANTOR WITHDRAWAL NOTICE**

[Colorado Bankers Life Insurance Company, a North Carolina domiciled insurance company][Standard Financial Ltd. (Malta), a company incorporated under the laws of Malta] (the "**Grantor**"), as a grantor under the Trust Agreement (the "**Trust Agreement**"), dated as of __ May 2017, by and among Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V., a Dutch life insurance company (the "**Beneficiary**"), the Grantor, [Colorado Bankers Life Insurance Company, a North Carolina domiciled insurance company][Standard Financial Ltd. (Malta), a company incorporated under the laws of Malta], and Fifth Third Bank, an Ohio state-chartered bank that is a member of the Federal Reserve System, as trustee thereunder (the "**Trustee**"), requests and authorizes the Trustee to withdraw the Assets described below from the Trust Account, and to transfer such Assets in accordance with the directions set forth below:

1. Assets to be Withdrawn and Transferred:[1]

   Amount: $__________________

   Property: ________________________________

2. Transfer Directions:

   Transferee: ________________________________

   Location of Account: ________________________

   Account No.: ________________

3. Said transfer should be made on [date].

This Certificate is a "**Grantor Withdrawal Notice**" within the meaning of Section 3(b) of the Trust Agreement. Capitalized terms used herein but not otherwise defined shall have the respective meanings ascribed to them in the Trust Agreement. This Grantor Withdrawal Notice shall not be effective unless signed below by authorized representatives of both the Beneficiary and the applicable Grantor.

Date: ____________________

**[COLORADO BANKERS LIFE INSURANCE COMPANY**, as Grantor

By: ______________________________
Name: ____________________________

---

[1] If Assets are to be transferred to more than one transferee, specify the amount and transfer directions with respect to each transferee.



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 71 of 103

Exhibit B

Title:____________________________

By:____________________________
Name:____________________________
Title:____________________________]

[**STANDARD FINANCIAL LTD. (MALTA)**, as Grantor

By:____________________________
Name:____________________________
Title:____________________________

By:____________________________
Name:____________________________
Title:____________________________]

The Beneficiary hereby consents to the above requested withdrawal.

**NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.**, as Beneficiary

By:____________________________
Name:____________________________
Title:____________________________

By:____________________________
Name:____________________________
Title:____________________________

**Exhibit C**

**GRANTOR SUBSTITUTION NOTICE**

[Colorado Bankers Life Insurance Company, a North Carolina domiciled insurance company][Standard Financial Ltd. (Malta), a company incorporated under the laws of Malta] (the "**Grantor**"), as a grantor under the Trust Agreement (the "**Trust Agreement**"), dated as of __ May 2017, by and among Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V., a Dutch life insurance company (the "**Beneficiary**"), the Grantor, [Colorado Bankers Life Insurance Company, a North Carolina domiciled insurance company][Standard Financial Ltd. (Malta), a company incorporated under the laws of Malta], and Fifth Third Bank, an Ohio state-chartered bank that is a member of the Federal Reserve System, as trustee thereunder (the "**Trustee**"), requests and authorizes the Trustee to substitute the Assets described below held in the Trust Account for the Eligible Assets described below. The Trustee is authorized and directed to transfer such property in accordance with the directions set forth below concurrent with receipt of the Eligible Assets set forth below:

1. Assets to be Withdrawn and Transferred:

[Description of each Asset and the market value of each such Asset to be withdrawn from the Trust Account.]

______________________________

2. Eligible Assets to be deposited into the Trust Account:

[Description of each Asset and the market value of each such Asset to be deposited in the Trust Account.]

______________________________

3. Transfer Directions:

Transferee: ______________________________

Location of Account: ______________________

Account No.: ________________

4. Said transfer should be made on [date].

This Certificate is a "**Grantor Substitution Notice**" within the meaning of Section 4(c) of the Trust Agreement. Capitalized terms used herein but not otherwise defined shall have the respective meanings ascribed to them in the Trust Agreement. This Grantor Substitution Notice shall not be effective unless signed below by authorized representatives of both the Beneficiary and the applicable Grantor.

Date: ____________________

[COLORADO BANKERS LIFE INSURANCE COMPANY, as Grantor

By:______________________________
Name:____________________________
Title:_____________________________

By:______________________________
Name:____________________________
Title:_____________________________]

[STANDARD FINANCIAL LTD. (MALTA), as Grantor

By:______________________________
Name:____________________________
Title:_____________________________

By:______________________________
Name:____________________________
Title:_____________________________]

The Beneficiary hereby consents to the above requested substitution.

NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V., as Beneficiary

By:______________________________
Name:____________________________
Title:_____________________________

By:______________________________
Name:____________________________
Title:_____________________________

## Exhibit D

## ELIGIBILITY CRITERIA

The financial instruments standing to the credit of the Trust Account shall at all times meet all of the following requirements and restrictions:

a. The financial instruments in the Trust Account shall be eligible for Solvency II;
b. The financial instruments in the Trust Account shall meet the investment policy of Colorado Bankers and shall comply with the requirements set forth in Section 58-7-178(a) of the North Carolina Insurance Code;
c. The financial instruments in the Trust Account shall be of sufficient credit quality, shall be of sufficient liquidity and shall be sufficiently stable in value as per article 214(1) sub (b) under (i) of Delegated Regulation (EU) 2015/35;
d. The financial instruments in the Trust Account shall not have any material positive correlation with the credit quality of Colorado Bankers as per article 214(1) sub (c) of Delegated Regulation (EU) 2015/35; and
e. The financial instruments in the Trust Account shall not include any securities issued by Colorado Bankers or a related undertaking of Colorado Bankers as per article 214(1) sub (d) of Delegated Regulation (EU) 2015/35.

EXECUTION COPY

## Schedule D

## Eligibility Criteria

The financial instruments standing to the credit of the Trust Account shall at all times meet all of the following requirements and restrictions:

a. The financial instruments in the Collateral shall be eligible for Solvency II;

b. The financial instruments in the Collateral shall meet the investment policy of the Reinsurer and shall comply with the requirements set forth in Section 58-7-178(a) of the North Carolina Insurance Code;

c. The financial instruments in the Collateral shall be of sufficient credit quality, shall be of sufficient liquidity and shall be sufficiently stable in value as per article 214(1) sub (b) under (i) of Delegated Regulation (EU) 2015/35;

d. The financial instruments in the Collateral shall not have any material positive correlation with the credit quality of the Reinsurer as per article 214(1) sub (c) of Delegated Regulation (EU) 2015/35; and

e. The financial instruments in the Collateral shall not include any securities issued by the Reinsurer or a related undertaking of the Reinsurer as per article 214(1) sub (d) of Delegated Regulation (EU) 2015/35.

f. The financial instruments in the Collateral shall not include any private placements, unless the shareholders of the Cedant and De Nederlandsche Bank N.V. agree to deviate from the restriction for private placements set forth in the agreement between such shareholders and De Nederlandsche Bank N.V. regarding post-completion covenants.

EXECUTION COPY

**Schedule E**

**Actuarial Assumptions and Guidelines**

[Actuarial assumptions used to calculate the Cedant's technical reserves under Solvency II as of 31 December 2017 to be inserted.]

# TAB D

Exhibit D to the Complaint — Rehabilitator's notice of December 22, 2019

(pages 79–80)

# EXHIBIT D

CBLife
COLORADO BANKERS LIFE INSURANCE COMPANY

December 22, 2019

BY ELECTRONIC MAIL

Mr. Rene Colle
Mr. Pim Poppe
Mr. Paul Heuperman
Nederlandsche Algemeene Maatschappij Van Levensverslchering Conservatrix N.V.

Re: Notice of Disavowal of Aggregate Excess of Loss Reinsurance Treaty

Gentlemen,

Please take notice that the Rehabilitator for Colorado Bankers Life Insurance Company ("CBL"), pursuant to his authority under N.C. Gen. Stat. § 58-30-85(a)(11), has disavowed the Aggregate Excess of Loss Reinsurance Treaty ("Treaty") dated May 15, 2017 between CBL and Nederlandsche Algemeene Maatschappij Van Levensversichering Conservatrix N.V. As a result of the disavowal, the Treaty is deemed to be void *ab initio*, and we will be seeking a judicial determination as to the proper distribution of assets in the Trust Account.

Regards,

Mike Dinius
Special Deputy Rehabilitator

2327 Englert Drive | Durham, NC 27713 | Toll Free: 800.367.7814 | Fax: 303.220.8056 | CBLife.com

Products and services are underwritten and/or provided by Colorado Bankers Life Insurance Company® (Durham, NC), licensed in 49 states (excluding New York), the District of Columbia, and Puerto Rico. Products and services may not be available in all states.

# TAB E

Exhibit E to the Complaint — Dentons e-mail of December 22, 2019

(pages 82–83)

# EXHIBIT E

| | |
|---|---|
| **From:** | Baty, Bruce E. <bruce.baty@dentons.com> |
| **Sent:** | Sunday, December 22, 2019 2:29 PM |
| **To:** | Frank.Kroes@bakermckenzie.com |
| **Cc:** | Olga.vanErpTaalmanKip@bakermckenzie.com; Tamre Edwards; Mike Dinius; John Murphy; Jim Hattaway; Hoogenboezem, Krijn; Jackie Obusek; John Hoomani; Kelly Dagger |
| **Subject:** | Colorado Bankers Life in Rehabilitation - 22 December 2019 letter |
| **Attachments:** | CSV Disavowel 122219.pdf; CBL Order of Rehabilitation 62719.pdf |

Mr. Kroes -

We are counsel for Mike Causey, Commissioner for the North Carolina Department of Insurance and the Rehabilitator of Colorado Bankers Life (CBL), and we are responding to your letter dated December 22, 2019 regarding the reinsurance agreement between CBL and Conservatrix.

Please be advised that the Rehabilitator has disavowed CBL's reinsurance agreement with Conservatrix, and we refer you to the attached letter from Mike Dinius, one of CBL's Special Deputy Rehabilitators.

