# CORRECTED EXHIBIT K

United States v. Lindberg, No. 3:23-cr-48 (W.D.N.C.)
Pages of the following filings, as filed:

ECF No. 245 (Special Master's Second Supplement, filed July 23, 2026) — page 35
ECF No. 245-1 (Proposed Final Order of Restitution, filed July 23, 2026) — page 6
ECF No. 308 (United States' Consolidated Position, filed August 17, 2026) — pages 7 and 8

Defendant Greg E. Lindberg's Notice of Developments Concerning Conservatrix N.V.,
filed October 9, 2026 (ECF No. ___), as filed (exhibits omitted)

[replace the Notice pages with the file-stamped copy before filing]

in the North Carolina Insurance Companies' Non-Defendant Response is addressed in the portion of this Supplement discussing payment priorities, *infra*.

Conservatrix. The Special Master does not recommend that the Court treat Conservatrix as a person due restitution in this Case because Conservatrix was not harmed in the same manner that the Defendant harmed the other entities that the Special Master recommends the Court treat as persons due restitution in this Case. The Fourth Circuit appears to agree with the Special Master's reasoning in its order denying Conservatrix's petition for writ of mandamus.

ULICO. In addition to responding to support certain of the Special Master's positions and reserving the right to seek greater damages if the Court deviates from the Special Master's recommendations on loss methodology, ULICO's Non-Defendant Response seeks to increase ULICO's loss amounts for (1) loans listed in the IALA and MOU under "PBLA Main" and (2) for amounts paid to PBLA but not passed along to ULICO as PBLA's primary, if not only, creditor. The First Supplement already adjusted the Special Master's figures to account for additional sums loaned out from the "PBLA Main" deposit account that the Special Master could not trace back to funds originating with the other insurance company victims, thereby addressing the "PBLA Main" issue. The difference between payments to PBLA and how much PBLA passes along to ULICO is a dispute between ULICO and PBLA, as the Special Master's methodology effectively treats them as a single unit.

NOLHGA. NOLHGA's Non-Defendant Response essentially preserves NOLHGA's rights to oppose arguments made by the Bermuda Insurance Companies concerning priority or sequencing of restitution distributions, which positions are addressed in the portion of this Supplement discussing payment priorities, *infra*.

- the assets of which Defendant or Defendant's agents had some power to invest or otherwise control, directly or indirectly,
- which assets were in fact diverted to a Defendant-affiliated entity,
- to whom, or to whose regulators, Defendant or Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies, and
- which diverted assets actually lost value as a proximate result of Defendant's activities.

Or (2)

- an insured of an insurance company described above (or a subrogee thereof),
- which actually suffered damages as a proximate result of Defendant's fraudulent activities.

The following victims qualify for restitution based on the foregoing criteria: CBL; BLIC; SNIC; SNRC; Northstar; Omnia; PBLA (including ULICO); and PBIHL.

Conservatrix does not qualify as a person due restitution because no unreturned assets belonging to Conservatrix were diverted to a Defendant-affiliated entity. It also appears that neither Defendant nor Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies to Conservatrix or Conservatrix's regulator(s).

Vista does not qualify as a person due restitution because it does not appear that Vista relied on any material misrepresentations or omissions concerning those affiliated investments or asset management strategies made by Defendant or Defendant's agents to Vista or Vista's regulator(s), at least not in the same manner as those described in the indictment.

Defendant agrees with the Special Master that Defendant's restitution responsibility should be calculated based on the outstanding balances owed on Affiliate Investments, using the principal balances shown in the IALA as the starting point. The Court finds this to be an appropriate methodology for calculating restitution losses in this Case, including the exclusion of "non-IALA" investments from the analysis.

| Issues Related to Credits for Outstanding IALA Loan Balances for Which Defendant Claims Others Shared Responsibility | | | |
|---|---|---|---|
| 12 | *Credit for Losses Suffered on Investments Related to Agera* | $129,000,000 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. Defendant agreed to include these loans in the IALA, and at the time of the IALA it appears that Defendant had a controlling ownership stake in Agera. Moreover, Defendant was aware of the Agera investments before he entered into an agreement with ULICO, and his false promises about fixing the issues with the Agera investments was part of his fraudulent conduct. |
| 15 | *Credit for Certain Affiliated Investments Purportedly Approved by Others at Eli Global Relating to insurance Holdco Debt* | $14,897,805 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. Even if other LINDBERG employees were involved in these affiliated loans, given Defendant's admitted fraudulent conspiracy, the losses are properly included in restitution. |
| **Issues Related to Other Entities Claiming Restitution** | | | |
| C<br>Doc. 221<br>Doc. 238 | Whether Vista (Now Cell 1.16) is a Party Due Restitution and, if not, Should the Court Recoup the Approximately $23 Million Distribution that Vista/Cell 1.16 Received from NHC's Sale of the Clanwilliam Group | TBD | **Disallow -** Vista is not a party due restitution, but the Court cannot recoup the payment it received from the sale of the Clanwilliam Group, which the Court already approved (Doc. 68). While Vista was no doubt harmed by Defendant's conduct, it has not shown that it reasonably relied on Defendant's misrepresentations and the United States does not have sufficient evidence to prove it.[6] |
| D | Whether Conservatrix is a Party Due Restitution | €215,356,806 | **Disallow -** Conservatrix is not a party due restitution. While Conservatrix appears to |

[6] The Court heard argument on this at the August 10 hearing, so it will not be further addressed herein, except that the United States notes that the affidavit upon which Cell 1.16/Vista relies does not claim that the affiant (who had an economic interest in Cell 1.16/Vista and worked closely with LINDBERG) personally relied upon false rating reports when agreeing to invest in LINDBERG-related investments. Rather, it merely concludes that "Cell 1.16 relied on those ratings reports in its financial reporting to VT DFR" and "in concluding that the loans complied with the investment guidelines." (Doc. 113 at ¶¶ 21, 24).

| | | | |
|---|---|---|---|
| Doc. 130<br>Doc. 258 | | | have been harmed by Defendant's conduct, as the Fourth Circuit found, Conservatrix "fail[ed] to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct." *In re: Zetteler, et al.*, Case 26-1749, Doc. 15 at 4 (June 13, 2026). The United States does not have sufficient evidence to demonstrate that Conservatrix was harmed by investing in LINDBERG related investments.[7] |
| **Issues Related to Payment Priority Among Parties Owed Restitution** | | | |
| E<br>Doc. 275<br>Doc. 297 | Whether the Court Should Order Restitution Payments on a Pro Rata Basis or Whether the Court Should Provide a Preference to the Bermuda Insurance Companies and/or ULICO Under 18 U.S.C. §§ 3664(j)(1) & (i) | N/A | **Disallow -** While the United States understands and agrees with the sentiment that the Court should endeavor to put the losses of individual policyholders above those of entities, it nevertheless agrees with the Special Master's position that a pro rata payment structure is most practical here. First, the North Carolina Insurance Companies are not a "provider of compensation" under § 3664(j)(i).[8] Second, unlike the process that allowed the Special Master to make payments directly to certain policyholders of the North Carolina Insurance Companies, there is no practical mechanism in place, or suggested, that could produce the same result for the policyholders of ULICO (which have not yet suffered any losses because of the actions of ULICO) or the Bermuda |

[7] Indeed, Conservatrix's filings in this case make a different loss claim, "it was entirely foreseeable that the Conservatrix policies would lose value because of Defendant's undercapitalization of Conservatrix" and "The losses Conservatrix suffered as a result of the non-performance of the Commitment total € 215,356,806." (Doc. 130 at 7-8; *see also* Doc. 258 at 10). Not providing capitalization or profit as promised – even if it may be actionable in other for a -- is different from taking money through deceit and misrepresentations.

