IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| J. ROBERT VAN FAASSEN, LLM and ELEONORA L. ZETTELER, LLM, in their capacity as insolvency practitioners in the insolvency of Nederlandsche Algemeene Maatschappij van Levensverzekering "CONSERVATRIX" N.V.,<br><br>Petitioners,<br><br>v.<br><br>GREG EVAN LINDBERG; TRIER HOLDING B.V.; NETHERLANDS INSURANCE HOLDINGS, INC.; and NIH CAPITAL, LLC,<br><br>Respondents. | Case No. 1:23-CV-879<br><br>Chief Judge Catherine C. Eagles |

**SECOND CORRECTED DECLARATION OF GREG EVAN LINDBERG IN SUPPORT OF RESPONDENTS' SUPPLEMENTAL SUR-REPLY**

I, Greg Evan Lindberg, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct and is stated on my personal knowledge:

1. I am over eighteen years of age and competent to make this declaration. I am a Respondent in this action, together with Trier Holding B.V., Netherlands Insurance Holdings, Inc., and NIH Capital, LLC (with me, the "Respondents").

2. I was not a party, and no other Respondent was a party, to (a) the 2017 proceeding in the District Court of Amsterdam that resulted in that court's order of May 15, 2017, approving the transfer of the shares in Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. ("Conservatrix") to Trier Holding B.V.; (b) Conservatrix Groep S.A.R.L.'s appeal in cassation from that order, which the Supreme Court of the Netherlands decided on May 17, 2019; or (c) the application by the same company, styled Conservatrix Group S.A.R.L., against De Nederlandsche Bank N.V. ("DNB") to revoke the 2017 order, which the District Court of Amsterdam decided on February 5, 2026 (Doc. 78-2).

3. The Respondents did not know that DNB had concealed the reinsurance between Conservatrix and Colorado Bankers Life Insurance Company from the District Court of Amsterdam in the 2017 proceeding until that court's order of February 5, 2026 was issued and publicized in February 2026. Gregory Nelson, the sole director of Trier Holding B.V., and I were the persons responsible for the Respondents' dealings concerning Conservatrix, and neither of us knew of the concealment until then. Mr. Nelson has confirmed this to me; he first told me of it when the order became public in February 2026, and he would have told me as soon as he learned of it. The Respondents knew that the reinsurance agreement existed; they did not know what DNB told, or withheld from, the District Court of Amsterdam in a proceeding to which no Respondent was a party.

4. The Respondents and the petitioners, as claimants, are parties to an arbitration under the Netherlands Arbitration Institute, NAI Case No. 4794 (the "Arbitration"), in which the claimants claim payment of damages from the Respondents, contending that the Respondents breached the Recapitalization Commitment. The Respondents dispute in the Arbitration that the replenishment condition was triggered and that any Respondent breached the Commitment. The Tribunal has not decided the merits, and no tribunal has determined that any Respondent breached the obligation on which the €150,000,000 sum in the Rotterdam order depends. The main hearing is scheduled for November 4 and 10, 2026; the Tribunal will then hear the claimants' claims and the Respondents' defences, including on breach, causation, and quantum. The Respondents' counterclaim in the Arbitration was treated as withdrawn for non-payment of the deposit; the claims it asserted are now brought in the Florida action described in paragraph 6 (Exhibit J), and the facts underlying them remain pleaded in the Arbitration as defences to causation and quantum.

5. In United States v. Lindberg, No. 3:23-cr-48 (W.D.N.C.), the petitioners filed an objection to the Special Master's report on May 4, 2026 (ECF No. 130) and, on June 11, 2026, a notice attaching their petition to the United States Court of Appeals for the Fourth Circuit for a writ of mandamus (ECF No. 189-1). Attached as Exhibit E are true copies of pages 2, 4, 30, 32, 33, 238, and 239 of ECF No. 189-1 as filed; the last two are pages 7 and 8 of ECF No. 130,