We also refer you to the attached Order of Rehabilitation (Order) entered by the Superior Court of Wake County, North Carolina, with respect to CBL and the affiliated insurers, which *inter alia* prohibits "any person from interfering in any manner with the property of [CBL] or with said Rehabilitator in the performance of his duties, and further enjoining and restraining any person from instituting or prosecuting any suit or other action against the Rehabilitator or [CBL's] property except by prior permission of this Court first had and obtained." The Order also prohibits all persons "from obtaining preferences, judgments, attachments, garnishments, or liens against [CBL] or [its] assets, or the levying of execution or foreclosure against [CBL] or [its] assets, until further order of the Court." In the event Conservatrix takes any action in violation of the terms of the Order, the Rehabilitator will take appropriate action to enforce the Order and seek appropriate sanctions.

Regards,
Bruce Baty

DENTONS

Bruce E. Baty
Partner

D +1 816 460 2495 | US Internal 22495
bruce.baty@dentons.com
Bio | Website

Dentons US LLP
4520 Main Street, Suite 1100, Kansas City, MO 64111-7700

Larrain Rencoret > Hamilton Harrison & Mathews > Mardemootoo Balgobin > HPRP > Zain & Co. > Delany Law > Dinner Martin > Maclay Murray & Spens > Gallo Barrios Pickmann > Muñoz > Cardenas & Cardenas > Lopez Velarde > Rodyk > Boekel > OPF Partners

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

# TAB F

Exhibit F to the Complaint — Conservatrix's Request for Arbitration dated December 22, 2019

(pages 85–103)

# EXHIBIT F

Baker McKenzie.

To the secretariat of the

Netherlands Arbitration Institute

Date: 22 December 2019

**REQUEST FOR ARBITRATION**

*in the matter of:*

**DE NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING 'CONSERVATRIX' N.V.**

claimant,

counsels: Chr.F. Kroes and O.E. van Erp Taalman Kip,

*against:*

**COLORADO BANKERS LIFE INSURANCE COMPANY**

respondent,

Baker McKenzie.

Contents


1. The parties of the proceedings ..... 3

1.1 Claimant ..... 3

1.2 Respondent ..... 3

2. Procedural Matters ..... 4

2.1 The arbitration agreement ..... 4

2.2 Arbitral tribunal and its decision-making ..... 4

2.3 The place and language of the arbitration ..... 5

2.4 Governing law ..... 5

2.5 The (cost) award ..... 6

3. Description of the dispute ..... 6

3.1 Parties ..... 6

3.2 The reinsurance ..... 7

3.3 The collateral ..... 8

3.4 Eligibility criteria ..... 9

3.5 Order of Rehabilitation regarding CBL ..... 10

3.6 Order of Rehabilitation resulting in solvency issues at Conservatrix ..... 10

3.7 Concerns arising from dealings with the Receiver ..... 11

3.8 Beneficiary Withdrawal Notice ..... 13

3.9 CBL fails to comply with the eligibility criteria of the Treaty ..... 13

4. Timeline for the arbitration ..... 15

5. Claims ..... 16

6. In conclusion ..... 17

List of Exhibits ..... 18

Baker McKenzie.

## 1. THE PARTIES OF THE PROCEEDINGS

### 1.1 Claimant

1. The claimant in the present proceedings is Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. ("Conservatrix"), a public limited liability company incorporated under the laws of the Netherlands with its corporate seat in Utrecht. Conservatrix's contact details are as follows:

**Nederlandsche Algemeene Maatschappij van Levensverzekering 'Conservatrix' N.V.**
Postbus 165; 3500 AD Utrecht
directie@conservatrix.nl
VAT nr.: 0019.93.641 B01

2. All communications to Conservatrix in this arbitration should be sent to its legal representatives at the following address:

**Baker McKenzie Amsterdam**
Claude Debussylaan 54
1082MD Amsterdam

**Chr.F. Kroes**
T: +31 20 551 7435
E: Frank.Kroes@BakerMcKenzie.com

**O.E. van Erp Taalman Kip**
T: +31 20 551 7542
E: Olga.vanErpTaalmanKip@BakerMcKenzie.com

### 1.2 Respondent

3. The respondent in the present proceedings is Colorado Bankers Life Insurance Company ("CBL"), a North Carolina domiciled insurance company. CBL's contact details are as follows:

**Colorado Bankers Life Insurance Company**
2327 Englert Drive



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 88 of 103

Baker McKenzie.

Durham, NC 27713
United States of America
T: +1 704 252 2014 (Lou Hensley)
F: +1 303 220 8056
E: Lou.Hensley@globalbankers.com (Board member)
E: Brian.Stewart@globalbankers.com (CFO)

4. Pursuant to Section 19 of the Trust Agreement, a copy shall be sent to Tamre.edwards@globalbankers.com (Chief Legal Officer).