[8] This is addressed in the Response filed by the North Carolina Insurance Companies (Doc. 123 at 6-7). In short, guarantee associations paid policyholders, not the insurance companies, and the insurance companies now owe the guarantee associations for those payments. That is much different than an insurance policy issuing a check to a victim to cover it loss. It is not surprising then, that numerous Courts have ordered restitution directly to failed insurance companies. (*See* cases collected in Doc. 137 at 3-4 and n.4).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT GREG E. LINDBERG'S NOTICE OF DEVELOPMENTS CONCERNING CONSERVATRIX N.V.**

Defendant Greg E. Lindberg respectfully submits this Notice of developments concerning Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. ("Conservatrix") and the insolvency practitioners who appear for it in this case, Eleonora L. Zetteler and J. Robert van Faassen (the "Trustees"). The Notice seeks no relief. Conservatrix has told the Court that the Preliminary Order of Restitution (Doc. No. 161) is preliminary, that the Fourth Circuit's denial of its petition for a writ of mandamus "does not preclude" the Court from adding it as a victim, and that it asks to be included "in the Court's final order of restitution." Doc. No. 258 at 1, 3–5. Out of an abundance of caution, Defendant places on the record the developments described below, most of which post-date the Fourth Circuit's decision and the Special Master's final recommendations, so that the record is prepared in case any further response to Conservatrix becomes due, in the final order or otherwise.[1]

[1] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

## I. Conservatrix's Claim in This Case and the Fourth Circuit's Decision on the Merits.

Conservatrix objected to the Special Master's Report (Doc. No. 130). The Special Master's Supplement of May 15, 2026 states that he "stands by the Report's exclusion of Conservatrix from classification as a person due restitution." Doc. No. 146 at 11 (as quoted in Doc. No. 258 at 2). The Court entered the Preliminary Order of Restitution on May 28, 2026 (Doc. No. 161) and the Judgment on May 29, 2026 (Doc. No. 162). The Preliminary Order is "captioned 'preliminary' as it precedes sentencing," is "subject to amendment by the Court sua sponte or upon application by any interested party, including the Special Master," and provides that "[t]he Court retains jurisdiction over all matters covered by, or related to, this Order." Doc. No. 161 at 1 n.1, 5.

On June 11, 2026, Conservatrix petitioned the Fourth Circuit for a writ of mandamus under 18 U.S.C. § 3771(d)(3), with a 278-page appendix (Doc. No. 189-1; 318 pages as filed), asking that court to vacate the Preliminary Order and the Judgment and to "direct the district court to find that Conservatrix is a victim under the MVRA and issue an order providing for Conservatrix to receive € 215,356,806 in restitution." *Id.* at 33. The Fourth Circuit's notice of the same day required Defendant's response by 12:00 p.m. the next day. Exhibit 6. Defendant, then appearing pro se in that court, filed a 28-page response on June 12, 2026 (Doc. No. 198). On June 13, 2026, the Fourth Circuit denied the petition on the merits. The per curiam opinion holds that "Petitioners fail to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct"; that "Petitioners have described

Lindberg's failure to replenish the company's capital and to maintain its SCR as agreed. But Petitioners do not identify facts closely tying those failures to Lindberg's criminal activities"; and that "[w]ithout more, we cannot find the district court to have abused its discretion in excluding Conservatrix from its restitution order and judgment." *In re Zetteler*, No. 26-1749, slip op. at 4–5 (4th Cir. June 13, 2026) (per curiam), *as amended* (June 15, 2026) (Doc. Nos. 203, 204). The judgment states, without qualification, that "the petition for writ of mandamus is denied." Exhibit 7 at 2.

The United States' Consolidated Position characterizes the Fourth Circuit's decision differently. It states: "While Conservatrix appears to have been harmed by Defendant's conduct, as the Fourth Circuit found, Conservatrix 'fail[ed] to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct.'" Doc. No. 308 at 7–8. To the extent that statement attributes to the Fourth Circuit a finding that Conservatrix was harmed by Defendant's conduct, it is untrue: the Fourth Circuit made no such finding and did not so hold. The Fourth Circuit's entire analysis reads:

> The Crime Victims' Rights Act enumerates certain rights to be afforded victims of federal crimes. 18 U.S.C. § 3771(a). Among these is the right to receive restitution. A person or entity seeking to assert rights under the CVRA must first raise the issue in the district court; if the district court denies relief, the purported victim may petition the court of appeals for a writ of mandamus. *Id.* § 3771(d)(3). In deciding a CVRA mandamus petition, a court of appeals "shall apply ordinary standards of appellate review." *Id.*; *see In re Brown*, 932 F.3d 162, 172 (4th Cir. 2019) (reviewing for abuse of discretion).

> The CVRA defines a crime victim as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." 18 U.S.C. § 3771(e)(2)(A). Petitioner argues that Lindberg's criminal conspiracy forced the company into bankruptcy, resulting in losses to the company and its policyholders of more than $200 million.
>
> Petitioners fail to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct. Direct harm to a victim, giving rise to an entitlement to restitution under the CVRA, requires the harm to be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010). Petitioners have described Lindberg's failure to replenish the company's capital and to maintain its SCR as agreed. But Petitioners do not identify facts closely tying those failures to Lindberg's criminal activities. Without more, we cannot find the district court to have abused its discretion in excluding Conservatrix from its restitution order and judgment.

*In re Zetteler*, slip op. at 4–5. The court reviewed this Court's exclusion of Conservatrix for abuse of discretion. It recited the Trustees' contention that Defendant's criminal conspiracy forced Conservatrix into bankruptcy and rejected it. The phrase "the harm suffered by Conservatrix" describes the harm the Trustees asserted; it is not a finding that Conservatrix suffered harm, still less that Defendant caused it. The opinion's background recital that the Trustees obtained a "judgment . . . for over $166 million" refers to the summary award (*id.* at 2–3), which is provisional on its face (Part II); no tribunal has decided breach, causation, or loss on the merits, and those questions are set for the evidentiary hearing in the Arbitration on November 4 and 10, 2026. The United States' conclusion—that Conservatrix "is not a party due restitution" and that the United States "does not have sufficient

evidence to demonstrate that Conservatrix was harmed by investing in LINDBERG related investments," Doc. No. 308 at 7–8—is correct. The premise it attributes to the Fourth Circuit is not.