reproduced in the petition's appendix. In those filings the petitioners stated that, "[a]part from the penalty, Conservatrix is pursuing, through Dutch arbitration proceedings, recovery of the damages its policyholders have suffered" (Ex. E at 238 n.6); that "[t]he losses Conservatrix suffered as a result of the non-performance of the Commitment total € 215,356,806" (id. at 30); that if Conservatrix received that sum, "Conservatrix's policyholders would be compensated in full" (id. at 32–33); and that "[a]ny restitution funds that Petitioners recover will be used to settle issues arising from the bankruptcy" of Conservatrix (id. at 4). All of Conservatrix's attorneys' approximately 15 hours of communications with the Government and the Special Master was ex-parte, with no documents shared with Greg Lindberg or his counsel. Greg Lindberg came to know less than 2 weeks ago through review of billing statements from the Special Master of these extensive ex-parte contacts.

6. Conservatrix is in bankruptcy in the Netherlands, and the petitioners act as its insolvency practitioners. It was declared bankrupt on December 8, 2020, as the petitioners pleaded (Doc. 24 ¶ 20), as the Amsterdam District Court recited (Doc. 78-2 at 24, 26), and as the Fourth Circuit described it (Doc. 64 at 3); the Amsterdam court appointed Mr. van Faassen co-insolvency practitioner in that bankruptcy effective April 1, 2024 (Doc. 44 ¶¶ 2, 4 and its Exhibit A); the petitioners sue here, and appear in the Arbitration, "in their capacity as insolvency practitioners in the insolvency of" Conservatrix (Doc.

81 at 1; Ex. F, message 4); and Exhibit I is their statutory report as its trustees under Article 73a of the Dutch Bankruptcy Act (Ex. I at 2, ¶ 1.1). The bankruptcy is also a matter of public record in the Netherlands, in three sources that were accessed on my behalf on October 9, 2026 (the English renderings in parentheses are machine-generated and not certified; the Dutch text controls): (a) the Dutch judiciary's Central Insolvency Register (Centraal Insolventieregister), which lists the bankruptcy of Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. before the Amsterdam District Court under insolvency number F.13/20/398, records "Uitspraak faillissement op 08 december 2020" (bankruptcy declared on December 8, 2020), names mr J.R. van Faassen and mr E.L. Zetteler as the trustees, and shows the entry as current to October 8, 2026, at https://insolventies.rechtspraak.nl/#!/details/13.ams.20.398.F.1307.1.24; (b) the enforcement notice published by De Nederlandsche Bank N.V. on April 19, 2021, which states that on December 8, 2020 DNB withdrew Conservatrix's licence and filed a bankruptcy petition with the Amsterdam District Court and that "De rechtbank Amsterdam heeft dezelfde dag het faillissement uitgesproken" (the Amsterdam District Court declared the bankruptcy the same day), at https://www.dnb.nl/algemeen-nieuws/handhavingsmaatregel-2021/dnb-heeft-wft-curator-benoemd-bij-en-vergunning-ingetrokken-van-levensverzekeraar-conservatrix-1; and (c) the letter of the Minister of Finance to the House of Representatives of June 15,

2023 (Kamerstukken II 2022/23, 29 507, nr. 160), which states that "Op 8 december 2020 ging levensverzekeraar Nederlandsche Algemeene Maatschappij van Levensverzekering Conservatrix N.V. (hierna: Conservatrix) failliet" (on December 8, 2020 the life insurer Conservatrix went bankrupt) and that the trustees appointed by the Amsterdam District Court have since been winding up the bankruptcy, at https://zoek.officielebekendmakingen.nl/kst-29507-160.pdf. Any sum paid to them on the Rotterdam order would be paid to the bankruptcy estate they administer, whose function is to distribute what it collects to creditors. According to the petitioners' own report, the estate had approximately €5.6 million of assets as of July 31, 2026 against approximately €100.3 million of admitted claims, had already distributed approximately €40 million to policyholders, and carries its claim against the Respondents without a value (Ex. I at 3–4; translation at 15–16; see paragraph 16 below). In their Supplemental Reply the petitioners state that the Respondents "have also presented no evidence that Conservatrix would be unable to pay Respondents if a judgment arose in Respondents favor," Doc. 81 at 9 n.3, and quote this Court's statement that "should the arbitrator later conclude that respondents are entitled to a refund or adjustment, there is nothing to indicate the petitioners would not comply," Doc. 81 at 12 n.5. The petitioners' own report, published on July 31, 2026, is that evidence. There is also a pending proceeding in which the petitioners, in that same capacity, could be held