## 2. PROCEDURAL MATTERS

### 2.1 The arbitration agreement

5. Conservatrix and CBL concluded the 15 May 2017 Aggregate Excess of Loss Reinsurance Treaty. The Treaty, including the 22 August 2018 Addendum to it, is exhibited as **Exhibit C-1**. The Treaty provides the following:

> 18.8.1. Any dispute arising out of or in connection with this Treaty or any agreement arising out of this Treaty shall, if no amicable settlement can be reached through negotiations, be referred to arbitration in accordance with the Arbitration Rules of the Netherlands Arbitration Institute (*Nederlands Arbitrage Instituut*). The party requesting the arbitration shall promptly give reasoned notice of its request by registered post to the other party.

### 2.2 Arbitral tribunal and its decision-making

6. The Treaty provides the following regarding the composition of an arbitral tribunal:

> 18.8.2. Unless parties agree otherwise, the arbitral tribunal shall be composed of three arbitrators and shall consist of disinterested persons retired from or engaged in life insurance or life reinsurance business or advising such business in a professional capacity, with no less than ten years international experience.

Baker McKenzie.

16.8.3. Unless the parties agree upon a single arbitrator within thirty days after receiving a written request from the other party for arbitration, the party requesting arbitration (the claimant) shall appoint one arbitrator (the first arbitrator) and shall give written notice thereof to the other party (the respondent). Within thirty days of receiving such notice, the respondent shall appoint another arbitrator (the second arbitrator) and give written notice to the claimant, failing which the claimant may apply to the Presiding Judge of the Court of Amsterdam (the appointer) to appoint the second arbitrator.

16.8.4. Once appointed, the first and second arbitrators shall, within thirty days of the appointment of the second arbitrator, appoint a third arbitrator. Should they fail to do so, either of them, or either of the parties, may apply to the appointer for the appointment of the third arbitrator. In any event, the third arbitrator shall be the chairman of the tribunal.

(...)

16.8.6. If an arbitrator, subsequent to his appointment, is unwilling or unable to act, a new arbitrator shall be appointed to replace him by the procedure set out above.

7. The Treaty provides the following with regard to the decision-making within the tribunal:

16.8.5. Upon acceptance of the appointment by the chairman, the tribunal shall be constituted. The three arbitrators shall decide by majority. If a majority cannot be achieved, the decision of the chairman shall prevail.

## 2.3 The place and language of the arbitration

8. The Treaty provides the following:

16.8.11. The place of arbitration shall be Amsterdam, The Netherlands. The arbitral proceeding shall be conducted in the English language.

## 2.4 Governing law

9. The Treaty provides the following:



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 90 of 103

Baker McKenzie.

> **16.7. Applicable law**
> This Treaty and any non-contractual obligations arising in relation thereto shall be governed by and construed in accordance with the laws of the State of New York, United States of America, without regard to such State's principles of conflict of law that could compel the application of the laws of another jurisdiction.
>
> (...)
>
> 16.8.8. The tribunal shall reach its decision by reference to the customs and practices of international life insurance and life reinsurance business and shall apply or follow the law stated in section 16.7. In the event of conflict between the customs and practices and the proper law, the customs and practices shall prevail in so far as permitted by the applicable law. The tribunal shall not be bound by the formal rules of evidence. The tribunal shall have power to fix all procedural rules relating to the conduct of the arbitration.

## 2.5 The (cost) award

10. The Treaty provides the following:

> 16.8.9. The tribunal shall, within sixty days of reaching its decision in the arbitration, issue to the parties its written and reasoned award. The award shall be final and binding on the parties which covenant to carry out the same. If either of the parties should fail to carry out the award, the other may apply for its enforcement to a court of competent jurisdiction in any country in which the party in default is domiciled, or has assets, or carries on business.
>
> 16.8.10. All costs of the arbitration shall be at the discretion of the tribunal which may decide to and by whom and in what manner they shall be paid.

# 3. DESCRIPTION OF THE DISPUTE

## 3.1 Parties

11. Conservatrix is a Dutch life insurer. Its statutory purpose is to act as life insurer within the meaning of the Dutch Financial Supervision Act (Wet op het financieel toezicht; "Wft"). Its articles of incorporation are exhibited as **Exhibit C-2**.

12. Conservatrix serves tens of thousands of insureds. These insureds depend on Conservatrix for their pensions, insurance linked insurance products (often connected to their pension planning or mortgage loans) and other products.

Baker McKenzie.

13. Conservatrix is a party the Treaty, as the Cedant, and to the 15 May 2017 Trust Agreement (the "Trust Agreement"), as the Beneficiary (**Exhibit C-3**).

14. CBL is a North Carolina domiciled insurance company. It is a party to the Treaty, as the Reinsurer, and to the Trust Agreement, as one of the two Grantors.

15. An Order of Rehabilitation applies to CBL (see § 24). The Order of Rehabilitation does not impact the validity and enforceability of the arbitration agreement against CBL. Further, there is no requirement that the Receiver be involved (as respondent or in another capacity) in these proceedings.

## 3.2 The reinsurance

16. On 15 May 2017, Conservatrix entered into the Treaty with CBL. Clause 7.2 of the Treaty provides that all amounts received and paid by CBL under the Treaty shall be received and paid from the "Trust Account".