The "undercapitalization" premise—Conservatrix's phrase, repeated in the United States' footnote (Doc. No. 308 at 8 n.7, quoting Doc. No. 130 at 7–8)—is also false. At the take-over, Trier injected €18.4 million directly and €72.1 million through the reinsurance, recapitalizing Conservatrix "above the envisaged minimum Solvency II ratio of 135%" (Exhibit 1 at 42, ¶ 5.12), and the summary award itself records that the reinsurance "increased the own funds of Conservatrix to the required level at the time of take-over" (Exhibit 5 at 27, ¶ 6.33). Conservatrix's audited statements reported a Solvency II ratio of 188% at the end of 2017. M.D.N.C. Lindberg Decl. ¶ 11. The ratio fell below 135% only in mid-2019, after CBL was placed in rehabilitation in North Carolina and downgraded, and the Rehabilitator's disavowal of the reinsurance on December 22, 2019 removed the support altogether. Exhibit 5 at 15 (¶ 3.13), 27–28 (¶¶ 6.34–6.36); Exhibit 8, Tab D. The Commitment did not require replenishment after stabilization. It provides that "[a]s soon as the Company is stabilized, the Commitment shall be limited in the sense that further capitalization of the Company over and above the initial amount of capitalization by the Transferee on Completion, shall be based on a viable business case for the Company." Exhibit 10 at 18 (¶ 1.2(b)). Conservatrix was stabilized by the end of 2017, when its Solvency II ratio stood at 188%. The capital lost in 2019 was lost through the Rehabilitator's act, long after stabilization; under the Commitment, any further capitalization then depended on a viable business case, not on an unconditional duty

to replenish. That is Respondents' defence in the Arbitration, which will decide it (Part II).

After the Fourth Circuit's decision, the Special Master's Second Supplement of July 23, 2026—his final recommendations—again did not recommend that Conservatrix be treated as a person due restitution, "because Conservatrix was not harmed in the same manner that the Defendant harmed the other entities that the Special Master recommends the Court treat as persons due restitution in this Case," adding that "[t]he Fourth Circuit appears to agree with the Special Master's reasoning in its order denying Conservatrix's petition for writ of mandamus." Doc. No. 245 at 35. His proposed final order states that "Conservatrix does not qualify as a person due restitution because no unreturned assets belonging to Conservatrix were diverted to a Defendant-affiliated entity," and that "[i]t also appears that neither Defendant nor Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies to Conservatrix or Conservatrix's regulator(s)." Doc. No. 245-1 at 6. Conservatrix's objection of July 28, 2026 argues that "the Fourth Circuit's opinion does not preclude this Court from finding—in its discretion—that Conservatrix is among Defendant's victims entitled to restitution in the Court's final order of restitution," adds in a footnote that a district court need not follow even a mandate where "a blatant error in the prior decision will, if uncorrected, result in a serious injustice," proposes its own victim criteria, and asks the Court to "overrule the Special Master's determination" and award €215,356,806 with Dutch statutory interest from December 8, 2020. Doc. No. 258 at 5 & n.2, 7–8, 11–13 & n.8. The United States' consolidated position of

August 17, 2026 is "Disallow – Conservatrix is not a party due restitution," and that Conservatrix's filings "make a different loss claim"—"[t]he losses Conservatrix suffered as a result of the non-performance of the Commitment total € 215,356,806"—which, "even if it may be actionable in other fora," "is different from taking money through deceit and misrepresentations." Doc. No. 308 at 7–8 & n.7. No final order of restitution has been entered, and Conservatrix has filed nothing further in this case since July 28, 2026.

Conservatrix's contacts with the Special Master appear to have been entirely ex parte. The Special Master's Report records that Conservatrix was among the persons that "contacted the Special Master seeking to be paid from the funds administered by the Special Master in this Case" (Doc. No. 106 at 18–19), and that the Special Master "has been in communication with counsel for various persons who seek restitution in this Case but for whom the Special Master recommends no restitution" (*id.* at 32). The Fourth Circuit's opinion itself records that "the Special Master spoke with Petitioners' counsel multiple times and reviewed information submitted by Petitioners." *In re Zetteler*, slip op. at 3. By the Trustees' own account, they "have previously provided to the Special Master and the Special Master's financial advisor information regarding the harm Defendant has inflicted on Conservatrix and its policyholders," and that information, they say, "demonstrates that . . . Conservatrix is due € 215,356,806." Doc. No. 258 at 11. Defendant was not party to those communications and has not been given what Conservatrix provided. Nothing Conservatrix gave the Special Master or his financial advisor has been filed or served; apart from notices of appearance, Conservatrix's filings in this case are its

two objections (Doc. Nos. 130, 258) and its notice of the mandamus petition (Doc. No. 189). The order appointing the Special Master names two parties—the United States and Defendant—and makes no provision for ex parte communication: it directs the Special Master to "regularly update the Parties," to advise Defendant "through Defendant's counsel" and "in writing," and provides that applications to the Court "shall be heard upon notice and hearing." Doc. No. 56 ¶¶ 5, 8, 15; *see* Doc. No. 332 at 6, 9–10 (Defendant's pending motion to compel production of the Special Master's ex parte communications, which records that the Special Master's communications with the United States were ex parte as well, and that the Government's own correspondence reflects "that many of the requested items were exchanged ex parte and so did not come to the Government"). The prejudice to Defendant has been severe and is continuing. He has had to answer a €215,356,806 claim—before the Special Master, in this Court, in the Fourth Circuit on less than a day's notice, in the Middle District of North Carolina, and in the Arbitration—without ever seeing what was said to the Special Master and his financial advisor on Conservatrix's behalf. That is a further reason the primary materials on Conservatrix's claim are placed on this record now.

## II. The Contract Claim Is Being Tried in the Netherlands Arbitration.

The claim Conservatrix describes in this case—€215,356,806 for "the non-performance of the Commitment," calculated as "the shortfall in the SCR as of December 8, 2020," the date of Conservatrix's bankruptcy (Doc. No. 189-1 at 30–31; Doc. No. 258 at 11–12)—is the claim it is litigating against Defendant, Trier Holding B.V., Netherlands Insurance Holdings, Inc., and NIH Capital, LLC (the

"Respondents") in the arbitration on the merits before the Netherlands Arbitration Institute, NAI Case No. 4794 (the "Arbitration"), under the Recapitalization Commitment of March 17, 2017 and the agreements made with it (Exhibit 10). The Trustees' own Fifteenth Public Report of July 31, 2026, issued under Article 73a of the Dutch Bankruptcy Act and published on their website, describes "arbitral proceedings on the merits against Lindberg et al. … in which Conservatrix claims damages from Lindberg et al.," pending since the beginning of 2020 and resumed in July 2024. Exhibit 3, translation ¶ 7.4. The evidentiary hearing, which that report placed on September 29 and 30, 2026, has since been set for November 4 and 10, 2026. Lindberg Decl. ¶ 4, *van Faassen v. Lindberg*, No. 1:23-cv-879 (M.D.N.C. Oct. 9, 2026), Doc. No. ___. The Arbitration will determine whether the Commitment was breached and, if so, causation and quantum—the questions whose answers Conservatrix presents in this case as established.