liable to me: on March 26, 2026 I filed Lindberg v. Zetteler, No. 2026-006354-CA-01, in the Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida, against both petitioners in their capacity as insolvency practitioners of Conservatrix, seeking damages exceeding €348 million for their administration of the estate, including the termination of the CBL reinsurance. A copy of the complaint as filed, without its exhibits, is Exhibit J. The petitioners describe that action in paragraph 7.5 of their Fifteenth Public Report (Ex. I at 8; translation at 18) and state that they have engaged American lawyers for it. I am not aware of any means by which the Respondents could recover from the bankruptcy estate a sum that it has distributed to its creditors.

7. Exhibit B is a true and correct copy of an e-mail sent on September 18, 2026 by Willem van Baren, Chair, "[f]or and on behalf of the Tribunal," to the parties, including me, and their counsel, with copies to the other members of the Tribunal and the NAI Secretariat, rescheduling the main hearing. Paragraph 1 of that e-mail refers to my indication of September 8, 2026 that I would be available "for the hearing starting 4 November 2026 through 10 November 2026," the window I had proposed, and states that the main hearing previously scheduled for September 29 and 30, 2026 "will be rescheduled to 4 and 10 September 2026." The hearing dates fixed within that window are November 4 and 10, 2026: paragraph 2 of the same e-mail refers to "the period including 4 and 10 November 2026," three days later the

claimants' counsel agreed to "start the second hearing day on 10 November 2026" (Exhibit C), and on October 7, 2026 the claimants themselves stated that "[t]he main hearing is scheduled for 4 and 10 November 2026" (Ex. F, message 4).

8. Exhibit C contains true and correct copies of two e-mails from Marco Eliëns of Lemstra Van der Korst N.V., counsel for the claimants: (a) an e-mail of September 21, 2026 to the Tribunal, stating that the claimants "agree with Mr Lindberg's proposal to start the second hearing day on 10 November 2026 at 14:00 CET"; and (b) an e-mail of October 5, 2026 to me, transmitting "the proposed hearing schedule on the final page of the draft PO5 that the Tribunal circulated previously." Each copy reproduces the message as sent. The earlier messages quoted beneath each message in the e-mail chain, which include the Tribunal's e-mail in Exhibit B, and the messages' attachments are omitted.

9. Exhibit D consists of true and correct copies of pages 1 and 11 (the first page and the signature page) of the Respondents' Notice to the Tribunal of Judicial Finding of Fraud by De Nederlandsche Bank N.V. in the Forced Transfer of Conservatrix, dated February 15, 2026, which the Respondents submitted in the Arbitration "[p]ursuant to the leave granted by the Arbitral Tribunal on 13 February 2026 through its Chair." The Notice transmitted the February 5, 2026 order of the District Court of Amsterdam that is already of record as

Doc. 78-2. That order and the Notice's remaining pages and exhibits are not refiled.

10. Exhibit F contains true and correct copies of the ten e-mails exchanged on October 6 through 8, 2026 with the Tribunal and the claimants' counsel concerning the disclosure of information from the Arbitration to this Court, each reproduced as sent, with the earlier messages quoted beneath each reply omitted.