> **7.2. Exclusive use of Trust Account**
> All amounts received and paid in furtherance to this Treaty, whether it be the reinsurance premium, payments received by way of reinsurance recoveries, payments of Covered Losses or otherwise, shall be received by the Reinsurer directly into the Trust Account and/or shall be by paid by the Reinsurer from the Trust Account.

17. In accordance with Clause 7.1 of the Treaty, CBL established the "Trust Account" subject to the terms and conditions of the Trust Agreement.

> **7.1. Trust Account**
> The Trust Account shall be established by the Reinsurer subject to the terms and conditions of the Trust Agreement as attached in Schedule C.

18. The Trust Agreement was also entered into on 15 May 2017. Parties to it are (as outlined in chapter 3.1) CBL, and an affiliate of CBL, Standard Financial Ltd., as Grantors, Conservatrix as Beneficiary and Fifth Third Bank ("Fifth Third") as Trustee.

Baker McKenzie.

**TRUST AGREEMENT**

This Trust Agreement, dated as of 15 May 2017 (this "**Trust Agreement**"), is entered into by and among Colorado Bankers Life Insurance Company, a North Carolina domiciled insurance company ("**Colorado Bankers**"), and Standard Financial Ltd. (Malta), a company incorporated under the laws of Malta ("**Standard Financial**") (each of Colorado Bankers and Standard Financial, a "**Grantor**" and, together, the "**Grantors**"), Nederlandsche Algemeene Maatschappij van Levensverzekeringen "Conservatrix" N.V., a Dutch life insurance company (the "**Beneficiary**"), and Fifth Third Bank, an Ohio state-chartered bank that is a member of the Federal Reserve System, as trustee hereunder (the "**Trustee**") (the Grantors, the Beneficiary and the Trustee are hereinafter each sometimes referred to individually as a "**Party**" and collectively as the "**Parties**").

## 3.3 The collateral

19. Clause 8 of the Treaty required CBL to provide security in the form of the collateral:

> **8. COLLATERAL**
>
> **8.1. Obligation to provide security**
>
> 8.1.1. The Reinsurer shall be required to provide security to the Cedant in the form of the Collateral.
>
> **8.2. Amount**
>
> 8.2.1. The Reinsurer shall ensure that the market value of the Collateral shall be maintained at 105% of the Net Reserves. The parties shall not have an obligation to adjust the value of the Collateral unless required pursuant to section 8.5. For the avoidance of doubt, for purposes of determining the amount of Collateral required to be maintained, the Net Reserves shall be determined in accordance with Solvency II.
>
> 8.2.2. The market value of the Collateral shall be calculated in accordance with the valuation practices and procedures as explicitly incorporated in Solvency II.

20. The collateral (or "Trust Assets") shall be maintained at 105% of the 'Net Reserves'. The Net Reserves are defined as "the share assumed by the Reinsurer [CBL] of the gross best estimate liability calculated by the Cedant [Conservatrix] using procedures, assumptions and methods consistent with Solvency II [Directive 2009/138/EC] on the Covered Policies [the *Natuurlijk*

Baker McKenzie.

*Garantieplan* and *Direct Ingaande Lijfrente* insurance policies written by Conservatrix], excluding any risk margin".[1]

21. Currently, according to reports provided by Fifth Third, the collateral kept in the Trust Account for the benefit of Conservatrix and the purpose of satisfying CBL's payment obligations under the Treaty (clause 7.2 of the Treaty) amounts to € 167,3 million.

**3.4 Eligibility criteria**

22. With respect to the 'quality' of the Trust Assets, the Treaty provides the following:

> **6.4. Eligibility criteria**
> The financial instruments standing to the credit of the Trust Account will have to meet the eligibility criteria as set out in <u>Schedule D</u> and will be denominated in Euro (€).

23. Schedule D of the Treaty provides the following 'Eligibility Criteria' for the Trust Assets:

> The financial instruments standing to the credit of the Trust Account shall at all times meet all of the following requirements and restrictions:
>
> a. The financial instruments in the Collateral shall be eligible for Solvency II;
>
> b. The financial instruments in the Collateral shall meet the investment policy of the Reinsurer and shall comply with the requirements set forth in Section 58-7-178(a) of the North Carolina Insurance Code;
>
> c. The financial instruments in the Collateral shall be of sufficient credit quality, shall be of sufficiant liquidity and shall be sufficiently stable in value as per article 214(1) sub (b) under (i) of Delegated Regulation (EU) 2015/35;
>
> d. The financial instruments in the Collateral shall not have any material positive correlation with the credit quality of the Reinsurer as per article 214(1) sub (c) of Delegated Regulation (EU) 2015/35; and
>
> e. The financial instruments in the Collateral shall not include any securities issued by the Reinsurer or a related undertaking of the Reinsurer as per article 214(1) sub (d) of Delegated Regulation (EU) 2015/35.

---

[1] Clause 1.1 (Definitions) under Net Reserves, p. 3 of the Treaty in combination with Schedule A of the Treaty.