The Commitment provides that "[a]s soon as the Company is stabilized, the Commitment shall be limited in the sense that further capitalization of the Company over and above the initial amount of capitalization by the Transferee on Completion, shall be based on a viable business case for the Company (the analysis thereof may include taking into account the interest of the shareholder)." Exhibit 10 at 18 (¶ 1.2(b)). De Nederlandsche Bank ("DNB"), Conservatrix's regulator, signed it "for acknowledgement and receipt." *Id.* at 22. In the Agreement re Post-Completion Covenants signed the same day, Trier agreed that it would, and would procure that Conservatrix would, "refrain from declaring or paying out any dividend within the period that is 10 (ten) years after Completion." *Id.* at 6 (¶ 3.1(n)). The summary award

of January 31, 2020 on which the Trustees rely (Doc. No. 258 at 10 & n.7) is provisional on its face: a summary arbitral measure "needs to be grounded on a prima facie basis" (Exhibit 5 at 25, ¶ 6.23); it was granted under the summary standard that weighs "the risk that a party cannot repay" (*id.*, ¶ 6.24); and the tribunal discounted that risk because the claim "eventually would be of a parent-company against a 100% subsidiary" (*id.* at 26, ¶ 6.27)—a premise that ended when Conservatrix was declared bankrupt on December 8, 2020. The same award records that "Trier made a capital injection of € 18.4M, and the reinsurance agreement with CBL increased the own funds of Conservatrix to the required level at the time of take-over." *Id.* at 27, ¶ 6.33. The Trustees carry the claim against Defendant on the estate's balance sheet "p.m."—without a value—describing it as "€ 150 million in nominal terms" arising from that summary award. Exhibit 3, translation ¶ 3.1 & note 4.

The record of the Arbitration is filed under seal with this Notice, subject to the accompanying motion to seal, as Exhibits S-1 through S-9: the Tribunal's Procedural Orders Nos. 1 and 2 and the procedural timetable (S-1); the Trustees' Statement of Claim (S-2); the Respondents' Statement of Defence and Counterclaim with its exhibits (S-3, S-3-A, S-3-B); the Tribunal's decision on the Respondents' request of October 13, 2025 (S-4); the Respondents' comprehensive notice to the Tribunal on the memorandum of law filed in this case (S-5); Procedural Order No. 4 on document production, with its annexes (S-6); the Respondents' comprehensive notice to the Tribunal on the Amsterdam District Court's fraud judgment (S-7); the Respondents' Statement of Rejoinder (S-8); and the Trustees' expert report and witness statements (S-9). They are filed so that the Court has the primary materials, rather than the

parties' characterizations of them, should any question concerning Conservatrix arise again: they show what Conservatrix claims in the Arbitration, what the Respondents answer, and where the Arbitration stands. They are also the answer to a record that, as to Conservatrix, has been built ex parte (Part I): with the primary documents on file, both sides and the Court can see the same claim.

## III. The Amsterdam District Court's Finding That DNB—Not Defendant—Committed Fraud in the 2017 Transfer Proceedings.

Conservatrix's account of 2017 in this case is that Defendant "contributed only a marginal amount of capital and compelled Conservatrix to enter into a reinsurance agreement with Colorado Bankers Life Insurance Company ('CBL')" (Doc. No. 258 at 4); that "Defendant caused Conservatrix to enter into a reinsurance agreement with CBL" (*id.* at 9–10); and that "Defendant induced De Nederlandsche Bank ('DNB'), Conservatrix's financial supervisor, to allow the transfer of Conservatrix's shares to Defendant," his "promises, by way of the Commitment," being "the reason why DNB allowed the transfer of shares in Conservatrix to Defendant and why the Amsterdam District Court approved this transfer plan" (*id.* at 10). The Trustees tell the Middle District of North Carolina the same thing: that the 2017 transfer was "part of Lindberg's scheme to enter reinsurance agreements," and that the information DNB withheld from the Amsterdam court "detailed Respondents' plan to reinsure Conservatrix." Exhibit 4 at 10–11.

On February 5, 2026, the Amsterdam District Court, ruling on the former shareholder's application to revoke that court's order of May 15, 2017 approving DNB's plan to transfer Conservatrix's shares to Trier, found that "there has indeed

been 'fraud committed in the proceedings' as referred to in Article 382 under a of Rv, because the reinsurance was excluded from the proceedings by DNB," so that "no full debate could take place on whether less drastic measures (alternatives) might have been possible to save Conservatrix." Exhibit 1 at 24 (¶ 1.5) (certified translation). The court found that in the 2017 proceedings "DNB did not mention the reinsurance with CBL at all" and "[n]or did DNB submit any documents showing this reinsurance" (*id.* at 40, ¶ 5.10); that "Trier and DNB agreed on a Submission Protocol on 17 March 2017, which set out the principal agreements with Trier, including those concerning the required solvency ratio of 135% and the reinsurance," so that "before the petition was filed on 22 March 2017, it was clear to DNB that a reinsurance agreement would be concluded" (*id.* at 44, ¶ 5.16); that "DNB created the impression, incorrectly as has now become apparent, that a capital injection of at least 58,1 million was necessary and that the transfer plan provided that this amount would be paid by Trier," when "[t]here was no capital injection of at least 58,1 million" (*id.* at 44, ¶¶ 5.15, 5.17); that DNB's plea of supervisory confidentiality did not excuse it, because "[n]either then nor now has DNB made clear why the Submission Protocol and the other documents recording the agreements with Trier could not be disclosed in proceedings and during a hearing held behind closed doors" (*id.* at 48, ¶ 5.19); and that "DNB adopted an unfair procedural position in the previous proceedings on a point that was partly decisive for the assessment of the application in DNB's favour," so that "[t]he Court's decision on the original application in 2017 was therefore based on fraud committed by DNB in the proceedings, as referred to in Article 382(a) of the Code of Civil Procedure" (*id.* at 51, ¶ 5.28). Revocation was nonetheless precluded because the

transfer's consequences are irreversible: "the shares in Conservatrix have been transferred and Conservatrix has moreover since been declared bankrupt." *Id.* at 52 (¶ 5.29). The court ordered DNB to produce the withheld documents. *Id.* at 58 (¶ 6.2). The Trustees' Fifteenth Public Report describes the judgment and DNB's appeal in cassation of February 19, 2026 against it. Exhibit 3, translation ¶¶ 7.14–7.17.

The fraud so found was DNB's own, and Defendant had nothing to do with it. The 2017 transfer proceeding was DNB's: on March 22, 2017, DNB, as Conservatrix's supervisor, applied to the court under Article 3:159u of the Dutch Financial Supervision Act for approval of "the transfer plan drawn up by DNB," the conditions of which "were set out in a unilateral declaration by Trier to DNB." Exhibit 1 at 24 (¶ 1.1), 28 (¶ 3.7). The judgment records DNB as the applicant in that proceeding and Conservatrix and the former shareholder as the interested parties heard in it; neither Defendant nor Trier is among them. *Id.* at 24 (¶ 1.1). Nor was Defendant, or any Respondent, a party to the revocation proceeding. Exhibit 12 at 2 n.1. What the court held fraudulent was DNB's own presentation of DNB's own application. The documents DNB withheld were agreements DNB had itself negotiated and signed —"the Submission Protocol signed by Trier and DNB on March 17, 2017," the Agreement re post-completion covenants "signed on March 17, 2017 by DNB, Trier, Netherlands Insurance Holding Inc. (Delaware), NIH Capital LLC (North Carolina) and [name 2]," and "the Recapitalization Commitment signed on March 17, 2017 by DNB, Trier [name 2] and NIG Capital LLC (North Carolina)"—and it was DNB that the court ordered to produce them. Exhibit 1 at 58 (¶ 6.2). The reinsurance was no secret from DNB. The court found that it "had already been fully negotiated by DNB