11. The Respondents' defence in the Arbitration rests in part on the text of the Recapitalization Commitment of March 17, 2017, which is of record as part of Exhibit C to the petition (Doc. 1-3 at 17–22) and which I signed. Paragraph 1.2(b) of the Commitment provides: "As soon as the Company is stabilized, the Commitment shall be limited in the sense that further capitalization of the Company over and above the initial amount of capitalization by the Transferee on Completion, shall be based on a viable business case for the Company (the analysis thereof may include taking into account the interest of the shareholder)." Doc. 1-3 at 18. That paragraph does not make stabilization subject to an assessment by DNB, and DNB signed the Commitment only "for acknowledgement and receipt." Id. at 22. By contrast, the Agreement re Post-Completion Covenants signed the same day, which is also part of Doc. 1-3, ties stabilization to DNB's assessment three times: "until the (organisation of the) Company is stabilised (to be assessed by DNB)" (paragraph 3.1(q), id. at 6), and "unless the Company would not yet be

sufficiently stabilised by then (to be assessed by DNB in accordance with paragraph (b) above), and if the Company is sufficiently stable (to be assessed by DNB in accordance with paragraph (b) above)" (paragraph 2.1(h), id. at 4), paragraph 2.1(b) being the provision under which DNB assesses, at the Company's request, "whether or not the Company is stabilised" (id. at 3). The Commitment and the Covenants were signed on the same day, March 17, 2017, by parties that were sophisticated commercial and regulatory actors, each acting with legal counsel: paragraph 1.3 of the Commitment itself refers to the legal opinions of Houthoff Buruma New York and McGuireWoods LLP delivered on the Commitment (Doc. 1-3 at 18); DNB is a named party to the Covenants and signed them as such (Doc. 1-3 at 1, 9), and it is the body whose assessment the Covenants require; it signed the Commitment for acknowledgement and receipt only (id. at 22). I signed the Commitment. I understood that once Conservatrix was stabilized—that is, once it had stable management and a stable solvency capital ratio, as its 2017 financial statements showed—the Commitment would no longer bind me unless there was a viable business case for further investment. It was clear to me that Conservatrix was stabilized and, as interest rates then declined significantly, that there was no longer a viable business case for further investment. The Respondents contend in the Arbitration, under the interpretation standard of the Supreme Court of the Netherlands' Haviltex decision of March 13, 1981, discussed in the Statement of Defence (Exhibit G at 49–50, Tab 4 at 17–18),

that among such parties the use of "(to be assessed by DNB)" three times in the Covenants and its omission from paragraph 1.2(b) of the Commitment was deliberate, so that stabilization under the Commitment is measured by objective evidence, principally the Solvency II ratio, and not by a DNB assessment; that Conservatrix was stabilized by the end of 2017, when its audited financial statements reported a Solvency II ratio of 188% (quoted at Doc. 78-2 at 48); and that no viable business case for further capital existed thereafter, which Conservatrix's chief executive, René Collé, acknowledged on a call on June 5, 2020, as Gregory D. Nelson has sworn in his affidavit of October 4, 2024, which is Exhibit A to the Statement of Defence in the Arbitration. Those contentions are set out in the Respondents' Statement of Defence and Counterclaim of September 15, 2025 (Exhibit G, Tab 4) and are for the Tribunal to decide after the November hearing.

12. Under paragraph 3.1(n) of the Agreement re Post-Completion Covenants, Trier agreed that it would, and would procure that Conservatrix would, "refrain from declaring or paying out any dividend within the period that is 10 (ten) years after Coexmpletion." Doc. 1-3 at 6. No dividend was ever proposed, declared, or paid by Conservatrix after Trier acquired it, and no Respondent, and no affiliate of a Respondent, took any loan, management fee, or other distribution from Conservatrix at any time. In United States v. Lindberg, the Special Master's final recommendations state that he does not recommend that Conservatrix be treated as a person due restitution "because