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 94 of 103

Baker McKenzie.

f. The financial instruments in the Collateral shall not include any private placements, unless the shareholders of the Cedant and De Nederlandsche Bank N.V. agree to deviate from the restriction for private placements set forth in the agreement between such shareholders and De Nederlandsche Bank N.V. regarding post-completion covenants.

**3.5 Order of Rehabilitation regarding CBL**

24. On 27 June 2019, CBL consented to an Order of Rehabilitation (**Exhibit C-4**) entered by the Superior Court of Wake County, North Carolina pursuant to a Petition filed by the Commissioner of Insurance of the State of North Carolina, Mike Causey (the "Commissioner"). Filings by the Commissioner allege that it instituted the Petition after determining that the long-term liquidity of the investment portfolios of CBL, Southland National Insurance Corporation, Southland National Reinsurance Corporation, and Bankers Life Insurance Company (collectively, the "Companies") had deteriorated to the point that the North Carolina Department of Insurance (the "Department") needed to act.

25. The North Carolina court has appointed the Commissioner as receiver of the Companies (the "Receiver"). The Receiver has appointed Noble Consulting Services, Inc. ("Noble"), to serve as Special Deputy Receiver to oversee the rehabilitation process. Mike Dinius and John Murphy of Noble act for the Receiver in the rehabilitation proceeding under the title of Special Deputy Receivers. The Receiver has retained Bruce Baty of the Dentons law firm to serve as counsel to the Receiver.

**3.6 Order of Rehabilitation resulting in solvency issues at Conservatrix**

26. Following the Order of Rehabilitation, AM Best, a rating agency, downgraded its credit rating for CBL. As a result of CBL's downgrade of the AM Best rating, Conservatrix's Solvency Capital Requirement ("SCR") ratio, according to the Directive 2009/138/EC ("Solvency II") reduced dramatically. On 6 August 2019, Conservatrix filed is Q2 Report with the Dutch Central Bank ("DNB") as its regulator. This showed a SCR of 70%. This meant that Conservatrix must present a recovery plan to DNB and take steps to recover urgently.

Baker McKenzie.

## 3.7 Concerns arising from dealings with the Receiver

27. Recent dealings of CBL and the Receiver show that Conservatrix cannot necessarily rely on strict compliance with the terms of the Treaty and the Trust Agreement. Rather than abiding by the terms of the Treaty, the Receiver seems anxious to enter into a settlement with Conservatrix. Initially, the Receiver had suggested that an appropriate settlement amount would be between Euro 167 million (the current value of the collateral) and Euro 236 million (which is the anticipated value of the collateral after the reassessment of CBL's obligations as at 31 December 2019 and the resultant recalculation of the collateral[2]). On 30 October 2019, however, a conference call with the Receiver took place in which Dentons participated. During that conference call, the Receiver stated that he intended to "disavow" the Treaty, and that the parties should find a way to settle the matter, and suggested that the settlement amount should be between Euro 100 million and Euro 167 million.

28. The conference call was followed by a 5 November 2019 e-mail message from the Receiver (represented by Bruce Baty of Dentons) to René Collé, Paul Heuperman, and Pim Poppe (the CEO, general counsel and CFO of Conservatrix respectively; **Exhibit C-5**) which states:

> "*FOR SETTLEMENT PURPOSES*
>
> Gentlemen,
>
> As discussed in our conference call last week, the Receiver for Colorado Bankers Life has determined that assuming and performing under the reinsurance agreement with Conservatrix would be materially detrimental to the estate and prejudicial to the interests of Colorado Bankers Life's policyholders and other creditors. Therefore, in lieu of exercising his statutory right to immediately disavow the reinsurance agreement with Conservatrix, he is proposing to commute the agreement back to inception and equitably distribute the assets currently held in trust at Fifth Third Bank. Within the next 30 days, we will provide you with our preliminary accounting and proposed distribution of assets, and assuming the parties are able to agree on terms (subject to the approval of the North Carolina receivership court), to move forward as quickly as possible with a final disposition of the agreement and trust.

---

[2] Pursuant to clause 2.3 and clause 8.5 of the Treaty respectively.

Baker McKenzie.

Understanding we are both working under circumstances that present serious challenges to Colorado Bankers Life and Conservatrix, we look forward to working with you cooperatively and diligently to bring this matter to a swift and equitable resolution."