before 15 May 2017" (*id.* at 42, ¶ 5.12), and the report of the evaluation committee established by the Netherlands' Minister of Finance, which the judgment reproduces, records that DNB, "in the Process Letter with which negotiations with [name 1] began, and the Agreement set out conditions that a reinsurance agreement must meet in order to qualify as risk mitigation under Solvency II," and "was involved in the final text of the agreement: the draft text was reviewed to determine whether all stipulated conditions had been met" (*id.* at 32, ¶ 3.11). The court found that "DNB was willing to allow Conservatrix to resume operating in the market under its licence after concluding a reinsurance agreement with an affiliated party." *Id.* at 51 (¶ 5.26). Nor was the reinsurance a secret from anyone else: Conservatrix's audited 2017 financial statements, on which DNB itself relied in the Amsterdam proceeding, recorded that "[a]s part of the agreement with DNB the new shareholder recapitalized the company above the envisaged minimum Solvency II ratio of 135% by injecting 18.4 million of capital directly and 72.1 million via a reinsurance agreement with Colorado Bankers Life, affiliate US company," the market value of which "was assessed by KPMG Advisory N.V." *Id.* at 42 (¶ 5.12). The reinsurance was kept from one place only—DNB's application to its own court—and nothing in the judgment attributes that silence to Defendant, to Trier, or to anyone acting for them. The finding runs against the regulator alone. Exhibit 11 at 14; Exhibit 12 at 13.

In the Middle District of North Carolina the Trustees call the judgment "irrelevant," reasoning that "[n]ot only were none of the parties to this case parties to the proceeding in the Amsterdam Court, but the order does not address Respondents' breach . . . and the Amsterdam Court declined to revoke the 2017 Order." Exhibit 4 at

12. Respondents' answer is on that court's record—in Part III of the parties' Joint Status Report of August 20, 2026 (Exhibit 11 at 9–21) and in Respondents' Supplemental Response of September 18, 2026 (Exhibit 12 at 11–14), which placed the Amsterdam judgment on that record—and both are filed here so that this Court has them. As Respondents told that court: "In 2017 De Nederlandsche Bank told a Dutch court that the incoming owner would strengthen Conservatrix's balance sheet through a capital injection, and the court approved the transfer. The Amsterdam court held that account false in a way that mattered: the regulator knew the recapitalisation would run principally through a reinsurance structure whose premium — more than €100 million — would be funded from Conservatrix's own assets, and that fact was kept out of the proceeding." Exhibit 11 at 13–14. "Respondents state plainly what the judgment is not. The applicant was Conservatrix Groep, the pre-2017 shareholder, not Respondents. The finding runs against the regulator, not against Petitioners, who were not parties. The operative disposition denied revocation. And the regulator has taken cassation, so the decision is not final. Respondents accordingly assert no theory of preclusion. They offer the judgment as what it is: evidence — a reasoned finding by a court of the very country whose judgment Petitioners ask this Court to enforce." *Id.* at 14. As to the outcome on which the Trustees rely: "The Amsterdam court did not doubt the fraud; it found it. What it lacked was a remedy. Revocation would have required unwinding the 2017 transfer, and by 2026 there was nothing left to unwind — Conservatrix had been bankrupt since December 2020, its portfolio transferred to a third-party insurer, its policyholders' positions restructured in the insolvency. The court declined revocation

on that ground alone and pointed instead to a claim for damages. No Dutch court has excused this fraud, and none has rejected it. One Dutch court found it and ran out of remedies." *Id.* at 15. As to the parties: "The concealment was practised by the supervisory authority itself, upon the court that approved the transfer, and DNB withheld the documents that would have revealed it—the Submission Protocol, the Recapitalization Commitment, the reinsurance treaty—invoking supervisory confidentiality. . . . Those documents were ordered produced for the first time on February 5, 2026. . . . DNB was not a party to the arbitration and was subject to no arbitral process. No tribunal in the chain that produced the Rotterdam order—not the arbitrator in summary proceedings, not the Court of Rotterdam on an exequatur application—had power to reach the regulator or its file." Exhibit 12 at 13 (citations omitted). And: "Respondents cast no aspersion on the Dutch judiciary: a Dutch court has found that a Dutch regulator misled a Dutch court, and Respondents follow that finding rather than quarrel with it." Exhibit 11 at 17.

The judgment matters in this case for a narrower reason. Conservatrix's claim here rests on the premise that the 2017 recapitalization structure was Defendant's device—that he "compelled" the reinsurance and "induced" DNB and the Amsterdam court by his promises. Doc. No. 258 at 4, 10. A court of the Netherlands, relying on the report of the Netherlands' own evaluation committee, has found that the reinsurance was agreed with the regulator and "fully negotiated by DNB" before the transfer; that the regulator "was willing to allow Conservatrix to resume operating in the market under its licence after concluding a reinsurance agreement with an affiliated party"; and that it was the regulator that "kept the reinsurance outside the proceedings in

2017." Exhibit 1 at 42 (¶ 5.12), 44 (¶ 5.16), 51 (¶¶ 5.26, 5.28). That is the opposite of a material misrepresentation or omission by Defendant "to Conservatrix or Conservatrix's regulator(s)" (Doc. No. 245-1 at 6), and it is consistent with the Special Master's conclusion that Conservatrix "was not harmed in the same manner" as the persons due restitution (Doc. No. 245 at 35) and with the United States' position that Conservatrix "is not a party due restitution" (Doc. No. 308 at 7–8 & n.7). Defendant places the judgment and Respondents' filings on this record so that, if the Trustees' account of 2017 is put to this Court again, the Court has the Dutch court's findings and not only the Trustees' description of them.

## IV. Money Went Into Conservatrix, Not Out of It.

No asset of Conservatrix was diverted to any affiliate of Defendant, as the Special Master's proposed final order finds. Doc. No. 245-1 at 6. The reinsurance premium that Conservatrix paid to CBL in 2017 was placed in a trust for Conservatrix's benefit, as CBL's own Special Deputy Rehabilitators pleaded under oath in *Colorado Bankers Life Insurance Co. v. Conservatrix*, No. 19 CV 017191 (Wake Cnty. Super. Ct. filed Dec. 23, 2019) (Exhibit 8): the trust account "was initially funded by CBL with a deposit of €100 million in cash and securities (an amount equal to the reinsurance premium paid by Conservatrix to CBL), plus additional amounts of €50 million and €7.5 million from CBL and SFL"; CBL was required "to maintain no less than 105% of the Net Reserves" in it; "the amount of the assets in the Trust Account is approximately €157.5 million"; and Conservatrix had "demanded that the Rehabilitator deposit an additional €70 million of CBL assets into the Trust Account." Exhibit 8, Tab A ¶¶ 20, 22. The treaty provides that "[a]ll amounts received and paid

in furtherance to this Treaty, whether it be the reinsurance premium, payments received by way of reinsurance recoveries, payments of Covered Losses or otherwise, shall be received by the Reinsurer directly into the Trust Account." *Id.*, Tab B cl. 7.2. In the Trustees' own accounting as of July 31, 2026, the estate holds cash balances of €4,310,724, commercial mortgage loans of €1,254,124 and a €5,000 loan, against policyholders' insurance claims of €59,065,819—the unpaid 10% balance after approximately €40,000,000 of interim distributions—and damages claims of €40,490,552. Exhibit 3, translation ¶ 3.1 & note 2.