Conservatrix was not harmed in the same manner that the Defendant harmed the other entities that the Special Master recommends the Court treat as persons due restitution" (ECF No. 245 at 35); his proposed final order states that "Conservatrix does not qualify as a person due restitution because no unreturned assets belonging to Conservatrix were diverted to a Defendant-affiliated entity" and that "[i]t also appears that neither Defendant nor Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies to Conservatrix or Conservatrix's regulator(s)" (ECF No. 245-1 at 6); and the United States' consolidated position is "Disallow – Conservatrix is not a party due restitution," because "[n]ot providing capitalization or profit as promised – even if it may be actionable in other fora -- is different from taking money through deceit and misrepresentations" (ECF No. 308 at 7–8 & n.7). Attached as Exhibit K are true copies of page 35 of ECF No. 245, page 6 of ECF No. 245-1, and pages 7 and 8 of ECF No. 308, as filed, and of the notice described in paragraph 19, as filed and without its exhibits. None of this belongs in this proceeding, but the Respondents are forced to place it on this record because the petitioners seek to relitigate here, and to color this Court's view with, the contention that Conservatrix's losses were caused by "Lindberg's fraud" and his "scheme" (Doc. 81 at 10–11, 13–14)—an argument that the Fourth Circuit considered and ruled on the merits, holding that the petitioners "fail to sufficiently connect the harm suffered by Conservatrix

with Lindberg's criminal conduct," and that the Special Master and the United States have likewise rejected. If the Court requires it, the Respondents will provide a fuller brief. As to the other entities referred to by the Special Master and the United States in those filings, the restitution determinations are on appeal to the Fourth Circuit, Nos. 26-4309 and 26-4310 (ECF No. 192).

13. On Completion in May 2017, Trier made a direct capital contribution to Conservatrix of €18.4 million. Conservatrix's audited financial statements for 2017, which the District Court of Amsterdam quoted, record that "the new shareholder recapitalized the company above the envisaged minimum Solvency II ratio of 135% by injecting 18.4 million of capital directly and 72.1 million via a reinsurance agreement with Colorado Bankers Life, affiliate US company," and that "[t]he market value of the reinsurance agreement was assessed by KPMG Advisory N.V." Doc. 78-2 at 42. DNB set the conditions a reinsurance agreement had to meet to qualify as risk mitigation under Solvency II, and DNB reviewed the final text of the agreement before it was concluded. Id. at 32. The arbitral tribunal itself recorded that "Trier made a capital injection of € 18.4M, and the reinsurance agreement with CBL increased the own funds of Conservatrix to the required level at the time of take-over." Doc. 1-2 at 27 (¶ 6.33).

14. The reinsurance was collateralized, and the premium went into a trust for Conservatrix. Exhibit H contains a true copy of the Verified Complaint for

Declaratory Judgment and Injunctive Relief filed on December 23, 2019 by CBL, in rehabilitation and acting through its Special Deputy Rehabilitators, in Colorado Bankers Life Insurance Co. v. Conservatrix, No. 19 CV 017191 (Wake County Superior Court), and of Exhibits B through F to that complaint, as served on Conservatrix on January 14, 2020; they are public records. In the complaint, CBL stated under oath that the Trust Account "was initially funded by CBL with a deposit of €100 million in cash and securities (an amount equal to the reinsurance premium paid by Conservatrix to CBL), plus additional amounts of €50 million and €7.5 million from CBL and SFL," that CBL was then required "to maintain no less than 105% of the Net Reserves" in it, that "the amount of the assets in the Trust Account is approximately €157.5 million," and that Conservatrix had "demanded that the Rehabilitator deposit an additional €70 million of CBL assets into the Trust Account." Ex. H at 7 (Tab A, ¶¶ 20, 22). Clause 7.2 of the Aggregate Excess of Loss Reinsurance Treaty of May 15, 2017 provides that "[a]ll amounts received and paid in furtherance to this Treaty, whether it be the reinsurance premium, payments received by way of reinsurance recoveries, payments of Covered Losses or otherwise, shall be received by the Reinsurer directly into the Trust Account," and clause 8.2.1 requires the Reinsurer to keep the market value of the collateral "at 105% of the Net Reserves." Ex. H at 28 (Tab B, Treaty p. 11). The Trust Agreement of the same date, among CBL and Standard Financial Ltd., a Maltese company that