29. Most recently, on 25 November 2019, Bruce Baty (representing the Receiver) sent an e-mail to René Collé, Paul Heuperman, and Pim Poppe, copying the Receiver (**Exhibit C-6**), which states:

> "FOR SETTLEMENT PURPOSES ONLY - ALL RIGHTS RESERVED
>
> Gentlemen,
>
> The Receiver for Colorado Bankers Life proposes the following terms for unwinding the reinsurance agreement with Conservatrix:
>
> The parties will enter into the attached Commutation Agreement. Conservatrix will instruct Fifth Third Bank to distribute all of the assets in the Trust Account as indicated to either Conservatrix or the Receiver. The effective date of the Commutation Agreement will be following distribution and receipt of the Trust Account assets as set forth herein and approval of the Agreement by the North Carolina Receivership Court.
>
> In the attached Schedule A - which will serve as the basis for Conservatrix's instruction to Fifth Third Bank - the Trustee will distribute the indicated cash and investments with a market value of US$112,948,402.00 (or €102,591,033.54) to Conservatrix. This amount represents a return of Conservatrix's entire reinsurance premium of €100,000,000 plus the ceding company's share of interest earned on those funds since deposit (total interest earned as of 10/31/19 is approximately €3,343,825).
>
> Fifth Third Bank will distribute any cash and assets remaining to the Receiver.
>
> Following this distribution, the parties should be returned to their relative original positions."

30. The threats of the Receiver to "disavow" the Reinsurance Treaty or to "unwind" or "commute" it "back to inception and equitably distribute" the Trust Assets raises serious and legitimate doubts on the part of Conservatrix that CBL will continue to honour its obligations under the Treaty and the Trust Agreement in its entirety, as it must.

Baker McKenzie.

### 3.8 Beneficiary Withdrawal Notice

31. Clause 3(a) of the Trust Agreement provides that "[t]he Beneficiary [Conservatrix] shall have the right, upon five (5) Business Days' prior written notice to the Trustee [Fifth Third] substantially in the form as attached hereto as Exhibit A (a "Beneficiary Withdrawal Notice"), to withdraw from the Trust Account such Assets as are specified in the Beneficiary Withdrawal Notice. The Beneficiary Withdrawal Notice shall instruct the Trustee as to how such specified Assets shall be delivered."

32. On 22 December 2019, Conservatrix sent a Beneficiary Withdrawal Notice, materially in conformity with Annex A of the Trust Agreement, to Fifth Third (**Exhibit C-7**). In doing so, Conservatrix "requested and authorized" Fifth Third to withdraw all Trust Assets from the Trust Account and transfer such assets to Kas Bank N.V. (account no.: NL52KASA0223565571).[3] According to clause 3(a) of the Trust Agreement, Fifth Third "shall take any and all steps necessary to transfer absolutely and unequivocally all right, title and interest in the Assets specified in such Beneficiary Withdrawal Notice and shall deliver such Assets to or for the account of the Person specified in such Beneficiary Withdrawal Notice on the date specified in the Beneficiary Withdrawal Notice." Taking into account the prescribed five business days-period, Fifth Third should transfer the Trust Assets no later than 31 December 2019 to the appointed Beneficiary Designee, Kas Bank N.V.

### 3.9 CBL fails to comply with the eligibility criteria of the Treaty

33. The Trust Assets contain Asset Backed Securities or "ABS". These ABS do not meet the eligibility criteria as prescribed in the Treaty (see § 3.4 regarding the eligibility criteria). These have been included in the *collateral* by CBL in breach of article 8.4 in conjunction with schedule D of the Treaty.

34. Pursuant to clause 9.1 of the Treaty, a "material breach" occurs when a party materially breaches any of its obligations under the Treaty and the Trust Agreement "and fails to remedy the same within a notice period of 30 days".

[3] As provided for in Exhibit A of the Trust Agreement.



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 98 of 103

Baker McKenzie.

35. Conservatrix brought to the attention of CBL multiple times that the ABS are not eligible as part of the collateral under the terms of the Treaty (and the Trust Agreement), for the first time on 17 April 2019 (before the Order of Rehabilitation).

36. On 17 April 2019, Conservatrix delivered the following notice to CBL (**Exhibit C-8**):

> "(...) On the liquidity part, however, we have some concerns, especially in relation to the Asset Backed Securities. Other findings are more detailed and smaller in size, but should be noticed as well. Please find in the Annex a summary of our complete assessment. We currently will limit us to the most important or urgent findings.
>
> Could you please:
>
> (a) **remove the ABS securities, since they do not meet the eligibility criteria with respect to, but not limited to, the "sufficient liquidity" requirement;**
>
> (b) **remove the non-investment grade bonds and non-rated bonds, since they do not meet the eligibility criteria with respect to, but not limited to, the "sufficient credit quality" requirement;**
>
> (c) **remove the (small) exposure to US$, since this does not meet the only Euro denominated requirement;**
>
> (d) **reduce the exposure to Financials in the collateral portfolio, since that has a correlation to your and our business, with we mean to not substitute the ABS's non-investment grade bonds, non-rated bonds and US$ with additional exposure to Financials.**
>
> (...) We have asked you on March 20th for a time-line to substitute the ABS securities with eligible assets. With this letter we extend our question to a time-line for the four requests. We like you to replace the illiquid part, i.e. the ABS, without unnecessary losses, although this is not a reason to refrain from prompt replacement. Given your own assessment and presumed possibilities to rearrange within CBL's investment portfolio, we estimate a period of two months is reasonable. We propose June 15th 2019 as due date to have the above requests solved. (...) [emphasis in original]".