## V. The Proceedings in the Middle District of North Carolina and in Florida.

In *van Faassen v. Lindberg*, No. 1:23-cv-879 (M.D.N.C.), the Trustees seek recognition of the Dutch judgment enforcing the summary award's €150,000,000 penalty. On July 14, 2026, the Fourth Circuit reversed the 2024 order confirming the award under the Federal Arbitration Act, because the petition was untimely, and remanded "for further proceedings on Petitioners' motion to enforce the Dutch judgment under North Carolina law." *Van Faassen v. Lindberg*, 181 F.4th 480 (4th Cir. 2026) (M.D.N.C. Doc. No. 64 at 2, 14). The parties' Joint Status Report of August 20, 2026 sets out Respondents' position on the remand, including on the Amsterdam judgment (Exhibit 11, Part III). The district court ordered supplemental briefing (M.D.N.C. Doc. No. 74); Respondents' Supplemental Response of September 18, 2026 (Exhibit 12) placed the Amsterdam judgment on that court's record (Exhibit 1). The Trustees' Supplemental Reply of October 5, 2026 (Exhibit 4) asserts that "the 60 days have elapsed, and Trier Holding B.V. ('Trier') did not restore Conservatrix's solvency

capital ratio" (at 4); that there is "no evidence—nor does any such evidence exist—of pending claims against Conservatrix or the existence of any proceedings that could result in Conservatrix's obligation to pay Respondents" (at 9 n.3); that "should the arbitrator later conclude that respondents are entitled to a refund or adjustment, there is nothing to indicate the petitioners would not comply" (at 12 n.5, quoting M.D.N.C. Doc. No. 52 at 6); and that recognition would prevent Respondents "from evading the obligations they undertook in 2017" and allow the policyholders to be repaid "for the harm Respondents inflicted on them," invoking "Lindberg's fraud," the Factual Basis in this case, and the Special Master's appointment (at 10–11, 13–14). The Respondents' Supplemental Sur-Reply, filed October 9, 2026 (Exhibit 2), answers those statements with the Arbitration record and the Amsterdam judgment; the Arbitration materials were filed there under seal, with a motion to seal, as part of that proceeding.

### A. North Carolina's grounds for nonrecognition are mandatory, and the burden of showing reasonableness is the Trustees'.

The Trustees describe the grounds for nonrecognition in N.C. Gen. Stat. § 1C-1853(c) as "nonmandatory." Exhibit 4 at 5. The statute says otherwise. If the court finds that any of the listed grounds exists, "recognition of the judgment shall be denied unless the court determines, as a matter of law, that recognition would nevertheless be reasonable under the circumstances." N.C. Gen. Stat. § 1C-1853(c). Once a ground is established, denial is the rule and recognition is the exception.

The statute also allocates the burdens. The party resisting recognition must establish that a ground under subsection (c) exists; but "[t]he party seeking

recognition of the judgment has the burden of establishing that, as a matter of law, recognition would nevertheless be reasonable under the circumstances." *Id.* § 1C-1853(g). The question in the Middle District is therefore not whether that court may, in its discretion, recognize the judgment, but whether the Trustees have shown, as a matter of law, that recognition is reasonable. On this record they cannot.

### B. No tribunal has found the condition on which the €150,000,000 depends.

The Act applies to a foreign-country judgment only "to the extent that" the judgment grants or denies recovery of a sum of money and is final, conclusive, and enforceable where rendered. N.C. Gen. Stat. § 1C-1852(a). It does not apply "to the extent that" the judgment is "[a] fine or other penalty." *Id.* § 1C-1852(b)(2). The Fourth Circuit described the summary award as requiring payment of €150,000,000 "if they did not replenish Conservatrix's solvency capital ratio within sixty days." M.D.N.C. Doc. No. 64 at 12. The sum is conditional: it is owed only if a condition occurred.

The Trustees assert that "the 60 days have elapsed, and Trier Holding B.V. ('Trier') did not restore Conservatrix's solvency capital ratio." Exhibit 4 at 4. They cite nothing for it, and no tribunal has so found. The summary award was provisional on its face: a summary arbitral measure "needs to be grounded on a prima facie basis." Exhibit 5 at 25 (¶ 6.23). The award's statement that the sum is "immediately payable" says when a forfeited sum would fall due; it presupposes the breach it does not find. *Id.* at 34. Whether the Commitment was breached, whether any breach caused loss, and in what amount are the questions set for the evidentiary hearing in the

Arbitration on November 4 and 10, 2026. Lindberg Decl. ¶ 4, *van Faassen v. Lindberg*, No. 1:23-cv-879 (M.D.N.C. Oct. 9, 2026), Doc. No. ___ ("M.D.N.C. Lindberg Decl."). A provisional measure is not a determination that the condition occurred, and a judgment that enforces it is not, to that extent, a judgment for a sum of money that is final and conclusive.

The Trustees' own statements confirm that the sum is not the measure of any loss. In this Court the Trustees stated that, "[a]part from the penalty, Conservatrix is pursuing, through Dutch arbitration proceedings, recovery of the damages its policyholders have suffered," Doc. No. 189-1 at 238 n.6, and that receipt of €215,356,806 would leave Conservatrix's policyholders "compensated in full," *id.* at 32–33; *see* M.D.N.C. Lindberg Decl. ¶ 5 & Ex. E. The damages claim is the claim being tried in the Arbitration (Part II above). The €150,000,000 is a penalty for not recapitalizing within sixty days, not compensation; to that extent the judgment falls outside the Act. N.C. Gen. Stat. § 1C-1852(b)(2).

The provisional character of the award matters for a further reason. The Trustees tell the Middle District that there is "no evidence—nor does any such evidence exist—of pending claims against Conservatrix or the existence of any proceedings that could result in Conservatrix's obligation to pay Respondents," and no evidence "that Conservatrix would be unable to pay." Exhibit 4 at 9 n.3. They also say that "should the arbitrator later conclude that respondents are entitled to a refund or adjustment, there is nothing to indicate the petitioners would not comply." *Id.* at 12 n.5. Both statements are wrong. The Arbitration on the merits is such a proceeding: if the Tribunal finds no breach, the provisional sum would have to be

repaid. The summary award itself discounted "the risk that a party cannot repay" because the claim "eventually would be of a parent-company against a 100% subsidiary." Exhibit 5 at 25–26 (¶¶ 6.24, 6.27). That subsidiary has been bankrupt since December 8, 2020. Defendant's action against the Trustees in Florida, seeking damages "exceeding €348 million," is another such proceeding. Exhibit 9 ¶ 1. And the Trustees' own Fifteenth Public Report shows an estate with approximately €5.6 million of assets against approximately €100.3 million of admitted claims, after interim distributions of approximately €40 million to policyholders, and carries the claim against Respondents without a value. Exhibit 3 ¶ 3.1; M.D.N.C. Lindberg Decl. ¶¶ 6, 16. Money paid to the estate now would not come back.