is an indirect shareholder of Conservatrix through Trier, as grantors, Conservatrix as beneficiary, and Fifth Third Bank as trustee, establishes the trust account "for the sole use and benefit of the Beneficiary" and "in order to secure payment of amounts owed by Colorado Bankers to the Beneficiary under the Reinsurance Agreement," and required CBL to deposit eligible assets of €150,000,000 and Standard Financial €7,500,000 on the contract date. Id. at 49–50 (Tab C, § 1(a)). In its own Request for Arbitration against CBL dated December 22, 2019, Conservatrix stated: "Currently, according to reports provided by Fifth Third, the collateral kept in the Trust Account for the benefit of Conservatrix and the purpose of satisfying CBL's payment obligations under the Treaty (clause 7.2 of the Treaty) amounts to € 167,3 million." Id. at 94 (Tab F, ¶ 21). Standard Financial's €7,500,000 was deposited in cash on May 26, 2017. On May 8, 2020, Conservatrix withdrew that €7,500,000 by a Beneficiary Withdrawal Notice to the trustee. Standard Financial disputes that the withdrawal was permitted and, on November 19, 2021, filed a claim of €7,587,704.92 in Conservatrix's bankruptcy. On December 22, 2019, the Rehabilitator of CBL, acting through Special Deputy Rehabilitator Mike Dinius, gave notice to Conservatrix that, "pursuant to his authority under N.C. Gen. Stat. § 58-30-85(a)(11)," he had disavowed the Treaty, that "[a]s a result of the disavowal, the Treaty is deemed to be void ab initio," and that CBL would be "seeking a judicial determination as to the proper distribution of assets in the Trust Account." Ex. H at 80 (Tab D); Doc.

1-2 at 18 (¶ 3.28). The reinsurance, backed by the Trust Account, "was installed to bridge the gap in the SCR of Conservatrix" at the acquisition, a gap of "€ 102.9M," and "was the biggest part of the initial recapitalization." Doc. 1-2 at 27 (¶ 6.33); id. at 15 (¶ 3.12); see Doc. 78-2 at 42. After CBL was placed in rehabilitation in North Carolina on June 27, 2019 and its credit rating was downgraded, the value of the reinsurance was written down and Conservatrix's solvency ratio fell below 135% in mid-2019; the Rehabilitator's disavowal of December 22, 2019 then removed the support altogether. Doc. 1-2 at 15 (¶ 3.13); id. at 27–28 (¶¶ 6.34–6.36). The arbitral tribunal itself recorded that unwinding the reinsurance would lead, on the calculation of Conservatrix's board, to a loss "of more than € 110M," and that the disavowal "must in all likelihood have its effect on the outcome of the actual calculation of the SCR." Doc. 1-2 at 27–28 (¶¶ 6.35, 6.37).

15. Exhibit G is a compendium of true and correct copies of the following documents from the Arbitration: Tab 1, Procedural Order No. 1 of October 9, 2024; Tab 2, the Procedural Timetable per October 3, 2025; Tab 3, Procedural Order No. 2 of October 24, 2025; and Tab 4, the Respondents' Statement of Defence and Counterclaim of September 15, 2025, without its exhibits. The Respondents file Exhibit G for the limited purpose of showing the Court the status, timetable, and subject-matter of the Arbitration, and have asked that it be sealed.

16. The petitioners publish periodic public reports on the Conservatrix bankruptcy at www.conservatrix.nl. Exhibit I is a copy of their fifteenth public report (Vijftiende openbare verslag), dated Utrecht, July 31, 2026 and signed by both petitioners as trustees, as published on that website; it is in Dutch (Ex. I at 2–12) and is followed by an English translation that was produced by machine translation for the Respondents (Ex. I at 14–21). The translation is disclosed as machine-generated on its face, is not certified, and is offered for the Court's convenience only; the Dutch text controls. The table in its paragraph 3.1 (Ex. I at 3–4; translation at 15–16) states the position of the estate as of July 31, 2026. Its assets are: liquid balances, €4,310,724; commercial mortgage loans, €1,254,124; a private loan, €5,000; and the claim against the Respondents ("Vordering op Lindberg"), carried "p.m." (pro memoria, without a value) and described in note (4) as nominally €150 million arising from the summary arbitral award of the first quarter of 2020. Its liabilities are: policyholders' insurance claims ("Verzekeringsvorderingen"), €59,065,819, being the unpaid 10% balance after interim distributions of approximately €40,000,000 (note 2); policyholders' claims for lost profit-sharing and guarantees ("Schadevorderingen"), €40,490,552; remaining 90% payouts, €263,000; premium-deposit claims, €13,275; tax, €285,476; and other admitted unsecured claims, €231,815 — in total approximately €100.3 million against approximately €5.6 million of assets, a deficit of approximately €94.8 million.