37. Many reminders followed, both by e-mail and mail. Correspondence at a later date regarding the rehabilitation of CBL included Conservatrix's request to replace the ABS. An example of this

Baker McKenzie.

correspondence is Conservatrix's letter of 22 August 2019 to CBL, in which it requested the following (**Exhibit C-9**):

> "1. Repositioning of ABS
>
> - At Q2 2019, the collateral trust contained assets valued at a total of €167m, including €38m of ABS assets currently disallowed under interpretation of SII [Solvency II] rules. It is worth noting, and as you are already aware, we had been in discussions with CBL management to exchange the ABS assets since Q 2018.
> - <u>We request that CBL repositions the ABS positions to assets in full conformity with the Eligibility Criteria and of equal carrying value as soon as possible, before the next quarterly reporting date of 30 September.</u>
> - Assuming the ABS assets are directly replaced with, for example, liquid corporate credit of a similar risk profile to the current collateral mix, the SII [Solvency II] ratio of Conservatrix would improve from 75% at Q2 2019 to 103%, based on Q2 2019 figures."

38. CBL was evasive and unresponsive to Conservatrix's requests. To date, it has not complied with Conservatrix's request. Given its difficult financial position, Conservatrix is in urgent need of Solvency II-eligible assets.

39. The letter of 17 April 2019 qualifies as a notice under clause 9.1 with respect to the non-eligibility of the Trust Assets. CBL failed to replace the ABS assets within 30 days' period. As a result, there is an Event of Default on the part of CBL in the meaning of clause 9.1 of the Treaty. This means that Conservatrix may resort to its remedies under Dutch law (clause 10.1 of the Treaty). Conservatrix seeks specific performance of the Treaty.

## 4. TIMELINE FOR THE ARBITRATION

40. Evidently, the situation with the SCR triggers (see § 26) a difficult situation for Conservatrix. Article 3:135 Wft demands that within two months of the SCR being found too low, a recovery plan must be submitted to DNB. The time for effective recovery is limited to 6 months in principle and an additional 3 months at DNB's discretion (Article 3:135 par. 3-4 Wft). On 6 August 2019, Conservatrix estimated a decrease of its SCR to 70%, which is below the 100% that is required as a statutory minimum. The period for recovery therefore ends on 6 February 2020.

Baker McKenzie.

41. Replacing the non-eligible ABS will improve Conservatrix's overall SCR. Therefore, Conservatrix requests the arbitral tribunal to apply short deadlines for the parties' submissions in this arbitration. Conservatrix will be able to submit its Statement of Claim shortly after the formalities have been completed.

## 5. CLAIMS

42. For the foregoing reasons, Conservatrix respectfully requests that the arbitral tribunal issue an award that:

declares that CBL must continue to abide by its obligations under the Treaty going forward;

and orders CBL:

(a) (i) to replace all the Trust Assets that do not comply with the Treaty with assets eligible under the Treaty within five days from the award, on a penalty of EUR 100,000 for each day that such replacement has not been completed in full within five days from the award; or

(ii) in the alternative, if Fifth Third has transferred the Trust Assets to Conservatrix, to provide any assistance that Conservatrix may ask from CBL in order to be able to replace the non-eligible assets with assets eligible under the Treaty, within five days from such a request, on a penalty of EUR 100,000 for each day that CBL fails to comply with such a request;

(b) to pay to Conservatrix the difference in value between the value of the non-eligible Trust Assets and the assets with which they are replaced, if the latter value is less than the first, within five days after replacement, as the case may be of each separate asset, to be increased with statutory interest after the fifth day after replacement;

(c) to compensate Conservatrix for the entire costs of the arbitration including extra-judicial costs.



Case 1:23-cv-00879-CCE-JEP Document 82-8 Filed 10/09/26 Page 101 of 103

Baker McKenzie.

## 6. IN CONCLUSION

43. Conservatrix reserves its right to make further submissions of fact and of law in support of its claims, and to amend, supplement and increase the claims stated herein.

44. In accordance with Article 7(3) in connection with Article 3(2) of the NAI Rules, this Request has been sent electronically by e-mail to the address secretariaat@nai-nl.org.

Submitted for and on behalf of Conservatrix on 22 December 2019.

Chr.F. Kroes

O.E. van Erp Taalman Kip

Baker McKenzie.

**LIST OF EXHIBITS**

| | |
|---|---|
| Exhibit C-1 | (Aggregate Excess of Loss Reinsurance) Treaty incl. Addendum |
| Exhibit C-2 | Articles of Incorporation Conservatrix |
| Exhibit C-3 | Trust Agreement |
| Exhibit C-4 | Order of Rehabilitation |
| Exhibit C-5 | E-mail of 5 November 2019 by the Receiver to Conservatrix |
| Exhibit C-6 | E-mail of 25 November 2019 by the Receiver to Conservatrix |
| Exhibit C-7 | Beneficiary Withdrawal Notice |
| Exhibit C-8 | Letter of 17 April 2019 by Conservatrix to CBL |
| Exhibit C-9 | Letter of 22 August 2019 by Conservatrix to CBL |