### C. The Trustees' own waiver cases support Respondents.

The Trustees argue that Respondents waived their North Carolina defenses by not raising them in 2024. The cases they cite hold the opposite of what they need. *Liberty University* states an appellate rule: "[g]enerally, 'a federal appellate court does not consider an issue not passed upon below.'" *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 103 (4th Cir. 2013) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). The Middle District is not an appellate court reviewing a ruling below. The North Carolina aspect of the Trustees' motion remains pending; the court "never ruled on" it. M.D.N.C. Doc. No. 74 at 5.

*Chittenden* found no waiver. There the Fourth Circuit held that a defendant who had conceded joint and several forfeiture liability under then-controlling circuit precedent had not waived her challenge after an intervening Supreme Court decision, explaining that "[t]he doctrine of waiver demands conscientiousness, not

clairvoyance, from parties." *United States v. Chittenden*, 896 F.3d 633, 639–40 (4th Cir. 2018) (quoting *Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 92 (2d Cir. 2009)) (internal quotation marks omitted). The same principle applies here with greater force. No "full opportunity" in 2024, M.D.N.C. Doc. No. 74 at 4, could have reached a finding of fraud that the Amsterdam District Court made on February 5, 2026. M.D.N.C. Doc. No. 78-2 at 51; Exhibit 1. Respondents did not sit on it: within ten days they placed the judgment before the Tribunal in the Arbitration. *See* Exhibit S-7 (February 15, 2026).

And the third decision the Trustees cite, *Amaplat*, Exhibit 4 at 7, no longer stands. The D.C. Circuit reversed the district court's determination that it had subject-matter jurisdiction, vacated the remainder of its orders, and remanded with instructions to dismiss; certiorari was denied. *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 143 F.4th 496 (D.C. Cir. 2025), *cert. denied*, No. 25-699 (U.S. Apr. 27, 2026).

### D. The Amsterdam District Court found a fraud on the court.

The Trustees invoke *Society of Lloyd's v. Mullin* for the proposition that the fraud relevant to recognition must be a fraud on the court. Exhibit 4 at 11. *Mullin* so holds: the fraud "must relate to matters other than issues that could have been litigated and must be a fraud on the court." *Society of Lloyd's v. Mullin*, 255 F. Supp. 2d 468, 473 (E.D. Pa. 2003) (emphasis and citation omitted), *aff'd*, 96 F. App'x 100 (3d Cir. 2004). That is exactly what the Amsterdam District Court found. In the 2017 proceeding "DNB did not mention the reinsurance with CBL at all." M.D.N.C. Doc. No. 78-2 at 40; Exhibit 1 at 40 (¶ 5.10). The court found "'fraud committed in the

proceedings' as referred to in Article 382 under a of Rv, because the reinsurance was excluded from the proceedings by DNB," so that "no full debate could take place on whether less drastic measures (alternatives) might have been possible to save Conservatrix." Exhibit 1 at 24 (¶ 1.5). The court that approved the 2017 transfer was itself deceived.

The Trustees answer that the 2017 order "benefited" Respondents, who "were not the victims of fraud." Exhibit 4 at 10–11. The money ran the other way. Respondents recapitalized Conservatrix: Conservatrix's audited 2017 financial statements, quoted by the Amsterdam court, record that "the new shareholder recapitalized the company above the envisaged minimum Solvency II ratio of 135% by injecting 18.4 million of capital directly and 72.1 million via a reinsurance agreement with Colorado Bankers Life." M.D.N.C. Doc. No. 78-2 at 42. DNB reviewed the final text of the reinsurance agreement before it was concluded. *Id.* at 32. The reinsurance premium went into a trust for Conservatrix's benefit, which by Conservatrix's own account held €167.3 million in December 2019. Exhibit 8, Tab F ¶ 21; M.D.N.C. Lindberg Decl. ¶¶ 13–14; *see* Part IV above. They took nothing out: no dividend was ever proposed, declared, or paid by Conservatrix after Trier acquired it, and no Respondent or affiliate took any loan, management fee, or other distribution from it. M.D.N.C. Lindberg Decl. ¶ 12; *see* Exhibit 10 at 6 (¶ 3.1(n)).

In any event, the public-policy ground does not ask who was harmed. It asks whether "[t]he judgment, or the cause of action or claim for relief on which the judgment is based, is repugnant to the public policy of this State or of the United States." N.C. Gen. Stat. § 1C-1853(c)(3). The obligation that the 2017 order produced

—the Commitment—is the obligation now being enforced, and the court that approved the order producing it was deceived by the regulator that applied for it. That the 2017 transfer itself cannot now be reversed, M.D.N.C. Doc. No. 78-2 at 52, does not make enforcing its product reasonable. Nor does Respondents' knowledge that the reinsurance existed mean they knew DNB had withheld it from a court before which they were not parties; they learned that from the 2026 judgment. M.D.N.C. Lindberg Decl. ¶¶ 2–3; *see* Exhibit 4 at 11–13.

**E. Recognition would not be reasonable as a matter of law.**

The Trustees' case for reasonableness rests on two things: "obligations an arbitral panel found they breached," Exhibit 4 at 13, and this case. Neither carries the burden that § 1C-1853(g) places on them.

The first is a provisional measure. No arbitral panel has found a breach on the merits; breach is for the Tribunal, at the hearing in November. Respondents' contract defence is on the record: the Commitment provides that "[a]s soon as the Company is stabilized, the Commitment shall be limited," so that further capitalization "shall be based on a viable business case for the Company"; unlike the Agreement re Post-Completion Covenants signed the same day, which ties stabilization to DNB's assessment three times, the Commitment does not make stabilization subject to any assessment by DNB, which signed it only "for acknowledgement and receipt." Exhibit 10 at 18 (¶ 1.2(b)), 22; M.D.N.C. Lindberg Decl. ¶ 11. Respondents contend in the Arbitration that Conservatrix was stabilized by the end of 2017, when its audited financial statements reported a Solvency II ratio of 188%, and that no viable business case for further capital existed thereafter. M.D.N.C. Lindberg Decl. ¶ 11; Exhibit S-3.

Converting a provisional sum into a final judgment weeks before the merits hearing, when a Dutch court has found that the order producing the obligation was "based on fraud committed by DNB in the proceedings," M.D.N.C. Doc. No. 78-2 at 51, is not reasonable as a matter of law.

The second is new in the Trustees' reply. They argue that recognition would prevent Respondents "from evading the obligations they undertook in 2017" and would repay the policyholders "for the harm Respondents inflicted on them," invoking "Lindberg's fraud," the Factual Basis in this case, and the appointment of the Special Master. Exhibit 4 at 10–11, 13–14 & n.6. Arguments raised for the first time in reply are not properly before the Middle District. M.D.N.C. LR 7.3(h); M.D.N.C. Doc. No. 38 at 15. They also fail on the merits. The Fourth Circuit has held that the Trustees "fail to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct." *In re Zetteler*, No. 26-1749, slip op. at 4 (4th Cir. June 13, 2026) (per curiam) (unpublished), as amended (June 15, 2026) (Doc. Nos. 203, 204). The Special Master has repeatedly declined to recommend that Conservatrix be treated as a person due restitution (Doc. No. 146 at 11, as quoted in Doc. No. 258 at 2; Doc. No. 245 at 35). And the United States has told this Court that not providing capitalization or profit as promised, even if actionable elsewhere, "is different from taking money through deceit and misrepresentations." Doc. No. 308 at 8 n.7. The Commitment claim is a contract claim, and it is being tried as one.