Paragraph 7.4 of the report (Ex. I at 8; translation at 18) describes the Arbitration as the proceeding in which Conservatrix claims damages from the Respondents.

17. The same report states, at paragraph 7.15 (Ex. I at 11; translation at 20), that DNB lodged an appeal in cassation on February 19, 2026 against the District Court of Amsterdam's finding of fraud in the 2017 proceeding, and, at paragraph 7.17, that DNB has appealed the order requiring it to produce documents and that the Court of Appeal has suspended the enforceability of that order while the appeal is pending. No Respondent is a party to those appeals.

18. The same report, at paragraph 7.9 (Ex. I at 9–10; translation at 19), describes the restitution proceedings in United States v. Lindberg. The District Court excluded Conservatrix from its restitution order and judgment. On June 11, 2026, the petitioners filed in the United States Court of Appeals for the Fourth Circuit a petition for a writ of mandamus under 18 U.S.C. § 3771 with a 278-page appendix (318 pages in all as filed in the District Court, ECF No. 189-1), asking that court to vacate the District Court's restitution order and judgment and to direct the District Court to find Conservatrix a victim and to award it €215,356,806 in restitution (id. at 33). The Fourth Circuit's notice of the same day required my response, with less than 24 hours' notice, by 12:00 p.m. on June 12, 2026; I filed a 28-page response on June 12, 2026 (ECF No. 198). On June 13, 2026, the Fourth Circuit denied the petition on the merits

in a per curiam opinion, holding that the petitioners "fail to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct" and that, "[w]ithout more, we cannot find the district court to have abused its discretion in excluding Conservatrix from its restitution order and judgment." In re Zetteler, No. 26-1749, slip op. at 4–5 (4th Cir. June 13, 2026) (per curiam), as amended (June 15, 2026). One member of the panel, concurring in part and dissenting in part, wrote that the court "should not address the merits" and would have denied the petition without prejudice; the majority addressed the merits and did not.

19. Exhibit K, as corrected, also contains a copy of my Notice of Developments Concerning Conservatrix N.V., filed on October 9, 2026 in *United States v. Lindberg*, No. 3:23-cr-48 (W.D.N.C.) (ECF No. ___), without its exhibits. That notice responds to a statement in the United States' consolidated position, at pages 7 and 8 of ECF No. 308 (also in Exhibit K): "While Conservatrix appears to have been harmed by Defendant's conduct, as the Fourth Circuit found, Conservatrix 'fail[ed] to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct.'" The Fourth Circuit made no finding that Conservatrix was harmed by my conduct, for the following reasons.

(a) The Fourth Circuit was repeating what the petitioners wrote. Its per curiam opinion, *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026), as amended (June 15, 2026) (ECF Nos. 203, 204), recited the petitioners' own

argument—"Petitioner argues that Lindberg's criminal conspiracy forced the company into bankruptcy, resulting in losses to the company and its policyholders of more than $200 million"—and its reference to "the harm suffered by Conservatrix" restates that argument. What the court held was that "Petitioners fail to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct," that the petitioners "do not identify facts closely tying" my failure to replenish the company's capital "to Lindberg's criminal activities," and that "[w]ithout more, we cannot find the district court to have abused its discretion in excluding Conservatrix from its restitution order and judgment." Slip op. at 4–5.

(b) The Fourth Circuit required my response by noon on the day after the petition was filed. In practice I had approximately 12 hours to respond. I had to answer a record that had been developed entirely ex parte, and to do so as if the Fourth Circuit were the court of first impression on Conservatrix's claim. For that reason, anything in that proceeding is extremely prejudicial to me.