**F. Comity adds nothing.**

The Trustees fall back on comity. Their own heading concedes that the Rotterdam order they ask the Middle District to honor is "interim equitable relief."

Exhibit 4 at 14. The case on which they rely, *Cardenas v. Solis*, 570 So. 2d 996 (Fla. Dist. Ct. App. 1990), enforced a temporary injunction freezing half of the funds in Florida bank accounts to preserve the status quo pending a domestic-relations suit in Guatemala, *id.* at 997, 1000; it did not enforce a final money judgment. The court began from the rule that, generally, "only the final judgments of courts of a foreign country are subject to recognition and enforcement in this country," *id.* at 998, and enforced the interim order only "so as to freeze the status quo and thereby preserve the Guatemalan court's jurisdiction to render such a final decree," *id.* at 1000. That is the opposite of what the Trustees seek: conversion of a provisional sum into a final judgment before the merits Tribunal decides whether its condition ever occurred.

Respondents have accordingly asked the Middle District to deny recognition under § 1C-1853(c) or, alternatively, to enter no judgment on a provisional sum before the Tribunal decides whether its condition occurred. Exhibit 2.

### G. The Florida action.

On March 26, 2026, Defendant filed *Lindberg v. Zetteler*, No. 2026-006354-CA-01 (Fla. 11th Jud. Cir. Ct.), against the Trustees in their capacity as insolvency practitioners, for damages "exceeding €348 million" arising from their administration of the Conservatrix estate (Exhibit 9, ¶ 1); the Trustees' report describes the action. Exhibit 3, translation ¶ 7.5.

## CONCLUSION

This Notice is filed to prepare the record in case any further response to Conservatrix becomes due, in the final order or otherwise. It seeks no relief, and it does not withdraw, narrow, or supplement any motion, objection, or reservation

Defendant has made in this case, including his Notice of Objections and Reservation of Issues (Doc. No. 329).

## INDEX OF EXHIBITS

**Public exhibits (filed with this Notice):**

Exhibit 1 — Order of the District Court of Amsterdam of February 5, 2026 (ECLI:NL:RBAMS:2026:1107), with certified English translation (61 pages).

Exhibit 2 — Respondents' Supplemental Sur-Reply, van Faassen v. Lindberg, No. 1:23-cv-879 (M.D.N.C.), filed October 9, 2026 (Doc. No. ___) (9 pages).

Exhibit 3 — Fifteenth Public Report of the Trustees in the Bankruptcy of Conservatrix N.V., dated July 31, 2026, with a machine-generated English translation (not certified; the Dutch text controls) (22 pages).

Exhibit 4 — Petitioners' Supplemental Reply, van Faassen v. Lindberg, No. 1:23-cv-879 (M.D.N.C.), filed October 5, 2026, Doc. No. 81 (17 pages).

Exhibit 5 — Summary Arbitral Award of January 31, 2020, Netherlands Arbitration Institute, as filed in van Faassen v. Lindberg, No. 1:23-cv-879 (M.D.N.C.), Doc. No. 1-2 (36 pages).

Exhibit 6 — United States Court of Appeals for the Fourth Circuit, No. 26-1749, Doc. 8 (June 11, 2026): "Response Requested" — response due by 12:00 p.m. on June 12, 2026 (2 pages).

Exhibit 7 — United States Court of Appeals for the Fourth Circuit, No. 26-1749, Doc. 16 (June 13, 2026): Judgment and Notice of Judgment (5 pages).

Exhibit 8 — Colorado Bankers Life Insurance Co., in Rehabilitation v. Conservatrix N.V., Standard Financial, Ltd., and Fifth Third Bank, Wake County Superior Court No. 19 CV 017191 — Verified Complaint (December 23, 2019) with Exhibits B–F (104 pages).

Exhibit 9 — Complaint, Lindberg v. Zetteler and van Faassen, No. 2026-006354-CA-01 (Fla. 11th Jud. Cir. Ct.), e-filed March 26, 2026 (without its exhibits) (20 pages).

Exhibit 10 — Recapitalization Commitment of March 17, 2017 and Agreement re Post-Completion Covenants, as filed in van Faassen v. Lindberg, No. 1:23-cv-879 (M.D.N.C.), Doc. No. 1-3 (23 pages).

Exhibit 11 — Joint Status Report, van Faassen v. Lindberg, No. 1:23-cv-879 (M.D.N.C.), filed August 20, 2026, Doc. No. 73 (24 pages).

Exhibit 12 — Respondents' Supplemental Response, van Faassen v. Lindberg, No. 1:23-cv-879 (M.D.N.C.), filed September 18, 2026, Doc. No. 78, with the Declaration of Vivek Ramachandran, Doc. No. 78-1 (22 pages).

**Exhibits filed under seal (subject to the accompanying Motion to Seal):**

Exhibit S-1 — Netherlands Arbitration Institute, Case No. 4794: Procedural Order No. 1 (October 9, 2024); Procedural Timetable per October 3, 2025; Procedural Order No. 2 (October 24, 2025) (28 pages).

Exhibit S-2 — NAI Case No. 4794: Claimants' Statement of Claim (January 17, 2025) (81 pages).

Exhibit S-3 — NAI Case No. 4794: Respondents' Statement of Defence and Counterclaim (September 15, 2025) (the exhibits to the Statement of Defence are Exhibits S-3-A and S-3-B) (52 pages).

Exhibit S-3-A — NAI Case No. 4794: Exhibits A through I-2 to Respondents' Statement of Defence and Counterclaim (September 15, 2025) (Exhibit J, a public court complaint, is omitted) (324 pages).

Exhibit S-3-B — NAI Case No. 4794: Exhibits K through R to Respondents' Statement of Defence and Counterclaim (September 15, 2025) (Exhibit N, a public court complaint, is omitted) (176 pages).

Exhibit S-4 — NAI Case No. 4794: Decision of the Arbitral Tribunal on the Request of Respondents of October 13, 2025 (NAI 4794.19) (5 pages).

Exhibit S-5 — NAI Case No. 4794: Respondents' Comprehensive Notice to the Tribunal on the Memorandum of Law filed in United States v. Lindberg (January 26, 2026) (112 pages).

Exhibit S-6 — NAI Case No. 4794: Procedural Order No. 4 (February 11, 2026), with Annex I and Annex II (187 pages).

Exhibit S-7 — NAI Case No. 4794: Respondents' Comprehensive Notice to the Tribunal on the Fraud Judgment against DNB (February 15, 2026) (54 pages).

Exhibit S-8 — NAI Case No. 4794: Respondents' Statement of Rejoinder (May 8, 2026) (23 pages).

Exhibit S-9 — NAI Case No. 4794: Claimants' Expert Report CE-01 (Brandenburg and Heyl) and Witness Statements CWS-01 (Brandenburg) and CWS-02 (Heyl) (74 pages).

Dated: October 9, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

Vivek Ramachandran
Dhamma Law, PLLC
202-860-4084
Email: vramachandran@dhammalaw.com

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case. Exhibits S-1 through S-9 to the Notice were filed through the Court's sealed-document event and are not viewable through CM/ECF; copies were served on the same date by electronic mail on counsel for the United States, counsel for the Special Master, and counsel for Eleonora L. Zetteler and J. Robert van Faassen.

Dated: October 9, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*