(c) The Special Master's fee applications (ECF Nos. 69, 81, 95, 148, 263) record approximately 85 hours billed by the Special Master, his counsel, and his financial advisor on matters concerning Conservatrix, approximately 72 of them before the petition was filed, including 37 entries recording telephone calls, conferences, and e-mails with the petitioners' counsel. None of those communications, and none of the information the petitioners

provided, was disclosed to me or to my counsel. The Fourth Circuit itself recorded that "the Special Master spoke with Petitioners' counsel multiple times and reviewed information submitted by Petitioners." Slip op. at 3.

(d) In approximately 12 hours I could not place before the Fourth Circuit much of the information in this declaration, including the matters described in paragraphs 11, 13, 14, and 20.

(e) I learned of the extent of the ex parte communications less than two weeks ago, from the Special Master's billing statements. The issue is still being developed and placed before the district court in *United States v. Lindberg* (see ECF Nos. 331, 332, 345), and it will be before the Fourth Circuit on appeal.

20. The characterization of Conservatrix as undercapitalized by me—the petitioners' phrase in that case (ECF No. 130 at 7–8), repeated in a footnote of the United States' consolidated position (ECF No. 308 at 8 n.7)—is false. As stated in paragraphs 11, 13, and 14, at the take-over Trier injected €18.4 million directly and €72.1 million through the reinsurance, recapitalizing Conservatrix above the minimum Solvency II ratio of 135% (Doc. 78-2 at 42); the arbitral tribunal recorded that the reinsurance "increased the own funds of Conservatrix to the required level at the time of take-over" (Doc. 1-2 at 27, ¶ 6.33); and Conservatrix's audited financial statements reported a Solvency II ratio of 188% at the end of 2017 (Doc. 78-2 at 48). The ratio fell below 135% only in mid-2019, after CBL was placed in rehabilitation in North Carolina

and its credit rating was downgraded, and the Rehabilitator's disavowal of the reinsurance on December 22, 2019 removed the support altogether. Doc. 1-2 at 15 (¶ 3.13); *id.* at 27–28 (¶¶ 6.34–6.36); Ex. H at 80 (Tab D). The Commitment did not require me to replenish capital after Conservatrix had stabilized. Paragraph 1.2(b) provides that "[a]s soon as the Company is stabilized, the Commitment shall be limited in the sense that further capitalization of the Company over and above the initial amount of capitalization by the Transferee on Completion, shall be based on a viable business case for the Company" (Doc. 1-3 at 18). Conservatrix was stabilized by the end of 2017, when its Solvency II ratio stood at 188%. The capital lost in 2019 was lost through the Rehabilitator's act, long after stabilization; under paragraph 1.2(b), any further capitalization then depended on a viable business case, and, as stated in paragraph 11, there was none. That is the Respondents' defence in the Arbitration, which the Tribunal will decide.

21. I am in the custody of the Federal Bureau of Prisons. Until October 11, 2026, my counsel could communicate with me only through limited telephone calls from custody. My original declaration and my corrected declaration had to be filed on October 9, 2026 to meet the deadline set by the Court's Order of August 26, 2026 (Doc. 74). Because of those limits, they could not include all of the information I intended to provide, including the matters now stated in paragraphs 19 through 22.

22. The transactions that the government and the Special Master characterize as circular were undertaken to carry out the disaffiliation of affiliated investments required by the North Carolina Department of Insurance, and in accordance with NCDOI and other insurance regulations. The facts are set out in my Statement of Facts Regarding the Disaffiliation Structure and my supporting declaration in *United States v. Lindberg* (ECF Nos. 300-2, 300-1), and in my filings at ECF Nos. 316 and 347. That issue is also before the Fourth Circuit in my pending appeals, Nos. 26-4309 and 26-4310.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 11th, 2026.

*/s/ Greg Evan Lindberg*
Greg Evan Lindberg
BOP Inmate 34-828-058